P. CRAIG CARDON, Cal. Bar No. 168646
BRIAN R. BLACKMAN, Cal. Bar No. 196996
KENDALL M. BURTON, Cal. Bar No. 228720
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:    415-434-9100
Facsimile:    415-434-3947

TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile: 404.443.5751

Attorneys for DIGITAL ENVOY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>DIGITAL ENVOY, INC.,<br><br>    Defendant.<br><br>DIGITAL ENVOY, INC.,<br><br>    Counterclaimant,<br><br> v.<br><br>GOOGLE, INC.,<br><br>    Counterdefendant. | Case No. C 04 01497 VRW (RS)<br><br>**ANSWER AND COUNTERCLAIMS OF DIGITAL ENVOY, INC.**<br><br>**[DEMAND FOR JURY TRIAL]** |

Digital Envoy, Inc. ("Digital Envoy") answers the complaint filed by Google, Inc. ("Google") as follows:

1. In response to paragraph 1 of the Complaint, Digital Envoy states that the first two sentences of the paragraph describe Google's requested relief and do not require a response except that Digital Envoy denies Google is entitled to any relief. Digital Envoy denies the allegations contained in the third and final sentence of the paragraph.

2. Digital Envoy admits the allegations contained in paragraph 2 of the Complaint on information and belief.

3. Digital Envoy admits the allegations contained in paragraph 3 of the Complaint.

4. In response to paragraph 4 of the Complaint, Digital Envoy admits there is diversity jurisdiction, but states that the Court should decline jurisdiction in light of the earlier filed action between the same parties addressing the same operative facts.

5. In response to paragraph 5 of the Complaint, Digital Envoy admits the allegations contained in first sentence of the paragraph and denies the second sentence. Accordingly, Digital Envoy admits that this District is an appropriate venue for this action.

6. In response to paragraph 6 of the Complaint, Digital Envoy denies the description of Google's business is comprehensive of all of the businesses of Google, but otherwise admits the allegations contained in this paragraph.

7. In response to paragraph 7 of the Complaint, Digital Envoy denies that there are several companies offering technology capable of providing the information provided by Digital Envoy. Digital Envoy further denies the implication that Digital Envoy's technology only provides the geographic information noted or that the information only can be used to tailor content of websites, to the extent such allegations are implied by this paragraph. Digital Envoy otherwise admits the allegations contained in this paragraph.

8. In response to paragraph 8 of the Complaint, Digital Envoy denies Google's characterization of the Contract contained in the first sentence and accordingly denies the

1 allegations contained in the first sentence. Digital Envoy admits the allegations contained in second sentence of this paragraph.

9. In response to paragraph 9 of the Complaint, Digital Envoy denies Google's characterization of the Contract contained in the first sentence and accordingly denies the allegations contained in the first sentence. In response to the second sentence, Digital Envoy admits that Google's monthly payments to Digital Envoy under the Contract were originally $3,000 and by amendment was raised to $8,000.

10. In response to paragraph 10 of the Complaint, Digital Envoy denies Google's characterization of the Contract and accordingly denies the allegations contained in this paragraph.

11. In response to paragraph 11 of the Complaint, Digital Envoy admits that Google has met its payment obligations under the Contract, but otherwise denies the allegations contained in this paragraph.

12. Digital Envoy denies the allegations contained in paragraph 12 of the Complaint.

13. Digital Envoy denies the allegations contained in paragraph 13 of the Complaint.

14. Digital Envoy denies the allegations contained in paragraph 14 of the Complaint.

15. Digital Envoy denies the allegations contained in paragraph 15 of the Complaint, except that it admits filing a lawsuit against Google on March 29, 2004.

16. In response to paragraph 16 of the Complaint, Digital Envoy incorporates its responses to paragraphs 1 through 15 of the Complaint.

17. Digital Envoy admits the allegations contained in paragraph 17 of the Complaint.

18. In response to paragraph 18 of the Complaint, Digital Envoy admits that Google has met its payment obligations under the Contract, but otherwise denies the allegations contained in this paragraph.

19. Digital Envoy denies the allegations contained in paragraph 19 of the Complaint.

20. Digital Envoy denies the allegations contained in paragraph 20 of the Complaint.

21. In response to paragraph 21 of the Complaint, Digital Envoy incorporates its responses to paragraphs 1 through 20 of the Complaint.

22. In response to paragraph 22 of the Complaint, Digital Envoy denies the allegations contained in the first two sentences of the paragraph and admits the allegations contained in the last two sentences.

23. In response to paragraph 23 of the Complaint, Digital Envoy states that the paragraph describes Google's requested relief and does not require a response except that Digital Envoy denied Google is entitled to any relief.

## AFFIRMATIVE DEFENSES

24. **First Affirmative Defense**  Some or all of plaintiff's claims for relief fail to state a claim upon which relief can be granted.

25. **Second Affirmative Defense:**  Under the comity doctrine, this Court should defer to the jurisdiction of the Northern District of Georgia where the issues raised in the complaint are properly before that district in an earlier filed civil action.  Accordingly, this action should be dismissed or stayed, pending determination ruling by the Northern District of Georgia on Google's venue motion.

26. **Third Affirmative Defense:**  Some or all of plaintiff's claims for relief are barred by waiver.

27. **Fourth Affirmative Defense:**  Some or all of plaintiff's claims for relief are barred by estoppel.

28. **Fifth Affirmative Defense:**  Some or all of plaintiff's claims for relief are barred by laches.

29. **Sixth Affirmative Defense:**  Some or all of plaintiff's claims for relief are barred by the doctrine of unclean hands.

30. **Seventh Affirmative Defense:**  Some or all of plaintiff's claims are barred by plaintiff's failure to mitigate its damages.

## PRAYER

31. WHEREFORE, Digital Envoy respectfully prays that the Court stay or dismiss this action, or in the alternative enter judgment in favor of Digital Envoy and against Google, for its costs and for such other relief as deemed just and proper.

# COUNTERCLAIMS

1. The following counterclaim is identical in substance to the Complaint filed by Digital Envoy in the United States District Court for the Northern District of Georgia on March 29, 2004. By asserting this counterclaim, Digital Envoy intends only to preserve that claim. Digital Envoy does not waive its right to proceed with its earlier filed action in the forum of its choice.

## I.    SUMMARY OF COMPLAINT

2. Digital Envoy brings this counterclaim because Google is using Digital Envoy's technology in non-permitted ways. Digital Envoy seeks to recover for Google's wrongful use of Digital Envoy's technology which helped grow Google's business at a phenomenal rate without Google properly compensating Digital Envoy. Digital Envoy is the inventor and market leader in IP Intelligence technology which enables the determination of the geographic location of any computer hooked to the Internet by reliably and rapidly tracking protocol addresses.

3. In November 2000, Digital Envoy and Google entered into an agreement permitting Google to use Digital Envoy's technology for limited uses. At the beginning of this business relationship, Google properly used the technology on its search site for a variety of purposes, including selling what is referred to by Google as "paid links" (or links directly related to a user search on Google.com which are paid for by third parties who want to highlight their products to users and are highlighted as such on Google.com).

4. Later, Google expanded its business model and began to service non-search related advertising on third party sites and sell geographically targeted advertising on those sites — using Digital Envoy's technology outside the scope of the license and without compensating Digital Envoy. From this wrongful conduct, Google has built a vast and profitable online advertising business (which is a $7.2 billion/year industry and growing), and Digital Envoy has lost substantial income opportunities. Digital Envoy brings this action to recover its lost income, to disgorge Google from its wrongful income, to prevent Google from further wrongful conduct, and to recover additional damages as provided by law.

## II.   JURISDICTION

5. Digital Envoy is a Georgia corporation with its principal place of business in Norcross, Georgia. The company was formed in October 1999 by the inventors of the technology which is the subject of this action and others.

6. Google, Inc. is a Delaware corporation with its principal place of business at its "Googleplex" in Mountain View, California.

7. Digital Envoy contends that this Court should decline jurisdiction over the matter in deference to the earlier filed Civil Action. Otherwise, this Court has jurisdiction over this dispute under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different States. Digital Envoy is a citizen of the State of Georgia and Google is a citizen of the State of California.

8. This District and Division is one of the districts and divisions in which venue properly lays under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred in this district and division.

## III.   FACTUAL ALLEGATIONS

**A.   Digital Envoy and its Technology**

9. Digital Envoy invented and developed technology ("IP Intelligence") which essentially delivers specific information about a visitor to a website, including: geographic location down to the closest city, connection speed and, in some cases, the industry in which the visitor works.

10. IP Intelligence represents a substantial breakthrough in Internet technology. The Internet contains more than 4 billion IP addresses, which incorporate no geographical information. Furthermore, IP addresses are assigned in random order, providing no logical associations based on the numbers. Digital Envoy's proprietary technology essentially maps the Internet's ever changing topology and overlays a geographical map which allows the technology to tie an IP address to a geographic location. Digital Envoy has applied for a patent covering certain aspects of its technology and has received favorable indication from the Patent and Trademark Office.

11. Digital Envoy delivers the information obtained through IP Intelligence with industry-leading reliability and virtually instantaneous speed which is essential for the practical uses of this information.

12. Digital Envoy's customers benefit from this information in a variety of ways, such as permitting the assemblage of basic market data, enabling the website to publish its content in the visitor's language, enhancing security and enabling geographically targeted advertising.

13. IP Intelligence also provides a superior manner of collecting this basic information, which otherwise would be obtained through the use of privacy-invading "cookies" or intrusive user questionnaires, either of which are more susceptible to abuse.

14. Digital Envoy's simple business model is predicated upon receiving payment for its customers' fair use of this limited information. Accordingly, its customers are restricted in their use of this information, such that it is not readily made available to third parties, except when expressly permitted in an agreement which fairly compensates Digital Envoy. These restrictions are necessary to not foreclose Digital Envoy's business opportunities (either directly or indirectly) to do business with third party web sites directly.

15. Digital Envoy's proprietary technology has significant and independent economic value to Digital Envoy because it is unique, and not generally known to, or readily ascertainable by proper means, by other persons who could obtain economic value from the use or disclosure of this technology. Furthermore, since the value of Digital Envoy's IP Intelligence technology is the delivery of information, the company takes reasonable measures to protect the unauthorized distribution of this information. Specifically, without limitation, Digital Envoy restricts its customers for specific licensed uses and transmits the information (known as Digital Envoy's "Database Library") in encrypted binary format.

16. One of the most profitable uses of Digital Envoy's IP Intelligence technology is to enable its users to geographically target advertising on their website. By instantaneously obtaining the geographical location of a visitor down to the closest city, the customer can target specific advertising relevant to the visitor.

17. The ability to target advertising in this matter is attractive to advertisers reluctant to buy Internet advertising which would otherwise be sent all over the world. Digital Envoy's customers can thus sell more advertising, and the advertising is more successful and thereby more profitable to the customer since Internet advertising is often paid on a click-through basis, meaning the advertiser pays when a computer user actually clicks on the advertisement. Since geographically targeted advertising is more relevant to the customer's visitors, the "click-through rate" (or whatever other measure of success of the ad is employed) is often higher than un-targeted advertising.

18. By filling this niche, Digital Envoy has developed into a small but profitable and growing business.

**B.     Google Background**

19. Google is an Internet search engine company formed in September 1998. Through excellent technological innovations and strong financial backing, Google became the world's largest search engine in mid-2000.

20. Google is a play on the word "googol" which refers to the number represented by the number 1 followed by 100 zeros. Google's use of the term reflects the company's mission to organize the immense, seemingly infinite amount of information available on the web.

21. Google portrays itself as having started with a couple of students with an innovative idea who opened its door in an office attached to a garage of a friend. The Googleplex, as Google's present world headquarters is known, is (or was) complete with lava lamps, roving large dogs, a chef who is a Dead-head (a fan of the musical group, the Grateful Dead), and room in the parking lot for twice-weekly roller hockey games. Google claims it is working on offering searches in the fictional Klingon language from the television show StarTrek.

22. At the same time, Google is backed by funding from two leading venture capital firms and has a management team, board of directors and technical advisory council that rivals any company in the world for business and financial acumen. Its two founders have also just joined *Forbes'* billionaire club. Google also exceeded $1 billion in revenue in 2003, mostly from advertising, and the company is valued at more than $15 billion.

-8-

23. As with many Internet-based companies, Google did not make a profit in its first three years. Google's principal source of income originally came from marketing its search technology to other Internet-based companies. At the same time, Google offered limited "paid link" opportunities on its website. However, as described below, Google soon began to expand its business from pure search into advertising and the company soon thereafter achieved elusive *profitability.*

**C.    The Agreement between Google and Digital Envoy**

24. Google's "paid link" program began in mid-2000 and was originally centered on the ability to offer paid links or relevant information tied to a user's search request. Thus on its site, through keyword targeting or "paid links", only those users who are actively conducting a web search and requesting information related to a third party's product are shown that third party's message. The third party pays Google for its placement of its "paid link" on Google.com.

25. Google recognized that one factor in the relevance of paid links is geography. Accordingly, shortly after it began its paid link program, Google was attracted to Digital Envoy's technology which would permit paid link results which was geographically targeted to its audience.

26. In November 2000, Google and Digital Envoy began to negotiate a license agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the geographic location of visitors to its website, presumably to publish Google's site text in the visitor's language without prompt and to sell geographically targeted "paid links" on its website.

27. On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the "Agreement").

28. Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries only in Google's business of producing and maintaining *information search* technology and for no other business purpose (emphasis added). Additionally, Google is expressly prohibited from selling, licensing, distributing, sharing or otherwise giving, *in any form*, the Database Libraries to any other party or using it outside of Google's site.

-9-

29.     Under the Agreement, Digital Envoy retained all ownership of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries of its IP Intelligence technology. Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence and is prohibited from sharing such information with any third parties, and from distributing, disclosing or *otherwise making available* the Database Libraries, or any information contained therein to any other party whatsoever.

30.     Google is also obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries.

31.     For the use of Digital Envoy's IP Intelligence technology, including the Database Libraries, Google pays to Digital Envoy a flat monthly fee, originally $3,000 during the evaluation period and currently $8,000 per month.

**D.      Google's use of Digital Envoy's technology**

32.     Google used Digital Envoy's IP Intelligence technology to enable geographically targeted paid links, solely in conjunction with a user search, on its information search technology website. Such targeting fit well with Google's business program and was incorporated into Google's promotional materials directed to potential third party paid link purchasers on its website.

33.     Google's paid link program as well as its third party ad network program, as it is directed to outside companies on Google's search site, is called "AdWords" by Google. Google also has a Premium Sponsorship program for large participants to negotiate a specific agreement with Google. Companies signing up to use paid links through the AdWords program pay Google based on cost-per-click such that Google benefits financially when advertisements placed by Google are "clicked" on by the visitor to the site.

34.     To enhance the "click through rate", companies signing to obtain paid links and to participate in the Google Ad Network through the AdWords program are offered the option to geographically target their link. In fact, the first of the four steps required to sign up for the Google AdWords program requests the advertiser to choose its geographic targets, which, unless "All Countries" and "All Languages" are chosen, requires use of Digital Envoy's technology.

-10-

35. The Premium Sponsorship paid link and ad network program is also based on the success of the paid link or advertisement, measured by the click through rate or some other measure, and also permits geographic targeting.

36. At the time of the Agreement, Google had just begun to sign agreements with other Internet companies to power search services on those companies' sites. However, Google did not supply <u>advertising</u> services to third party web sites at that time, had not contemplated providing such services and did not disclose to Digital Envoy its intention to enter into this business. Instead Google's business at the time was solely related to information search.

37. On the strength of Google's targeted paid link program, which included Regional Targeting using Digital Envoy's IP Intelligence, Google had signed up more than 350 Premium Sponsorships and thousands of AdWords participants by mid-2001. Due to Google's targeted paid link program on Google.com, its click through rates at that time were four to five times higher than click through rates for traditional advertisement programs.

**E.  Google's misuse of Digital Envoy's technology**

38. By August 2002, Google began to enter into agreements to provide Google advertisements (including advertisements developed under its AdWords program) on third party websites to which it was providing search services.

39. In February – March, 2003, Google began to syndicate advertisements to major advertising networks supporting nearly 24,000 websites. Google announced that it entered into this arrangement as part of a test of a new service to place text ads on pages selected for their relevance to a marketer's products or services. Thus, for the first time, Google announced plans to place cost-per-click listings on content-targeted websites, rather than search-related pages. Google advertisers, including the more than 100,000 active advertisers in its Google AdWords program, would thereafter have the option to appear on websites unrelated to search. Google's business thus was expanding outside of information search.

40. In May – June 2003, Google launched a new program which it called "Google AdSense" wherein Google would supply advertisements to any content-based website which signed up. Google announced that the program was designed to maximize the revenue potential

-11-

of a website by serving highly relevant ads specific to the content of the page. Under this program, Google and the AdSense client share in revenue paid by the advertisers, typically on a per click basis or some other measure of the success of the advertisement on the AdSense client's website. Google's initial clients in the AdSense program included ABC.com, HowStuffWorks, Internet Broadcasting Systems, Inc., Lycos Europe, New York Post Online Edition, Reed Business Information and U.S. News & World Report. Google refers to third party web sites in its AdSense program and the delivery of advertisements on such sites, as the "Google Ad Network."

41. As part of the service it provides to its clients, Google uses Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted, non-information search related, advertisements on those third party websites in the "Google Ad Network". Such use is beyond the scope of the Agreement between Google and Digital Envoy. Google did not obtain authorization from Digital Envoy to make such use and did not, in fact, tell Digital Envoy that it was doing so.

42. Due in large part to the strength of its AdSense program, Google more than doubled its revenues from 2002 to 2003, and the trend continues upward in 2004. Google specifically makes substantial income and profit from the placement of geographically targeted, non-information search related, advertisements on its client's websites in the Google ad network.

43. At the same time, Digital Envoy has received no income from Google's unauthorized use of Digital Envoy's proprietary technology, but instead has lost significant licensing opportunities.

44. In February 2004, Digital Envoy notified Google that it considered Google's use of Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted advertising on third party websites to be unauthorized under the Agreement. Google admitted to its conduct but refused to stop. Instead, in response to Digital Envoy's inquiry, Google offered to increase its payment under the Agreement to $12,000 per month. Digital Envoy rejected this offer because it fell woefully short of the income enjoyed by Google and the lost income to Digital Envoy as a result of Google's unauthorized conduct.

## COUNT I

### (Misappropriation of Trade Secrets)

### (Cal. Civ. Code § 3426 *et seq.*, O.C.G.A. § 10-1-760 *et seq.*, and Georgia Common Law)

45. Digital Envoy incorporates its allegations contained in paragraphs 1 through 44 as if fully stated herein.

46. Digital Envoy's IP Intelligence and its Database Libraries are trade secrets, protected by law.

47. Although acquired by lawful means, Google's misuse of Digital Envoy's trade secrets constitutes a misappropriation in that it was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use and that Google used Digital Envoy's trade secrets through improper means, including failing to limit its use of the trade secrets.

48. Google's misappropriation of Digital Envoy's trade secrets have damaged Digital Envoy through lost income, licensing and other business opportunities.

49. Google's misappropriation of Digital Envoy's trade secrets have also unjustly enriched Google.

50. Digital Envoy is entitled to recover damages against Google in amounts to be proved at trial.

51. Google's actions have been willful and malicious. Accordingly, Digital Envoy is entitled to recover punitive or exemplary damages, including those provided for in Cal. Civ. Code § 3426.3(c), against Google in amounts to be determined by the jury.

## COUNT II

### (Federal Unfair Competition)

### (15 U.S.C. § 1125(a))

52. Digital Envoy incorporates its allegations contained in paragraphs 1 through 51 as if fully stated herein.

53. Google's actions, as set forth above, made in connection with services and used in commerce, falsely designate the origin of its services, are misleading in their description or representation of fact. Google's actions deceive others (including its AdSense and AdWords

-13-

customers) as to the origin and approval of its services and its commercial activities and Digital Envoy is damaged by this conduct. Google's actions thus constitute violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

54. Google acted as set forth above with knowledge and in disregard of Digital Envoy's rights.

55. Digital Envoy is entitled to recover its actual damages, Google's profits, treble damages and its attorneys' fees.

56. In the manner set forth above, Google has also irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

**Count III**

**(Unfair Competition)**

**(O.C.G.A. § 10-1-372)**

57. Digital Envoy incorporates its allegations contained in paragraphs 1 through 56 as if fully stated herein.

58. As set forth above, Google has engaged, and is continuing to engage in acts of unfair competition in violation of O.C.G.A. § 10-1-372.

59. Google acted as set forth above with knowledge and deceit and in disregard of Digital Envoy's rights and has caused Digital Envoy actual damages.

60. In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

61. Digital Envoy is thereby entitled to recover its attorneys' fees from Google.

**COUNT IV**

**(Georgia and California Common Law Unfair Competition)**

62. Digital Envoy incorporates its allegations contained in paragraphs 1 through 61 as if fully stated herein.

-14-

W02-SF:5BB\61412723.1

ANSWER AND COUNTERCLAIM
JURY TRIAL DEMAND
Case No. C 04 01497 RS

63. The actions of Google set forth above constitute unfair competition in violation of common law in that:

(a) the actions enable Google to obtain the benefit of, and trade on, the goodwill of Digital Envoy;

(b) the actions by Google damage Digital Envoy in that Digital Envoy has no control over the business of Google;

(c) the actions of Google are likely to cause, and have caused, confusion, mistake or deception; and

(d) the actions of Google will result in the unjust enrichment of Google.

64. Google acted as set forth above with knowledge, in bad faith and in willful disregard of Digital Envoy's rights.

65. In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court. Digital Envoy is without an adequate remedy at law.

66. Digital Envoy is also entitled to an award of damages to be proved at trial, punitive damages and attorneys' fees.

## COUNT V

### (Georgia Common Law Unjust Enrichment)

67. Digital Envoy incorporates its allegations contained in paragraphs 1 through 66 as if fully stated herein.

68. As set forth above, Google has used and continues to use Digital Envoy's technology and information for purposes outside the scope of the Agreement.

69. Google and Digital Envoy had no agreement or understanding which would govern the relationship of the parties for the extra-contractual use set forth above.

70. In this manner, Google has received distinct and direct benefits from Digital Envoy, but without compensating Digital Envoy. Google has thereby been unjustly enriched.

W02-SF:5BB\61412723.1

ANSWER AND COUNTERCLAIM
JURY TRIAL DEMAND
Case No. C 04 01497 RS

71. Accordingly, Digital Envoy is entitled to recover from Google all monies earned in connection with Google's extra-contractual use of Digital Envoy's proprietary technology and information, in amounts to be proved at trial.

WHEREFORE, Counterclaimant Digital Envoy, Inc. prays for:,

(1) judgment in its favor and against Counterdefendant Google, Inc. for actual damages,

(2) disgorgement of profits,

(3) recovery of monies earned,

(4) trebling of damages pursuant to 15 U.S.C. § 1125,

(5) punitive damages on Counts for which such relief is available,

(6) attorneys' fees interest and costs,

(7) and for an injunction prohibiting Google, Inc. from using Digital Envoy's proprietary technology and information beyond the scope of the Agreement, specifically including supplying geographically targeted advertisements on third party websites.

DATED: May 10, 2004

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By      -s-     
P. CRAIG CARDON

TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile: 404.443.5751

Attorneys for DIGITAL ENVOY, INC.

-16-

## JURY TRIAL DEMAND

Defendant Counterclaimant Digital Envoy, Inc. demands trial by jury in this action as to all issues so triable.

DATED: May 10, 2004

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By         -s-
        P. CRAIG CARDON

TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile: 404.443.5751

Attorneys for DIGITAL ENVOY, INC.

-17-