1  P. CRAIG CARDON, Cal. Bar No. 168646
   BRIAN R. BLACKMAN, Cal. Bar No. 196996
2  KENDALL M. BURTON, Cal. Bar No. 228720
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
3  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4106
4  Telephone:     415-434-9100
   Facsimile:     415-434-3947
5

6  TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
   LUKE ANDERSON (Admitted *Pro Hac Vice*)
7  McGUIRE WOODS, L.L.P
   1170 Peachtree Street, N.E., Suite 2100
8  Atlanta, Georgia 30309
   Telephone: 404.443.5706
9  Facsimile:  404.443.5751

10  Attorneys for DIGITAL ENVOY, INC.

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14  DIGITAL ENVOY, INC.,                    Case No. C 04 01497 RS

15                                          **AMENDED COMPLAINT OF DIGITAL**
              Plaintiff/Counterdefendant,   **ENVOY, INC.**
16
                                            **[DEMAND FOR JURY TRIAL]**
17       v.

18  GOOGLE, INC.,

19

20                Defendant/Counterclaimant.

21

22       Plaintiff Digital Envoy, Inc. ("Digital Envoy"), for its Amended Complaint against

23  defendant Google, Inc. ("Google"), respectfully shows to the Court the following:

24                  **I.      SUMMARY OF COMPLAINT**

25       1.      Digital Envoy brings this action because Google is using Digital Envoy's

26  technology in non-permitted ways.  Digital Envoy seeks to recover for Google's wrongful use of

27  Digital Envoy's technology which helped grow Google's business at a phenomenal rate without

28  Google properly compensating Digital Envoy.  Digital Envoy is the inventor and market leader in

-1-

IP Intelligence technology which enables the determination of the geographic location of any computer hooked to the Internet by reliably and rapidly tracking protocol addresses.

2.    In November 2000, Digital Envoy and Google entered into an agreement permitting Google to use Digital Envoy's technology for limited uses.  At the beginning of this business relationship, Google properly used the technology on its search site for a variety of purposes, including selling what is referred to by Google as "paid links" (or links directly related to a user search on Google.com which are paid for by third parties who want to highlight their products to users and are highlighted as such on Google.com).

3.    Later, Google expanded its business model and began to service non-search related advertising on third party sites and sell geographically targeted advertising on those sites — using Digital Envoy's technology outside the scope of the license and without compensating Digital Envoy.  From this wrongful conduct, Google has built a vast and profitable online advertising business (which is a $7.2 billion/year industry and growing), and Digital Envoy has lost substantial income opportunities.  Digital Envoy brings this action to recover its lost income, to disgorge Google from its wrongful income, to prevent Google from further wrongful conduct, and to recover additional damages as provided by law.

## II.    JURISDICTION

4.    Digital Envoy is a Georgia corporation with its principal place of business in Norcross, Georgia.  The company was formed in October 1999 by the inventors of the technology which is the subject of this action and others.

5.    Google is a Delaware corporation with its principal place of business at its "Googleplex" in Mountain View, California.

6.    The Court has jurisdiction over this dispute under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different States.  Digital Envoy is a citizen of the State of Georgia and Google is a citizen of the State of California.

7.      This District and Division is one of the districts and divisions in which venue properly lays under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred in this district and division.

### III.      FACTUAL ALLEGATIONS

**A.      Digital Envoy and its Technology**

8.      Digital Envoy invented and developed technology ("IP Intelligence") which essentially delivers specific information about a visitor to a website, including: geographic location down to the closest city, connection speed and, in some cases, the industry in which the visitor works.

9.      IP Intelligence represents a substantial breakthrough in Internet technology.  The Internet contains more than 4 billion IP addresses, which incorporate no geographical information. Furthermore, IP addresses are assigned in random order, providing no logical associations based on the numbers.  Digital Envoy's proprietary technology essentially maps the Internet's ever changing topology and overlays a geographical map which allows the technology to tie an IP address to a geographic location.  Digital Envoy has applied for a patent covering certain aspects of its technology and has received favorable indication from the Patent and Trademark Office.

10.      Digital Envoy delivers the information obtained through IP Intelligence with industry-leading reliability and virtually instantaneous speed which is essential for the practical uses of this information.

11.      Digital Envoy's customers benefit from this information in a variety of ways, such as permitting the assemblage of basic market data, enabling the website to publish its content in the visitor's language, enhancing security and enabling geographically targeted advertising.

12.      IP Intelligence also provides a superior manner of collecting this basic information, which otherwise would be obtained through the use of privacy-invading "cookies" or intrusive user questionnaires, either of which are more susceptible to abuse.

13.      Digital Envoy's simple business model is predicated upon receiving payment for its customers' fair use of this limited information.  Accordingly, its customers are restricted in their use of this information, such that it is not readily made available to third parties, except when

expressly permitted in an agreement which fairly compensates Digital Envoy. These restrictions are necessary to not foreclose Digital Envoy's business opportunities (either directly or indirectly) to do business with third party web sites directly.

14.     Digital Envoy's proprietary technology has significant and independent economic value to Digital Envoy because it is unique, and not generally known to, or readily ascertainable by proper means, by other persons who could obtain economic value from the use or disclosure of this technology. Furthermore, since the value of Digital Envoy's IP Intelligence technology is the delivery of information, the company takes reasonable measures to protect the unauthorized distribution of this information. Specifically, without limitation, Digital Envoy restricts its customers for specific licensed uses and transmits the information (known as Digital Envoy's "Database Library") in encrypted binary format.

15.     One of the most profitable uses of Digital Envoy's IP Intelligence technology is to enable its users to geographically target advertising on their website. By instantaneously obtaining the geographical location of a visitor down to the closest city, the customer can target specific advertising relevant to the visitor.

16.     The ability to target advertising in this matter is attractive to advertisers reluctant to buy Internet advertising which would otherwise be sent all over the world. Digital Envoy's customers can thus sell more advertising, and the advertising is more successful and thereby more profitable to the customer since Internet advertising is often paid on a click-through basis, meaning the advertiser pays when a computer user actually clicks on the advertisement. Since geographically targeted advertising is more relevant to the customer's visitors, the "click-through rate" (or whatever other measure of success of the ad is employed) is often higher than un-targeted advertising.

17.     By filling this niche, Digital Envoy has developed into a small but profitable and growing business.

**B.       Google Background**

18.      Google is an Internet search engine company formed in September 1998.  Through excellent technological innovations and strong financial backing, Google became the world's largest search engine in mid-2000.

19.      Google is a play on the word "googol" which refers to the number represented by the number 1 followed by 100 zeros.  Google's use of the term reflects the company's mission to organize the immense, seemingly infinite amount of information available on the web.

20.      Google portrays itself as having started with a couple of students with an innovative idea who opened its door in an office attached to a garage of a friend.  The Googleplex, as Google's present world headquarters is known, is (or was) complete with lava lamps, roving large dogs, a chef who is a Dead-head (a fan of the musical group, the Grateful Dead), and room in the parking lot for twice-weekly roller hockey games.  Google claims it is working on offering searches in the fictional Klingon language from the television show StarTrek.

21.      At the same time, Google is backed by funding from two leading venture capital firms and has a management team, board of directors and technical advisory council that rivals any company in the world for business and financial acumen.  Its two founders have also just joined *Forbes'* billionaire club.  Google also exceeded $1 billion in revenue in 2003, mostly from advertising, and the company is valued at more than $15 billion.

22.      As with many Internet-based companies, Google did not make a profit in its first three years.  Google's principal source of income originally came from marketing its search technology to other Internet-based companies.  At the same time, Google offered limited "paid link" opportunities on its website.   However, as described below, Google soon began to expand its business from pure search into advertising and the company soon thereafter achieved elusive *profitability*.

**C.       The Agreement Between Google and Digital Envoy**

23.      Google's "paid link" program began in mid-2000 and was originally centered on the ability to offer paid links or relevant information tied to a user's search request.  Thus on its site, through keyword targeting or "paid links", only those users who are actively conducting a

web search and requesting information related to a third party's product are shown that third party's message. The third party pays Google for its placement of its "paid link" on Google.com.

24.     Google recognized that one factor in the relevance of paid links is geography. Accordingly, shortly after it began its paid link program, Google was attracted to Digital Envoy's technology which would permit paid link results which was geographically targeted to its audience.

25.     In November 2000, Google and Digital Envoy began to negotiate a license agreement whereby Google would have use of Digital Envoy's IP Technology to obtain the geographic location of visitors to its website, presumably to publish Google's site text in the visitor's language without prompt and to sell geographically targeted "paid links" on its website.

26.     On November 30, 2000, Google and Digital Envoy entered into a Product and Electronic Database Evaluation and License Agreement (the "Agreement").

27.     Under the Agreement, Google obtained a strictly limited, non-exclusive right to use Digital Envoy's IP Intelligence technology and Database Libraries only in Google's business of producing and maintaining *information search* technology and for no other business purpose (emphasis added). Additionally, Google is expressly prohibited from selling, licensing, distributing, sharing or otherwise giving, *in any form*, the Database Libraries to any other party or using it outside of Google's site.

28.     Under the Agreement, Digital Envoy retained all ownership of the Database Libraries, including any patents, copyrights or trade secrets associated with the Database Libraries of its IP Intelligence technology. Google is also obligated under this Section to hold all of Digital Envoy's product information in strict confidence and is prohibited from sharing such information with any third parties, and from distributing, disclosing or *otherwise making available* the Database Libraries, or any information contained therein to any other party whatsoever.

29.     Google is also obligated under the Agreement to promptly notify Digital Envoy of any possible infringement of Digital Envoy's rights in the Database Libraries.

AMENDED COMPLAINT & JURY TRIAL DEMAND
Case No. C 04 01497 RS

30.     For the use of Digital Envoy's IP Intelligence technology, including the Database Libraries, Google pays to Digital Envoy a flat monthly fee, originally $3,000 during the evaluation period and currently $8,000 per month.

**D.     Google's Use of Digital Envoy's Technology**

31.     Google used Digital Envoy's IP Intelligence technology to enable geographically targeted paid links, solely in conjunction with a user search, on its information search technology website. Such targeting fit well with Google's business program and was incorporated into Google's promotional materials directed to potential third party paid link purchasers on its website.

32.     Google's paid link program as well as its third party ad network program, as it is directed to outside companies on Google's search site, is called "AdWords" by Google. Google also has a Premium Sponsorship program for large participants to negotiate a specific agreement with Google. Companies signing up to use paid links through the AdWords program pay Google based on cost-per-click such that Google benefits financially when advertisements placed by Google are "clicked" on by the visitor to the site.

33.     To enhance the "click through rate", companies signing to obtain paid links and to participate in the Google Ad Network through the AdWords program are offered the option to geographically target their link. In fact, the first of the four steps required to sign up for the Google AdWords program requests the advertiser to choose its geographic targets, which, unless "All Countries" and "All Languages" are chosen, requires use of Digital Envoy's technology.

34.     The Premium Sponsorship paid link and ad network program is also based on the success of the paid link or advertisement, measured by the click through rate or some other measure, and also permits geographic targeting.

35.     At the time of the Agreement, Google had just begun to sign agreements with other Internet companies to power search services on those companies' sites. However, Google did not supply advertising services to third party web sites at that time, had not contemplated providing such services and did not disclose to Digital Envoy its intention to enter into this business. Instead Google's business at the time was solely related to information search.

-7-

AMENDED COMPLAINT & JURY TRIAL DEMAND
Case No. C 04 01497 RS

36.     On the strength of Google's targeted paid link program, which included Regional Targeting using Digital Envoy's IP Intelligence, Google had signed up more than 350 Premium Sponsorships and thousands of AdWords participants by mid-2001.  Due to Google's targeted paid link program on Google.com, its click through rates at that time were four to five times higher than click through rates for traditional advertisement programs.

**E.      Google's Misuse of Digital Envoy's Technology**

37.     By August 2002, Google began to enter into agreements to provide Google advertisements (including advertisements developed under its AdWords program) on third party websites to which it was providing search services.

38.     In February – March, 2003, Google began to syndicate advertisements to major advertising networks supporting nearly 24,000 websites.  Google announced that it entered into this arrangement as part of a test of a new service to place text ads on pages selected for their relevance to a marketer's products or services.  Thus, for the first time, Google announced plans to place cost-per-click listings on content-targeted websites, rather than search-related pages.  Google advertisers, including the more than 100,000 active advertisers in its Google AdWords program, would thereafter have the option to appear on websites unrelated to search.   Google's business thus was expanding outside of information search.

39.     In May – June 2003, Google launched a new program which it called "Google AdSense" wherein Google would supply advertisements to any content-based website which signed up.   Google announced that the program was designed to maximize the revenue potential of a website by serving highly relevant ads specific to the content of the page.  Under this program, Google and the AdSense client share in revenue paid by the advertisers, typically on a per click basis or some other measure of the success of the advertisement on the AdSense client's website.  Google's initial clients in the AdSense program included ABC.com, HowStuffWorks, Internet Broadcasting Systems, Inc., Lycos Europe, New York Post Online Edition, Reed Business Information and U.S. News & World Report.  Google refers to third party web sites in its AdSense program and the delivery of advertisements on such sites, as the "Google Ad Network."

40.    As part of the service it provides to its clients, Google uses Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted, non-information search related, advertisements on those third party websites in the "Google Ad Network". Such use is beyond the scope of the Agreement between Google and Digital Envoy. Google did not obtain authorization from Digital Envoy to make such use and did not, in fact, tell Digital Envoy that it was doing so.

41.    Due in large part to the strength of its AdSense program, Google more than doubled its revenues from 2002 to 2003, and the trend continues upward in 2004. Google specifically makes substantial income and profit from the placement of geographically targeted, non-information search related, advertisements on its client's websites in the Google ad network.

42.    At the same time, Digital Envoy has received no income from Google's unauthorized use of Digital Envoy's proprietary technology, but instead has lost significant licensing opportunities.

43.    In February 2004, Digital Envoy notified Google that it considered Google's use of Digital Envoy's IP Intelligence technology and Database Libraries to provide geographically targeted advertising on third party websites to be unauthorized under the Agreement. Google admitted to its conduct but refused to stop. Instead, in response to Digital Envoy's inquiry, Google offered to increase its payment under the Agreement to $12,000 per month. Digital Envoy rejected this offer because it fell woefully short of the income enjoyed by Google and the lost income to Digital Envoy as a result of Google's unauthorized conduct.

**COUNT I**

**(Misappropriation of Trade Secrets)**

**(Cal. Civ. Code § 3426 *et seq.*, O.C.G.A. § 10-1-760 *et seq.*, and Georgia Common Law)**

44.    Digital Envoy incorporates its allegations contained in paragraphs 1 through 43 as if fully stated herein.

45.    Digital Envoy's IP Intelligence and its Database Libraries are trade secrets, protected by law.

46.     Although acquired by lawful means, Google's misuse of Digital Envoy's trade secrets constitutes a misappropriation in that it was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use and that Google used Digital Envoy's trade secrets through improper means, including failing to limit its use of the trade secrets.

47.     Google's misappropriation of Digital Envoy's trade secrets have damaged Digital Envoy through lost income, licensing and other business opportunities.

48.     Google's misappropriation of Digital Envoy's trade secrets have also unjustly enriched Google.

49.     Digital Envoy is entitled to recover damages against Google in amounts to be proved at trial.

50.     Google's actions have been willful and malicious.  Accordingly, Digital Envoy is entitled to recover punitive or exemplary damages, including those provided for in Cal. Civ. Code § 3426.3(c), against Google in amounts to be determined by the jury.

## COUNT II

### (Federal Unfair Competition — 15 U.S.C. §  1125(a))

51.     Digital Envoy incorporates its allegations contained in paragraphs 1 through 50 as if fully stated herein.

52.     Google's actions, as set forth above, made in connection with services and used in commerce, falsely designate the origin of its services, are misleading in their description or representation of fact.  Google's actions deceive others (including its AdSense and AdWords customers) as to the origin and approval of its services and its commercial activities and Digital Envoy is damaged by this conduct.  Google's actions thus constitute violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

53.     Google acted as set forth above with knowledge and in disregard of Digital Envoy's rights.

54.     Digital Envoy is entitled to recover its actual damages, Google's profits, treble damages and its attorneys' fees.

-10-

55.     In the manner set forth above, Google has also irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court.  Digital Envoy is without an adequate remedy at law.

**Count III**

**(Unfair Competition -- O.C.G.A. § 10-1-372 and Cal. Bus. & Prof. Code § 17200, *et seq.*)**

56.     Digital Envoy incorporates its allegations contained in paragraphs 1 through 55 as if fully stated herein.

57.     As set forth above, Google has engaged, and is continuing to engage in acts of unfair competition in violation of O.C.G.A. § 10-1-372 and Cal. Bus. & Prof. Code § 17200, *et seq.*.

58.     Google acted as set forth above with knowledge and deceit and in disregard of Digital Envoy's rights and has caused Digital Envoy actual damages.

59.     In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court.  Digital Envoy is without an adequate remedy at law.

60.     Digital Envoy is thereby entitled to an injunction and to recover its attorneys' fees and restitution from Google.

**COUNT IV**

**(Georgia and California Common Law Unfair Competition)**

61.     Digital Envoy incorporates its allegations contained in paragraphs 1 through 60 as if fully stated herein.

62.     The actions of Google set forth above constitute unfair competition in violation of common law in that:

(a)     the actions enable Google to obtain the benefit of, and trade on, the goodwill of Digital Envoy;

(b)     the actions by Google damage Digital Envoy in that Digital Envoy has no control over the business of Google;

(c)     the actions of Google are likely to cause, and have caused, confusion, mistake or deception; and

(d)     the actions of Google will result in the unjust enrichment of Google.

63.     Google acted as set forth above with knowledge, in bad faith and in willful disregard of Digital Envoy's rights.

64.     In the manner set forth above, Google has irreparably damaged Digital Envoy and will continue to irreparably damage Digital Envoy unless enjoined by this Court.  Digital Envoy is without an adequate remedy at law.

65.     Digital Envoy is also entitled to an award of damages to be proved at trial, punitive damages and attorneys' fees.

## COUNT V

### (Common Law Unjust Enrichment)

66.     Digital Envoy incorporates its allegations contained in paragraphs 1 through 66 as if fully stated herein.

67.     As set forth above, Google has used and continues to use Digital Envoy's technology and information for purposes outside the scope of the Agreement.

68.     Google and Digital Envoy had no agreement or understanding which would govern the relationship of the parties for the extra-contractual use set forth above.

69.     In this manner, Google has received distinct and direct benefits from Digital Envoy, but without compensating Digital Envoy.  Google has thereby been unjustly enriched.

70.     Accordingly, Digital Envoy is entitled to recover from Google all monies earned in connection with Google's extra-contractual use of Digital Envoy's proprietary technology and information, in amounts to be proved at trial.

## COUNT VI

### (Breach of Contract)

71.     Digital Envoy incorporates its allegations contained in paragraphs 1 through 70 as if fully stated herein.

W02-SF:5BB\61426651.1

AMENDED COMPLAINT & JURY TRIAL DEMAND
Case No. C 04 01497 RS

72.    As set forth above, the parties have entered into a valid and enforceable contract, the Agreement described above, which requires Google, among other things, to pay a monthly fee to Digital Envoy in exchange for the limited license granted by Digital Envoy.

73.    Google has breached the Agreement by, among other things, failing to pay the monthly fee as required by the Agreement.  As of August 16, 2004, Google has failed to pay to Digital Envoy $16,000 in monthly fees owing and past due.

74.    Digital Envoy has fully performed all of its obligations under the Agreement.

75.    In the manner set forth above, Digital Envoy has been damaged by Google's breach of contract.  Digital Envoy is thereby entitled to recover its damages to be proved at trial.

WHEREFORE, plaintiff Digital Envoy, Inc. prays for:,

(1)    judgment in its favor and against defendant Google, Inc. for actual damages,

(2)    disgorgement of profits,

(3)    recovery of monies earned,

(4)    trebling of damages pursuant to 15 U.S.C. § 1125,

(5)    punitive damages on Counts for which such relief is available,

(6)    attorneys' fees interest and costs,

////

////

////

-13-

1    (7)    and for an injunction prohibiting Google, Inc. from using

2    Digital Envoy's proprietary technology and information

3    beyond the scope of the Agreement, specifically including

4    supplying geographically targeted advertisements on third

5    party websites.

6    DATED:  August 27, 2004

7                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

8

9    By    _____
                    /s/
                P. CRAIG CARDON

10

11    TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
      LUKE ANDERSON (Admitted *Pro Hac Vice*)
12    MCGUIRE WOODS, L.L.P
      1170 Peachtree Street, N.E., Suite 2100
13    Atlanta, Georgia 30309
      Telephone: 404.443.5706
14    Facsimile:  404.443.5751

15                Attorneys for DIGITAL ENVOY, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

-14-

1

## <u>JURY TRIAL DEMAND</u>

2      Plaintiff Digital Envoy, Inc. demands trial by jury in this action as to all issues so triable.

3

4    DATED:  August 27, 2004

5                                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

6

7                        By      _____-s-_____
                                        P. CRAIG CARDON
8
                                TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
9                               LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
                                MCGUIRE WOODS, L.L.P
10                              1170 Peachtree Street, N.E., Suite 2100
                                Atlanta, Georgia 30309
11                              Telephone: 404.443.5706
                                Facsimile:  404.443.5751
12
13                                     Attorneys for DIGITAL ENVOY, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-