P. CRAIG CARDON, Cal. Bar No. 168646
BRIAN R. BLACKMAN, Cal. Bar No. 196996
KENDALL M. BURTON, Cal. Bar No. 228720
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:    415-434-9100
Facsimile:    415-434-3947

TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
LUKE ANDERSON (Admitted *Pro Hac Vice*)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5500
Facsimile: 404.443.5751

Attorneys for DIGITAL ENVOY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DIGITAL ENVOY, INC., <br><br> Plaintiff/Counter defendant, <br><br> v. <br><br> GOOGLE, INC., <br><br> Defendant/Counterclaimant. | Case No. C 04 01497 RS <br><br> **[REDACTED] DIGITAL ENVOY, INC.'S MEMORANDUM IN OPPOSITION TO GOOGLE, INC.'S MOTION FOR A PROTECTIVE ORDER [FILED CONDITIONALLY UNDER SEAL]** <br><br> **Honorable Richard Seeborg** <br><br> Courtroom:  4, 5th Floor <br> Date:         January 26, 2005 <br> Time:         9:30 a.m. |

## I. INTRODUCTION

By written agreement, Google was permitted to use Digital Envoy's technology and/or data to determine the general location (geo-location) of a visitor to its web site for the principal purpose of showing geographically relevant (geo-targeted) advertisements to the visitor. Google was not permitted to share Digital Envoy's technology and data with third parties, but willfully ignorant Google did exactly that. The targets of the subpoenas at issue in this motion are a sampling of those third parties with whom Google shared Digital Envoy's technology and data. Digital Envoy seeks to discover their agreements with Google, discussions and negotiations pertaining thereto, payments flowing any direction resulting therefrom, how Google presented the deal to them, and the technical specifics of the relationship.

To Digital Envoy, Google's business with these third parties represents lost opportunity. These third parties represent customers lost. Digital Envoy's liability theories involve the specifics of the relationship between Google and the third party – how geo-targeted advertisements were displayed, what the third party was told and what terms they negotiated. Digital Envoy's damage theories, including but not limited to lost licensing income opportunities and disgorgement of Google's income, involve the specifics of the business transaction between Google and the third party including the structure of the deal and the amount of money changing hands.

This current dispute arises from Google's inappropriate, persistent efforts to control Digital Envoy's discovery activities. Google is either unwilling or unable to provide complete discovery responses, yet complains when Digital Envoy takes steps to obtain the information to which it is entitled. Google's motion should be DENIED because it has no valid basis for interjecting itself into Digital Envoy's reasonable third party discovery efforts. Alternatively, Google should be ORDERED to produce all of the requested documents in its possession custody or control, and STAY the enforcement of the subpoenas pending resolution of the matter through Google's production.

## II. Background

For no obvious purpose related to the motion before the Court, Google introduces its narrow and misleading version of the parties' pre-contractual negotiations, its erroneous interpretation of the contract itself, its deceptive spin on subsequent events, and its offensive view of the genesis of Digital Envoy's suit. The essence of Digital Envoy's response to this material is contained in this section. The foregoing debate is relevant to this motion in that it establishes that: (1) Google's permissible use of Digital Envoy's technology is restricted to specific uses which is the proper subject of detailed scrutiny; (2) Google's various representations of its use are inconsistent and unreliable, emphasizing the legitimate need for Digital Envoy to verify even the information it can obtain from Google; and (3) Google misunderstands the source and scope of its potential liability exposure, such that its interpretation of Digital Envoy's discovery needs should be given no consideration.

### A.   The Parties' Agreement

Among the "several companies" that Google claims at page 1 of its Motion for Protective Order can make "an educated guess[1] about the approximate geographic location of a visitor to a website", Digital Envoy was the "clear leader" when Google was searching for a geo-location vendor in 2000. *Plaintiff's Exhibit 1 to Kratz Dec.*[2] Accordingly, the parties negotiated a specific License Agreement for Google to make specific use of such capabilities. *Plaintiff's Exhibit 2*.

At the time of the negotiation and entry of the License Agreement, Google had just begun to advertise on its own websites. Google contemplated using Digital Envoy's data for a variety of purposes on its own website properties, including to geo-target advertisements shown to users on its websites. Google had not contemplated serving advertisements on third parties' websites. At the same time, Digital Envoy had various pricing structure for its data, some accounting for the

---

[1] Despite the inaccuracy implied by its choice of words in this litigation, Google disclosed publicly (although incorrectly and in violation of its agreement with Digital Envoy) that the accuracy of this process is close to 99%. *Plaintiff's Exhibit 4*.

[2] The Declaration of Timothy Kratz is attached hereto and contains all of Plaintiff's Exhibits and will be cited to simply as "Plaintiff's Exhibit" hereinafter.

-3-

actual volume of usage. Google requested and Digital Envoy agreed to an "all you can eat" structure so that Google would not have to forecast *volume* of usage (not "*how* it would use it in the future" as now suggested by Google.[3]

Consistent with Google's zeal to spin the facts in its favor, it does not recite the subsequent portion of the pre-contractual negotiation which contradicts its current "sweeping authorization" theory. Following the exchange regarding unlimited volume, the parties began to draft the license agreement. The parties defined Google's "Business" and agreed to limit the scope of the "strictly limited" license for use in Google's Business. The parties further agreed that Digital Envoy's information could not be "sold, licensed, distributed, shared or otherwise given (in any form) to any other party or used outside of the site set forth herein."

During the course of negotiations, Google decided they wanted to develop and market a country index of websites, which would require use of Digital Envoy data to match the sites' IP address to a particular country. This use would not involve geo-locating visitors to third party websites but log additional data in Google's current business of indexing the Internet. Google approached Digital Envoy and obtained an agreement that such use would be permissible. Google then drafted language subordinate to the prohibition of selling, licensing, distributing, sharing or otherwise giving the Database Libraries in any form to any other party or used outside of the site. The language permitted Google "to develop indices, services or applications that are provided to third parties (e.g. developing a country-specific index of web pages)."



---
[3] In essence, this case arises from Google buying an all you can eat meal and using its place in the buffet line to sneak in hundreds of its closest friends to eat for free.

-4-

1   Next, in November 2000, the parties executed the License Agreement containing
2   restrictive and limiting language throughout. *Plaintiff's Exhibit 2.*
3   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
4   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
5   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
6   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
7   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
8   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
9   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
10  ▬▬▬▬▬ ▬▬▬▬▬
11  Accordingly, whether parole evidence is considered or not, the record establishes that
12  Google's use of Digital Envoy's technology and data is restricted to specific permitted uses.
13  **B.    Google's Misuse of Digital Envoy's Data**
14  Soon after entering into the License Agreement, Google began using Digital Envoy
15  technology and data to geo-locate visitors to Google's websites for the purposes of showing the
16  visitor geo-targeted advertisements.
17  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
18  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
19  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
20  ▬▬▬▬▬▬▬▬▬▬ This potential factual dispute places the technical framework of Google's
21  offerings to those third party websites, along with the sales and marketing material and other
22  communications clearly at issue.
23  By the summer of 2002[4], Google began to syndicate its advertisement program
24  wherein Google would provide advertising on the web sites owned by third parties.▬▬▬
25  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

26  [4] Google represents in its brief that its AdSense program began in late 2001, but Digital Envoy
27  believes the evidence available to it places this date in 2002, another factual discrepancy
      that can be resolved through full discovery.
28

-5-

1 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

2 ▉▉▉▉▉▉▉▉

3   Instead of discussing the matter with Digital Envoy and negotiating an expanded license, or even consulting the persons familiar with the license agreement and its restrictions, or at least obtaining a copy of the license agreement and determining that the use was not permitted, Google recklessly began sharing, distributing and giving Digital Envoy's data with third party web site owners to enable visitors to the third party websites to be shown geo-targeted advertisements.

  To make matters worse, and as the ultimate proof that Google's actions were in violation of the license agreement and intentionally caused Digital Envoy harm, Google promoted its geo-targeting advertising service as including geo-locating so as to expressly discourage its customers from becoming licensees of Digital Envoy. 

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Each instance of such communication resulting in the web site owner becoming a Google network member represents an intentional action by Google which directly damages Digital Envoy by shrinking its potential market opportunities.

  Google now seeks to minimize the importance of geo-targeting in its advertisement program. But the truth is that Google's advertising program prominently promotes geo-targeting as a significant feature that distinguishes its ability to serve relevant quality advertisements over its competitors. The truth is that Google has signed up hundreds or even thousands of network members, all benefiting along with Google in Digital Envoy's technology and data. Roughly during the period in which Digital Envoy technology and data was used by Google in this extra-contractual manner, Google and its network members shared in more than $1 billion of advertising revenue, the majority of which came from geo-targeted advertisements. Google's protestation regarding the significance of geo-targeting in this wildly successful program only serves to underscore the necessity of full and fair discovery regarding the promotion of this program, the

particulars of the arrangement between the parties, the mechanics of geo-location in this process and the details of its financial success.

**C.     The Litigation**

Google continues to suggest a link between its public offering and Digital Envoy's lawsuit. There is, of course, no evidence of such a link because there is no such link. Instead, Digital Envoy became suspicious of Google's AdSense program, made appropriate, professional inquiries of Google, confirmed Google's extra-contractual activities, attempted to find a reasonable business solution to the problem and only upon failure of this process did Digital Envoy resort to litigation.

In this action, Digital Envoy contends that Google's use of Digital Envoy's technology and data in its AdSense program is unauthorized by the license agreement. Digital Envoy asserts various causes of action arising from Google's wrongful conduct. Digital Envoy's liability proof will include details regarding various aspects of the AdSense program including the relationship between Google and its network members, the technical implementation, the scope and extent of the program, the manner in which it was sold to the network members, internal and external communications, and the role of geo-targeting in the program.

Two of Digital Envoy's damage theories also establish the relevance of the information sought in the subpoenas. Digital Envoy claims it is entitled to a disgorgement of Google's revenues (or profits) gained from its wrongful conduct. The nature of the financial relationship between Google and its "partners' and the financial performance of the AdSense program are particularly relevant to this theory. Digital Envoy also claims it is entitled to recover its actual damages, which includes its lost business opportunities occasioned by Google's wrongful conduct. Google intentionally shrunk an extremely large portion of Digital Envoy's market. Digital Envoy's losses can be measured by evaluating the identity and nature of Google's partners, the relationship between Google and its partners, the scope of usage of Digital Envoy's technology and data in AdSense, the extent of advertisements served to the Google partner, and the financial results of the program.

**D.     The Status of Discovery**

On July 29, 2004, Digital Envoy sent its first discovery requests to Google, to which Google initially responded on August 30, 2004. On September 10, 2004, Digital Envoy sent a letter to Google in a good faith effort to resolve disputes relating to Google's deficient answers. Google partially responded on November 10, 2004, supplementing its responses to some of the discovery requests, but also indicating as to several of the discovery requests that the information would not be provided to Digital Envoy unless the Protective Order could be modified to prevent access to the information by in-house counsel.

On December 3, 2003, Digital Envoy sent its second discovery requests to Google, to which Google responded on January 3, 2005. To date, Google has not confirmed that its production is complete with respect to those discovery requests. Digital Envoy has alerted Google to several disputes which arise from Google's deficient responses.

Despite Google's assertion to the contrary, Digital Envoy asked Google for virtually everything it now seeks from the third parties (to the extent Google has identical information, which Digital Envoy does not concede). Specifically relevant herein, Digital Envoy has asked for the following:

- The identity of all of the Google network members (RPD 25)
- The agreements between Google and its network members (RPD 22)
- Documents referring to negotiations between Google and its network members (RPD 23)
- Internal communications regarding the agreements or negotiations (RPD 24)
- Revenue and cost of revenue attributable to advertisements on network member sites, along with other divisions of financial data (Ints 10 and 11)
- Promotional or marketing material to network members regarding the AdSense program (RPD 18)
- Technical documents and drawings relating to Google's implementation of AdSense (RPD 3)

1   Google has produced virtually none of this information and Digital Envoy has patiently
2   negotiated with Google in an effort to obtain this information through the cooperative discovery
3   process.
4   Finally, more than four months after the Court denied Google's effort to stage discovery so
5   that financial information would not be disclosed at the early stage of discovery and after the
6   Court ordered Google to produce to outside counsel those documents it was withholding pending
7   Google's request for heightened protection such that inside counsel never be given access to those
8   records (which request was subsequently denied), on January 8, 2005, Google produced a single
9   document it had been withholding – a 15 column, 7 row spreadsheet. Nothing else has been
10  produced.
11  Google's complete failure to cooperate in the discovery process, highlighted by its
12  propensity to engage in self help (i.e. declaring what Digital Envoy is not entitled to receive
13  despite legitimate request and justifying it with every excuse under the sun), will be the subject of
14  one or more motions to compel should Digital Envoy be unsuccessful in extracting the
15  information it seeks from Google or other sources.
16  So certainly not to harass Google or its "partners", Digital Envoy subpoenaed a small
17  portion of the third parties known by Digital Envoy to have shared in revenue generated from
18  Google serving advertisements (often geo-targeted with Digital Envoy's technology and data) to
19  their visitors. Despite Google's curious statements to the contrary, the subpoenas do, in fact,
20  primarily seek information which had already been requested of Google. Had Google produced
21  the information during the voluntary portion of the discovery phase, no subpoenas would have
22  been necessary and Digital Envoy would not be incurring the substantial cost occasioned by
23  Google's continued wrongful interference in the process.[5]

---

[5] Ironically, Google does not aspire to the same standards it seeks to apply to Digital Envoy. In late December and early January, Google served wide-sweeping subpoenas on many of Digital Envoy's customers (and many non-customers) inquiring into far more extraneous relationships than Digital Envoy has targeted with its non-party discovery.

### III. Argument and Citation of Authorities

Digital Envoy properly seeks information from third parties unquestionably involved in the events giving rise to Digital Envoy's claims. Google has intervened in this process, seeking to block this legitimate discovery process. Google's motion should be denied because there is insufficient basis for this and Google cannot meet its burden to justify its requested relief.

Google makes three arguments in an effort to block Digital Envoy's legitimate third party discovery requests. Google first claims that *all* of the information sought by the subpoenas has no relevance to this case. Google next contends the information sought from these other parties is overly broad and burdensome to them. Google finally contends that Digital Envoy made "no request that Google itself produce any of this information in the first place" and that it should be required to pursue discovery from Google rather than the non-parties.

These arguments all fail. Digital Envoy has amply shown the relevance of all of the information sought. Google is not a proper party to object to the breadth or burden of the discovery. And Google has failed to provide the information requested of it, justifying Digital Envoy's pursuit of this third party discovery, or at least requiring that Google immediately step up and produce the information requested of it.

In *Gray v. First Winthrop Corp.*, the Northern District of California described Google's burden for this motion:

> The district court has considerable latitude under Fed. R. Civ. Pro. 26(c) to craft protective orders during discovery. Such orders are only appropriate, however, upon a showing of "good cause" by the party seeking the order. *Id.* A party seeking a stay of discovery carries the heavy burden of making a "strong showing" why discovery should be denied. Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975). The moving party must show a particular and specific need for the protective order, as opposed to making stereotyped or conclusory statements. *See* Wright & Miller, *Federal Practice and Procedure* § 2035; A.W. Tashima & J. Wagstaffe, *Federal Civil Procedure Before Trial* § 11:88.

133 F.R.D. 39, 40 (N.D. Cal. 1990); see also *Methode Elecs., Inc. v. Finisar Corp.*, 205 F.R.D. 552, 554 (N.D. Cal. 2001) (Seeborg, J.) ("A party seeking to limit discovery must make a 'strong showing' for limitation, and a particular and specific need for the protective order.").

As set forth herein, Google fails to make a strong showing for the limitation of discovery it seeks.

### A.     Relevance

As set forth above in appropriate detail, Digital Envoy seeks information that is relevant to several aspects of its liability and damages theories. Google offers conclusory statements which are expressly insufficient to justify the requested relief. Google states that Digital Envoy has sought information "bearing no relationship to the parties' dispute". Kramer Dec. ¶ 5. Google claims that "the information demanded is not relevant to this case". Holmes Dec. ¶ 3. In its brief, Google asserts: "they only seek irrelevant, but confidential information" (p. 1); "Such information is not relevant to this dispute"; "None of the information sought by these requests has any relevance to this case".

To the extent that Google's Background section is designed to set the stage for the conclusion that Digital Envoy's subpoenas seek information, it is unavailing. As set forth in appropriate detail above, much of Google's statements therein are incomplete and misleading, contested or simply wrong. Google's protestations to the contrary, it makes no showing the information is actually irrelevant. In the simplest terms the connection between the claims in the case and the information sought is blatant – we *claim* Google wrongfully conducted its AdSense program and we *seek information* about the conduct between and among the participants in the AdSense program.

### B.     Breadth and Burden

There is substantial authority that a party to the case, but not the target of a subpoena has very limited standing to challenge a subpoena. See *Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979) (no standing unless the party has a personal right or privilege with respect to the materials subpoenaed); *Vogue Instrument Corp. v. LEM Instruments Corp.*, 41 F.R.D. 346, 348 (S.D. N.Y. 1967); *Shepherd v. Castle*, 20 F.R.D. 184, 188 (W.D. Mo. 1957). Google has presented authority suggesting otherwise, and Digital Envoy does not assert that Google has no standing to bring this motion. But there is a basis for limiting the scope of Google's challenge to

those arguments in which Google has a personal stake.[6] Digital Envoy suggests a reasonable line be drawn against permitting Google to complain about the burden on another party, which invalidates this argument as a stand alone theory.

The breadth and burden issues are not ripe for consideration, and there is certainly insufficient evidence to make any determination of further limitations on Digital Envoy's request. Digital Envoy is in process of communication with many of the parties under subpoena. Digital Envoy has conferred with those parties who have raised issues regarding breadth or burden, and is willing to cooperate with a particular party in refining the scope of the subpoena to meet the reasonable concerns of the party. The status of those discussions, as well as the particular burden raised by any particular party is not the subject of this motion. To the extent such conferences are ongoing, there is nothing ripe for consideration. Moreover, Google's testimony that the burden must be great for those parties under subpoena is incompetent.

**C.        Requirement to Seek the Documents from Google First**

Google suggests, bootstrapping its arguments on relevance, breadth and burden, that Digital Envoy should be required to seek the information from Google in the first instance. Incredibly, Google contends that "Digital Envoy made no effort to request that Google itself produce any of this information in the first place." Brief, p. 5. Digital Envoy cannot fathom the cycle of reasoning that led Google to make such a statement. As set forth above in appropriate detail, Digital Envoy has requested virtually all of this information from Google, and Google has produced virtually nothing. Google's argument should be rejected accordingly.

The premise behind much of the authority cited by Google is that the party issuing the subpoena had made no effort to seek the information from the opposing party before seeking it from the non-party. *See e.g. Haworth, Inc. v. Herman Miller, Inc.*, 998 F.2d 975, 976 (Fed Cir.

---

[6] Google appears to also suggest it is concerned regarding the sensitive nature of the information. The parties and this Court have amply addressed the issues raised by this argument by the entry of the protective order and consideration of Google's request for a heightened outside counsel eyes only designation. The issues raised by that motion are nearly identical to that raised by Google herein. *See e.g.* Ware Dec. ¶ 2. Google readdresses these issues, no doubt, because of its standing problem.

W02-SF:5BK\61441983.1         [REDACTED] DIGITAL ENVOY'S OPPOSITION TO
                              GOOGLE'S MOTION FOR PROTECTIVE ORDER

1993) ("Herman Miller first aggressively pursued discovery in every forum *except* that of the actual suit for infringement.") (emphasis in original); *Audiotext Communications Network, Inc. v. US Telecom, Inc.*, No. M8-85, 1994 WL 9666 (SD.D. N.Y. Jan 12, 1994 at *1 ("plaintiff *could* have sought such documents" from defendant) (emphasis added). Here, Digital Envoy has sought most of the documents from Google, only to be met with refusal, and now Google hypocritically complains that Digital Envoy is seeking the documents elsewhere. Such incongruity should be rejected.

However, to the extent the Court is inclined to consider whether the best method of obtaining meaningful information is to compel Google to make full production, Digital Envoy is amenable to a stay of the enforcement of the issued subpoenas. Such was the result in a case relied upon by Google, *Braxton v. Farmer's Insurance Co.*, 209 F.R.D. 651 (N. D. Ala. 2002), wherein the court ordered the defendant-movant to produce the documents at issue. *See also Harris v. Wells*, No. B-89-391 (WWE), 1990 WL 150445, at *4 (D. Conn. Sept. 5, 1990) (ordering production from the parties in connection with temporary grant of protective order, staying enforcement of non-party subpoenas).

## IV.   CONCLUSION

For the foregoing reasons, Digital Envoy respectfully requests that Google's motion for a protective order be DENIED. Alternatively, if the Court grants Google's motion in whole or in part, Digital Envoy requests an ORDER that Google produce by February 4, 2005, the requested information in Digital Envoy's Requests for Production 3, 18, 22 – 25 and Interrogatories 10 – 11.

1  DATED: January 24, 2005

2  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

4  By _____
    P. CRAIG CARDON
5   BRIAN R. BLACKMAN

6  TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
7  LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
   MCGUIRE WOODS, L.L.P
   1170 Peachtree Street, N.E., Suite 2100
8  Atlanta, Georgia 30309
   Telephone: 404.443.5706
9  Facsimile:  404.443.5751

10       Attorneys for DIGITAL ENVOY, INC.