1   DAVID H. KRAMER, State Bar No. 168452
    STEPHEN C. HOLMES, State Bar No. 200727
2   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
3   650 Page Mill Road
    Palo Alto, CA 94304-1050
4   Telephone: (650) 493-9300
    Facsimile: (650) 565-5100
5
6   Attorneys for Defendant/Counterclaimant
    Google Inc.

7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                             SAN JOSE DIVISION

11

12  DIGITAL ENVOY, INC.,                    )   CASE NO.: C 04 01497 RS
                                            )
13            Plaintiff/Counterdefendant,   )   **GOOGLE INC.'S NOTICE OF**
                                            )   **MOTION AND MOTION FOR**
14       v.                                 )   **SUMMARY JUDGMENT**
                                            )
15  GOOGLE INC.,                            )   **(PUBLIC VERSION)**
                                            )
16            Defendant/Counterclaimant.    )   Judge:      Hon. Richard Seeborg
                                            )   Courtroom: 4, 5th Floor
17                                          )   Date:       March 30, 2005
                                            )   Time:       9:30 a.m.
18  _____)

19

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ....................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 2

I.      INTRODUCTION .............................................................................................. 2

II.     BACKGROUND ................................................................................................. 3

        The Parties ........................................................................................................ 3

        The Parties' License Agreement .................................................................... 4

        Google's Advertising Programs ..................................................................... 7

                AdWords ................................................................................................ 7

                AdSense ................................................................................................ 10

        This Litigation ................................................................................................. 11

III.    ARGUMENT ..................................................................................................... 12

        DIGITAL ENVOY'S TRADE SECRET MISAPPROPRIATION CLAIM
        FAILS AS A MATTER OF LAW BECAUSE DIGITAL ENVOY
        CANNOT SHOW MISAPPROPRIATION ....................................................... 13

        A.      Google Did Not Engage in Misappropriation Because Digital Envoy
                Authorized Google to Use Its Data in AdSense for Content .................... 14

                1.      Use in AdSense for Content Is Use in Google's Business of
                        "Producing and Maintaining Information Search Technology." ........... 14

                2.      Use in AdSense for Content Is Use in Google's "Information Search
                        Technology" Itself. ................................................................................ 15

                3.      Google Does Not Disclose Digital Envoy's Data to Third Parties in
                        Operating AdSense for Content. ........................................................... 17

        B.      Google Did Not Engage in Misappropriation Because Google Did Not
                Know or Have Reason to Know That It Was Prohibited From Using Digital
                Envoy's Data in AdSense for Content. ...................................................... 19

IV.     CONCLUSION .................................................................................................. 22

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4  *Aktiebolaget Bofors v. United States*, 194 F.2d 145 (D.C. Cir. 1951) .......................................... 21

5  *Aozora Bank, Ltd. v. 1333 North Cal. Blvd.*, 119 Cal. App. 4th 1291 (2004) ............................... 15

6  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................................. 13

7  *Cline v. Industrial Maint. Eng'g & Contracting Co.*, 200 F.3d 1223 (9th Cir. 2000) ................... 13

8  *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326 (S.D. Fla.
9     2001)........................................................................................................................................... 21

10  *Digital Envoy Inc. v. Google, Inc.*, 319 F. Supp. 2d 1377 (N.D. Ga. 2004) ................................. 12

11  *Dym v. Provident Life & Accident Ins. Co.*, 19 F. Supp. 2d 1147 (S.D. Cal. 1998) .................... 21

12  *Guebara v. Allstate Ins. Co.*, 237 F.3d 987 (9th Cir. 2001) ........................................................... 21

13  *Hard v. Cal. State Employees Ass'n*, 112 Cal. App. 4th 1343 (2003)............................................ 15

14  *Imax Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161 (9th Cir. 1998)................................................. 13

15  *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573 (2d Cir. 2000).................................... 4

16  *Opsal v. United Servs. Auto. Ass'n*, 2 Cal. App. 4th 1197 (1991) ................................................. 21

17  *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658 (2003) ........................................... 13

18  *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756 (N.D. Cal. 1987)................................. 13

19  *State Farm Fire & Cas. Co. v. Superior Court*, 216 Cal. App. 3d 1222 (1986)........................... 22

20

**STATUTES**

21  Cal. Civ. Code §1641 ........................................................................................................................ 15

22  Cal. Civ. Code §3426 ........................................................................................................................ 13

23  Cal. Civ. Code §3426.1(b)(2)(B)(ii)................................................................................................. 13

24  Cal. Civ. Code §3426.1(b)(2)(ii)...................................................................................................... 19

25  Cal. Civ. Proc. Code § 2019(d) ........................................................................................................ 13

26

27

28

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................ 1

Fed. R. Civ. P. 56(c) ...................................................................................................... 12

Fed. R. Civ. P. 56(d) ...................................................................................................... 13

**MISCELLANEOUS**

Management of Internet Names and Addresses, 63 Fed. Reg. 31,741 (June 10,
     1998) ......................................................................................................................... 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 30, 2005, at 9:30 a.m. or as soon thereafter as it may be heard, defendant/counterclaimant Google Inc. ("Google") will move and hereby does move, pursuant to Fed. R. Civ. P. 56, for entry of summary judgment in its favor on plaintiff/counterdefendant Digital Envoy, Inc.'s ("Digital Envoy") Amended Complaint, or in the alternative for partial summary judgment as to individual claims in the Amended Complaint or individual issues presented in the motion. Google makes this motion on the grounds that there are no remaining triable issues of fact with respect to Digital Envoy's claim for trade secret misappropriation or any other claim remaining in the case, and that Google is entitled to judgment as a matter of law on those claims.

Google's motion is supported by the following memorandum, the accompanying Declarations of David H. Kramer, Mark Rose and Susan Wojcicki, the argument of counsel and any other matters properly before the Court.

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3      When offering to license its geo-location technology and data to Google, Digital Envoy

4  expressly encouraged Google to use it in Google's advertising programs.  Indeed, Digital Envoy

5  promised that Google could "use it for everything" and that Google would have "unlimited use."

6  Not surprisingly, that is precisely what Google thought it got in the parties' license agreement

7  (the "License Agreement") under which Digital Envoy authorized Google to use the technology

8  and data as Google saw fit in its "Business."  But according to Digital Envoy's allegations in this

9  action, its promises to Google were false.

10      Digital Envoy has charged Google with trade secret misappropriation and related

11  dependent claims.  It contends that Google's use of Digital Envoy's data in a Google advertising

12  program known as AdSense for content ("AFC") was not authorized by the License Agreement.

13  To support that contention, it badly misstates the terms of the contract.

14      Under the License Agreement, Digital Envoy authorized Google to use its technology

15  and data in Google's "Business," defined as "the business of producing and maintaining

16  information technology."  From the start of the parties' relationship, Google has "produced" and

17  "maintained" its information search technology through its advertising programs.  Indeed, those

18  programs are Google's business.  Moreover, Digital Envoy expressly concedes that Google's use

19  of the data in another, indistinguishable advertising program called AdWords is authorized under

20  the License Agreement.  Plainly, Digital Envoy itself recognizes that Google produces and

21  maintains its information search technology through its advertising programs.  Accordingly,

22  Google's use of Digital Envoy's data in AFC falls squarely within the authorization granted to it

23  by the License Agreement.

24      Digital Envoy proffers an alternative and unsupportable reading of the license as the basis

25  for its claims.  It suggests that Google's authorization to use the data in "producing and

26  maintaining information search technology" actually limits Google to using the data in

27  information search technologies themselves.  That interpretation violates basic rules of

28  contractual interpretation and should be rejected.  In any event, it does not rescue Digital

1     Envoy's claims. Google's AFC program is simply another of Google's information search

2     technologies, used by Google to locate relevant commercial information to display to end-users.

3     It operates in the same manner as the AdWords program that Digital Envoy concedes is licensed.

4     Because Google's AFC program is itself an information search technology, Google's use of

5     Digital Envoy's data in that program is authorized, even accepting Digital Envoy's misreading of

6     the License Agreement.

7         Perhaps recognizing the infirmity of its initial theory, Digital Envoy has shifted course in

8     midstream. It now claims that in using Digital Envoy's data in the AFC program, Google

9     somehow discloses Digital Envoy's data to third parties. But Digital Envoy cannot possibly

10     support that claim. At all times during the operation of the AFC program, Digital Envoy's data

11     remained resident on Google's computers and was accessed only by Google. Google did not

12     disclose or share the contents of Digital Envoy's database with third parties. Accordingly, this

13     new theory cannot salvage Digital Envoy's claims.

14         Because it cannot show that Google made unauthorized use of its data, Digital Envoy

15     cannot establish a prima facie case of misappropriation. All of its claims should fall for that

16     reason alone. But even if the Court ultimately accepts Digital Envoy's strained contractual

17     interpretation and finds Google's use was unauthorized, summary judgment for Google on the

18     trade secret claim would still be warranted. Given Digital Envoy's promises of "unlimited use"

19     and the testimony of Google's representatives, Digital Envoy cannot possibly show that Google

20     acted unreasonably in believing its conduct was authorized. As a matter of law, Google cannot

21     be held liable for the intentional tort of trade secret misappropriation based upon a reasonable, if

22     erroneous, interpretation of the License Agreement.

23     **II.**      **BACKGROUND**

24         **The Parties**

25         Google is a global technology leader focused on improving the ways people connect with

26     information. Its longstanding company mission is to "organize the world's information and

27     make it universally accessible and useful." The utility and ease of use of Google's services have

28     made it one of the world's best known brands, almost entirely through word of mouth from

GOOGLE'S MOTION FOR SUMMARY JUDGMENT     3
C 04 01497 RS

1  satisfied users.  Visitors to Google's various Internet web sites can locate information in

2  Google's "web index," a database containing the sortable content of more than eight billion

3  Internet pages; they can scan through more than one billion images; or peruse the world's largest

4  archive of online bulletin board messages dating back to 1981.  Declaration of Susan Wojcicki

5  ("Wojcicki Decl.") at ¶ 2.  Google supports these endeavors through advertising revenue which

6  accounted for approximately 99% of its gross revenues in 2004.  Google enables advertisers to

7  deliver cost-effective online advertising by targeting their messages to the content on a given

8  web page that a user is viewing.  *Id.*

9      Digital Envoy is one of several companies that generate data that can help users make an

10  educated guess about the approximate geographic location of a visitor to a website.  Specifically,

11  Digital Envoy's data attempts to match the unique IP addresses[1] assigned to the computers of

12  individual Internet users to particular countries, regions or metropolitan areas.  Declaration of

13  Mark Rose ("Rose Decl.") at ¶ 2.

14      **The Parties' License Agreement**

15      Digital Envoy's CEO, Rob Friedman, introduced his company to Google in an email

16  dated October 24, 2000, stating: "I believe that our geo-targeting product could help you target

17  search results and advertising on a geographic basis."  Declaration of David H. Kramer ("Kramer

18  Decl."), Ex. A.  Thus, from its very first communication to Google, Digital Envoy encouraged

19  Google to use Digital Envoy's data and technology – specifically its IP Address/location

20  database – both to target search results and to support Google's advertising programs.

21      When discussions regarding a licensing agreement began, Digital Envoy suggested

22  several additional ways in which Google could use Digital Envoy's data.  Kramer Decl., Ex. B

23  (email thread).  In his reply, one of Google's negotiators, Steve Schimmel, explained:  "We will

24  probably, eventually use your product in all of the ways mentioned.  That being said, we will

---

26  [1]    An "IP address" or "Internet Protocol Address" is a string of four sets of numbers,
27  separated by periods, such as "241.30.241.28," uniquely assigned to each computer accessing the
Internet at a given time.  *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 576 (2d Cir.
2000); *see also* Management of Internet Names and Addresses, 63 Fed. Reg. 31,741 (June 10,
28  1998).

1    most likely just use it for advertising targeting for a while (but like to have flexibility)."  *Id.*

2    Responding to Google's desire for "flexibility," Digital Envoy then promised Google that

3    Google could use Digital Envoy's technology for any purpose.  *Id.*  ("The fee that I quoted

4    earlier would be for 'all you can eat' metro-targeting – *you can use it for everything* and there is

5    no volume cap.") (emphasis added).  Google replied with an offer to license Digital Envoy's

6    technology if Digital Envoy could meet the following terms:  "*Unlimited volume and use* for

7    country targeting.... for ~$3000/mth total."  Kramer Decl., Ex. B (emphasis added).  Digital

8    Envoy accepted the offer on the condition that the parties finalize an agreement in short order.

9    *Id.*  Google then asked Digital Envoy to draft a contract reflecting the $3000/month price and

10   "*unlimited servers, usage and volume.*"  *Id.*  (emphasis added).  Digital Envoy responded with "a

11   draft of an agreement incorporating the terms" the parties had discussed.  Kramer Decl., Ex. C.

12   *See also* Kramer Decl., Ex. D (Friedman Dep.) at 82:15-83:5 (draft transmitted was intended to

13   incorporate Google's proposed terms).

14          Plainly, one of the central terms that the parties had discussed was Digital Envoy's

15   promise of "unlimited use."  As Mr. Friedman explained in his deposition, that promise was

16   incorporated into the draft Digital Envoy sent to Google.  *Id.*  And it appears in the parties'

17   November 2000 License Agreement in the form of a sweeping grant of license rights by Digital

18   Envoy to Google.  Kramer Decl., Ex. E.

19          The License Agreement, which expired in January 2005, authorized Google to use Digital

20   Envoy's data in Google's "Business" – broadly defined as "the business of producing and

21   maintaining information search technology."  Kramer Decl., Ex. E (whereas clause defining

22   "Business").  Google was expressly authorized to use the data at any of its "offices and data

23   centers" and to "develop indices, services, or applications that are provided to third parties."

24   Kramer Decl., Ex. E at § 3.[2]

25

26   _____

         [2]    The full text of the license grant provision states:

27   Licensor hereby grants Licensee the limited, worldwide right to use in its Business (and not
     distribute to any third-party in whole or in part) the Product and the Database Libraries.  Such
28   right shall be nonexclusive.  Such rights shall be strictly limited to the right to:

1    The language of the License Agreement and the parties' negotiations made plain to

2   Google's representatives that Google's right to use Digital Envoy's technology was expansive.

3   Indeed, from the time they negotiated the contract through the taking today, Google's

4   representatives have always understood that Google had the right to use Digital Envoy's data as

5   Google saw fit, subject only to the limitation that it not distribute or resell the data to third

6   parties.

7    For example, Matthew Cutts, who negotiated the contract with Digital Envoy and then

8   implemented Google's use of Digital Envoy's technology in Google's advertising program,

9   testified under cross-examination:

10       Q.  So your understanding is that -- at that point in time, your understanding was that you
         could use the data in any way you wanted except for giving the complete code to another
11       third-party?

12       A.  I believe that's correct.

13           * * *

14       Q:  My question is, that understanding, did you have that understanding consistently from
         the time of entering into the relationship with Digital Envoy to today, that you had the
15       ability to use the information for whatever you wanted, except for moving the whole
         database to a third-party?
16
         A.  I believe I did have that understanding.
17

18   Kramer Decl,, Ex. F (Cutts Dep.) at 54:3-7; 64:1-16.

19       Steve Schimmel, who managed the Digital Envoy relationship for years, likewise

20   testified:

21       Q.  Did you yourself consider whether or not this sentence was broad enough to suit
         Google's desire?
22

23   ───────────────────

     1. Input, download, and store some or all of the Database Libraries in files and memory; and
24   compile some or all of the Database Libraries at the Site.  Licensee may also use the Database
     Libraries to develop indices, services, or applications that are provided to third parties (e.g.
25   developing a country-specific index of web pages).  In no event, however, are the Database
     Libraries to be sold, licensed, distributed, shared or otherwise given (in any form) to any other
26   party or used outside of the site set forth herein.

27   2. Access and use the Database Libraries in the Business only at the Site.  The "Site" shall be
     defined as Google's offices and data centers.

28   Kramer Decl., Ex. E at § 3.

     GOOGLE'S MOTION FOR SUMMARY JUDGMENT     6
     C 04 01497 RS

A.  It seemed to reflect the concept of unlimited usage, which is what I understood an [sic] agreement to be.

* * *

Q.  Okay.  Would you agree that the language could have been more explicit in Google's desire to use Digital Envoy's technology in a general sense in case they think about things they want to do?
. . .
[A]: Every call, every e-mail that we'd had together always discussed the concepts of unlimited use, including [Digital Envoy] volunteering additional ways in which we hadn't thought of in which we might use it.  So at no time did it ever come into my mind that I'd have to be concerned with such a thing.

Kramer Decl., Ex. G (Schimmel Dep.) at 103:8-11, 105:18-106:5.  And Kulpreet Rana, Google's

in-house counsel who oversaw the license negotiations, testified:

I believe I would have interpreted this recitation as being very broad for a few reasons.  One is that it describes the business as producing and maintaining information search technology, and another is that in our view, in Google's view, information search technology itself is a very broad function.  Our business has been to organize the world's information and to make it universally useful and accessible, and we believe that to be a very broad information search function.

Kramer Decl., Ex. H (Rana Dep.) at 22:3-12, 9:11-15 ("That in my view is a broad grant of

rights.  The only limitation – well, it's not even a limitation – is it's a right to use in its business,

and business is defined earlier in the contract very broadly.").

Based on the understanding of its representatives, Google openly used Digital Envoy's

data to support its advertising programs for years without any objection whatsoever from Digital

Envoy.  Kramer Decl., Ex. D (Friedman Dep.) at 213:2-6.

**Google's Advertising Programs**

As the parties had discussed, after the License Agreement was signed, Google began

using Digital Envoy's data in its advertising programs – first in AdWords, and later in AdSense.

AdWords

The advertising program that Google offers to advertisers is known as AdWords.

AdWords permits hundreds of thousands of advertisers to display their messages to Internet

users all over the world.  If a user "clicks" on a given advertising message, the sponsoring

advertiser pays Google for that click.  Wojcicki Decl. at ¶ 3.

1    To implement the AdWords program, Google analyzes the content of advertisers'

2    messages and stores them in an indexed database. When called upon to display a message to an

3    end-user, Google searches this database to find what it believes is the most relevant commercial

4    information using a highly complex, weighted algorithm that takes dozens of factors into

5    consideration. Rose Decl. at ¶ 3.

6    One of the most important factors Google uses to locate advertisements to display to a

7    user is the user's demonstrated interest in a particular subject. Thus, for example, when a visitor

8    queries Google's web index for "basketball," Google will search its inventory for a basketball-

9    related advertisement to match the user's interest. But the user's demonstrated interest is only

10   the first of dozens of factors used in the search process. Others include, for example, the

11   "clickthrough" rate for a particular advertisement, and the amount of money that an advertiser is

12   willing to pay for a user's click.[3] Wojcicki Decl. at ¶ 4.

13   In some cases, another factor used in Google's search for a relevant advertisement is the

14   perceived geographic location of the Internet user. Google uses this factor in those instances in

15   which an advertiser has asked that Google display its messages only to users in particular places

16   (*e.g.,* where the advertiser chooses to target its messages only to users in Europe). And for a

17   time, until shortly after this lawsuit was filed, as one step in estimating a user's geographic

18   location, Google often used information from Digital Envoy's IP Address/Location database.[4]

19   Rose Decl. at ¶ 4.

20   _____

21   [3]    In the Google AdWords program, Google's advertisers inform Google of the "keywords"
     to which they want display of their advertisements connected (*e.g.*, display only when users
22   search for the term "basketball"). Advertisers also select the maximum amount they are willing
     to pay Google each time a user "clicks" on their message (*e.g.*, $.50 per click). Where two
23   advertisers are interested in the same keywords, one advertiser can generally increase its chance
     of having its message displayed by setting a higher maximum payment per click than another.
24   But because Google is interested in locating advertisements that users find relevant, the
     advertiser offering the highest maximum cost per click will not necessarily have its message
25   displayed. Users may find another advertiser's message more appealing and thus "click" on that
     message more often. Google uses the comparative "clickthrough rates" of competing messages
26   as one of the factors in its analysis of which message to display. Wojcicki Decl. at ¶ 5.

27   [4]    Even during this period, there were a variety of circumstances in which Google could not
     or would not use Digital Envoy's data in an effort to determine an end-user's geographic
28   location. For example, in many instances, Google would not receive or could not determine an
     end-user's IP address. In such cases, Digital Envoy's IP Address/Location database was of no

1    In the simplest case, a user would visit Google's own site at www.google.com, and ask

2    that Google provide listings of web pages from its web index for the keyword "basketball." The

3    user's computer would communicate the search query "basketball" along with other information

4    to Google's computers, including the user's IP address. Google would then initiate two separate

5    processes – one to find the results from its web index that may be responsive to the user's query,

6    and the other to locate advertising messages that may be relevant to the user. As one step in the

7    process of identifying potentially relevant advertising messages, Google would typically look up

8    the user's geographic location in the Digital Envoy IP Address/Location Database stored at

9    Google. If certain advertisers had excluded that geographic location from their targeted

10   audience, their messages would be dropped from the selection process. Google would continue

11   its search for the appropriate advertising messages from the remaining candidates using its

12   complex multi-factored algorithm. It would then send the selected advertisements, along with

13   the requested results from its web index, back to the user's computer.[5] At no time in the process

14   would Google allow the user or another third-party to access Digital Envoy's database, or

15   transmit the contents of the database to a third-party. Rose Decl. at ¶¶ 5-7.

16   Digital Envoy concedes that Google was fully licensed under the License Agreement to

17   operate its AdWords program in this fashion, and to display advertisements to users visiting

18   Google's own website at www.google.com. Kramer Decl., Ex. D (Friedman Dep.) at 91:20-92:5

19   (testifying that License Agreement affirmatively authorizes (and does not prohibit) Google's use

20   of Digital Envoy's technology to display geo-targeted ads on www.google.com); *see also*

21   Kramer Decl., Ex. I (Friedman email to Schimmel dated Feb. 6, 2004 "we agree that Adwords is

22   just a subcategory of Information search. . . . I think it should be covered under our current

23   agreement."). Thus, Digital Envoy admits that Google's use of Digital Envoy's data to help

24   target advertisements to end-users was fully authorized, and was part of Google's "Business" of

25   "producing and maintaining information search technology." *Id. See also* Kramer Decl., Ex. E

26   _____

27   use. In other instances, Google would receive a user's IP Address, but that address could not be
     located within Digital Envoy's database. Rose Decl. at ¶ 4 n.1.

28

1  (License Agreement) at § 3.  Digital Envoy further admits that in this process, Google was not

2  selling, licensing, distributing, sharing or otherwise giving Digital Envoy's data to any third-

3  party.  *Id.*

4        AdSense

5        In early 2002, Google formally launched what is now known as its AdSense program.

6  AdSense allows Google to display advertisements to users visiting a participating third-party

7  publisher's web site.  If a user clicks on a message displayed on the third-party site, the

8  advertiser pays Google, and Google shares a portion of that payment with the third-party

9  publisher.  Wojcicki Decl. at ¶ 6.

10        The mechanical process by which Google searches for the advertising messages to

11  display to users visiting third-party sites is identical, in relevant part, to the process used to locate

12  advertising messages to display to users visiting Google's own site.  Indeed, the process of

13  selecting advertising messages is run by the same computers using virtually identical multi-

14  factored and weighted algorithms.  As before, an end-user's geographic location may be one of

15  the variables used in the process of locating the right messages to display.  And Google often

16  used Digital Envoy's IP Address/Location data as one of several factors in making its

17  determination about a user's geographic location in AdSense.[6]  Rose Decl. at ¶ 8.

18        Google used Digital Envoy's data in AdSense in the same way it used it in AdWords.

19  The Digital Envoy data remained at all times on Google's computers only.  At no time in

20  operating the AdSense program did Google permit the third-party publishers to access Digital

21  Envoy's data or transmit the information in Digital Envoy's database to them.  Just as in

22  AdWords, Google alone accessed the data to aid in its search for relevant advertising messages.

23  Rose Decl. at ¶¶ 8-9.

24  _____

25        [5]  This process (and the associated computations) occurs in a matter of milliseconds.  Rose Decl. at ¶ 6.

26        [6]  Several of the third-party publishers participating in the AdSense program did not provide Google with the IP Address of the end-user visiting their site.  Others provided Google

27  with their own assessment of the user's geographic location or information suggesting a particular location.  In such cases, Google made no use of the Digital Envoy data in determining

28  the user's geographic location.  Rose Decl. at ¶ 8 n.2.

Today, Google's AdSense program takes two forms.  In AdSense for search ("AFS"), Google's advertising messages are displayed to end-users who query a web index while visiting a third-party publisher's site.  Again, the user's query is the principal factor that Google weighs in locating relevant advertisements.  It then selects specific messages using its multi-factored algorithm, and displays them alongside responsive listings from the web index.  Wojcicki Decl. at ¶ 7.  In AdSense for content ("AFC"), Google's advertising messages are displayed to end-users alongside particular content on the third-party publisher's site.  Google analyzes the content the user is viewing and uses that analysis, rather than a specific query by the end-user, to guide its search for relevant advertisements.  Thus, if an individual is reading an article on baking at the Washington Post's site, Google may display advertising messages matching that interest, though again, the specific advertisement(s) selected will depend on a host of factors including, perhaps, the user's geographic location.  Wojcicki Decl. at ¶ 8.

**This Litigation**

Earlier this year, amidst the hype surrounding Google's impending public offering, Digital Envoy demanded higher license fees from Google.  It claimed, for the first time, that Google was exceeding the scope of the license granted to it.  Specifically, Digital Envoy claimed that by using Digital Envoy's data in its AdSense for content program, Google was breaching the License Agreement because AFC was allegedly not part of Google's "Business" of "producing and maintaining information search technology."  *See* Digital Envoy's Amended Complaint at ¶¶ 39-42; Kramer Decl., Ex. I.

From the start of the parties' relationship, Google had always "produced and maintained" its "information search technology" through its advertising programs.  It responded to Digital Envoy's claim by highlighting the parties' discussions in which Digital Envoy had repeatedly promised Google "unlimited use" of its technology, and noted that the parties had specifically emphasized advertising as Google's intended use.  Kramer Decl. Ex. I (Schimmel email response, Feb. 6, 2004).  Google also explained that the advertising programs themselves were part and parcel of Google's information search technology.  *Id.*  Accordingly, Google reiterated

1    its consistently-held belief that it had every right to use Digital Envoy's technology to help target

2    advertisements in its AFC program. *Id.*

3        When Google refused what it perceived as extortionate demands, Digital Envoy filed suit

4    against Google in Georgia, in violation of the forum selection clause in the License Agreement.

5    Kramer Decl., Ex. E at § 12 (forum selection clause). Upon Google's motion, the Northern

6    District of Georgia transferred the case here. *Digital Envoy, Inc. v. Google, Inc.*, 319 F. Supp. 2d

7    1377 (N.D. Ga. 2004). In its Order effecting the transfer, the Georgia court concluded that

8    interpretation of the License Agreement was at the heart of the case and recognized that Digital

9    Envoy's claims "will almost certainly fail if Google's use of its technology is found to be within

10   the scope of the agreement." *Id.* at 1380.

11       When Digital Envoy filed an amended complaint in this Court, it again claimed that

12   Google's use of Digital Envoy's data in AFC exceeded the scope of the use authorized by the

13   License Agreement, and thus constituted willful trade secret misappropriation. Amended

14   Complaint at ¶¶ 44-50 (Count I). Digital Envoy tacked on additional state law claims based

15   upon the same predicate allegation. *Id.* (Counts II-V); Kramer Decl., Ex. D (Friedman Dep.) at

16   223:6-14.

17       As the litigation has progressed, Digital Envoy has apparently become less enamored of

18   the theory set forth in its Amended Complaint, and has concocted another basis for its trade

19   secret charge. Digital Envoy now additionally contends that Google's use of its data in AFC

20   exceeds the scope of the License Agreement because Google, in operating AFC, somehow

21   disclosed Digital Envoy's data to third parties. But as noted, no such disclosure took place. As

22   in all of Google's advertising programs, in AFC, Digital Envoy's data remained at all times on

23   Google's own computers and was not accessed by any third-party.

24   **III.    ARGUMENT**

25       A party is entitled to summary judgment as a matter of law where the pleadings and

26   evidence show that there is no genuine issue of material fact on the claim in question. Fed. R.

27   Civ. P. 56(c). Where the moving party does not have the burden of proof on a particular issue, it

28   need not introduce evidence to obtain a summary judgment. Rather, it need only show the Court

1    that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v.*

2    *Catrett*, 477 U.S. 317, 323 (1986); *Cline v. Industrial Maint. Eng'g & Contracting Co*., 200 F.3d

3    1223, 1229 (9th Cir. 2000).[7]

4    **DIGITAL ENVOY'S TRADE SECRET MISAPPROPRIATION CLAIM FAILS**
     **AS A MATTER OF LAW BECAUSE DIGITAL ENVOY CANNOT SHOW**
5    **MISAPPROPRIATION.**

6    To establish a *prima facie* case of trade secret misappropriation, the plaintiff has the

7    burden to prove that (1) it owns information that is a trade secret; (2) the defendant

8    misappropriated the trade secret by acquiring, disclosing or using the trade secret through

9    improper means; and (3) the defendant's actions damaged the plaintiff.  Cal. Civ. Code §3426 *et*

10   *seq*.; *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1666 (2003) (plaintiff bears

11   burden on each element of claim); *see also Imax Corp. v. Cinema Tech., Inc*., 152 F.3d 1161,

12   1164 (9th Cir. 1998) (plaintiff has the burden to identify each alleged secret and prove secrecy);

13   *see also* Kramer Decl., Ex. E at § 12 (California choice of law clause).  In this action, Digital

14   Envoy cannot offer evidence to establish the required element of "misappropriation."

15   Digital Envoy contends that Google has engaged in misappropriation by using Digital

16   Envoy's data, without Digital Envoy's consent, while knowing or having reason to know that

17   such use was unauthorized.  Amended Complaint at ¶ 46 (alleging *misuse*); Cal. Civ. Code

18   §3426.1(b)(2)(B)(ii) ("Misappropriation" statutorily defined as "use of a trade secret . . . *without*

19   *express or implied consent* by a person who, . . . [a]t the time of the use, *knew or had reason to*

20   *know* that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to

21   a duty to limit its use") (emphasis added).  Digital Envoy's misappropriation charge is meritless

22   for at least two reasons.

23

24
   ---
   [7]    Even if summary judgment or summary adjudication of an entire claim is not warranted,
25   Federal Rule of Civil Procedure 56(d) allows a court to grant partial summary judgment, thereby
     reducing the number of facts at issue in a case.  Fed. R. Civ. P. 56(d); *State Farm Fire & Cas.*
26   *Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987).  If for any reason the Court believes that
     summary judgment or summary adjudication of entire claims is unavailable, Google respectfully
27   requests that the Court grant it summary adjudication with respect to the specific issues raised
     herein, including the interpretation of the License Agreement, the operation of Google's AFC
28   program, and any other issues the Court believes are appropriate for resolution.

1    First, Digital Envoy cannot show that Google's use of Digital Envoy's data in AdSense

2    for content was unauthorized.  Digital Envoy authorized such use under the terms of the parties'

3    License Agreement.

4    Second, even if Google's use was not authorized, Google did not know or have reason to

5    know that it was prohibited from using Digital Envoy's data as it did.  The evidence uniformly

6    demonstrates that (1) Google believed that the License Agreement permitted use of Digital

7    Envoy's data in AFC, and (2) Google's contract interpretation was eminently reasonable.  As a

8    matter of law, given that Google acted based on a reasonable interpretation of the License

9    Agreement, Google cannot face liability for intentional misappropriation – even if its reasonable

10    interpretation is ultimately deemed to have been incorrect.

11    **A.    Google Did Not Engage in Misappropriation Because Digital Envoy
        Authorized Google to Use Its Data in AdSense for Content.**

12

13    **1.    Use in AdSense for Content Is Use in Google's Business of "Producing
        and Maintaining Information Search Technology."**

14

15    Digital Envoy has conceded that Google was expressly authorized to use Digital Envoy's

16    data as part of its AdWords program to display geo-targeted advertisements on Google's own

17    sites.  That concession is fatal to Digital Envoy's claims.  It reveals Digital Envoy's recognition

18    that Google's use of the data to support its advertising programs constituted use by Google of the

19    data in Google's "Business" of "producing and maintaining information search technology."

20    In an attempt to avoid the consequences of its concession, Digital Envoy offers an

21    obvious misreading of the License Agreement, hoping to distinguish AdSense for content from

22    AdWords.  According to Digital Envoy, Google's use in AFC is not authorized because the

23    program is not itself an "information search" technology.  That assertion is wrong, but it is

24    beside the point in the first instance.  The License Agreement did not restrict Google to those

25    uses of Digital Envoy's data that themselves constitute "information search technology."  Rather,

26    the License Agreement expressly authorized Google to use the data in its "business" of

27    "*producing and maintaining* information search technology."  Digital Envoy's attempt to read

28    the words "producing and maintaining" out of Google's license is improper as a matter of law.

1    *See* Cal. Civ. Code §1641 (stating rule of contract interpretation that all words in contract should

2    be given effect); *Aozora Bank, Ltd. v. 1333 North Cal. Blvd.,* 119 Cal. App. 4th 1291, 1296

3    (2004) (rejecting contract interpretation that would render words in contract "mere surplusage.");

4    *Hard v. Cal. State Employees Ass'n*, 112 Cal. App. 4th 1343, 1348 (2003) (deeming

5    interpretation that would render language meaningless an "irrational construction").

6         Taking the License Agreement as written, with every word given meaning, there can be

7    no dispute but that Google's use of Digital Envoy's data in AFC was authorized.  Google

8    "produces and maintains" its "information search technology" through its advertising programs.

9    As noted, roughly 99% of Google's revenues for 2004 came from advertising.  Absent this

10   advertising, Google obviously would have enormous difficulty "producing or maintaining"

11   anything at all.

12        That should be the end of the matter.  Because Google's AFC program is part of

13   Google's "business" of "producing and maintaining information search technology," Google was

14   expressly authorized to use Digital Envoy's data in that program.  Google is thus entitled to

15   summary judgment on Digital Envoy's claims that such use constituted trade secret

16   misappropriation or was otherwise unlawful.

17              **2.    Use in AdSense for Content Is Use in Google's "Information Search
                        Technology" Itself.**

18

19        Digital Envoy's attempt to rewrite the parties' agreement to limit Google to using Digital

20   Envoy's data directly in Google's information search technology should be rejected.  But even if

21   the Court were to consider this strained revision of the license, Google's use of the data in

22   AdSense for content would remain authorized because the AFC program is simply another one

23   of Google's information search technologies.

24        In the AFC program, Google searches for and displays commercial information that it

25   believes best matches the interests of end-users visiting a third-party publisher's site.  The search

26   process is complex, and weighs a host of factors in an effort to find those messages in Google's

27   inventory that are most likely to be relevant to a particular end-user.  In short, Google's

28   advertising programs have always been another way of helping people find relevant information.

GOOGLE'S MOTION FOR SUMMARY JUDGMENT    15
C 04 01497 RS

1   *See, e.g.,* Kramer Decl., Ex. H (Rana Dep.) at 23:17-22 ("We view advertisements as another

2   source of information for users.  When users are searching for information, we try to provide

3   them a variety of information that they will find relevant.  Some of which is in the form of

4   advertisements, and some of which is not."); Ex. F (Cutts Dep.) at 114:19-115:16, 117:13-24

5   ("We think of ads as just another type of search;" "I don't think Google draws a dichotomy

6   between ads and between searching over the web or searching any other type of information

7   because I believe that Google believes that returning the best information possible is the best

8   way to get information to users . . . .").

9        Digital Envoy is in no position to contend otherwise.  From the very start of the parties'

10  discussions, Digital Envoy suggested that Google utilize Digital Envoy's data in its advertising

11  programs.  Kramer Decl., Ex. A ("our geo-targeting product could help you target search results

12  and advertising on a geographic basis").  And Digital Envoy has conceded that Google was

13  authorized to do so when displaying advertisements on its own site.  Kramer Decl., Ex. I

14  (Friedman email to Schimmel dated Feb. 6, 2004) ("we agree that Adwords is just a subcategory

15  of Information search. . . .  I think it should be covered under our current agreement.").  In

16  making that concession, Digital Envoy has already acknowledged that Google's advertising

17  programs are information search technologies.

18       The selection of advertisements for display in the AFC program is performed by the same

19  computers, using algorithms that are materially identical to those used in Google's AdWords

20  program.  In both programs, Google's computers receive a request to locate advertising messages

21  and then search for those messages that Google believes will be of most interest to the end-user.

22  Rose Decl. at ¶¶ 5-9.  That the messages in AFC are displayed on third-party sites, as opposed to

23  Google's own site, in no way alters the fact that they are selected through an information search

24  process.[8]

25

26       [8]   *See* Kramer Decl., Ex. H (Rana Dep.) at 23:24-24:10 ("Q.  And in the AdSense for
        Content program, how is it that the user is searching for information?  A.  When a user visits a
27      Web page, it is because they are interested in the content of that page.  And our AdSense for
        Content service attempts to provide the user, again, with information that is of interest or
28      relevant to what they are viewing or what they are looking for.  It does so by using the content of

To manufacture some distinction between the program it concedes is licensed and the AFC program it claims is not, Digital Envoy points out that advertising messages on Google's site are displayed only after an end-user queries Google's web index. In the AFC program, by contrast, Google displays advertisements based on the content of the page a user is viewing, regardless of whether the user has queried Google's web index. This purported distinction, however, is irrelevant. The License Agreement nowhere limits Google's use to displaying advertising messages on www.google.com or Google's own web sites. Likewise, it nowhere requires that Google only display advertising messages on screens presented after end-users submit queries on Google's Internet search engine.[9] Indeed, the License Agreement imposes no limitations at all concerning end-users, their location, their queries, or the display of advertising. Even under Digital Envoy's misinterpretation, the only limitation is that Google use Digital Envoy's data in an information search technology.

Because Google's use of Digital Envoy's data in AFC is use in Google's information search technology itself, such use is authorized even under Digital Envoy's attempted revision of the License Agreement. Accordingly, such use cannot support Digital Envoy's claim for trade secret misappropriation and related torts. Google's is entitled to judgment as a matter of law on the claim.

### 3. Google Does Not Disclose Digital Envoy's Data to Third Parties in Operating AdSense for Content.

Perhaps recognizing the weakness in the misappropriation theory espoused in its complaint, Digital Envoy has shifted its focus to an alternative theory as the case has progressed.

---

the Web page as a way to, as a proxy or a way to determine what the user – what type of information the user is searching for.")

[9] On this point, the drafting history of the Agreement is highly probative. The original draft of the Agreement proposed licensing Google to use Digital Envoy's technology in its "business of producing and maintaining *an Internet search engine*." Kramer Decl., Ex. J (Draft of agreement) (emphasis added). In the final agreement, the "Internet search engine" language was stricken. In its place, the parties substituted the language "information search technology," making the grant of the license considerably broader. Kramer Decl., Ex. E; Ex. D (Friedman Dep.) at 205:21-23, 206:12-15 (acknowledging change broadened the grant of license to Google). Digital Envoy's attempt to re-insert a restriction tying Google's use to an "Internet

1   It now claims that in operating AFC, Google improperly disclosed or distributed Digital Envoy's

2   data to third parties in violation of its license grant.  Digital Envoy thus contends that Google's

3   use of its data in AFC was not authorized.  This new charge is both mystifying and baseless.

4        In operating AFC, Google in no way distributed, disclosed, shared or otherwise gave

5   Digital Envoy's data to any third-party.  At all times, Digital Envoy's data remained on Google's

6   own computers.  The data was accessed only by Google itself, as part of Google's multi-factored

7   process for selecting advertisements to display to end-users.  Rose Decl. at ¶¶ 8-9.  In short, there

8   is nothing at all to Digital Envoy's new theory.

9        Digital Envoy seems to believe that Google violated the license's prohibition on

10  disclosing or sharing data because it allowed third-party publishers to benefit from a Google

11  service in which Google used the data internally.  That is, even though the publishers did not

12  ever obtain or access Digital Envoy's data, Digital Envoy objects because publishers earned

13  money from advertisements that were selected through a process that may have included

14  Google's internal use of Digital Envoy's data.  This reading of the license's prohibition on

15  *disclosure* of the data to third parties is frivolous.

16       The license clause at issue proscribes distributing, sharing or *otherwise giving* Digital

17  Envoy's data to other parties.  Kramer Decl., Ex. E (License Agreement) at § 3.  Thus, the

18  prohibition is focused on methods by which Google might *give* Digital Envoy's data to others.

19  There is no prohibition on allowing third parties to benefit from a Google service in which

20  Google makes only internal use of the data.  In fact, the clause immediately preceding the

21  disclosure prohibition expressly authorizes Google to provide services to third parties using the

22  data:  "Licensee may also use the Database Libraries to develop indices, services, or applications

23  that are provided to third parties."  *Id.*  Digital Envoy thus asks the Court to invent a prohibition

24  that does not exist, and ignore an affirmative authorization that does.[10]  Its newly-manufactured

25  theory should be rejected out of hand.

26  _____

27  search engine" is as baseless as its request that the Court ignore the "producing and maintaining"
    language altogether.

28  [10]   Digital Envoy's suggestion that Google was not entitled to permit third parties to benefit
    from Digital Envoy's technology makes no sense.  In virtually every use that Google made of

1

**B.    Google Did Not Engage in Misappropriation Because Google Did Not Know or Have Reason to Know That It Was Prohibited From Using Digital Envoy's Data in AdSense for Content.**

2

3      Even if the Court were to somehow find that Google was not authorized to use Digital

4  Envoy's data in Google's AFC program, Digital Envoy's "misappropriation" charge would still

5  fail.  Digital Envoy cannot show that Google knew, or had reason to know, that its broad license

6  to use Digital Envoy's data excluded use of the data in AFC.  *See* Cal. Civ. Code §

7  3426.1(b)(2)(ii) (defining "misappropriation" to require "use of a trade secret of another . . . by a

8  person who . . . [a]t the time of . . . use, *knew or had reason to know* that his or her knowledge of

9  the trade secret was . . . [a]cquired under circumstances giving rise to a duty to . . . limit its use")

10  (emphasis added).

11      The individuals who negotiated the License Agreement for Google have uniformly

12  testified to their consistent understanding that Digital Envoy broadly granted to Google the right

13  to use Digital Envoy's data for *any* purpose.  *See, e.g.,* Kramer Decl., Ex. G (Schimmel Dep.) at

14  105:25-106:5 ("Every call, every e-mail that we'd had together always discussed the concepts of

15  unlimited use, including [Digital Envoy] volunteering additional ways in which we hadn't

16  thought of in which we might use it.  So at no time did it ever come into my mind that I'd have to

17  be concerned with such a thing."); Ex. H (Rana Dep.) at 8:15-10:16, 20:2-14; Ex. F (Cutts Dep.)

18  at 53:20-54:7.

19      It is no surprise that Google's representatives held this view in light of the parties'

20  negotiations over the license agreement.  From the start, Digital Envoy's representative was

21  aware that Google intended to use Digital Envoy's data in various ways, including in Google's

22  advertising programs.  Kramer Decl., Ex. B ("I was assuming you'd be using [Digital Envoy's

23  technology] in targeting your new advertising push."); *Id.* ("we will probably, eventually use

24  your product in all of the ways mentioned.  That being said, we will most likely just use it for

25  ─────────────────────

26  Digital Envoy's data, a third-party benefited in some manner from the data.  For example, in the undisputedly authorized AdWords program, Google theoretically enabled advertisers to better target their messages through use of Digital Envoy's data.  Those advertisers gained the benefit

27  of Digital Envoy's technology without themselves having licensed the technology from Digital Envoy.  Digital Envoy concedes that such use was authorized. Thus, the fact that third parties benefit from the technology could not bar Google's use of the technology.

28

GOOGLE'S MOTION FOR SUMMARY JUDGMENT        19
C 04 01497 RS

advertising targeting for a while (but like to have flexibility).").  Indeed, Digital Envoy told

Google that Google could use Digital Envoy's technology however it wished.  *Id.*  ("The fee that

I quoted earlier would be for 'all you can eat' metro-targeting – *you can use it for everything* and

there is no volume cap.") (emphasis added).  Google responded to that representation with an

offer to license Digital Envoy's technology if Digital Envoy could meet the following terms:

"*Unlimited volume and use* for country targeting . . . . *for ~$3000/mth total.*"  Kramer Decl., Ex.

B (emphasis added).  And when Digital Envoy accepted, contingent upon entering an agreement

quickly, Google again highlighted the requirement that the contract provide for "unlimited

usage."  *Id.*  Digital Envoy accepted, supplying "a draft of an agreement incorporating the terms"

the parties had discussed.  Kramer Decl., Ex. C.  Given this sequence, Google could not have had

an understanding other than that it was entitled to make "unlimited use" of the Digital Envoy's

data and technology and "use it for everything," including its advertising programs.

Further, from the time the License Agreement was signed in November 2000 until this

dispute arose in February 2004, Digital Envoy never so much as hinted that Google's use of

Digital Envoy's data was somehow limited.  Kramer Decl., Ex. D (Friedman Dep.) at 213:2-6.  It

certainly raised no objection when the AFC program was launched to widespread press attention

in March 2003, even though it clearly knew about the program.  Kramer Decl., Ex. K (Google

press release); Ex. L (Google's April newsletter discussing its ad network circulated at Digital

Envoy on May 1, 2003).  In fact, in October 2003, Digital Envoy boasted of Google's use of its

data in Google's advertising network.  *Id.*, Ex. M (Friedman email dated October 24, 2003

referencing Google's advertising network: "███████████████████").  Digital

Envoy certainly gave Google no reason to believe that Google was not authorized to use Digital

Envoy's data in its advertising programs.

Finally, the License Agreement itself in no way informed Google that it was barred from

using Digital Envoy's data in AFC.  Indeed, as discussed above, Google continues to believe that

the license expressly authorized such use.  But even if it did not, no juror could find that

Google's understanding of the contract was unreasonable.

1    Google has found no court to ever have imposed trade secret liability on a party for using

2    alleged secrets under a reasonable, but ultimately erroneous, belief that such use was authorized

3    by a license agreement.[11]    That is not surprising, as trade secret misappropriation is an

4    intentional tort.  *See Del Monte Fresh Produce Co. v. Dole Food Co.,* 148 F. Supp. 2d 1326,

5    1338 (S.D. Fla. 2001) (applying California law).  Thus, where a party acts in good faith, liability

6    should not attach.

7    Indeed, California courts addressing the analogous issue of tortious "bad faith" denial of

8    insurance coverage have barred tort liability as a matter of law where an insurer has acted based

9    upon a reasonable, if mistaken, interpretation of a contract.  *Opsal v. United Servs. Auto. Ass'n*, 2

10   Cal. App. 4th 1197, 1205-07 (1991) (overturning jury verdict on "bad faith" claim where, as a

11   matter of law, insurer's erroneous interpretation of policy was not "unreasonable"); *see also*

12   *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (observing that, under California

13   law, "bad faith" claim against insurance company "can be dismissed on summary judgment if the

14   defendant can show that there was a genuine dispute as to coverage"); *Dym v. Provident Life &*

15   *Accident Ins. Co.*, 19 F. Supp. 2d 1147, 1151 (S.D. Cal. 1998) (no tort liability as a matter of law

16   for insurer whose "error was not based on a mistake regarding the facts surrounding plaintiff's

17   disability fact but rather a mistake as to how the disability provision should be interpreted").

18   California has thus already recognized the impropriety of imposing intentional tort

19   liability on a party that acted based upon a reasonable but erroneous contractual interpretation.

20

21

22   _____

23   [11]    In fact, in the only case on point, the D.C. Circuit went far further than the position
     advocated by Google here.  *See Aktiebolaget Bofors v. United States*, 194 F.2d 145, 147 (D.C.
24   Cir. 1951).  According to that court, a trade secret licensee can *never* be held liable for tort in
     connection with alleged unauthorized use of licensed trade secrets.  Rather, any claim against the
25   licensee must sound in breach of contract.  ("[O]ne who has lawfully acquired a trade secret may
     use it in any manner without liability unless he acquired it subject to a contractual limitation or
26   restriction as to its use.  In the event a licensee uses the secret for purposes beyond the scope of
     the license granted by the owner is liable for breach of contract, but he commits no tort, because
27   the only right of the owner which he thereby invades is one created by the agreement of
     disclosure.").  Google does not contend that a trade secret licensee can never be held liable for
28   misappropriation; merely that such liability cannot be imposed where the licensee acts based
     upon a reasonable, if mistaken, interpretation of the license.

GOOGLE'S MOTION FOR SUMMARY JUDGMENT        21
C 04 01497 RS

1  As the "reasonableness" standard in the insurance context is akin to the "reason to know"

2  standard imposed by California's Trade Secret Act, that same principle should apply here.[12]

3      Given Google's reasonable interpretation of the License Agreement, Digital Envoy

4  cannot – as a matter of law – demonstrate that Google had "reason to know" that it could not use

5  Digital Envoy's data in AFC.  Accordingly, even if Google's understanding of the license is not

6  validated by the Court, Digital Envoy would still be unable to raise a triable issue of fact as to

7  Google's supposed trade secret misappropriation.  Google is thus entitled to summary judgment

8  on the claim.

9  **IV.    CONCLUSION**

10     Google's use of Digital Envoy's data in AFC was expressly authorized by the parties'

11 License Agreement.  Google is thus entitled to summary judgment on all of Digital Envoy's

12 claims in this action.  But even if the Court should find that Google was not licensed, Google's

13 reasonable understanding of the parties' agreement shields it from intentional tort liability.

14 Google thus respectfully requests, in the alternative, that the Court grant it partial summary

15 judgment on Digital Envoy's claim for trade secret misappropriation, or on the specific issues

16 raised herein.

17

18                                          Respectfully Submitted,

19 Dated:  February 23, 2005                WILSON SONSINI GOODRICH & ROSATI
                                             Professional Corporation
20

21                                          By:  _____/s/ David H. Kramer_____
                                                 David H. Kramer
22

23                                          Attorneys for  Defendant/Counterclaimant
                                            Google Inc.

24

25  [12]    California courts are particularly solicitous of the insurer-insured relationship, describing
    it as a "special" one, akin to a "fiduciary" relationship.  *See, e.g., State Farm Fire & Cas. Co. v.*
26  *Superior Court,* 216 Cal. App. 3d 1222, 1226-27 (1986)("The relationship between an insurer
    and an insured is akin to a fiduciary relationship.")  If California is willing to relieve quasi-
27  fiduciaries of tort liability where they act based upon a reasonable, but erroneous contract
    interpretation, it would be at least as willing to do the same in the context of an ordinary
28  commercial relationship.