**KRAMER DECLARATION EXHIBIT F**

Dockets.Justia.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

DIGITAL ENVOY, INC.,          )
                              )
              Plaintiff,      )
                              )
        vs.                   )  Case No. C 04 01497 RS
                              )
GOOGLE, INC.,                 )        CERTIFIED COPY
                              )
              Defendant.      )
_____)    HIGHLY CONFIDENTIAL
                              )
AND RELATED CROSS-ACTION.     )
_____)    Attorneys' Eyes Only

DEPOSITION OF

MATTHEW D. CUTTS

_____

Wednesday, September 1, 2004

Volume I

(Pages 1 - 178)

*** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

REPORTED BY:  CARLA SOARES, CSR 5908 (01-355005)



**LEGALINK**
A **WORDWAVE** COMPANY

**LegaLink San Francisco**
601 Van Ness Ave, Suite 2052
San Francisco, CA 94102

tel (415) 359 2040
tel (800) 869-9132
fax (415) 359 2050

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

*** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

1    I might have had would have been responsible because a

2    lawyer sent an e-mail out.

3            MR. KRATZ:  Q.  Back on Plaintiff's Exhibit 1,

4    still on the response to the second question, your next

5    sentence, the last sentence, describes what you used the

6    data for, and it looks like there's two uses, to

7    determine country targeting for ads and to select which

8    home page, google.ca or google.fr, to a visitor.

9            Do you at least see where I'm referring?

10           A.   Yes, I do.

11           Q.   Were you aware of any other uses that Google

12   was making of Digital Envoy's technology at that time?

13           A.   Yes.

14           Q.   What were the other uses?

15           A.   I know that we built country-specific indices

16   in the search engine, so that, for example, someone

17   could search for pages which were hosted in Germany.

18   That fits in with the agreement, as I understood it,

19   that we could use the data in any way we wanted.

20           Q.   Let me ask you that part.  Your understanding,

21   let's say, at that point in time was that you could use

22   the data in any way you wanted?

23           A.   Other than perhaps giving the complete code to

24   another party, yes.

25           Q.   To be clear, the time frame we're talking

53

1    about is November 2001?

2        A.    Yes.

3        Q.    So your understanding is that -- at that point

4    in time, your understanding was that you could use the

5    data in any way you wanted except for giving the

6    complete code to another third party?

7        A.    I believe that's correct.

8        Q.    And on what do you base that understanding?

9            MR. KRAMER:    After the fact objection on the

10   grounds that "code" is vague, but --

11           MR. KRATZ:    That's probably not the right

12   word.

13           THE WITNESS:    Yeah.    By "code," I mean the

14   data, the complete data of Digital Envoy.

15           MR. KRATZ:    Q.    The wholesale moving of this

16   dump of information to an outside person.

17           MR. KRAMER:    What was the most recent

18   question?

19           THE WITNESS:    The most recent question was --

20           MR. KRATZ:    Q.    On what do you base that

21   understanding?

22       A.    During the negotiation process with Steve

23   Schimmel, I believe I wanted to make sure that we got

24   the cheapest price and the most flexibility that we

25   could to use the data in any way we wanted.

                                                          54

\*\*\* HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY \*\*\*

```
 1              MR. KRAMER:  Okay.  Let's take a break now for
 2    lunch.
 3              (Recess taken.)
 4              MR. KRATZ:  Back on the record after the lunch
 5    break.
 6         Q.  We've been talking about the understanding
 7    that you had, as of the time of this Exhibit 1 e-mail,
 8    November 2001, regarding what you were free to do under
 9    the license.
10              My question is, that understanding, did you
11    have that understanding consistently from the time of
12    entering into the relationship with Digital Envoy to
13    today, that you had the ability to use the information
14    for whatever you wanted, except for moving the whole
15    database to a third party?
16         A.  I believe I did have that understanding.
17         Q.  If you drop down to No. 8 --
18              MR. KRAMER:  We're in Exhibit 1, right,
19    Plaintiff's Exhibit 1?
20              MR. KRATZ:  Indeed.
21         Q.  On page 2, starting with the word "Truthfully,
22    every vendor that we've used, we end up writing our own
23    version of the software," at the time that you wrote
24    this, what other vendors had you used that you had
25    knowledge of?
```

64

*** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

```
 1   of information.  So it wasn't as much my responsibility

 2   for how to take the criteria for the ads and determine

 3   which ads would show up.

 4          MR. KRATZ:  Q.  Who was?

 5       A.   Other members of the ads group.

 6       Q.   Do you recall anyone specifically being

 7   involved in meshing the geographical solution into the

 8   criteria?

 9          MR. KRAMER:  Lacks foundation.

10          Go ahead.

11          THE WITNESS:  I wouldn't characterize it as an

12   individual working on solving geography.

13          For example, we often think about how to

14   maximize the benefit to users and advertisers and to

15   Google, and that leads to a philosophy much more akin to

16   solving a set of equations or maximizing some value

17   rather than an emphasis on one particular facet like

18   geolocation.

19          MR. KRATZ:  Q.  Was the geolocation used in

20   the criterion that resulted in the search results as

21   opposed to the page search, the pure search?

22          MR. KRAMER:  Objection to the question as

23   vague and ambiguous.  I'll also object to the question

24   as compound and as lacking foundation.

25          THE WITNESS:  I wouldn't at all fragment
```

114

*** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

1   something into saying it's search and ads.  We think of

2   ads as just another type of search.

3          MR. KRATZ:  Q.  All right.  But when you run a

4   search on Google, it's right, isn't it, that your

5   results that you get in the search aren't -- there are

6   some that get placed in front of you as a result of this

7   paid and bidding process, and there are some that don't

8   have that paid and bidding process involved or

9   influencing your result, correct?

10         MR. KRAMER:  I'll object on the grounds that

11   it's lacking in foundation, calls for speculation, it's

12   an incomplete hypothetical, and it's vague.

13         THE WITNESS:  I think at Google we take a

14   pretty broad view in search in that we want to return

15   the most useful information to users.  So, for

16   example --

17         MR. KRATZ:  Q.  I got that, but --

18         MR. KRAMER:  Let him finish.

19         THE WITNESS:  So, for example, if we think

20   that there might not be a good answer to a question

21   because there are very few results, we might do our

22   types of searches differently.  And in the same way, if

23   there are very few results, we might suggest Google

24   answers, which is another property that can refer people

25   to experts who are willing to solve problems in return

115

*** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

1    belief?

2        A.    I believe that providing the best information

3    to users as quickly as possible is the best way to gain

4    the loyalty and the trust of the user, which is how you

5    will get them to visit Google again and again and trust

6    Google in the future and return to Google as a user.

7        Q.    And that trust includes providing responses to

8    a search question that are not influenced by money?

9        A.    That's correct.

10        MR. KRAMER:  Okay.  He's answered the

11    question.  Let me object after the fact on the grounds

12    that it calls for speculation and it's vague.

13        MR. KRATZ:  Q.  And those particular results,

14    the ones not influenced by money, are displayed in some

15    fashion in the search result, correct?

16        MR. KRAMER:  Objection.  Vague.

17        THE WITNESS:  I think part of the

18    misunderstanding I'm having of your questions is that I

19    don't think Google draws a dichotomy between ads and

20    between searching over the web or searching any other

21    type of information because I believe that Google

22    believes that returning the best information possible is

23    the best way to get information to users so that they

24    return.

25        MR. KRATZ:  Q.  So Google doesn't take great

117