1  DAVID H. KRAMER, State Bar No. 168452 (dkramer@wsgr.com)
   STEPHEN C. HOLMES, State Bar No. 200727 (sholmes@wsgr.com)
2  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
3  650 Page Mill Road
   Palo Alto, CA 94304-1050
4  Telephone: (650) 493-9300
   Facsimile:  (650) 565-5100
5
   Attorneys for Defendant/Counterclaimant
6  Google Inc.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12 DIGITAL ENVOY, INC.,            )   CASE NO.:  C 04 01497 RS
                                   )
13         Plaintiff/Counterdefendant, )   **GOOGLE INC.'S REPLY BRIEF IN
                                   )   SUPPORT OF ITS MOTION FOR
14     v.                          )   SUMMARY JUDGMENT**
                                   )
15 GOOGLE INC.,                    )   **(PUBLIC VERSION)**
                                   )
16         Defendant/Counterclaimant. )   Judge:      Hon. Richard Seeborg
                                   )   Courtroom:  4, 5th Floor
17                                 )   Date:       March 30, 2005
                                   )   Time:       9:30 a.m.
18 _____ )

GOOGLE'S REPLY BRIEF ISO SJ MOTION
CASE NO.: C 04 01497 RS

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

I. INTRODUCTION...............................................................................................................1

II. THE EVIDENCE OF RECORD. .......................................................................................2

III. ARGUMENT .....................................................................................................................3

    A. Google's Use of Digital Envoy's Data in AFC Was Authorized as Use in Google's Business of "Producing and Maintaining Information Search Technology." ..........................................................................................................4

    B. Google's Use of Digital Envoy's Data in AFC Was Authorized as Use in Google's Information Search Technology Itself. .......................................................7

    C. Google Did Not Disclose or Give Digital Envoy's Data to Third Parties in Operating AFC. .....................................................................................................10

    D. Google Did Not Engage in Misappropriation Because Google Did Not Know or Have Reason to Know That It Was Prohibited From Using Digital Envoy's Data in AFC. ...........................................................................................12

        1. Digital Envoy Has Offered No Evidence to Challenge Google's Belief That It Was Authorized to Use Digital Envoy's Data in AFC. .......12

        2. Google's Belief That It Was Authorized to Use Digital Envoy's Data in AFC Was Reasonable. ................................................................13

        3. There Is No Such Thing as "Good Faith" Misappropriation. ...................14

IV. CONCLUSION ................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*American Cas. Co. v. Krieger*, 181 F.3d 1113 (9th Cir. 1999) ......................................................... 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................................... 3

*Aozora Bank, Ltd.* v. 1333 North Cal. Blvd., 119 Cal. App. 4th 1291 (2004) ................................. 8

*Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.* 971 F.2d 272 (9th Cir. 1992) ......................................................................................................................... 3, 8, 13

*Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326 (S.D. Fla. 2001) ....................................................................................................................................... 14

*Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217 (9th Cir. 1988) ................................. 13

*Hard v. Cal. State Employees Ass'n*, 112 Cal. App. 4th 1343 (2003) ......................................... 8, 9

*In re Bennett*, 298 F.3d 1059 (9th Cir. 2002) ............................................................................. 3, 10

*Karoun Dairies Inc. v. Los Altos Food Products Inc.,* 107 Fed. Appx. 785 (9th Cir. 2004) ......................................................................................................................................... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................... 13

*PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368 (2000) ................................................................... 14

### STATUTES

Cal. Civ. Code §1641 ....................................................................................................................... 8

Cal. Civ. Code §1644 ....................................................................................................................... 5

Cal. Civ. Code §3426.1(b)(2)(ii) .................................................................................................... 11

Cal. Civ. Proc. Code § 1856 ............................................................................................................ 3

GOOGLE'S REPLY BRIEF ISO SJ MOTION         ii
CASE NO.:  C 04 01497 RS

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Digital Envoy's opposition is long on hyperbole, unsupported factual assertions, and mischaracterizations of the record. It is fatally short, however, on admissible evidence, law and logic.

Under the parties' License Agreement, Digital Envoy authorized Google to use Digital Envoy's data, as Google saw fit, in its "Business." Google's "Business" was defined broadly as "producing and maintaining information search technology." It is undisputed that Google produces and maintains its information search technology through its advertising programs such as AdSense for content ("AFC"). Indeed, such programs are Google's "Business." Accordingly, Google was licensed to use Digital Envoy's data in AFC.

This conclusion is impelled by a straightforward reading of the License Agreement. Further, it is the only conclusion that makes any sense out of Digital's Envoy's concession that Google's use of the data in its AdWords advertising program is fully authorized. It is not tenable to contend, as Digital Envoy does, that one advertising program helps Google produce and maintain its information search technology, while another does not. In short, Google's use of Digital Envoy's data in AFC falls squarely within the authorization granted to Google and is not actionable.

Digital Envoy cannot salvage its claims by rewriting the language of the License Agreement on the fly. Its proposed revision – limiting Google to using Digital Envoy's data in Google's information search technologies themselves – renders the "producing and maintaining" language a nullity. But even if Google's license were subject to this hypothetical limitation, Digital Envoy's claims would still fail because the AFC program is itself an information search technology. In this regard, the AFC program is indistinguishable from the AdWords program that Digital Envoy concedes is licensed. In AFC, as in AdWords, Google uses its sophisticated technology to search for commercial information of relevance. Nothing more is required, even under Digital Envoy's attempted reconstruction of the License Agreement.

Digital Envoy's alternative contention, never mentioned in its pleadings, is that Google has "given" or "distributed" Digital Envoy's data to third parties in violation of the License Agreement. That contention is specious. It is undisputed that Digital Envoy's data was never "disclosed," "distributed" or "otherwise given" to any third party under any rational interpretation of those terms in the contract. Google simply used the data internally in its AFC program, as a small part of a service from which third parties derive a benefit. Not only is there no prohibition in the License Agreement on such internal use, the use is expressly authorized by the License Agreement which states: "Licensee may also use the database libraries to develop indices, services, or applications that are provided to third parties." Kramer Decl., Ex. E at § 3.

By its terms, the License Agreement disposes of Digital Envoy's entire case and entitles Google to summary judgment on Digital Envoy's Amended Complaint. But as noted in Google's opening brief, even if the Court concludes Google somehow erred in believing it was licensed to use Digital Envoy's data in AFC, Google's reasonable interpretation of the License Agreement shields it from liability for the intentional tort of trade secret misappropriation. Digital Envoy's assertion that a party can engage in "good faith" misappropriation is wrong as a matter of law.

## II.   THE EVIDENCE OF RECORD

Digital Envoy cannot and does not contest any of the facts upon which Google's motion for summary judgment is based. For example, Ms. Wojcicki's testimony concerning the development of Google's advertising programs is undisputed. Thus, it is undisputed that Google produces and maintains its information search technology through revenue from its advertising programs. Wojcicki Decl. at ¶ 2. Likewise uncontroverted is Mr. Rose's declaration about the mechanics of Google's advertising programs. There is no dispute that AFC operates in precisely the same manner as the concededly licensed AdWords program, and that both use the same complex technology to search for relevant commercial information to display. Rose Decl. at ¶¶ 3-9. It is also undisputed that Google did not ever distribute, disclose or otherwise give Digital Envoy's data to any third party in operating these programs, and did not allow any third party to access the data. Rather, the Digital Envoy data remained at all times on Google's servers and

1  was accessed only by Google. *Id.* at ¶¶ 7, 9. Given the language of the License Agreement,

2  these undisputed facts are all that is necessary to demonstrate that Google's use of Digital

3  Envoy's data in AFC was authorized. They entitle Google to summary judgment on Digital

4  Envoy's claims.

5  Digital Envoy purports to dispute a number of other factual propositions, often times

6  without citing to evidence of its own. None of these supposedly disputed issues, however, is

7  material to an interpretation of the License Agreement. *See Anderson v. Liberty Lobby, Inc.,* 477

8  U.S. 242, 247-48 (1986) (to avoid summary judgment, non-moving party must bring forth

9  evidence on material facts, i.e., "facts that might affect the outcome of the suit under the

10 governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted.").[1]

## ARGUMENT

12 The interpretation of the License Agreement is a question of law. *In re Bennett*, 298 F.3d

13 1059 (9th Cir. 2002). Where, as here, the contract is integrated, extrinsic evidence is generally

14 not admissible to interpret it. *Id.* at 1064; Cal. Civ. Proc. Code § 1856; *see also* Kramer Decl.,

15 Ex. E at § 13 (integration clause). Only if the License Agreement is ambiguous and reasonably

16 susceptible of a meaning proffered by Digital Envoy may its extrinsic evidence be considered.

17 *In re Bennett*, 298 F.3d at 1064 ("the contract must be ambiguous and reasonably susceptible to

18 the proffered meaning before parol evidence is permitted."); *citing Brinderson-Newberg Joint*

---

[1] Evidence of the parties' negotiations is relevant to show the basis for Google's good faith belief that its conduct was authorized. As a result, Google cannot permit Digital Envoy's fictional account of the negotiations to stand. In its opening brief, Google provided an email-by-email description of the negotiations. *See* Opening Br. at 4-5. In them, Digital Envoy repeatedly promised that Google would have "unlimited use" of Digital Envoy's technology and could "use it for everything." For its part, Google repeatedly listed these "unlimited use" rights as a material term to be incorporated into the License Agreement. Digital Envoy then represented that its draft incorporated that term. *Id.* Digital Envoy does not claim otherwise. Instead, it asserts that Google subsequently "gave up" its rights to unlimited use during the negotiations. Opp'n at 2. That is a fabrication, and it is entirely unsupported by evidence. *Id.* The license provision in the draft that Digital Envoy said was intended to reflect "unlimited use," was virtually unchanged in the final version. Kramer Decl., Ex. J (redline showing changes to draft). The only substantive modification to the provision was the addition of the sentence: "Licensee may also use the Database Libraries to develop indices, services, or applications that are provided to third parties." *Id.* At no point did Google ever indicate to Digital Envoy it wanted anything less than the "unlimited use" that Digital Envoy had promised. And at no time did Digital Envoy ever tell Google that Google was receiving anything less than the "unlimited use" license the parties had agreed upon.

*Venture v. Pacific Erectors, Inc.* 971 F.2d 272, 277 (9th Cir. 1992) (whether a contract is reasonably susceptible of a proffered meaning is question of law for the court; reversing decision considering extrinsic evidence). Here, Digital Envoy contends the License Agreement is unambiguous. *See* Supplemental Declaration of David H. Kramer ("Kramer Supp. Decl."), Ex. N (interrogatory responses) at Nos. 5, 6. Digital Envoy is correct. Its claims against Google fail because the License Agreement unambiguously authorized Google to use Digital Envoy's data in Google's AFC program. The Court need go no further.

The bar on resort to extrinsic evidence is even stronger in this case in light of the specific integration provision of the License Agreement. The parties did not merely agree their contract was integrated. They agreed that:

> [N]o use of trade or other regular practice or method of dealing between the parties shall be used to modify, interpret, supplement, or alter in any manner the terms of this Agreement.

Kramer Decl., Ex. E at §13. Having drafted that provision, and having conceded that the License Agreement is unambiguous in any event, Digital Envoy inexplicably has offered a morass of extrinsic evidence, largely consisting of supposed use of trade materials. Such evidence is not admissible for purposes of interpreting the License Agreement. *See also* Google Inc.'s Objection to Evidence, filed concurrently herewith.[2]

**A.    Google's Use of Digital Envoy's Data in AFC Was Authorized as Use in Google's Business of "Producing and Maintaining Information Search Technology."**

The parties agree that under the License Agreement, Google was authorized to use Digital Envoy's data within its "Business" defined as "producing and maintaining information search technology." Accordingly, to determine whether Google was authorized to use Digital Envoy's data in AFC, the only relevant question is whether Google produced and maintained its information search technology through the AFC advertising program. The answer to that

---

[2] In contrast to Digital Envoy, Google's contract interpretation arguments were based upon the language of the License Agreement itself, Digital Envoy's concession that the AdWords program was licensed, and the undisputed facts concerning operation of its AdWords and AFC programs. *See* Opening Br. at 14-19. While Google recounted the history of the parties' negotiations in its brief, it did so to support its alternative argument that it did not engage in the intentional tort of trade secret misappropriation.

1  question is an undisputed "yes"; Google has always produced and maintained its information
2  search technology through revenues derived from its advertising programs such as AFC.
3  Wojcicki Decl. at ¶ 2.[3]  That undisputed proposition, by itself, establishes that Google's was
4  expressly authorized under the License Agreement to use Digital Envoy's data in its AFC
5  advertising program.  Kramer Decl., Ex. E at §3.

6  Digital Envoy's concession that Google was authorized to use its data in Google's
7  AdWords advertising program is another nail in Digital Envoy's coffin.  The concession reveals
8  Digital Envoy's own understanding that Google produces and maintains information search
9  technology through revenues from its advertising programs.  AFC works in exactly the same way
10 as AdWords, using the same algorithms, running off the same computers and using Digital
11 Envoy's data in the same manner.  Rose Decl. at ¶¶ 3-9.  Moreover, the revenues from AFC help
12 Google produce and maintain its information search technology in the same manner as the
13 revenues from AdWords.  If Google's use of the data in AdWords was licensed, as Digital Envoy
14 admits, so too was the use in AFC.

15 Digital Envoy charges that the License Agreement should be interpreted as limiting
16 Google's use of the data only to that specific advertising program in effect at the time the
17 contract was signed.  In fact, the License Agreement directly refutes that position.  It expressly
18 authorized Google to develop new services, products and applications and use Digital Envoy's
19 data in them.  Kramer Decl., Ex. E at § 3 ("Licensee may also use the database libraries *to*
20 *develop* indices, services, or applications that are provided to third parties") (emphasis added);
21 *Id.* at § 7.1a ("Licensee shall be the sole owner of any services or products *developed* using the

---

[3] Digital Envoy offers no extrinsic evidence at all on the meaning of the terms "producing" or "maintaining."  The words have their ordinary meaning. *See* Cal. Civ. Code §1644 (words are to be interpreted in their ordinary and popular sense).  The verb to "produce" is defined *inter alia* to mean "to cause to occur or exist" and "[t]o supervise and finance the making and public presentation of."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2004), at *http://education.yahoo.com/reference/dictionary*; see also Merriam-Webster Online (produce defined: "to give birth or rise to"), at *http://www.m-w.com*.  The verb "maintain" is defined inter alia to mean "To provide for; support," "To keep up or carry on." American Heritage Dictionary ("maintain"); *see also* Merriam-Webster Online (maintain defined: "To support or provide for" and "to keep in an existing state; preserve from failure or decline").  Under any of these definitions, Google's AFC program "produces" and "maintains" Google's information search technology.  Google was thus expressly authorized to use Digital Envoy's data in AFC.

Database Libraries….") (emphasis added). Digital Envoy cites no language from the contract (or any other evidence at all) to support a contrary view.

Digital Envoy also asserts that Google's interpretation of the contract is "absurd" because it allows Google to use the data in any manner it believes will generate revenue for the company. Digital Envoy apparently now believes that the notion of a license allowing Google to make "unlimited use" of the data is unthinkable. Yet even Digital Envoy acknowledges that is what it offered to Google over and over again in the parties' negotiations. Kramer Decl., Exs. B, C. In truth, the whole point of this contract was to authorize Google to use Digital Envoy's data however it wanted to within its business. The contract defined Google's business in a whereas clause, as "producing and maintaining information search technology," the same business it is in today. There is no discussion anywhere in the contract about "use restrictions" or limitations on Google's use. To the contrary, the License Agreement contains an express understanding that Google's business would continue to develop with new "indices, services and applications" within which it was free to use the data without limitation.

The absurdity here lies is Digital Envoy's suggestion that Google could somehow usurp Digital Envoy's customers and transfer to Google the "entire commercial potential of Digital Envoy's technology." *See* Opp'n at 4-5. Google *licensed* the right to use Digital Envoy's data for a *limited term* (originally six months), and it *paid* Digital Envoy for the right to use it. At the end of a given term, if Digital Envoy was unhappy with or threatened by Google's use of the data, Digital Envoy could simply have chosen not to renew the license, leaving Google without any right to use it at all. Alternatively, Digital Envoy could have imposed explicit, additional restrictions on Google's use of the data or substantially increased the license fee it charged (as it did through renewals over the course of the parties' relationship, from $3000/month to $8000/month). These options gave Digital Envoy ample control over how its data was used, notwithstanding its broad grant of rights to Google.[4] In short, Google's right to use Digital Envoy's data in its AFC advertising program posed no threat to Digital Envoy's business.[5]

---

[4] The only true risk to Digital Envoy's control over its data would be the public disclosure of the data. In the event of such a disclosure, third parties might be able to make use of the data without Digital Envoy's knowledge and/or beyond its ability to control. That is no doubt why the

Under the License Agreement, Google was authorized to use Digital Envoy's data in its AFC advertising program, as that program undisputedly is part of Google's business of producing and maintaining information search technology. Digital Envoy's claims thus fail as a matter of law and Google is entitled to summary judgment on them.

### B. Google's Use of Digital Envoy's Data in AFC Was Authorized as Use in Google's Information Search Technology Itself.

Digital Envoy erroneously believes its claims in this case would be stronger had it limited Google to using its data in Google's information search technology itself. Regardless, it did not do so. Instead, the License Agreement authorizes Google to use the data in "producing and maintaining its information search technology." As set forth above, the unambiguous license actually granted to Google is case-dispositive.

In its opposition, Digital Envoy claims that the "producing and maintaining" phrase in the contract did not expand the scope of Google's license beyond the right to use the data directly in information search technology. Opp'n at 18 ("Nothing about those words requires an expansion of the subject matter beyond the concept of information search technology."). In making that assertion, Digital Envoy acknowledges the obvious – its construction of the contract renders the phrase "producing and maintaining" meaningless surplusage. According to Digital Envoy the phrase "producing and maintaining" simply allows Google to use Digital Envoy's data in "developing its search engine, its web indices and its paid links program." Opp'n at 17-18. But

---

sole restriction imposed in the License Agreement is a prohibition on disclosing or distributing the data to third parties.

[5] Digital Envoy claims that online advertising networks like AFC threaten its business, yet fails to inform the Court that it has licensed numerous such networks to use its data. Indeed, a week before it signed its contract with Google, Digital Envoy entered into a virtually identical agreement with one of the leading online advertising networks, 24/7 Media, to allow it to use Digital Envoy's data to target advertisements across a network of third-party sites. *See* Kramer Supp. Decl., Ex. O (12/11/2000 Digital Envoy press release announcing contract; describing 24/7's intended use of data and noting it would protect the privacy of end-users visiting the third party sites in 24/7's network). Like the Google License Agreement, the 24/7 contract authorized the advertising network to use Digital Envoy's data in its "Business," defined simply as "producing and maintaining a web site." Kramer Supp. Decl., Ex. P. Given its press release, Digital Envoy plainly understood that even this more narrow license grant, permitted 24/7 to use the data in operating its online advertising network. The press release itself also betrays Digital Envoy's claim that such use was harmful to its business. *See also* Kramer Supp. Decl., Ex. Q (email from Digital Envoy CEO attaching Digital Envoy marketing materials extolling

1  if the phrase was stricken, and Google were limited to using the data in its information
2  technology itself, those same activities would remain licensed. Despite its assertion to the
3  contrary, under Digital Envoy's construction, the "producing and maintaining" language is of no
4  effect. As a matter of law, the contract is not reasonably susceptible of that interpretation. *See*
5  Cal. Civ. Code §1641; *Brinderson-Newberg,* 971 F.2d at 278 (rejecting contract interpretation
6  that would violate fundamental rule of interpretation by rendering language meaningless; parol
7  evidence offered to support interpretation inadmissible); *Aozora Bank, Ltd. v. 1333 North Cal.*
8  *Blvd.,* 119 Cal. App. 4th 1291, 1296 (2004) (rejecting contract interpretation that would render
9  words in contract "mere surplusage."); *Hard v. Cal. State Employees Ass'n*, 112 Cal. App. 4th
10 1343, 1348 (2003) (rejecting contract interpretation that would render language meaningless an
11 "irrational construction").

12    Even if the Court were to consider Digital's Envoy's substitute contractual language,
13 however, Google's use of Digital Envoy's data in AFC would remain licensed. Under Digital
14 Envoy's version, the Court would be asked to determine whether or not Google's advertising
15 programs are themselves information search technologies. On that question, Digital Envoy has
16 already spoken. It has conceded that Google's use of its data in the AdWords advertising
17 program is fully licensed. Opp'n at n. 3 (AdWords "is not a violation" of the License
18 Agreement.). By Digital Envoy's own admission, the AdWords program is itself an information
19 search technology within which Google was authorized to use Digital Envoy's data. *Id.*; Kramer
20 Decl., Ex. I (Friedman email to Schimmel 2/6/04) ("we agree that AdWords is just a subcategory
21 of Information search"); *see also* Rose Decl. at ¶¶ 3-9 (describing in detail how Google's
22 advertising programs search for relevant commercial information to display to users). The AFC
23 program, which undisputedly works in exactly the same way as AdWords, is likewise an
24 information search technology. *Id.* As a result, Google was licensed to use Digital Envoy's data
25 in AFC as well.

26
27 ───────────────
28 Advertising.com's use of Digital Envoy's data in its online advertising network "reaching approximately 50% of the Internet").

Digital Envoy attempts to avoid the dispositive impact of its concession by noting that in the AdWords program, advertisements are displayed after end-users query Google's web index. But the License Agreement says nothing at all about end-users, their queries or the display of advertising. In describing Google's business, the License Agreement was far broader, speaking of "information search technology" in general (not any one specific application), and explicitly recognizing that Google's "business" included other "indices, services and applications" that Google would be developing in the future for "third parties" in general (not merely for end-users querying Google's web index).[6]

Moreover, if the license were limited to using the data to support end-user queries of Google's web index, then AdWords could not be licensed, as Digital Envoy concedes it is. The process by which Google retrieves information from its web index in response to end-user queries is undisputedly separate from the process by which Google locates relevant advertisements to display. Rose Decl. at ¶ 5. It is in the latter process, searching for relevant advertisements, that Google's AdWords program used Digital Envoy's data. It is this latter process that Digital Envoy recognizes was authorized as a "subcategory of Google's information search technology." Kramer Decl., Ex. I. And it is this latter process that is undisputedly identical in AFC.

Just as Google's AdWords program is a Google information search technology, so too is Google's AFC program. Accordingly, even if Google were limited to using Digital Envoy's data directly in its information search technology (which it was not), Google's use of the data in AFC was unambiguously authorized.

---

[6] Digital Envoy nowhere explains how it would actually read the License Agreement to incorporate a limitation that Google could only use the data after an end-user queried Google's web index. Regardless, such a limitation simply is not compatible with the broad license Digital Envoy granted to use the data for "information search technology" and the express recognition that Google had the right to use the data in "indices, services and applications" that it would be developing "for third parties." Accordingly, Digital Envoy's extrinsic evidence on the issue is inadmissible.

GOOGLE'S REPLY BRIEF ISO SJ MOTION         9
CASE NO.:  C 04 01497 RS

**C. Google Did Not Disclose or Give Digital Envoy's Data to Third Parties in Operating AFC.**

It is undisputed that in operating AFC, Google at no time disclosed, distributed or otherwise gave Digital Envoy's data to any third party. Rose Decl. at ¶¶ 7, 9. It is likewise undisputed that at all times the Digital Envoy data remained on Google's computers alone, and was acessed only by Google. *Id.* Those undisputed propositions dispose of Digital Envoy's final contention that Google violated the non-disclosure provisions of the License Agreement. Kramer Decl., Ex. E § 3 ("In no event, however, are the Database Libraries to be sold, licensed, distributed, shared or otherwise given (in any form) to any other party....").[7]

In its opposition, Digital Envoy attempts again to rewrite the License Agreement. This time it seeks to transmute the ordinary non-disclosure language into a provision that barred Google from making purely internal use of Digital Envoy's data if that use benefitted a third party. According to Digital Envoy, it wanted to prohibit such use because it allows third parties to benefit from Digital Envoy's data without taking a license from Digital Envoy. But Digital Envoy appears to have invented this position from thin air.

There is nothing in language of the contract even hinting at an interpretation that would prevent Google from using Digital Envoy's data for the benefit of third parties. To the contrary, the License Agreement squarely refutes the position as it expressly authorizes Google to use Digital Envoy's data "to develop indices, services or applications *that are provided to third parties*." Kramer Decl., Ex. E at §§ 3, 7.1a (emphasis added). These third parties obviously were to benefit from the services Google was expressly authorized to provide using Digital Envoy's data. The non-disclosure language in License Agreement simply is not susceptible of

---

[7] Digital Envoy also invokes section 7.2 of the License Agreement, a general confidentiality clause, hoping to find some alternative support for the notion that Google improperly disclosed Digital Envoy's data. Because Digital Envoy had not mentioned the provision before, Google did not discuss it in its opening brief. In any event, it adds nothing to Digital Envoy's claim. Just as Google did not "disclose, distribute or otherwise give" Digital Envoy's data to a third party (Section 3), it did not "distribute, disclose or otherwise make available" the data to any third party (Section 7.2).

an interpretation that bars Google from using Digital Envoy's data to provide services to benefit third parties.[8]

In addition, Digital Envoy's admission concerning AdWords again conclusively refutes its charge. In AdWords, where Digital Envoy freely admits Google was authorized to use its data, Google enabled third-party advertisers to target their advertising messages to users' locations through Google. These advertisers obtained the "benefit" of Digital Envoy's data from Google without having to take a license from Digital Envoy. And according to Digital Envoy, Google was authorized under the License Agreement to confer that benefit upon the advertisers. Having made that concession, Digital Envoy cannot credibly argue that the contract prohibited Google from benefiting third parties through services involving use of Digital Envoy's data.[9]

In short, there is no basis for Digital Envoy's claim that Google somehow violated the non-disclosure provisions of the License Agreement.[10] As Google's use of Digital Envoy's data in AFC was authorized by the contract, all of Digital Envoy's claims fail as a matter of law.

---

[8] As a result, extrinsic evidence is not admissible on this issue either. *See In re Bennett*, 298 F.3d at 1064. Regardless, the only extrinsic evidence that Digital Envoy submits, an email exchange between the parties, is of no assistance to it. In the exchange, Digital Envoy asked Google to confirm that the third party services Google contemplated "would not involve shipping [the] database to third parties (or giving them direct access to our database)...." Kratz Decl. Ex. L (describing Digital Envoy's sole concern as "Google repackaging [the] Database in conjunction with product offerings and allowing third parties to directly access it....") (emphasis added). Noting the non-disclosure language in the License Agreement, Google responded that Digital Envoy need not be concerned. *Id.* Google was correct. In operating AFC, Google never shipped Digital Envoy's data, and it never allowed third parties to access the data. Thus, the extrinsic evidence is again both inadmissible and irrelevant.

[9] For extrinsic evidence that is actually probative on this issue the Court may note that Digital Envoy has licensed a host of other online advertising networks to utilize its data in operating their networks. *See supra*, n. 6. Not surprisingly, each of its contracts with these advertising networks contains Digital Envoy's standard non-disclosure language barring the licensee from disclosing or giving Digital Envoy's data to third parties. *See, e.g.,* Kramer Supp. Decl., Exs. P, R (Digital Envoy license agreements with 24/7 Media, and Advertising.com) at §§ 3, 7.2. But, Digital Envoy proudly proclaimed, that these other advertising networks were using its data to serve geo-targeted advertisements across a network of third-party web sites. Kramer Supp. Decl., Ex. O (December 11, 2000 press release announcing 24/7 Media contract); Ex. Q (Digital Envoy marketing materials praising Advertising.com's use of data in online advertising network). That Digital Envoy publicly boasted of use it now claims violates its license, speaks volumes about the legitimacy of its position.

[10] Digital Envoy reports in its opposition brief that it now also contends Google's use of its data in AdSense for Search ("AFS") was not authorized. Opp'n at n.8. It claims that use in AFS, like AFC, violated the non-disclosure provisions in the License Agreement because it allowed third parties to benefit from Google's internal use of the data. As Digital Envoy acknowledges, claims concerning AFS do not appear in its Amended Complaint. Regardless, as they are based

GOOGLE'S REPLY BRIEF ISO SJ MOTION     11
CASE NO.: C 04 01497 RS

**D.     Google Did Not Engage in Misappropriation Because Google Did Not Know or Have Reason to Know That It Was Prohibited From Using Digital Envoy's Data in AFC.**

Google is entitled to summary judgment on Digital Envoy's trade secret claim for a separate reason. Regardless of whether Google was authorized to use Digital Envoy's data in its AFC program, Digital Envoy has not carried its burden of establishing that Google knew or had reason to know that such use was unauthorized. *See* Cal. Civ. Code § 3426.1(b)(2)(ii) (defining "misappropriation" to require "use of a trade secret of another . . . by a person who . . . [a]t the time of . . . use, *knew or had reason to know* that his or her knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to . . . limit its use") (emphasis added).

In its opening brief, Google detailed the history of the parties' negotiations over the License Agreement in which Google insisted on, and Digital Envoy promised that Google would receive, the right to make "unlimited use" of Digital Envoy's data. Google also offered the testimony of the representatives involved in those negotiations, Messrs. Cutts, Schimmel and Rana, each of whom testified they understood that Google received unlimited use rights under the License Agreement. Google further noted that Digital Envoy had never objected to Google's use of Digital Envoy's data or even claimed that Google's rights were limited. Indeed, Digital Envoy actually boasted about Google's use of the data in AFC months before it came up with its misappropriation theory. Kramer Decl., Ex. M (Friedman email to colleagues dated October 24, 2003 referencing Google's advertising network: "                              ").

In its opposition, Digital Envoy contends that: (1) there is a genuine issue about whether Google's representatives subjectively believed Google was authorized to use Digital Envoy's data in AFC; (2) that Google's understanding of the contract was unreasonable as a matter of law; and (3) Google can be liable for "good faith" misappropriation. All three of Digital Envoy's contentions badly miss the mark.

**1.     Digital Envoy Has Offered No Evidence to Challenge Google's Belief That It Was Authorized to Use Digital Envoy's Data in AFC.**

---

solely upon the same meritless argument that Google improperly disclosed the data, any claims concerning AFS fail as a matter of law.

Digital Envoy first contends that there is some dispute as to whether Google's representatives subjectively believed that Google was authorized to use Digital Envoy's data in AFC. But the evidence it proffers to cast doubt on their testimony does no such thing.[11]

Digital Envoy was obligated to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That requires it to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. That is the case here. In light of the representatives' testimony, the negotiations in which Google was repeatedly promised "unlimited use," and Digital Envoy's long-standing failure to state otherwise, there is no question but that Google acted in the good faith belief that it was authorized to use Digital Envoy's data as it did.[12]

### 2. Google's Belief That It Was Authorized to Use Digital Envoy's Data in AFC Was Reasonable.

Digital Envoy next claims that Google's interpretation of the contract is unreasonable as a matter of law. Thus, Digital Envoy would have the Court conclude as a matter of law that the License Agreement cannot reasonably be read as authorizing Google's use of the data in AFC.[13]

---

[11] Digital Envoy first points to an August 2001 email sent by Matt Cutts describing the manner in which Google was using Digital Envoy's technology at the time. Kratz Decl., Ex. P. The email actually refutes Digital Envoy's position. Mr. Cutts specifically explains that Google was using Digital Envoy's data to geotarget ads, and in no way suggests an understanding that use of the data in the AFC advertising program would be impermissible. *Id.* Indeed, Mr. Cutts would not have had occasion to even consider AFC since he sent the email roughly two years before AFC was launched. *See also* Kramer Supp. Decl., Ex. S (report on same conversation with Cutts: noting Cutts explained Google used the data to "geotarget ads for customers" and also used the data "internally"). The evidence supposedly calling into question Mr. Schimmel's and Mr. Rana's subjective understanding of the contract is equally inapposite. It consists of an email exchange in which they acknowledge that Google did not plan to ship Digital Envoy's data to third parties or repackage the data to allow third parties to directly access it. Kratz Decl., Ex. L. The exchange in no way suggests either believed that Google was not entitled to use and access the data itself for the AFC program. *Id.*; *see also supra*, n. 10.

[12] Whether or not Google's representatives knew that Digital Envoy's data was specifically being used in AFC is irrelevant, because Digital Envoy has in no way shown that Google's representatives believed such use was unlicensed. They each believed that Google had "unlimited use rights" and specifically had the right to use Digital Envoy's data in Google's advertising programs. Those beliefs amply demonstrate Google's good faith.

[13] Whether Google's interpretation of the License Agreement is reasonable, is a question of law, not fact. *Brinderson-Newberg*, 971 F.2d at 277. To find that Google's interpretation was not

1  Digital Envoy has it backwards.  The terms of the License Agreement unambiguously authorized
2  Google to use Digital Envoy's data in AFC because AFC is part of Google's business of
3  producing and maintaining information search technology.  As set forth above, Google's
4  understanding of the License Agreement was not only reasonable, but entirely correct.  Digital
5  Envoy cannot possibly show that Google's belief was unreasonable as a matter of law.

### 3.  There Is No Such Thing as "Good Faith" Misappropriation.

As a last gasp, Digital Envoy claims that even if Google acted reasonably, it can still be held liable for "good faith" trade secret misappropriation.  It cites no authority to support this position, because there is none.  Digital Envoy is wrong as a matter of law.

Trade secret misappropriation is an intentional tort.  *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1382 (2000); *Karoun Dairies Inc. v. Los Altos Food Products Inc.*, 107 Fed. Appx. 785, 786-87 (9th Cir. 2004) (affirming grant of summary judgment to defendant where plaintiff did not "demonstrate that [defendant] knew or should have known that a product it distributed was manufactured using trade secrets misappropriated from [plaintiff]."); *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001) (applying California law).  To commit the offense, a party must know or have reason to know that its use of a trade secret is wrongful.  As the California Court of Appeals has made clear, "[u]se of a trade secret without knowledge it was acquired by improper means does not subject a person to liability unless the person receives notice that its use of the information is wrongful."  *PMC*, 78 Cal. App. 4th at 1383.  Accordingly, to raise a triable issue of fact on the requisite mental state, Digital Envoy must offer evidence showing that Google knew or had reason to know that its use of Digital Envoy's supposed secrets in AFC was wrongful.  Digital Envoy cannot do so.

---

reasonable, the Court would have to conclude that the contract could not be read in Google's favor.  And the Court would have that reach that conclusion after taking into consideration the extrinsic evidence including, *inter alia*, the parties' negotiations reflecting Google's desire for and Digital Envoy's intent to provide Google with "unlimited use" rights.  Put differently, all Google must show to prevail as a matter of law, is that its contract interpretation was reasonable, even if erroneous. *See American Cas. Co. v. Krieger*, 181 F.3d 1113, 1123 (9th Cir. 1999) (no bad faith as a matter of law where insurer had reasonable interpretation of contract); *Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir. 1988) (same).

GOOGLE'S REPLY BRIEF ISO SJ MOTION            14
CASE NO.: C 04 01497 RS

Instead, Digital Envoy claims that Google is liable for misappropriation if Google knew its right to use Digital Envoy's data was limited *in some way*, regardless of whether Google believed it was violating that limitation. The argument is sophistry. Digital Envoy's legal standard would transmute the intentional tort of trade secret misappropriation into a strict liability offense for any trade secret licensee – any unauthorized use, whether knowing or not, would constitute misappropriation. Again, that is not the law. *PMC*, 78 Cal. App. 4th at 1383; *Karoun Dairies*, 107 Fed. Appx. at 786.[14] A party that uses a trade secret in the reasonable belief that its use is authorized cannot face liability for the intentional tort of trade secret misappropriation. As there is no genuine dispute as to Google's good faith here, Digital Envoy's trade secret claim against Google fail as a matter of law.

## IV.   CONCLUSION

Google's use of Digital Envoy's data in AFC was expressly authorized by the parties' unambiguous License Agreement. Google is thus entitled to summary judgment on all of Digital Envoy's claims in this action. But even if the Court should somehow find that Google was not licensed, Google's undisputed good faith belief that it was licensed shields it from intentional tort liability. Google thus respectfully requests, in the alternative, that the Court grant it partial summary judgment on Digital Envoy's claim for trade secret misappropriation, or on the specific issues raised herein.

Dated: March 16, 2005                             WILSON SONSINI GOODRICH & ROSATI

By:   /s/ David H. Kramer
         David H. Kramer

Attorneys for Defendant / Counterclaimant
GOOGLE INC.

---

[14] Digital Envoy claims the UTSA's authorization of attorney's fees for "willful and malicious" misappropriation shows there must be a claim for the "lesser offense" of good faith misappropriation. But Digital Envoy's conclusion does not follow from its premise. The UTSA contemplates that a party may be liable for misappropriation where it knows or has reason to know that it has acted improperly. Where the defendant has actual knowledge that it is engaged in misconduct attorney's fees may be imposed, if the plaintiff also shows the defendant's conduct was "malicious." Where the defendant only has reason to know of its misconduct (i.e. where the defendant acted unreasonably), and does not have actual knowledge of its misconduct, the defendant may face liability, but the fees provision is inapplicable. All the attorney's fees provision demonstrates therefore, is that the UTSA can impose liability for unreasonable conduct. It in no way suggests there can be liability for good faith behavior.
GOOGLE'S REPLY BRIEF ISO SJ MOTION         15
CASE NO.: C 04 01497 RS