\*\*E-Filed\*\*

May 20, 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DIGITAL ENVOY, INC.,

    Plaintiff,

v.

GOOGLE, INC.,

    Defendant.

NO. 5:04-cv-1497 RS

**ORDER DENYING GOOGLE'S MOTION FOR SUMMARY JUDGMENT AND GRANTING GOOGLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendant Google, Inc. ("Google") moves for summary judgment on all six claims for relief advanced by plaintiff Digital Envoy, Inc. ("Digital"). Google contends that those claims are fatally flawed because: (1) the only reasonable interpretation of the parties' November 2000 License Agreement ("License") permitted Google to use Digital's technology in both its AdWords and AdSense programs; (2) Digital's state law claims all relate to the theory of trade secret misappropriation and are thereby preempted by the California Uniform Trade Secrets Act ("UTSA"); and, (3) as a matter of law, Digital cannot sustain its Lanham Act claim. Digital opposes the motions and argues that its claims for relief are legally cognizable

and that entry of judgment is inappropriate at this stage of the litigation.[1] The motions were fully briefed and heard by the Court on May 4, 2005. Based on all papers filed to date, as well as on the oral argument of counsel, the Court denies the motion for summary judgment and grants the motion for partial summary judgment, for the reasons set forth below.

## II.  BACKGROUND

This action stems from a dispute between the parties as to the scope of a license obtained by Google from Digital regarding the use of technology which assists a user in making an educated guess about the approximate geographic location of a visitor to a website. Although Google has now discontinued its use of the technology, it contends that the terms of its license permitted it in the past to afford its advertisers the opportunity to use Digital's technology through Google's advertisement programs, known as AdWords and AdSense.

### A.    Google's AdWords Program

AdWords is an advertising program offered by Google which allows advertisers to display their messages on the Google website to Internet users all over the world. See Wojcicki and Rose Declarations. In its simplest form, the program is implemented through Google's analysis of several factors, such as the user's estimated geographic location, the user's demonstrated interest in a particular subject, and the rate the advertiser will pay for the placement of its advertisement on the website. Id. For example, if a user visits Google's website and types in a search for "furniture," such query is communicated to Google's computers, along with the user's IP address[2]. In a matter of milliseconds, Google then initiates two separate processes - one to find the results from its web index which may be responsive to the user's inquiry and the

---

[1] In addition, on the eve of oral argument, Digital filed a motion pursuant to Fed. R. Civ. Pro. 56(f), requesting that the Court defer ruling on Google's motion for summary judgment, if it was inclined to grant the motion, to hear Digital's pending motion to compel further discovery, scheduled for oral argument on June 15, 2005. Based on the ruling herein, the motion is denied as moot. In any event, Digital's Rule 56(f) motion was neither timely nor properly filed. The Court does not interpret the decisions cited by Digital to permit the filing of a Rule 56(f) request on the eve of the summary judgment hearing. Further, Digital's supporting affidavit was not received until after the hearing. See e.g., U.S. v. Kitsap Physicians Service, 314 F.3d 995 (9th Cir. 2002) (Rule 56(f) motion must be filed prior to hearing and accompanied by affidavit setting forth facts supporting motion); Ashton-Tate Corp. v. Ross, 916 F.2d 516, 520 (9th Cir. 1990) (same).

[2] An "IP address" or "Internet Protocol Address" is a string of four sets of numbers, separated by periods, such as "241.30.241.28," uniquely assigned to each computer accessing the Internet at a given time. Name.Space, Inc. v. Network Solutions, Inc., 202 F.3d 573, 576 (2nd Cir. 2000).

other to locate ads which might be relevant to the user. Id.  In searching for relevant advertisements to display, Google often utilized Digital's technology to ascertain the user's geographic location and thereby to assist it in displaying the most geographically pertinent ads where that factor was important to its advertising customer. Id.

At the time that the parties entered into the License, Google was operating AdWords. Digital concedes that Google's use of its technology in the AdWords program was both contemplated by the parties when they executed the License and covered by its express terms. See Digital's Opposition Brief at p. 6, fn. 3.

### B.    Google's AdSense Program

Almost two years after the execution of the License[3], Google launched its AdSense program, under which Google displays advertisements not on its own website but rather on those of third-parties. See Wojcicki Decl. at ¶ 6.  If a user clicks on an advertisement displayed on the third-party site, the advertiser pays Google which in turn shares a portion of that payment with the third-party site owner. See Susan Wojcicki Declaration ("Wojcicki Decl.") at ¶ 6. According to Google, this program operates in precisely the same manner as does its AdWords program, except that the interface with the internet user occurs at a separate and distinct website. Id. at ¶¶ 7, 8.  In AdSense for search ("AFS"), a user's query is utilized to determine which ads will be displayed, while in AdSense for content ("AFC"), advertising messages are displayed to an end-user based on the content of the material such user is viewing, rather than on that particular user's query. Id.

As with the AdWords program, Google states that in AdSense, Digital's data remained at all times on Google's computers and was accessed and manipulated only by Google. See Rose Declaration at ¶¶ 8-9. Since, from Google's perspective, there is no difference in the manner in which Google utilized Digital's proprietary technology in either the AdWords or AdSense programs, Google argues that there is no breach of the License. Digital, on the other hand, contends that by including Digital's data in Google's algorithm and transferring the resulting application, in AdSense, to a third-party website, Google "distributed, shared

---

[3] While the record is not entirely clear on this point, it appears that the AdSense program was launched in early 2002.

3

or otherwise gave" another party Digital's proprietary technology, in violation of Section 3, ¶ 1 of the License.

   C.  <u>The Parties' License Agreement</u>

  At the heart of this dispute lies the scope of the License negotiated between Digital and Google, which permitted Google to use Digital's data in Google's "Business;" defined as "producing and maintaining information search technology." Kratz Decl., Exh A. From the outset of the parties' negotiations regarding the terms of the License, Google states that it was encouraged by Digital to use its technology in a variety of ways to assist Google in targeting search results and in advertising on a geographic basis. (<u>See</u>, <u>e.g.</u>, Kramer Decl, Exh. A, email from Digital's CEO Rob Friedman to Google stating his belief that Digital's technology "could help [Google] target search results and advertising on a geographic basis", and Exh. B, emails from Digital suggesting several ways in which Google could use Digital's data).

  Google acknowledged the versatility of Digital's product and noted that, while it would likely use it solely for advertising targeting for a while, Google "liked to have flexibility." <u>Id.</u> at Exh. B. In response to Google's flexibility concern, Digital assured Google that Digital was providing an "'all you can eat' metro-targeting-you can use it for everything and there is no volume cap." <u>Id.</u> at p. 8759. Google replied with an offer to license Digital's technology if it was granted "unlimited servers, usage and volume." <u>Id.</u> Digital submitted a draft of the License to Google "incorporating the terms the parties had discussed." <u>Id.</u> at Exh. C. Specifically, the License grants Google "....the limited, worldwide right to use in its Business (and not distribute to any third party in whole or in part) the Product and the Database Libraries." Kratz Decl., Exh. A at Section 3. The License provided, however, that such right was nonexclusive and strictly limited to the right to:

> Input, download, and store some or all of the Database Libraries in files and memory; and compile some or all of the Database Libraries at the Site. Licensee may also use the Database Libraries to develop indices, services, or applications that are provided to third parties (e.g., developing a country-specific index of web pages). In no event, however, are the Database Libraries to be sold, licensed, distributed, shared or otherwise given (in any form) to any other party or used outside of the site set forth herein.

<u>Id.</u> at Section 3, ¶ 1.

The License further defined the "Site" as Google's offices and data centers. <u>Id.</u> at ¶ 2. The License also

4

provided that the agreement would be governed by "the laws of the State of California as it applies to a contract made and performed in such state, excluding conflicts of laws principles." Id. at Exh. A, Section 12.

Google concedes that it regularly utilized Digital's geolocation technology as one factor in determining which advertisements to display for customers in its AdSense program. See Mark Rose Declaration ("Rose Decl.") at ¶ 8. Google contends, however, that it did not allow third parties to access or manipulate Digital's database, nor did it send the contents of the database to any third party. Id. at ¶ 9. Rather, Google states that Digital's data remained on Google's computers and it alone employed the data as an aid in its search for relevant advertising messages to send to a third party site. Id. Google contends, therefore, that it honored the express terms of the License and is entitled to judgment as a matter of law as to Digital's claims that it breached the parties' agreement and/or misappropriated Digital's trade secrets.

Digital responds that, prior to the execution of the License, it clarified with Google the meaning of the clause, "[I]n no event, however, are the Database Libraries to be sold, licensed, distributed, shared or otherwise given (in any form) to any other party or used outside of the site set forth herein," as provided in Section 3, ¶ 1 of the License. Digital noted that, although Google would be licensed to create applications by applying Digital's databases to Google's own information, Google would not be permitted to "repackage" Digital's database in conjunction with Google's product offerings, thereby indirectly providing third parties access to Digital's technology. See Kratz Decl. at Exh. E, p. 9359. In response to a specific inquiry from Digital on this point, Digital contends that Google confirmed that it did not intend to ship Digital's database and acknowledged that it was prohibited from "....distributing, sharing, or otherwise giving (in any form) [Digital's database libraries] to any other party." Id. Digital argues that Google now concedes it "made available" information contained in Digital's database by allowing third parties to access a user's geographic location simply by sending Google the IP address of the visitor and enabling those third parties to "forget about having to try any geotargeting on their own side." Id. at Exh. V.

By these motions, Google seeks entry of judgment in its favor on Digital's claims for relief based on:

5

1  (1) misappropriation of trade secrets in violation of the UTSA and Georgia common law[4]; (2) unfair

2  competition pursuant to 15 U.S.C. § 1125(a); (3) unfair competition under state business codes; (4) unfair

3  competition based on state common law; (5) unjust enrichment; and, (6) breach of contract.  Google

4  contends that the License permitted it to use Digital's technology in its AdSense programs, thereby entitling

5  it to judgment as a matter of law on all of Digital's claims.  Even assuming that the License is not so

6  construed, Google argues that it is entitled to summary judgment with respect to Digital's third, fourth, and

7  fifth state law claims for unfair competition and unjust enrichment because each rests on exactly the same

8  facts as those averred in the claim for trade secret misappropriation and are, therefore, preempted by the

9  UTSA.  Google also contends that Digital's second claim based on the Lanham Act falls as a matter of law

10 because Digital has failed to prove the elements necessary to sustain a claim for relief based on that Act.

11 Digital opposes both motions, arguing that the proper interpretation of the License raises disputed factual

12 issues, and, further, that the disputed claims for relief are all legally cognizable.

### III.  STANDARDS

14 Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if

15 any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

16 judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and

17 dispose of factually unsupported claims or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

18 The moving party "always bears the initial responsibility of informing the district court of the basis

19 for its motion, and identifying those portions of 'the pleadings and admissions on file, together with the

20 affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Id. at 323.

21 If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving

22 party fails to make a sufficient showing on an essential element of his case with respect to which he bears

23 the burden of proof at trial.  Id. at 322-23.

---

[4] Digital takes the position, without explanation, that both California and Georgia misappropriation and unfair competition statutes apply in this litigation.  See Digital's Opposition to Motion for Partial Summary Judgment at p. 10, fn. 5.  Google points out that the parties' License Agreement contains a California choice of law provision.  Kratz Decl. at Exh. A.  As the choice of law question is apparently not implicated in these motions, however, it will not be resolved at this juncture.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. Masson v. New Yorker Magazine, Inc., 111 S.Ct. 2419, 2434-35 (1991) (citing Anderson, 477 U.S. at 255); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 588 (1986); T.W. Elec. Service v. Pacific Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Service, 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587.

Interpretation of a contract is an issue of law if: (1) the contract is not ambiguous, or (2) the contract is ambiguous but no parol evidence is admitted or the parol evidence is not in conflict. Id. "When two equally plausible interpretations of the language of a contract may be made, as in our case, parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory." Id., quoting, Walter E. Heller Western, Inc. v. Tecrim Corp., 196 Cal.App.3d 149, 158 (1987). Ordinarily, where parol evidence of intent is admitted, summary judgment will be improper because differing views of the intent of the parties will raise genuine issues of material fact. J.R. Maffei v. Northern Insurance Co. of New York, 12 F.3d 892, 898 (9th Cir.

1993). "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature, and subject matter of the contract; and the subsequent conduct of the parties." Morey v. Vannucci, 64 Cal.App.4th 904, 912 (1998).

## IV.  DISCUSSION

A.    <u>Google's Motion for Summary Judgment on All Claims</u>

Google contends that the terms of the parties' License permitted it to operate its AdSense program using Digital's technology. Based on the fact that Digital concedes Google was fully licensed under the parties' agreement to operate its AdWords program, see Digital's Opposition Brief at p. 6, fn. 3, Google argues that it is entitled to summary judgment as a matter of law on all claims because it utilized Digital's intellectual property in exactly the same manner in AdSense.

Digital, on the other hand, argues that while the parties fully contemplated and discussed Google's use of Digital's geolocation technology on Google's own website through the AdWords program, the parties never contemplated that Digital's technology would be used in conjunction with third party sites, as in AdSense. Digital insists, therefore, that when Google expanded its advertising program to encompass third party sites and not just its own, Google violated the terms of its License. Specifically, Digital asserts that Google violated the terms of the License in three ways: First, Google's AFC program is not a "search" technology and, therefore, falls outside the narrow definition of Google's "business" as defined in the License. Second, even assuming that the program fell within the definition of Google's business, Digital contends that Section 3 of the License prohibited Google from "selling," "licensing," "distributing," "sharing," or "otherwise giving in any form" Digital's database to any other party. By utilizing Digital's proprietary technology in its formula and then transferring the results to third party websites, Digital argues that Google engaged in just such sharing, distributing or otherwise giving its technology to other parties without Digital's permission. Third, and again assuming that AFC falls within the definition of Google's business as defined in the License, Digital notes that Section 7.2 prohibits Google from making any information contained in Digital's database available to any other party and argues that Google made Digital's geolocation

technology available to third parties through the operation of AdSense.

Although it appears that Google's AFC program qualifies as a search technology and, therefore, falls within the definition of "Business" as defined in the License, it is less clear whether Google was authorized to incorporate Digital's technology into its AdSense program, since that program is concededly sent to third party publisher's sites. In order to resolve that issue, it is first necessary to review the License and determine whether it is ambiguous. If an ambiguity exists, then it must be determined whether extrinsic evidence may be admitted. "Under California law, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible.'" Barris Industries, Inc. v. Worldvision Enterprises, Inc., 875 F.2d 1446, 1450 (9th Cir. 1989), quoting Pacific Gas and Electric Co. v. G.W. Thomas Drayage and Rigging Co., 69 Cal.2d 33, 36 (1968).

In this instance, while Google argues that the contract is unambiguous on its face and the Court need look no further than the plain language contained in the License, in the event that extrinsic evidence is examined, it proffers the email correspondence evidencing the negotiations between the parties in which Google plainly stated that it desired an "all-you-can-eat" license, with "no volume cap," whereby it was entitled to an expansive use of Digital's technology. See Kramer Decl. at Exh. B, pp. 8756-8760.

Digital contends, however, that during the parties' negotiations, they clarified that, while Google would be able to create new applications through the use of Digital's databases for Google's own information, Google would not be permitted to repackage Digital's database in conjunction with Google's product offerings, thereby indirectly providing third parties access to Digital's technology. See Kratz Decl. at Exh. E, p. 9359. Digital contends that Google confirmed that it did not intend to ship Digital's database to any third party and acknowledged that it could not "....distribute, share or otherwise give (in any form) [Digital's database libraries] to any other party." Id.

A review of all of the evidence submitted by both parties makes it clear that the License is reasonably susceptible to the meanings proffered by both Google and Digital. Although at this stage of the litigation it appears that the more reasonable interpretation of the parties' agreement is the position

9

1  articulated by Google, based on the standards enunciated herein, the Court cannot find as a matter of law
2  that the interpretation ascribed to the License by Digital is unreasonable.  A fair reading of the terms
3  "distribute," "share," and "or otherwise make available," in conjunction with the extrinsic evidence submitted
4  by the parties, could lead a reasonable trier of fact to conclude that Google distributed, shared, or
5  otherwise made available Digital's proprietary technology to third parties through its AdSense campaign.
6  Although the uncontroverted evidence establishes that Google maintained Digital's database libraries at its
7  site and did not permit third parties to access directly such data, see generally, Wojcicki and Rose
8  Declarations, the evidence also shows that Google's AdSense partners sent Google their IP visitor
9  addresses so that those partners could "forget about having to try any geotargeting on their own side." See,
10 e.g., Kratz Decl., Exh. V.

11   Based on the language contained in the License and the discussions between the parties regarding
12 Google's use of Digital's technology, such utilization might be characterized as a "sharing," "distributing," or
13 "otherwise making available," of Digital's proprietary technology to third parties, as prohibited under the
14 terms of the License.  While the element of web to web service introduced in AdSense but absent from
15 AdWords may not ultimately undermine Google's contention that Digital's database libraries are treated in
16 an identical manner under both programs, the language of the License in the context of evidence of the
17 intent of the parties is not so self-evident.  While on the one hand, Google points to evidence that it received
18 assurances from Digital that it could employ its technology in an open-ended fashion, the limitation language
19 in the License, coupled with the potential lost business opportunity for Digital represented by the then as yet
20 to be launched AdSense program, point in the opposite direction. To phrase it another way, since the
21 language contained in the License is susceptible to more than one reasonable interpretation, summary
22 judgment is improper, unless the ambiguity can be resolved only in a manner inconsistent with Digital's
23 claim.  Pardi v. Kaiser Foundation Hospitals, 389 F.3d 840, 848 (9th Cir. 2004) (disputed issues of fact
24 precluded summary judgment where ambiguity in contract could not be resolved through examination of
25 extrinsic evidence).  In this instance, the ambiguity cannot be resolved only in favor of Google.
26 Accordingly, Google has failed to establish that is entitled to judgment as a matter of law with respect to
27 Digital's claims for relief and its motion for summary judgment is, therefore, denied.
28

B.      <u>Google's Motion for Partial Summary Judgment on Claims Two, Three, Four, and Five</u>

Google also seeks partial summary judgment on Digital's second, third, fourth, and fifth claims for relief on the grounds that (1) claims three, four, and five are preempted by the UTSA, and (2) Digital has not established the elements necessary to support claim two under the Lanham Act. Digital responds that the UTSA only preempts common law misappropriation of trade secrets claims and that, accordingly, claims three, four, and five remain viable as alternate theories of relief, and that it has met the requisite elements for relief under the Lanham Act.

1.      <u>Digital's Claims Three, Four, and Five</u>

Google argues that the UTSA preempts all common law claims that are based on an allegation of misappropriation of trade secrets. See <u>Accuimage Diagnostics Corp. v. Terarecon, Inc.</u>, 260 F.Supp.2d 941, 954 (N.D. Cal. 2003) (holding that plaintiff's common law claim for misappropriation of trade secrets was preempted by the UTSA); <u>Callaway Golf Co. v. Dunlop Slazenger Group Am., Inc.</u>, 318 F.Supp.2d 216, 219-220 (D. Del. 2004) (concluding that, under California law, UTSA preempts common law claims that are based on misappropriation of trade secrets). Google argues that Digital's third, fourth, and fifth claims are subject to preemption because they all arise from the identical nucleus of facts and are based on the claim that Google improperly utilized Digital's proprietary information. As Google notes, California's UTSA statute explicitly states that it does not preempt claims that are based upon breach of contract, criminal remedies, or other claims that are not based on trade secret misappropriation. Cal. Civ. Code § 3426.7(b). It suggests, therefore, that there would be no need for inclusion of this provision in California's statutory scheme unless the UTSA preempted other claims based on misappropriation. Indeed, Google points out that Georgia law, upon which Digital purports in part to base some of its claims for relief, holds that state law claims based on the same operative facts as a trade secret claim are preempted by that state's Trade Secrets Act. See <u>Penalty Kick Management Ltd. v. Coca Cola Co.</u>, 318 F.3d 1284, 1297-98 (11th Cir. 2003) (holding that claims for conversion, breach of confidential relationship and duty of good faith, unjust enrichment, and quantum meruit are superceded by the Georgia Trade Secrets Act).

Digital responds that the <u>Accuimage</u> holding is limited to a common law claim for trade secret misappropriation and that the decision does not apply to alternative claims for relief, such as those it has

11

pled for unfair competition and unjust enrichment. In fact, Digital notes that the complaint in the Accuimage case also alleged claims for unfair competition, Lanham Act violations, and unjust enrichment but that the only claim that was held preempted was the common law trade secret claim. Accuimage Diagnostics Corp. v. Terarecon, Inc. 260 F.Supp.2d at 954-955. Digital also relies on a decision issued in this district in which the court declined to conclude "....that the tort of common law unfair competition has been superceded by the UTSA in this circuit." See Postx Corporation v. Secure Data in Motion, Inc., 2004 WL 2663518 (N.D. Cal. 2004) (holding that common law unfair competition claim survived "because it was based on alternative theory of liability as well as on new facts"). The Postx decision was based, in part, on the opinion in City Solutions v. Clear Channel Communications, Inc., 365 F.3d 835 (9th Cir. 2004), in which the Ninth Circuit rejected the defendant's argument that, because the jury did not find it liable on the UTSA claim, it could not have found it liable for unfair competition. Rather, the Circuit concluded that the evidence in the record supported the finding that the defendant misappropriated the plaintiff's property, even if that property was not a trade secret. Id. at 842.

The Postx and Clear Solutions cases, however, as noted by Google, are not particularly persuasive in this instance for several reasons. First, neither case faced the factual scenario presented in this action, namely: Digital's common law claims based on the identical nucleus of facts as those alleged in the misappropriation claim. Rather, in Postx, the district court had previously dismissed plaintiff's claim for misappropriation of trade secrets based on its failure to disclose adequately the trade secrets at issue. Postx Corp. v. Secure Data, 2004 WL 2663518, *1. Based upon defendant's subsequent production of an email correspondence containing a confidential customer list, however, the court permitted plaintiff to amend its complaint to allege a common law unfair competition claim. Id. When defendant moved to dismiss the amended claim on the basis of preemption, the court denied the motion, finding the new claim not to be premised on precisely the same nucleus of facts. Id. at *3. The court also noted that the City Solutions decision suggests a plaintiff may allege trade secrets misappropriation and unfair competition as alternative theories of liability, but acknowledged that the preemption question had not been presented in that case. Id.

Second, neither case discussed the holding in Callaway Golf, which specifically addressed the

12

precise issue presented in this motion and concluded that all state law claims based on the same nucleus of facts as the trade secrets claim are preempted under California's UTSA. Callaway Golf v. Dunlop Slazenger Group Americas, 318 F. Supp.2d at 219. Although the Postx court mentioned the decision, it did so simply in noting that other circuits have held that common law claims are preempted where they are based on the same facts as a misappropriation claim. Postx, 2004 WL 2663518, *2. The court failed to note, however, that the decision, although rendered in Delaware, applied California law.

Third, neither case considered the provision in California's UTSA statute which explicitly states that claims based upon breach of contract, criminal remedies, or other claims that are not based on trade secret misappropriation are not preempted by the statute. See Cal. Civ. Code § 3426.7(b). This provision would appear to be rendered meaningless if, in fact, claims which are based on trade secret misappropriation are not preempted by the state's statutory scheme.

A review of Digital's amended complaint reveals that its third, fourth, and fifth claims for relief are based on the identical facts alleged in its claim for misappropriation of trade secrets. Indeed, Digital does not argue otherwise in its opposition. For this reason, this action is readily distinguishable from the situation presented in Postx, wherein that court based its ruling specifically on the fact that plaintiff's common law unfair competition claim did not involve the same nucleus of facts as its claim for misappropriation of trade secrets. Postx Corp. v. Secure Data, 2004 WL 2663518, *3. Moreover, as acknowledged in the Postx decision, the Ninth Circuit did not address the preemption issue in City Solutions v. Clear Channel Communications, Inc., 365 F.3d at 842. As a result, the Court finds that California's statute, as persuasively interpreted in Callaway, preempts Digital's claims for unfair competition and unjust enrichment since those claims are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief. Therefore, Google's motion for partial summary judgment on Digital's third, fourth, and fifth claims for relief is granted.

2.   Digital's Claim Two

Google similarly seeks partial summary judgment on Digital's second claim for relief under the Lanham Act as lacking the requisite elements under 15 U.S.C. § 1125(a). As Google argues, the Ninth Circuit has held that in order to constitute a false advertising claim for purposes of the Lanham Act, the

statement must be made "by a defendant who is in commercial competition with plaintiff." <u>Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.</u>, 173 F.3d 725, 735 (9th Cir. 1999). Digital does not directly refute that contention. In fact, the case it relies upon in support of the adequacy of its false advertising claim confirms that the parties must be competitors in the relevant market in cases involving false designation of origin under the Lanham Act. <u>See</u>, <u>Lamothe v. Atlantic Recording Corp.</u>, 847 F.2d 1403, 1406 (9th Cir. 1988).

In a prior order, based on representations made by Digital, the Court found that the parties were not competitors. <u>See</u> Order filed on January 20, 2005, Docket No. 63. As a result, it held that Digital's primary business negotiator could review Google's highly sensitive material - information which Google sought to protect from review based on the competitiveness of the market. For purposes of this motion, Google correctly notes that Digital cannot have it both ways - either the parties are not competitors, in which case Digital cannot maintain its claim under the Lanham Act, or, the parties are competitors, in which case it may be appropriate for the Court to revisit its prior ruling regarding Google's request for a protective order. Based on the record to date, no evidence or argument has been submitted to support a conclusion that the parties were competitors at the time of the alleged Lanham Act violations. Accordingly, Digital's Lanham Act claim fails and Google is entitled to judgment as a matter of law on that claim.

## V.  CONCLUSION

For the reasons stated above, the Court denies Google's motion for summary judgment as to all of Digital's claims, but grants Google's motion for partial summary judgment as to claims two, three, four, and five. As a result, the case will proceed against Google on Digital's first and sixth claims for relief based on trade secret misappropriation and breach of contract, respectively.

IT IS SO ORDERED.

Dated: May 20, 2005                                   /s/ Richard Seeborg
                                                      RICHARD SEEBORG
                                                      United States Magistrate Judge

14

1
2
3
4
5
6
7
8
9
10
11
**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER WERE ELECTRONICALLY PROVIDED TO:**
12
13  Brian R. Blackman     bblackman@sheppardmullin.com
14  P. Craig Cardon     ccardon@sheppardmullin.com, msariano@sheppardmullin.com
15  Charles Tait Graves     tgraves@wsgr.com
16  Stephen C. Holmes     sholmes@wsgr.com, pmarquez@wsgr.com
17  David H. Kramer     dkramer@wsgr.com, dgrubbs@wsgr.com
18  Michael S. Kwun     mkwun@google.com
19  David L. Lansky     dlansky@wsgr.com
20  Chan S. Park     cpark@wsgr.com
21  Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the Court's CM/ECF program.
22
23  **Dated: 5/20/05**                                             **Richard W. Wieking, Clerk**
24
                                                                   **By:___DM_____**
25                                                                      **Chambers**
26
27
28