# KRAMER DECLARATION EXHIBIT E

Dockets.Justia.com

Hearing in Digital Envoy v. Google
The Honorable Richard Seeborg Presiding
January 26, 2005

CLERK:      You may be seated, the follow matter on calendar is Number C04-01497RS Digital Envoy, Inc. v. Google

KRAMER:     David Kramer from Wilson Sonsini for Google

KRATZ:      Timothy Kratz with McGuire Woods for Digital Envoy

JUDGE:      Morning. Mr. Kratz let me ask you on the requests. First of all I take it the subpoena requests have a counterpart in the requests you have propounded to Google - I didn't look at the actual requests to Google, because I don't think anyone gave me, if you gave those to me I didn't see them but I have a copy of at least one of the subpoenas to one of these entities some of the same requests are made to Google directly right?

KRATZ:      Yes your honor. I guess we summarized the requests and meant to attach it but probably didn't do it. They're no parallel there are differences that are drafted completely separately but there's overlap that we have pointed out in the brief itself.

JUDGE:      Okay why don't you come up actually so that . . . I have some questions for you so why don't you come up to the microphone here because we are doing this electronically today. My reaction is that at least with respect to the subpoena that I saw the sample I guess the representative sample the one that's to AskJeeves is very broad I think extremely broad some of these requests in particular the let me find it, requests such as, and putting aside for a moment whether or not it is properly directly to in the first instance to these entities or these requests should at the get go be directed to Google put that aside for the moment. Questions like produce all documents that reference evidence or relate to negotiations between you and Google about anything is extraordinarily broad I mean presumably they have I mean this is an assumption on my part but there are all sorts of negotiations that have absolutely nothing to do with your technology. Even if you, even if all your allegations prove to be borne out by the facts of the case, your technology as I understand it is specifically concerning the effort to geographically place visitors to the website that's what the technology is about. Presumably there were negotiations about all sorts of things that had nothing to do with your technology.

KRATZ:      Your honor, we don't know that, we've looked at the public filings of AskJeeves and have pulled two redacted agreements. Both of them relate to Google's placement of advertisements on AskJeeves and we found no evidence of there being anything else.

JUDGE:      But the whole focus of all these negotiations is the issue of the geographic placement of the . . .

KRATZ: Certainly not, but it is what we believe to be an extremely important part the negotiations relating to Google's advertising activities. It's an integral part and can't be separated between the negotiation pertaining to how they split the money is relevant. Anything that Google is out in the world advertising beyond its site is something we believe integrally involves the geographic location. Integrally involves the claims that we are making in this case and Google is 99% advertising and a good part of it is advertising off its own site. They don't do anything else, they do search technology but even the search technology they do with third party sites we have claims.

JUDGE: But making a judgment as to where the visitors to the site are geographically located is not the be all and end all of what's going on, it may be a part of what's going on but to say that because one part of this puzzle you say you supply with your technology therefore we get to see everything, we get to see every piece of paper that goes between Google and all of these entities. I mean to be specific with you, number 8 as an example of your request seems to me to be an appropriately fashioned request - produce all communications from Google to you including without any limitation, a phrase a I don't like but, any communications that reference, evidence or relate to software other processes that may be the geographic location of users on any of your websites in conjunction with Google products. Okay, that appears to me to be in connection with what you are claiming but then produce all documents that reference, evidence or relate to negotiations between you and Google. That's just so expansive as to be improperly overbroad in my view.

KRATZ: I understand your view. Respectfully I don't know of any agreements or negotiations that AskJeeves has entered into with Google that doesn't touch upon our technology, that doesn't involve the claims we are making in this case and to say that it is just a part

JUDGE: Whats your basis for that contention, why do you say that?

KRATZ: I say that based on our investigation of the relationship between AskJeeves and Google which involves looking at what Google's involved in and it actually evolves looking at what AskJeeves is involved in. My understanding of the relationship between the two parties is that at least for a time Google is providing the services for AskJeeves and also Google is supplying advertisements for AskJeeves. They may have been part and parcel the same agreement but the importance is that they split money based on the advertisements they place on AskJeeves sites and those advertisements are geo-targeted and it is that revenue that is an issue in this case and I am not aware of any additional agreements between the parties. Now there is the part of the subpoena that talks about all communications whether its related or not and I understand that Ms. Ware has declared that they talk all the time and certainly at that point there is a breadth issue and we are absolutely willing and have already worked with some of the targeted subpoenas to make sure they understand what our request is, what we are looking for, the typical things you would do when negotiating a subpoena. We're not here to enforce the subpoena against AskJeeves we are simply

-2-

|   |   |
|---|---|
|   | here to let that process continue but to say this is just a little geo-targeting it doesn't do justice to our claim. Our claim is that technology was employed and they made a lot of money off of it and specifically with respect to AskJeeves we are going to find in the evidence is we've attempted to license AskJeeves to do geo-targeting and they have told us that we will not take a license to do geo-targeting for advertising because we don't have to because we let Google do our geo-targeting and we've got evidence that Google has since the inception of this program that they are making scads of money on saying we would encourage all of our partners not to geo-target and effectively the two companies have started out at about the relatively size we have no licensing opportunities for everywhere that Google has entered into our market. That market is what we are targeting. |
| JUDGE: | Discussions along the lines of, and again I'm the first to say this is just speculating, but if Google and some of these entities are talking about the placement on the page where these advertisements are going to go, are they going to be on the righthand side, the lefthand side, down at the bottom up at the top, it has nothing to do with your technology. Right? |
| KRATZ: | Except for the, it doesn't have anything to do with our technology but it might have something to do with our case. |
| JUDGE: | Why? |
| KRATZ: | To the extent that Google is trying to make an argument and apparently they are persuasive so far, that we are just a small piece of the bigger picture of the value that they are providing to these particular people like AskJeeves |
| JUDGE: | So forget what they are saying you just focus on my question, one would assume that there might be some discussion, by way of example, about the placement on the page of the advertisements. That in and of itself that negotiation if you will you would agree with me has nothing to do with your technology. |
| KRATZ: | It doesn't have to do with technology, we contend it may have something to do with our case. But to answer your question it doesn't have to do with our technology, that's correct. |
| JUDGE: | And whether or not the your technology the license issues that there has been a misuse of the license and beyond the scope of the license again those questions I'm not my comments are not meant to belittle the importance of what you perceive to be your technology as part of their operations but what I am very concerned about is that on the theory that somehow your technology is being misused that you are saying to me through these requests gives you a basis to explore every aspect of the business relationship, every aspect of the business relationship, between the party you sued and all those 22 or how every many and that may be something you will get there but as the first request that's overbroad. You've got to I think start from a more specific set of requests and then if that doesn't give you what you need you make the argument to |

-3-

|   |   |
|---|---|
|   | me that you get to expand out further. The question is it is a matter of how you proceed, you try to target it and then say that targeting it for these reasons judge makes no sense and we have to be more expansive or we say we've got to swing the net very wide, get everything in here because we don't really know exactly what's there so we get to see the relationship between this entity and the 22 other entities and I have lots of concern about that. I mean I know just because you've subpoenaed 22 doesn't mean you don't think there are others and that's my concern and by just the way these are phrased they are so broad I mean you know produce all sales or marketing materials regarding any Google product. Well, until you show me that every single aspect of Google's operations implicates your technology I'm not comfortable with saying that you get the open the door to every single aspect of their business transactions. That's what you're saying here and that troubles me. |
| KRATZ: | It is and I'm sorry it troubles you. |
| JUDGE: | Well it troubles me that maybe someday you'll be able to show me why that is your technology implicates every single thing Google does. Right now you haven't shown me that in my view and therefore I'm also not going to spend time redrafting your requests, its your job to give me or give to the parties you've subpoenaing or requesting documents from non-overbroad properly crafted requests. If I think they are overbroad my call is are they overbroad or are they not and if they're overbroad you can't ask them and you have to start again and I'm inclined to say that with the exception of number 8 and possibly with respect to some of the requests that go to the payment issue because I know you got your contention is you've got to know how much money they are making, I understand that but you know every piece of paper that pertains to negotiations between Google and these entities I'm not comfortable with you on the showing you've made to me now in getting all that. |
| KRATZ: | I certainly understand that with every single paper with respect to communications. The negotiations of promotional materials and marketing of this to me is absolute essential because they are going to argue that they're minimizing the importance of our technology in their marketing scheme and in their economic model and our response to that is that for one we need to discover the evidence to be able to respond to the placement of that. We have a general argument that it doesn't matter, its a misuse of technology if its involved in that we want to disgorge the entire amount except that's not going to be accepted, it surely isn't by Google then we may be finding that it is just a small piece. We need to know the spectrum of what's involved in this technology and the relationship of the parties in order to be able to properly place it and if we don't cast a broad net now, my concern is that we are going to be left with the inability to get the information we need to get. My concern is if we have to create a narrowly tailored request now we are never going to get to the point where can respond like Google is able to respond based on all the information they have and they're not giving it to us. So it is our intent is to draft an intentionally broad subpoena, and I understand its broad, and to talk to these parties which we have been doing to tell them what it is we are actually interested in getting at this point and time and to save the remainder so we can make a determination. We don't have any desire |

-4-

to get a million pieces of paper from AskJeeves, it doesn't do us any good whatsoever, what it does do us good is our ability to react quickly in this litigation to the arguments that Google is making or to the documents that Google ultimately produces to us which I think they will be compelled to do but at this point we don't have it and we are shooting in the dark to some extent but we know that the way Google makes money is by placing advertisements on their sites. We know that they've been using geo-targeting to do that. So we know that everything like for example money changing hands we know that we are entitled to a piece of that money. Absolutely.

JUDGE: Using one of these by way of example because you've highlighted it a bit, the sales and marketing materials. If the sales and marketing materials say absolutely nothing about the geographic location of those who are visiting the sites, why would that have anything to do with what you are doing?

KRATZ: It absolutely does because in fact it is a piece of evidence that Google is going to want to make a _____ and we need to know the importance of that. They are going to say that look this is just a _____ technology that has nothing to do with our ability to capture these markets, okay, so their marketing and _____ you know the website they are talking about geo-targeting all the place.

JUDGE: As I say if you crafted that as all sales and marketing materials that make any reference in any way to the geographic location of potential customers that would be one thing. That's not what you asked for.

KRATZ: I understand its not nor is it intended to be because then we are missing whatever contrary evidence there might be out there. The contrary evidence saying we market this stuff without reference to geo-targeting. We need to know that - we need to get that piece of information so that we can assess the importance of that marketing versus the marketing they did with the geo-targeting. Our contention is our belief is

JUDGE: On that theory you can get every piece of paper that Google has ever generated about anything because if it doesn't say anything about geo-targeting, you're saying oh well that's relevant because it doesn't say anything about our product.

KRATZ: We're interested in advertising

JUDGE: Okay

KRATZ: and we know that Google makes 99% of its money advertising

JUDGE: Sure

KRATZ: so when they are marketing, they are marketing advertising. Yes, the answer is yes. We need to see it all.

| | |
|---|---|
| JUDGE: | Right, and if its if there is material in there in their marketing that says we can one of the things that we bring to the table is we can get people, we can tell you where your customers are located through our operations, that's one thing. If they say you know we the reason you want to advertise on Google is because we have very pretty displays when you go to our page it's beautiful, it has nothing to do with what you do. And so if there are marketing materials that say look at our beautiful graphics I don't understand why that has any relevance to your claim and defenses. |
| KRATZ: | If their not going to make a claim that this was not the reason why people signed up, if their not going to make a claim that this is a minor piece of our ability to attract and service our advertising clientele, if they are going to do that and concede the point that geo-targetings place is where we think it is then you're right, we don't have any need for that type of evidence, absolutely not. But they are not going to do that. Their going to say that you're making a mountain out of your little geo-targeting technology, which we think is untrue. Anything that they do to try to track and get the customers that they are able to track and get, we need to know about. We absolutely do and it is broad but this is as broad as it gets. |
| JUDGE: | Comment for me and then I'll ask Mr. Kramer to comment. On the question of subpoenaing their customers as opposed to getting the information from them and I know your first answer is going to be they haven't given us anything so we are forced to do this, but lets assume I was going to compel them on a short string to say to Google you have to produce things. What's your view on that in terms of who you look to at least initially? |
| KRATZ: | We did look to Google initially. We are still willing to look to Google initially |
| JUDGE: | That's what you said in your papers |
| KRATZ: | our brief is we would absolutely stay the enforcement of the subpoenas |
| JUDGE: | Right. |
| KRATZ: | in exchange for an order compelling the list the request for the production of interrogatories. We had an order compelling them, we suggested a date. I don't really care that much about the date |
| JUDGE: | Right. |
| KRATZ: | but if there's an order compelling this these lists of interrogatories and document requests fine |
| JUDGE: | Right |
| KRATZ: | let's find out how good they do. We still don't know. |

| | |
|---|---|
| JUDGE: | I don't as I said I don't think I have maybe I do have a copy of the requests that you propounded to Google [] |
| KRATZ: | Your Honor I don't think you do. |
| JUDGE: | I wouldn't have them you wouldn't file them in the ordinary course so there's no reason why I would have them. I would like to get a copy so that if your request is that I compel through this process and end up compelling them to respond to certain particular requests, I need to see the requests obviously. |
| KRATZ: | We listed the references on page 8 in summary, I have a copy that |
| JUDGE: | Okay |
| KRATZ: | I'll locate while you're talking to Mr. Kramer and I'll hand it up to you. |
| JUDGE: | Okay. Okay. Mr. Kramer. |
| KRAMER: | Thank you Your Honor. Let me start first by saying this is an end run around the discovery process. The way it is supposed to work is you serve requests to your adversary in litigation, you deal with the objections of your adversary in a meet and confer process which has not taken place here and if you are unsatisfied as the party seeking discovery, you make a motion to compel setting forth in detail your relevance theories and having the adversary an opportunity to respond to those. That's not what's going on here. |
| JUDGE: | Is there any rule that says you can't go and subpoena third parties? |
| KRAMER: | There actually are rules your honor and we cited a bunch of cases in our papers which say first you must seek discovery from the third party |
| JUDGE: | They don't say must they say they talk in terms of you can stage discovery in particular ways and it may be better to seek it from, there's no rule that says until you have asked for a document they are all in terms of better practice and this is the way that you do it but there is no rule of discovery that says, no rule of civil procedure that says you may not subpoena under Rule 45 until you have asked your adversary for the documents. There's no such thing |
| KRAMER: | That's right Your Honor it comes under the context of Rule 26 motions asking the court to conclude that the information sought is available from a more reasonable, less expensive, less burdensome source. And every case that is on this point has concluded as we said in our papers that where you are subpoenaing customers you should first make the effort to obtain the documents from your litigation adversary and its not really serving a request as the Hayworth case says. The Federal Circuit said its not just serving a request on your adversary its going thru the process, its moving to compel that's the rational way to structure discovery. The Joy case and the Audiotext cases say you have to show as a party seeking discovery from a third party |

-7-

|  |  |
|---|---|
|  | that the only way to get this discovery is from the third party and they can't possibly make that showing. |
| JUDGE: | Although certainly at some point in this litigation they will is a common practice that you get both sides of the discussion, so if you get material from your from Google and your counterpart shows me there is relevance to interaction between you and let's say AskJeeves then there's nothing that precludes you then from wanting to make sure that you got everything by going to AskJeeves and saying we want to get your side of the discussion. That's standard |
| KRAMER: | I do agree your honor but I do think the first order of business is to talk to Google and ultimately talk to this Court about the requests that are issued and let me say there are requests as we made clear in our papers to Google. They say the following, produce all contracts between you and any participant in your advertising program. That's tens of thousands of contracts. Produce all documents relating to any negotiations with any of the parties in your advertising program - that's who knows how many buts its tens of thousands of negotiations, it's absurdly overbroad. The way you deal with these kinds of issues in a rational discovery plan is there is a meet and confer between the parties. Hey, I don't need all the contracts |
| JUDGE: | Why hasn't that taken place yet? |
| KRAMER: | Mr. Kratz can speak to that better; there hasn't been any inquiry of Google concerning our objections to any of the discovery that was served in this case. |
| JUDGE: | So what's happened so far is Mr. Kratz you served request to produce on Google and Google has filed objections I presume or provided you with objections. Right? Is that right? Has that happened yet? |
| KRATZ: | Two sets, yes. |
| JUDGE: | Okay then what has happened after that. There's been no discussion back and forth between the parties or they've objected and that's where things sit right now. |
| KRATZ: | No Your Honor. After the first set of documents |
| JUDGE: | Right |
| KRAT: | from us and the interrogatories an extensive good faith letter they did a supplement and then at that point and time they raised the issue that we need to have heightened attorneys eyes only |
| JUDGE: | I've dealt with that one |
| KRATZ: | they were purported to produce the documents notwithstanding their concerns |
| JUDGE: | Right. |

-8-

KRATZ: in the interim they've produced three pages, that was last week or so and then this issue arose and so yes what we were intending to do was to have them indicate that they are not going to produce us anything else, we made that request two or three times and then have the meet and confer with respect to the finality of the thing so that we could file our comprehensive motion to compel. Though we have been in the stage where we are trying to get documents from them, we thought if your honor would had opened the door to get any meaningful documents responses we wouldn't get it and they'd send us over documents early this month that consisted of three pages, one spreadsheet, so we're stuck in a position where yeah our next move is to compel on this issue all their claiming it seems like is of relevance and we've jointed that issue right here.

KRAMER: So Your Honor Mr. Kratz just acknowledged that there was not a meet and confer process on any of the requests that are that were served to Google and its is certainly not just a relevance objection my goodness every contract between Google and any participant in its advertising program, any communication between Google and participants in its advertising program, the, Your Honor pegged it exactly right when you came out on the bench and starting asking about the relevance of these things. They're not relevant. If they came forward instead as Mr. Kratz did here, Ask Jeeves has told us that we would license your technology but for the fact that we get it from Google. If that was a damaged claim that they could support in this case and was not high in the sky, I want everything that Google has made from its advertising program because there is this component one, dozen of factors in one occasion, that's occasionally a vote. Then we would say ok, that's a showing that we could deal with. You can see whether we've had communications with Ask Jeeves concerning geo-targeting technology because if you identified a concrete loss to your business by virtue you claim of our suppose misappropriation, but that's not on the table. This is the first time I've heard of that at this hearing. Asking us for every document relating to our adverting program because somewhere in that program their technology was used which they contend was used beyond the scope of license is abusive. It's a pie in the sky damages theory that has no basis in law.

JUDGE: Well, let's – let me use by way of example this request number 8 on their subpoenas. Which I assume is the same on each of the subpoenas. Would you agree with me that at least ask for potential relevant information?

KRAMER: Your Honor, they ask for all communications from Google on any subject. So the phrase your honor, you said you didn't like "including, but not limited to" phrase is the critical phrase there. If they ask for ...

JUDGE: Let's assume it's not there.

KRAMER: All communications from Google concerning the geo-targeting capabilities, it they ask us that request to Google concerning specific partners that they identified whom they believe they would have sold geo-targeting technology to but for Google's offer that geo-targeting technology, we would respond to that barring something that I'm

-9-

|  |  |
|---|---|
|  | not familiar with today. Remember, we're only talking about a year and a half period of time in which this service was offered. So, I don't know what the verdict is like. But I can't imagine that geo-targeting technology entered into these discussions at all. So if it were targeted to a specific partner that they identified as having |
| JUDGE: | You don't think there was any discussion with any of these customers about the location of the customers that would be visiting the site and the ability to fine tune it and give them information on where their customer's are located? You don't think that ever entered into the discussion? |
| KRAMER: | I think most certainly not. |
| JUDGE: | That it did not. |
| KRAMER: | I think certainly not. |
| JUDGE: | REALLY? |
| KRAMER: | I do not think so, Your Honor. |
| JUDGE: | Really? That surprises me. |
| KRAMER: | Well, let me tell you why. I think, Your Honor, is thinking about advertising on Google. The advertising that's taking place is actually on Ask Jeeves. It's entirely run by Google. Goggle sends the ads to Ask Jeeves. Ask Jeeves says, send us whatever you want. |
| JUDGE: | Yes. |
| KRAMER: | And we'll take a cut of the amounts the advertiser pays to youGoggle. |
| JUDGE: | Ok. |
| KRAMER: | So, Ask Jeeves doesn't really care where the users are or what the ads are? Ask Jeeves cares that its getting money from Google via the advertiser. It's getting a cut of what Google gets. So if Your Honor asks... |
| JUDGE: | I just find it hard to believe that in this day and age any of these sophisticated players would not be interested. |
| KRAMER: | Well... |
| JUDGE: | And where, I mean -- we live in a -- the context that this arises in where the more information they can get, the more specific it is, the more – that's what they want. If fact, we find we spend a lot of time here on the privacy concerns that that implicates. So, I would be amazed if it's we don't care and that's not part of what we – just give us the money. |

-10-

KRAMER: No, the advertisers care. There's no question that the advertisers want...

JUDGE: Yeah.

KRAMER: In some sense the ability to target advertisements. The important factor for the advertisers is for targeting to a search query targeting to the content that the users actually looking at. User searches for Pepsi; Coke Cola wants an ad there.

JUDGE: Who are – I have to go back. Who are these 22 people that have been – we know about Ask Jeeves. Who are in this batch of 20?

KRAMER: Amazon.

JUDGE: Ok.

KRAMER: Expedia, The New York times, _____ newspapers, Lycos...

JUDGE: And your saying none of those people, none of those entities because I'll be honest with you, I'm not sure I understand how exactly this works.

KRAMER: I'm happy to talk about it if you want.

JUDGE: None of these entities care about; the Amazon for example couldn't care less about the geographic location of people that are visiting the site and visiting the Amazon site for example.

KRAMER: That's not the way it works, Your Honor.

JUDGE: Ok.

KRAMER: Amazon may care about the geographic location of visitors to the Amazon site, but Goggle is not telling them that. That information is not coming from Google, Amazon may well have its own license with Digital Envoy for geo-targeting technology or any of the other players in the industry. That information is not coming from Google. What Digital Envoy is complaining about is an advertiser comes to Google and says, "I want to place my ads on your network."

JUDGE: Right.

KRAMER: Google says great. How do you want to place your ad? What time of day? Where do you want them to appear? How often? How much are you willing to pay? What content you want it located to? What language you want the pages to be in? And do you want to geographically locate your ads so that they don't only show up to people in Nebraska.

JUDGE: Right.

KRAMER: If that is what takes place, if that transaction occurs, then when a visitor hits Ask Jeeves page, the visitor is sent to Google's website, Google looks up the IP address, does some other calculations to figure out where the user is coming from. Goes through this very complicated algorithm and comes up with an advertisement to display to the user – ah ha – one of the many, many factors is included in here is that this user happens to be in Nebraska. Therefore, I'm going to display this ad to the user who happens to be visiting Ask Jeeves page. Frankly, the notion that that is somehow a disclosure of Digital Envoy's data which is their theory is this case is troubling.

JUDGE: Yea, that's the merits of the case.

KRAMER: I agree, Your Honor I agree. But if they could show that as result of the relationship between Google and Ask Jeeves, there were some loss of business to them, but for the fact that Google geo targets these ads for Ask Jeeves. Ask Jeeves would have no choice but to obtained a contract from Digital Envoy if of course Ask Jeeves wanted to geo target ads at all. To show that they have to – the degree of tangible proof that they would need to make that claim is never going to exist. Because there's no way, they could show what might had happened if Goggle didn't offer this. There are dozens of advertising networks out there that geo-target ads just like Google. There's no way, there's no reason to believe that Ask Jeeves would had, but for the fact that it gets its ads from Google directly license technology from Digital Envoy. And if they proof of that, great. If they don't have proof of that, then this is not just a fishing expedition, it is harassment—it's a waste of time and money to ask for every document related to advertising program. But that's what Digital Envoy is asking for now. Now, I've spent a lot of time talking about the relevancy, but this is the first time we've been in front of Your Honor in this case. I don't think . . .

JUDGE: Well, I've seen you on case management conferences, but . . . .

KRAMER: But, on a motion practice.

JUDGE: Right.

KRAMER: This is—this is not the right context for us to be debating the relevance of this discovery.

JUDGE: I-I—well . . . .

KRAMER: It—it is—I-I'm giving you the background here, but I think the appropriate context is for Digital Envoy to lay out why it thinks its relevant on motion after a meet and confer process and give us an opportunity, not in two days, but in, in, th-the appropriate course of time to respond to their relevance theories.

JUDGE: Well, I'm of two minds on that. On the one hand, I don't disagree with you that, ah-h, that there is certainly case laws you've cited to me that, that it makes sense to approach cases of this kind in a particular way and first look to, to, ah, your adversary

-12-

|  |  |
|---|---|
|  | for information and then broaden it out. At the same time, it is not your choice as to how they do their discovery. You can't say to them, ah, "we would prefer if you do it in this order with these people and, gee, it's uncomfortable for us because some of these people are our customers." That doesn't end the inquiry in my mind. Ah, what I have in front of me is . . . they've used Rule 45. They've issued some subpoenas. Those subpoenas, as I've indicated already in some respects, and in many respects, are over broad; and they cause me concern. But, the idea that they must do their discovery as you would like them to do it, in terms of order and the like, is not how we proceed. Ah, and, so to say that, that, well, don't even address this because, ah, they should have done it in a different way; I don't have the luxury to do that because Rule 45, under the terms of it, allows them to serve subpoenas. |
| KRAMER: | Your Honor, I don't disagree that we can't dictate the manner in which they conduct the discovery. |
| JUDGE: | Right. |
| KRAMER: | What I'm suggesting, however, is that where there is nothing but dispute that we have this information; we're not contending that don't have the contracts with these partners, or that we don't have documents reflecting negotiations with these companies. What we're saying is in the proper course of discovery—in this instance—Digital Envoy should be coming to us, seeking that discovery from us with rational requests, meeting and conferring over those requests, and if they have a relevance theory, have that theory litigated in this court as opposed to seeking the documents via an end-run from a non-party in Indiana or wherever they are and argue to a court that doesn't know anything about this case. But, of course, the documents are relevant; and, of course, the requests are not overbroad. That's my problem.. |
| JUDGE: | Okay, well . . . . I want to bring this to an end. Ah-h, my concern is that, ah, at least, I-I-I have some sympathy for a concern that I see expressed in the papers by Digital Envoy that, ah, the whole process has come to—there is a danger that because there are some issues about, ah-h, how to proceed, over breadth and the like, that no discovery has happened. Now, I understand what you say, Mr. Kramer, that the— let's have the "meet and confer" and the rest, but I don't want this process to be an excuse for otherwise relevant material not to go over. By way of example, I think if there is anything that Google has that is responsive to number 8, there's no reason to wait. That should go! |
| KRAMER: | We produced it Your Honor |
| JUDGE: | Well . . .Mr. . . . . . |
| KRAMER: | We've already produced that discovery. All documents relating to geo-targeting. |
| JUDGE: | Mr., Mr. Kratz says you've produced three pages. |

-13-

| | |
|---|---|
| KRAMER: | No! Mr. Kratz is -- I think there's a miscommunication here. The only documents that Mr. Kratz is referring to—we reproduced twenty boxes of documents in this litigation. |
| JUDGE: | They have. All right. |
| KRAMER: | The three, the three pages he's referring to were those pages that we thought ought to be designated as highly confidential attorneys' eyes only |
| JUDGE: | Oh, all right. |
| KRAMER: | We produced a substantial quantity of documents . . . |
| JUDGE: | Okay. All right. |
| KRAMER: | . . . and, and there's no reason to believe the discovery process isn't working. As we discussed, the "meet and confer" process hasn't even started yet—on the request to be served to Google. So, that's what we think ought to happen first, before we start getting into whether or not these documents should be obtained from third parties. |
| JUDGE: | All right. Okay. I'll give you one more, ah, opportunity to comment; and then I'm going to bring this to a close. |
| KRATZ: | Your Honor, my main comment is with respect to Mr. Kramer's mischaracterizations of our damage theory. He's now saying, well, we first have to meet certain thresholds to make a particular argument to get discovery on. We have to show them who would have gotten this particular license due to our contact with them, ah, in order to get discovery on this; and that is a threshold that's absolutely not fair, and to its a damage theory that you wishes for the case, but it's not the case. We have several damage theories, and, and the law accounts for the fact that if they go out and use our technology where they're not supposed to, they don't get to sit back and say, well, you've gotta prove that you would have been able to license that technology for all the different places where we use that. They've made hundreds-of- millions of dollars, using our technology—using our technology—in almost every instance. He minimizes it now, and that's the point of our argument with respect to we need to know the contracts. He's argued that, "well, the way it works is they don't care—we just place it; they don't have any involvement in that." We know that, that's not the case. We know-w-w that they sell geo-targeting its on their website. They don't sell much else. They get this, and we know that the customers care; because what they get sold on is the amount of flicks that Google's advertisements get. And that is how they make their money. They absolutely care. How do we get clicks? By showing a guy in Nebraska a Nebraska ad. And that's what gets it. The marketing analysis that this local advertisement, advertising, that everyone cares about is referred to as the Holy Grail of advertisement on the internet. This is a big deal, and this is a situation where they get out there, and they contact all these people, they set up payment arrangements where they share the technology, and they share the revenues from that |

-14-

|||
|---|---|
| | technology. The law is gonna be we're gonna get every piece of that, that they made a profit because they discouraged because they don't have the right to go out and say, "well, we're not gonna look at their licenses; we're just gonna move into this area, and we're gonna take all these customers away. We've got evidence that they did that intentionally, and we're gonna have, ah, all of that evidence before the court. We have evidence that Larry Paige, with his first program, started what they said. We gotta get this technology up and running, 'cause there's lots of money to be made out there. We got all of this evidence in here now. |
| JUDGE: | This technology being your geographic targeting technology? |
| KRATZ: | Absolutely. Now at the time he said that, he was talking about advertising on Google; because at the time, this was pre-licensing and they had no idea that they were going go capture with all the rest of the markets they captured. But he knew then that this was a big deal; and they got out and got out and the geo-targeting on Google. It worked so well, they started to do a search for other people they decided to syndicate. And at the point of syndication, is what's created the violations. They syndicated, they took our technology with them, and went out and sold all these people. |
| JUDGE: | I understand you're saying that's the misuse of your license. |
| KRATZ: | That's the misuse. It's important, though, in the context of what we're talking about. It's important in the context of the breadth that he claims is abusive. It's not; because every time you go out there, he's sign people up. A lot of their contacts they sign up, are just automated off the internet. We know they sold that—we need to know who those people are, we need to know how they funded and made all those things; because other people are absolutely sold on the technology that included geo-targeting. Then, they.... |
| JUDGE: | But, you see, that's, that's the _____ of the question. You—I do think it is for you to show me that there was, that, that was some critical aspect of this, of this selling process. And, until I see that, until I have a demonstration of that, it is you're expecting me to say, ah, "take our word for it; we think we'll find every single customer is motivated by the geo-geographic targeting; and I don't see that. All I see—you may be right—but you got to at least develop the case to a certain point to establish that. You're assuming that every contact that, ah, between Google and any of these entities, the focus of this marketing activity—or at least some aspect of it—is the geographic targeting aspect of it; and I-I don't, I have no reason to believe that, other than you telling me that you think that's what you'll find. |
| KRATZ: | Your Honor, the question is at what point do I have to show that..I mean.... |
| JUDGE: | Well, if you're going to, if you're going to ask for |
| KRATZ: | We haven't. |

-15-

| | |
|---|---|
| JUDGE: | mountains of material, you'd better have a-a reason to say that, ah, there is, there is something more than a hope and a prayer that that it what you're going to find. |
| KRATZ: | That is. Why do we have to. . . .Until we know what exactly they pulled. We know what we know, and we can demonstrate for what we know. We can know our business. We can know what they do on the internet. We can know what we've already asked for so far in this point of discovery. But at what point do we have to come and say, "Your Honor, this is really important to us. We've got this amount of proof. We need the rest." At what point do we have to do that? I thought that the point was we have a reasonable basis to get to this discovery. We get _____ for it.. |
| JUDGE: | Well, reasonable basis is not the standard. The standard is quite specific. The standard under Rule 26 is, "It has to be relevant to a claim or a defense or for good cause shown, it has a slightly broader description. You have to show me—you have to—it is, it is your burden to show me that the material that you're seeking is, is either relevant to a claim or a defense or likely to lead to the discovery of relevant evidence if you've shown me good cause to get that. So, that's your initial burden. You can't say there's a, there's a whole universe of material out there, and we think if we look at it, it's going to help us, or it's going to show this. WHY? You have to, you have to do more than just say, ah, if we look through all this, maybe there's something in there that's going to be helpful; because we think it must have been involved in these, in these discussions. I don't—that's just your hope . . . right now. Ah, I'm not saying that, I'm not saying that aren't, aren't materials that you're entitled to get from Google, and from other entities. <u>But you don't get to say, "let's take every piece of paper in that entity, because maybe—MAYBE—there's some, something that's relevant to what we're talking about in that. And that—if I read literally these requests, you, you could make the argument that you've asked for every piece of paper in Google's operations. You could interpret it that way. And I'm telling you right now; you're not getting every piece of paper that Google has. That's ridiculous.</u> That's grossly over broad; and that's not belittling your technology or the importance of it; but, I could take judicial notice that everything that Company does is not your technology! They do other things! |
| KRATZ: | Your Honor, I understand that |
| JUDGE: | Right? |
| KRATZ: | But what they do is advertising. |
| JUDGE: | That's true. |
| KRATZ: | You are not going to be able to separate out the relevance of their marketing with respect to advertising. Can't do it. You absolutely can't |
| JUDGE: | Well |

C:\NrPortbl\PALIB1\LMU\2603190_1.DOC (37465)

KRATZ: because either --we come here and right now with lots of proof. We come with lots of proof. It's in there. It's in the materials we submitted as well. We know.

JUDGE: There's a lot 'a argument you've submitted to me. You haven't submitted an awful lot of proof. I have a, I have a brief that makes a, an argument—and talks about your theory of the case. Okay. But I wouldn't say that, that . . . . Who knows? I mean right now, aw, this is the beginning of discovery. So, ah, my focus is much more narrow than ultimately what I'm going have to do in terms of deciding the legal issues in the case. Um-m, I'm bringing this to a close; because we could talk about this forever. Um-m, what I'm going do is this, ah; if the, if the requests on the subpoenas, frankly, had been more targeted, ah, it would be a tougher call. They are, they are overbroad as a, as I sit here now. So, I will stay these requests, ah, with respect to the subpoenas that are outstanding. Um-m, and I anticipate that there will be a "meet and confer" session with respect to the requests that, as I understand it, are pending with Google, and that it may be that I have a motion to compel. Ah-h-h, and I will take up these questions with respect to the motion to compel once the issues have crystallized; and we'll go from there. But as it stands now, I think the subpoena requests are overbroad; and, ah, therefore, I'm not going to grant a motion to quash; but I will stay the, the a, obligation to respond to those; and it may be that after there is, ah-h, motion practice with respect to the requests that are, are, are, um, that Google has to respond to, I may reactivate those, ah, in, in whole or in part. So, they're, they are not, they're not quashed. But they are, they are stayed at this, at this juncture; and I will expect a prompt "meet and confer" session; and, ah, will bring this to a head; and I think Mr. Kramer is right that the best way to proceed on this is to first address whatever the requests are that are outstanding to Google; and then once I've done that, I think we will be in a better position to have some sense of whether or not the subpoenas, in whole or in part, should go forward. So that will be my ruling. Thank you.

\* \* \* \* \* \* \*