1  DAVID H. KRAMER, State Bar No. 168452 (dkramer@wsgr.com)
   DAVID L. LANSKY, State Bar No. 199952 (dlansky@wsgr.com)
2  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
3  650 Page Mill Road
   Palo Alto, CA 94304-1050
4  Telephone:  (650) 493-9300
   Facsimile:   (650) 565-5100
5
   Attorneys for Defendant/Counterclaimant
6  Google Inc.

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  DIGITAL ENVOY, INC.,                    )   CASE NO.:  C 04 01497 RS
                                            )
13          Plaintiff/Counterdefendant,     )
                                            )   **GOOGLE INC.'S SUPPLEMENTAL**
14      v.                                  )   **BRIEF IN OPPOSITION TO**
                                            )   **DIGITAL ENVOY, INC.'S**
15  GOOGLE INC.,                            )   **MOTIONS TO COMPEL**
                                            )
16          Defendant/Counterclaimant.      )   **(PUBLIC VERSION)**
                                            )
17                                          )
                                            )   Judge:    Hon. Richard Seeborg
18                                          )
   _____)
19

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

**Digital Envoy's Motions Should be Denied Based On Undue Burden Alone**

The burden Digital Envoy seeks to impose upon Google through its document requests at issue in these motions is enormous.  *See generally* Declarations of Kim Malone and David DiNucci.  The multi-layered, impermissibly compound interrogatories are equally burdensome, even assuming Google possesses the information Digital Envoy seeks.  *See* Malone Decl., ¶4.  At no point has Digital Envoy ever addressed Google's compelling evidence of undue burden, despite being asked to do so specifically by the Court.  Under these circumstances the Court need not even consider whether Digital Envoy's pie-in-the-sky damages theories might be tenable.  Based on undue burden alone, Digital Envoy's motions must be denied. Fed. R. Civ. P. 26(b)(2)(iii).

**Digital Envoy Has Failed to Show Good Cause for the Discovery**

The burden Digital Envoy seeks to impose through this discovery would be undue under any circumstances.  It is particularly problematic here given that Digital Envoy's has attempted to justify the discovery only by claiming it is generally relevant to its damages theories.   This purported justification fails for two reasons.

First, Digital Envoy has made no effort at all to reasonably tailor its discovery requests to its damages hypotheses.  For example, its request seeking all communications at any time between Google and any advertiser on any subject, could never be justified.  Its request for all documents relating to any use of Digital Envoy's data is also wildly overbroad, since only one use is at issue in the case.  The list of glaring foibles in Digital Envoy's goes on and on.[1]

Second, Digital Envoy's damages theories are impossibly speculative.[2]  As the Court has already made clear, Digital Envoy is not entitled to demand mountains of discovery in the hopes of finding something to justify its claims.  *See, e.g.* Kramer Decl., Ex. E, Tr. at 15-16 (Digital

---

[1]  The overbreadth and burden of Digital Envoy's requests is made all the more manifest through a request-by-request examination of the discovery at issue.  In its prior briefs, Google addressed specific flaws in Digital Envoy's requests, and laid additional objections, such as vagueness, as applicable.

[2]  Digital Envoy has suggested that Google is mischaracterizing Digital Envoy's damages theories.  But Google's understanding was informed by Digital Envoy's initial disclosures, and later by Digital Envoy's refusal to provide substantive answers to Google's contention interrogatories.

Google's Supplemental Brief in Opposition
of Digital Envoy's Motions to Compel
Case No.: C 04 01497 RS                                                      - 1 -                        C:\NrPortbl\PALIB1\DAG\2685661_1.DOC

1  Envoy "can't say ... there's a whole universe of material out there, and we think if we look at it,

2  it's going to help us, or it's going to show this. [It has to] do more than just say, ah, if we look

3  through all this, maybe there's something in there that's going to be helpful; because we think it

4  must have been involved in these, in these discussions.");  *see also Allen v. Howmedica*

5  *Leibinger, GmhH*, 190 F.R.D. 518, 523-24 (W.D. Tenn. 1999) (denying discovery to support

6  speculative damages claim:  "[T]he plaintiff must enunciate some factual support for the theory

7  with some degree of particularity.  Broad, general conclusory allegations of "lost market share"

8  or "reduced price" will not suffice.  [Plaintiff's] damage theory of "lost market share" is too

9  tenuous at this time to permit discovery of the leading competitor's financial, sales, and

10  marketing information."); *Ocean Altantic Woodward Corp. v. DRH Cambridge Homes, Inc.*, 262

11  F. Supp. 2d 923, 927 (N.D. Ill. 2003) (assessing "attenuated" and "speculative" lost profits claim

12  in copyright action and denying "massive discovery" relating to that claim); *Surles v. Air France*,

13  No. 00CIV5004RMBFM, 2001 WL 815522, at *4 (S.D.N.Y. July 19, 2001) (denying motion to

14  compel where request "is based upon nothing more than the speculative hope that useful

15  impeachment material will be unearthed."), *aff'd*, 2001 WL 1142231 (S.D.N.Y. Sep. 27, 2001);

16  *U.S. v. Rezaq*, 156 F.R.D. 514, 521 (D. D.C. 1994) (denying motion to compel where requesting

17  party "offers the court nothing more than speculative hopes that the evidence requested here will

18  help defendant track down something that will help his case.").

19       Digital Envoy first claims to have suffered "lost profits" because Google "ate" Digital

20  Envoy's market of web site publishers by using Digital Envoy's geotargeting data in its AdSense

21  for Content ("AFC") advertising program.[3]  Even before it licensed Google, Digital Envoy

---

23     [3]  Digital Envoy's complaint in this action does not challenge Google's use of Digital
   Envoy's data in Google's AdSense for Search ("AFS") advertising program.  Indeed, when
24  pressed at the hearing for an explanation as to how the complaint placed AFS at issue, Digital
   Envoy's counsel could identify no paragraph in the complaint in which Digital Envoy
25  affirmatively claimed that Google's use of the data in AFS exceeded the scope of Google's
   license.  Hearing Tr. at 42:4-13.  Google was thus entirely justified in believing that AFS was not
26  part of the case and objecting to Digital Envoy's AFS-related discovery back in August 2004.
   Google offered Digital Envoy an opportunity to amend its complaint and add claims concerning
27  AFS in January 2005.  Digital Envoy failed to do so.  It then waited until after the close of
   written discovery, indeed until the last possible day to file motions to compel, to seek a judicial
28  determination that AFS was part of the case and that it was entitled to discovery concerning it.
   Google would be greatly prejudiced at this point were the Court to permit Digital Envoy to

licensed the then-leading Internet advertising network in the country, Advertising.com, to use its data to run advertisements across a network of publisher sites -- precisely the use it complains about in this case -- ███████████████████████. Advertising.com, and a host of other Digital Envoy licensees have been and remain free to use Digital Envoy's data to display advertisements on publishers' web sites, and thereby "eat" the supposed market Digital Envoy now claims to care about. *See, e.g.,* Supp. Dec. of David H. Kramer in Support of Google's Motion for Summary Judgment, Ex. Q (email from Digital Envoy CEO attaching Digital Envoy marketing materials extolling Advertising.com's use of Digital Envoy's data in its online advertising network "reaching approximately 50% of the Internet"); *Id.*, Ex. O (Digital Envoy press release, December 2002 announcing license of data for use in Internet advertising network known as 24/7 Media).   As its own licensing activities make clear, even Digital Envoy does not believe the cannibalized market theory it has invented for this litigation.

More fundamentally, the causal nexus Digital Envoy must establish in order to even offer this theory does not withstand scrutiny.  Digital Envoy has not shown that any web site publisher cared enough about receiving geotargeting ads to have acted any differently if Google had been unable to supply them. [4]  Accordingly, there is no reason to believe that if Google had been unable to offer geotargeting to advertisers in its AFC program, publishers would have sought out an alternative means of geotargeting the advertisements that appeared on their sites.  Kramer

---

expand its case to include claims concerning AFS. Hearing Tr. at 37:23-41:16 (identifying prejudice as *inter alia* lack of discovery concerning allegedly improper "sharing" of data by identically situated advertising networks and focus of summary judgment motions on definition of "business" in License Agreement).  Accordingly, Digital Envoy's attempt to amend its complaint through the vehicle of a discovery motion (after the close of written discovery) must be rejected.  *See Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000) (refusing to allow plaintiff to expand claims after close of discovery; a "complaint guides the parties discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

[4]  At the hearing on these motions, Google's counsel indicated in passing that geotargeting was not mentioned in Google's "materials for publishers." Hearing Tr. at 48:20-22.  Since the hearing, Digital Envoy has displayed a publisher-directed page from Google's *current* web site that mentions that advertisers can geotarget their messages, as one of the ways that advertisements served by Google are targeted.  Digital Envoy had not produced the current page in discovery (nor any other similar page), accordingly Google's counsel was not familiar with it.  Nevertheless, Google apologizes for the misstatement, while noting that it does not in any way

1   Decl., Ex. E, Tr. at 15-17 (Court instructing Digital Envoy in January '05 that it had to show that

2   geotargeting was some critical aspect of selling process and establish that customers were

3   motivated by geotargeting).  Further, Digital Envoy has failed to show that any publisher that

4   believed geotargeting was so important, would have sought geotargeting capability from Digital

5   Envoy directly instead of using a host of other options, most notably alternative advertising

6   networks, all of whom offer it as a standard feature to advertisers in their networks.[5]  *Again,*

7   *Google has already asked Digital Envoy to identify any publisher that it believes would have*

8   *licensed Digital Envoy's data but for Google's supposed misuse of the data in AFC.  While it is*

9   *surely in the best position to know of any lost business, Digital Envoy did not identify a single*

10  *publisher in response to the interrogatory, and audaciously claimed that the interrogatory was*

11  *"an improper hypothetical."*  See, e.g., Kramer Decl., Ex. A at 2-3.  By itself, that response

12  dooms Digital Envoy's lost profits theory as rank speculation, and reveals its burdensome

13  discovery requests as unjustified.

14       Digital Envoy separately claims that Google was unjustly enriched through its use of

15  Digital Envoy's data in AFC.  The claim is equally speculative; the causal nexus equally lacking.

---

17  suggest that a publisher makes its decision about the advertising space on its site based upon the
    availability of geotargeted advertisements.

18      [5]  According to two disinterested Internet advertising networks, Digital Envoy's lost profits
19  theory fails because publishers do not wish to operate their own advertising infrastructure for
    which they would need their own geotargeting license.

1   Digital Envoy has no idea what a particular advertiser would have done had Google not been

2   able to offer them geotargeting capabilities *in the AFC program.*[6]  It certainly has made no

3   showing that an advertiser would not have participated in the AFC program but for the

4   availability of geotargeting.  Once again, it failed to identify any such advertiser in response to a

5   Google interrogatory.  Nevertheless, it has demanded that Google produce all communications

6   on any subject with each of its ███████████████ advertisers, as well as detailed

7   information on each.  Such discovery is simply abusive.

8          The Court may be reluctant, even at this late stage of the case, to reject Digital Envoy's

9   damages theories outright.  But given ample opportunity, in fact having been instructed by the

10  Court on the problem with its approach, Digital Envoy has offered no evidence at all to suggest

11  that it could ever establish the causal nexus required for its damages theories.  At the same time,

12  it is demanding discovery that would cost Google millions of dollars and months to produce.

13  Under the circumstances, the Court should reject discovery directed to these speculative claims.

14                      **Google's Proposal Regarding the Discovery Requests**

15         Without in any way giving credence to Digital Envoy's damages theories, Google is

16  prepared to provide reasonable discovery to Digital Envoy in the interest of resolving these

17  motions.  Specifically:

18    ▪ Google will conduct a reasonable search for general communications with publishers and
         advertisers -- those delivered to publishers or advertisers as a group -- during the period
19       of time in which Google was utilizing Digital Envoy's data, if any, that directly discuss
         the geotargeting of advertisements;

20

21

22  _____

23         [6]  Digital Envoy has repeatedly conceded that Google was licensed to use Digital Envoy's
    data in the process of selecting advertising messages in its AdWords program, for display on
24  Google's own web sites.   During the relevant time period, the AdWords program was roughly
    ████████ times the size of AFC in terms of revenue, and every advertiser necessarily
25  participated in it (in contrast to their selective participation in AFC).  Under the circumstances, it
    would do Digital Envoy no good to show that an advertiser was attracted to Google because of
26  its geotargeting capabilities.  To the extent an advertiser even cared about geotargeting, Google
    was perfectly entitled to attract such advertisers to the vastly more prominent AdWords program.
27  What Digital Envoy would have to show in this case, is that an advertiser participated in the
    allegedly unlicensed AFC program (and would not otherwise have) because Google offered its
28  geotargeting capabilities in AFC.  Google cannot imagine how such a showing could ever be
    made, even with the nearly boundless discovery Digital Envoy demands.

1    ▪   Google will conduct a reasonable search for communications between Google and up to
2        ten individual advertisers (to agreed upon by the parties), if any, that directly discuss the
         geotargeting of advertisements;

3    ▪   Google will conduct a reasonable search for communications reflecting negotiations over
         geotargeting, if any, with up to ten web site publishers (to be agreed upon by the parties)
4        who joined Google's AFC program during the period in which Google was using Digital
         Envoy's data;
5
     ▪   Google will produce representative samples of the contracts it used with advertisers and
6        web site publishers that participated in the AFC program during the relevant time period.

7    To be clear, no matter what this discovery reveals, it will not enable Digital Envoy to establish a

8    causal connection between Google's use of data in AFC and either revenue earned by Google or

9    revenue lost by Digital Envoy.  Nevertheless, such a sampling is a reasonable accommodation of

10   Digital Envoy's overbroad and burdensome discovery requests.

11             **Digital Envoy's New Proposals Do Not Address the Problems with Its Requests**

12           Last week, Digital Envoy provided Google with "modifications" to the discovery in

13   question.  But, as Google responded, these proposed "limitations" do nothing to correct the

14   fundamental problems with the requests.  For example, Digital Envoy purports to limit the number

15   of advertisers about which it seeks volumes of information by excluding "documents that relate

16   specifically and solely to Google's use of Digital Envoy's technology with respect to ... non-

17   AdSense advertisers."  This limitation still leaves Digital Envoy demanding all communications

18   and a host of other irrelevant information for roughly ███████████████ Google

19   advertisers.  Further, the requests remain unbounded by time or subject matter, and Digital Envoy

20   still has failed to explain what the specific information it seeks will be used to show.  In short, the

21   proposed limitation merely demonstrates that Digital Envoy's requests were and remain absurdly

22   overbroad and unduly burdensome.

23           Digital Envoy's proposals to limit discovery concerning Google's publishers are no better.

24   Digital Envoy still demands that Google *inter alia* identify each ████████████████ web

25   site publishers participating in its network, and produce *all communications with any of them*,

26   ever, concerning geotargeting or Internet Protocol addresses.  Further, while it purports to limit the

27   number of publishers about which it seeks certain additional documentation, it still *seeks all*

28   *contracts, all documents relating to negotiations, and all communications related to the contracts*

1    *for hundreds of web site publishers and thousands of web sites* – without the slightest factual

2    showing that any of these publishers has even heard of Digital Envoy, let alone that they might

3    have been a Digital Envoy licensee but for Google's use of Digital Envoy's data in AFC.  *See*

4    Kramer Decl., Ex. E, Tr. at 15-17 (Court: "you have to do more than just say... maybe there's

5    something in there that's going to be helpful.").[7]   Again, Digital Envoy has not limited its

6    demands to communications concerning geotargeting, or by time period, or to the AFC program.

7    For good measure, Digital Envoy demands Google produce *all documents related to the marketing*

8    *of its AdSense program, ever*, and claims the right to demand additional discovery (even though

9    discovery has been closed for two months).  Once again, all Digital Envoy has done by purporting

10   to limit its requests, is to show how patently overbroad and burdensome they were and remain.

11        In addition, Digital Envoy continues to insist that Google respond to its impermissibly

12   compound and vague interrogatories and perform multi-variable mathematical calculations for

13   every one of ████████ web sites participating in Google's advertising network.  It maintains

14   this demand despite Google's unchallenged declaration describing the enormous burden

15   involved.   Burden aside, Digital Envoy has offered no explanation as to why it makes any

16   difference (1) how much a particular publisher earned from the AFC program; (2) for each of the

17   myriad sites that the publisher operates (3) by month (4) from geotargeted ads, combined with

18   (5) the dates on which such ads were shown on each site; (6) whether Digital Envoy's data could

19   technically and permissibly be used that month on that site; and (7)  Google's costs of revenue

20   for each site.  Google has never compiled such information, assuming that Google even has it.

21        As far as Google can tell, the relevant question for Digital Envoy is whether but for the

22   availability of geotargeting in AFC, a given publisher would have somehow licensed Digital

23   Envoy's data.  If Digital Envoy truly lost licensing revenue, it should be able to calculate its

_____

25        [7]  As noted, Digital Envoy previously sought similar information from twenty-two of

26   Google's partners via subpoena.  Despite the more limited number of targets, the Court correctly
     recognized that the discovery was unduly burdensome. *Id.  See also* Declaration of Hilary Ware

27   In Support of Google's Motion for Protective Order at ¶3 (describing burden associated with
     collecting documents reflecting communications and negotiations with two dozen publishers).

28   Even on this point, Digital Envoy's modified proposal is considerably more burdensome than
     that the Court previously frowned upon.

1   supposed losses without regard to the information it demands for Google, particularly since such

2   information would be prohibitively expensive and disruptive for Google assemble (if assembly

3   were even possible).

### To The Extent the Court Is Prepared To Permit Any Significant Portion of the Discovery Digital Envoy Seeks, This Litigation Should Be Bifurcated

4

5       A decision on Digital Envoy's pending motions, as well as the significant burden inherent

6   in responding to even a limited version of the requested discovery, can be postponed – and

7   potentially avoided altogether – by bifurcating this action to first resolve issues of Google's

8   supposed liability for trade secret misappropriation.[8]  If, as Google believes, it is found not to

9   have knowingly or unreasonably exceeded the scope of the License Agreement, the case will be

10  over.  Should Digital Envoy prevail in the liability phase, however, the Court and the parties

11  would then turn their attention to the separate and distinct issue of damages.  Because bifurcation

12  would be practical, convenient, and efficient, this Court should order the case to proceed in two

13  phases:  a liability phase followed, if necessary, by a damages phase.

14      This "Court has broad discretion to bifurcate the trial of liability and damages issues

15  under Federal Rule of Civil Procedure 42(b)."  *Ryan v. Carl Corp.,* No. C97-3873 FMS, 1999

16  WL 16320, at *4 (N.D. Cal. Jan. 13, 1999); *See also Bates v. United Parcel Service,* 204 F.R.D.

17  440, 448 (N.D. Cal. 2001) (noting court's "broad discretion" to order separate trials under Rule

18  42(b)); *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1517 (9th Cir. 1985) (same).  Pursuant to

19  Rule 42(b), "[t]he court, in furtherance of convenience or to avoid prejudice, or when separate

20  trials will be conducive to expedition and economy, may order a separate trial of … any separate

21  issue ...."  Fed. R. Civ. P. 42(b).  Indeed, courts in this district routinely bifurcate cases to address

22  separately issues of liability and damages.[9]  Moreover, the Court "has power to order a separate

23

_____

24      [8]  This Court previously denied Google's motion to limit discovery to Google's license

25  defense and to bifurcate that issue from the rest of the case.  The relief sought here is different -- bifurcation along the clearly delineated lines of liability and damages.  Further, the case is much

26  further along and written discovery is closed, making disputes over the lines of demarcation far less likely.

27      [9]  *See, e.g. Dolby Labs., Inc. v. Lucent Techs., Inc.,* No. 5:01-CV-20709 JR RS, 2004 WL

28  2445232, at *4 (N.D.Cal. May 26, 2004) (referencing case's bifurcated liability and damages phases); *North Pacifica, LLC v. City of Pacifica,* 335 F. Supp. 2d 1045 (N.D. Cal. 2004) (same); *Kure Shipping S.A. v. Louisiana Pacific Corp.*, No. 98-CV-648, 2001 WL 34037327, at *1 (N.D.

1  trial of issues, sua sponte, to further convenience, or to avoid prejudice." *Huffmaster v. United*

2  *States,* 186 F. Supp. 120, 124 (N.D. Cal. 1960). "The instant situation is one where the exercise

3  of such authority is eminently required." *Id.*

4        In deciding whether to bifurcate, the Court must consider "avoiding prejudice,

5  separability of the issues, convenience, judicial economy, and reducing risk of confusion."

6  *Bates,* 204 F.R.D. at 448. These factors weigh heavily in favor of separating the liability and

7  damages phases here. First, no prejudice would result from bifurcation, as it would impose no

8  extra burdens on the parties and would not unreasonably delay resolution of the litigation.

9  Indeed, as detailed below, it would likely have the opposite effect. Next, the issues of liability

10  and damages are entirely separable in this case. "The essence of [Digital Envoy's] claims is that

11  Google exceeded the scope of the License Agreement by sharing Digital Envoy's trade secrets

12  with third parties." Digital Envoy Reply Br. at 1. Accordingly, the liability phase will turn on

13  straightforward questions of contract interpretation and Google's state of mind in using Digital

14  Envoy's data. A damages determination, by contrast, depends on Digital Envoy's supposed

15  losses, if any, and the extent to which Google was allegedly unjustly enriched. Only in that

16  phase would any discussion of Digital Envoy's lost customers or Google's profits have

17  relevance. In short, the damages issues in this case are wholly distinct from the liability issues,

18  and bifurcation would potentially moot the extraordinarily burdensome damages-related

19  discovery that Digital Envoy has improperly demanded.

20        The final three factors – convenience, judicial economy, and reducing risk of confusion –

21  also weigh in favor of bifurcation. "Because the issues of liability and damages are separable, it

22  would be convenient to bifurcate. Moreover, reducing the types and amount of evidence to be

23  produced in each phase of trial would promote judicial economy and reduce the risk of

24

25  Cal. Aug. 27, 2001) (same); *Wafford v. U.S.*, No. C95-01134 MMC, 1999 WL 360755, at *1

26  (N.D. Cal. June 1, 1999) (same); *Schroeder v. U.S.*, No. C-95-1736 SI, 1996 WL 754090, at *1
    (N.D. Cal. Dec. 13, 1996) (same); *Butler v. Home Depot, Inc.*, No. C-94-4335 SI, 1996 U.S.

27  Dist. LEXIS 3370, at *18 (N.D. Cal. Jan. 24, 1996) ("As evidenced by the numerous cases
    across the country that have addressed this issue, the Seventh Amendment does not mandate that

28  all phases of the litigation be heard by the same jury.")

1    confusion.  Judicial economy would be further promoted because bifurcation might eliminate the

2    need to consider evidence of damages." *Bates,* 204 F.R.D. at 449.

3         In ruling on Google's motion for summary judgment, this Court expressed its own view

4    that Google's interpretation of the License Agreement was not only reasonable, but was "more

5    reasonable" than Digital Envoy's.  Order dated May 20, 2005 at 9-10.  Google is confident that a

6    jury will share that view, thereby obviating the need for a second phase to determine damages.

7    *See, e.g., General Patent Corp. v. Microcomputer,* No. SA CV 97-429-GLT ANX, 1997 WL

8    1051899, at *1 (C.D. Cal. Oct. 20, 1997) ("Bifurcation is particularly appropriate when

9    resolution of a single claim or issue could be dispositive of the entire case").  Further, because

10   the discovery requests at issue relate to evidence of damages (*see, e.g.,* Reply Br. at 8-12),

11   bifurcation would postpone, if not eliminate, the need for a decision on the pending motions, as

12   well as the expense associated with any further production. *See Ellingson Timber Co. v. Great*

13   *Northern Ry. Co.,* 424 F.2d 497, 499 (9th Cir. 1970) ("One of the purposes of Rule 42(b) is to

14   permit deferral of costly and possibly unnecessary discovery proceedings pending resolution of

15   potentially dispositive preliminary issues").  Likewise, bifurcation may moot Google's

16   forthcoming motion for summary adjudication on damages and would potentially allow the

17   parties to avoid the significant expense of expert discovery on damage issues. [10]  Accordingly, to

18   the extent the Court contemplates permitting any of Digital Envoy's oppressive discovery, it

19   should first exercise its broad discretion to bifurcate liability and damages in this case.

20

21   Respectfully Submitted**,**

21   Dated:  July 5, 2005                                          WILSON SONSINI GOODRICH & ROSATI

22

23                                                                By:    /s/ David H. Kramer
                                                                         David H. Kramer
24

25                                                                Attorneys for Defendant / Counterclaimant
                                                                  GOOGLE INC.
26

27   ──────────────
        [10]  Should damages remain part of this phase of the case, Google intends to move for
     summary adjudication based on the two limitation of liability clauses in the License Agreement
28   and on the ground that Digital Envoy is unable to demonstrate a causal nexus between Google's
     use of Digital Envoy's data and Digital Envoy's claims for damages.