1  P. CRAIG CARDON, Cal. Bar No. 168646
   BRIAN R. BLACKMAN, Cal. Bar No. 196996
2  KENDALL M. BURTON, Cal. Bar No. 228720
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
3  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4106
4  Telephone:    415-434-9100
   Facsimile:    415-434-3947
5

6  TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
   LUKE ANDERSON (Admitted *Pro Hac Vice*)
7  MCGUIRE WOODS, L.L.P
   1170 Peachtree Street, N.E., Suite 2100
8  Atlanta, Georgia 30309
   Telephone: 404.443.5500
9  Facsimile:  404.443.5751

10  Attorneys for DIGITAL ENVOY, INC.

11                          UNITED STATES DISTRICT COURT

12                         NORTHERN DISTRICT OF CALIFORNIA

13                                  SAN JOSE DIVISION

14  DIGITAL ENVOY, INC.,                    Case No. C 04 01497 RS

15              Plaintiff/Counterdefendant, **MEMORANDUM OF POINTS AND**
                                            **AUTHORITIES IN SUPPORT OF**
16       v.                                 **DIGITAL ENVOY'S MOTION FOR**
                                            **PARTIAL SUMMARY JUDGMENT ON**
17  GOOGLE, INC.,                           **CONTRACT ISSUES**

18              Defendant/Counterclaimant.  Date:       August 10, 2005
                                            Time:       9:30 a.m.
19                                          Courtroom:  4, 5th Floor

20                                          **The Honorable Richard Seeborg**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................... 1

II. RELEVANT FACTS ................................................................................................................ 1

III. ARGUMENT ............................................................................................................................ 3

    A. Digital Envoy is Entitled to Summary Judgment Because the Language of the Agreement is Clear and Unambiguous, and There Are No Genuine Issues of Material Fact as to Whether Google Licensed Digital Envoy's Database Libraries to Third Parties. ............................................................................ 3

    B. The Plain and Ordinary Meaning of the Agreement Must Be Adopted Because the Relevant Language of the Agreement is Clear and Unambiguous. ............................................................................................................ 3

    C. The Plain and Customary Meaning of the Agreement Prohibits Google from Licensing Digital Envoy's Database Libraries to Third Parties. .............................. 5

        1. A "license" is a grant of permission to do a particular thing. ........................ 6

        2. The phrase "in no event are the database libraries to be . . . licensed . . . to any other party" clearly forbids licensing of the database libraries to third parties. ............................................................................ 7

    D. Google's Licensing of AdSense with Geo-Targeting Necessarily Resulted in a Licensing of Digital Envoy's Database Libraries in Violation of the Agreement. ............................................................................................................... 8

        1. It is undisputed that Google licensed AdSense to third parties. .................... 9

        2. It is undisputed that Digital Envoy's Database Libraries were a component of geo-targeting for AdSense. .................................................... 11

        3. Since a license to the whole necessarily encompasses a license to its component parts, Google's licensing of AdSense with geo-targeting capabilities necessarily resulted in a licensing of Digital Envoy's Database Libraries. ................................................................................... 12

IV. CONCLUSION ...................................................................................................................... 14

# TABLE OF AUTHORITIES

**Federal Cases**

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ................................................................................................................ 3

In re Bennett,
   298 F.3d 1059 (9th Cir. 2002) ................................................................................................. 4

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) ................................................................................................................ 3

Herman v. United Brotherhood of Carpenters and Joiners of America,
   60 F.3d 1375 (9th Cir. 1995) ................................................................................................... 6

Humboldt Bank v. Gulf Insurance Co.,
   323 F. Supp. 2d 1027 (N.D. Cal. 2004) .................................................................................. 4

**State Cases**

AIU Insurance Co. v. Superior Court,
   51 Cal. 3d 807 (1990) ..................................................................................................... 4, 6, 8

Blatz Brewing Co. v. Collins,
   69 Cal. App. 2d 639 (1945) ................................................................................................ 6, 7

Jordan v. Allstate Insurance Co.,
   116 Cal. App. 4th 1206 (2004) ............................................................................................... 4

O'Connor v. West Sacramento Co.,
   189 Cal. 7 (1922) .................................................................................................................... 4

San Gabriel Tribune v. Superior Court,
   143 Cal. App. 3d 762 (1983) .................................................................................................. 6

Stamm Theatres, Inc. v. Hartford Casualty Insurance Co.,
   93 Cal. App. 4th 531 (2001) ................................................................................................... 4

**State Statutes**

Cal. Civ. Code
   § 1635 ...................................................................................................................................... 5
   § 1636 ...................................................................................................................................... 4
   §§ 1638 and 1644 ................................................................................................................... 4
   § 1639 ...................................................................................................................................... 4
   § 1641 ...................................................................................................................................... 4

**Miscellaneous**

Uniform Computer Information Transactions Act (UCITA) § 102(a)(41) ................................... 7

Article 9 of the Uniform Commercial Code ................................................................................. 7

## I.  INTRODUCTION

Google violated its agreement with Digital Envoy by impermissibly licensing Digital Envoy's technology to third parties.

Section 3.1 of the Agreement clearly and unambiguously prohibits Google from licensing Digital Envoy's technology to third parties.  Google licensed AdSense with geo-targeting capabilities to third parties.  Digital Envoy's technology was a component of AdSense's geo-targeting capabilities.

In short, a license of the whole necessarily entails a license of its component parts.  Thus, because Digital Envoy's technology was a component of AdSense, a license of AdSense was necessarily a license of Digital Envoy's technology.

Given the clarity of the Agreement and the uncontroverted evidence supporting Google's licensing of Digital Envoy's technology to third parties, Digital Envoy is entitled to judgment as a matter of law that Google's licensing of Digital Envoy's technology violates the parties licensing agreement.

## II.  RELEVANT FACTS

On November 30, 2000, Digital Envoy and Google entered into the Product and Electronic Database Evaluation and License Agreement (hereafter "Agreement").  Google's Answer to Amended Complaint of Digital Envoy and Counterclaims for Breach of Contract and Declaratory Judgment (hereafter "Answer to Amended Complaint"), ¶¶ 26 and 72.[1]  The subject matter of the Agreement included Digital Envoy's proprietary and confidential geographic/IP address database ("Database Libraries").  Exh. A.[2]  The Database Libraries included information that permitted IP-based geo-targeting.  The Agreement expressly recites that Digital Envoy was the sole owner of the Database Libraries.  Exh. A at 1; Google's Answer to Amended Complaint, ¶ 28.

---

[1] The Agreement expired in January of 2005.
[2] Both Google and Digital Envoy have stipulated to the authenticity of the Agreement

1    Section 3.1 of the Agreement allowed Google to "use in its Business (and not distribute to
2 any third party in whole or in part)" Digital Envoy's Database Libraries. Exh. A, § 3.1; Google's
3 Answer to Amended Complaint, ¶ 27.  Section 3.1 also provided:

4
> Such rights shall be <u>strictly limited</u> to the right to . . . input,
> download, and store some or all of the Database Libraries in file and
> memory; and compile some or all of the Database Libraries at the
> Site. . . .  In no event, however, are the Database Libraries to be
> sold, licensed, distributed, shared, or otherwise given (in any form)
> to any other party or used outside of the site set forth herein.

5

6

7

8 *Id*. (emphasis added).

9    In addition to the limitations in section 3, section 7.2 of the Agreement provided that "in no
10 event shall Licensee [Google] distribute, disclose, or otherwise make available the Database
11 Libraries, or any information contained therein . . . ."  Exh. A, § 7.2.

12    Between November 30, 2000, and January of 2005, Google implemented a program
13 through which it executed licenses with third parties.  Declaration of Susan Wojcicki in Support of
14 Google Inc.'s Motion for Summary Judgment (hereafter "Wojcicki Declaration"), ¶¶ 6, 7, and 8.
15 That program is "AdSense."

16    Google used Digital Envoy's Database Libraries to implement the geo-targeting
17 capabilities for third parties who licensed AdSense with geo-targeting capabilities.  Declaration of
18 Mark Rose in Support of Google Inc.'s Motion for Summary Judgment (hereafter "Rose
19 Declaration"), ¶ 8.  In fact, "Google <u>often</u> used Digital Envoy's IP Address/Location data as one of
20 several factors in making its determination about a user's geographic location in AdSense."  Rose
21 Declaration, ¶ 4 (emphasis added).  In other words, geo-targeting was a necessary part of the
22 AdSense license for some third parties.

23    Digital Envoy notified Google, in February of 2004, that Digital Envoy believed Google
24 was exceeding the scope of the Agreement.  Answer to Amended Complaint, ¶ 43.  After
25 attempting unsuccessfully to resolve this issue with Google, Digital Envoy brought this lawsuit for
26 recovery of damages.

27    During the course of litigation, Google filed a Motion for Summary Judgment, contending
28 that Google had not violated the Agreement.  *See* Google's Motion for Summary Judgment.

Specifically, Google argued that "[i]n operating [AdSense for Content], Google in no way distributed, disclosed, shared or otherwise gave Digital Envoy's data to any third-party." Google's Motion for Summary Judgment at 18. Google, however, never addressed whether Google *licensed* Digital Envoy's Database Libraries to third parties.

The Court denied Google's motion, finding that the term "[to] share" (among other terms) was ambiguous, and that the violation of the Agreement turned on disputed facts. Order at 14. The Court, however, did not rule on whether the term "license" was ambiguous, because Google had conspicuously omitted that key contract term from its arguments.

### III.    ARGUMENT

**A.    Digital Envoy is Entitled to Summary Judgment Because the Language of the Agreement is Clear and Unambiguous, and There Are No Genuine Issues of Material Fact as to Whether Google Licensed Digital Envoy's Database Libraries to Third Parties.**

Summary judgment is appropriate where no genuine issue of material fact exists and a party is entitled to prevail in the case as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Here, as described in greater detail below, the relevant terms of the Agreement are susceptible only to one interpretation. Thus, Digital Envoy is entitled to judgment as a matter of law. Additionally, no reasonable juror could find that Google did not license Digital Envoy's Database Libraries to third parties. Thus, Digital Envoy is entitled to judgment as a matter of law that Google violated its Agreement with Digital Envoy.

**B.    The Plain and Ordinary Meaning of the Agreement Must Be Adopted Because the Relevant Language of the Agreement is Clear and Unambiguous.**

"[T]he construction of a contract is always a matter of law for the court, no matter how ambiguous or uncertain or difficult its terms, that the jury can only assist the court by determining

disputed questions of fact." *O'Connor v. West Sacramento Co.*, 189 Cal. 7, 18 (1922). "If the facts and circumstances to be considered in the interpretation of the contract are undisputed, there is nothing to submit to the jury and the court <u>must</u> direct a verdict in accordance with the construction placed on the contract by the court in the light of the admitted circumstances." *Id*. (emphasis added). "On the other hand, if such circumstances are in dispute and the meaning of the contract is to be determined one way according to one view of the facts and another way in accordance with the other view of the facts, then the determination of the disputed fact must be left to the jury, but in no case can the proper construction of the contract be left to a jury." *Id*. "Any instruction that leaves more than this to a jury is erroneous." *Id*.

"Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation." Cal. Civ. Code, § 1636; *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). "Such intent is to be inferred, if possible, <u>solely</u> from the written provisions of the contract." Cal. Civ. Code, § 1639; *AIU*, 51 Cal. 3d at 822 (emphasis added). "The clear and explicit meaning of the provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." Cal. Civ. Code, §§ 1638 and 1644; *AIU*, 51 Cal. 3d at 822. "Thus, if the meaning a layperson would ascribe to the contract language is not ambiguous, we apply that meaning." *AIU*, 51 Cal. 3d at 822. Additionally, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practical, each clause helping to interpret the other." Cal. Civ. Code, § 1641. Where the contract is integrated, extrinsic evidence is generally not admissible to interpret the contract. *In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002).

"It is well settled that in order to construe words in an insurance policy in their 'ordinary and popular sense,' a court may resort to a dictionary." *Humboldt Bank v. Gulf Ins. Co.*, 323 F. Supp. 2d 1027, 1033 (N.D. Cal. 2004), citing *Jordan v. Allstate Ins. Co.*, 116 Cal. App. 4th 1206 (2004) and *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.*, 93 Cal. App. 4th 531 (2001).

1  Additionally, all contracts are to be interpreted by the same rules. Cal. Civ. Code, § 1635. Thus,
2  this Court may resort to a dictionary to construe the words in the Agreement at issue.[3]
3        Here, the plain and ordinary meaning of the prohibition of licensing Digital Envoy's
4  Database Libraries is clear and unambiguous. The Court should, therefore, construe the contract
5  as a matter of law.

6  **C.    The Plain and Customary Meaning of the Agreement Prohibits Google from**
7        **Licensing Digital Envoy's Database Libraries to Third Parties.**

8        The prohibition of licensing Digital Envoy's technology is clear and unambiguous.
9  Specifically, the relevant portion of the Agreement recites: "In no event, however, are the
10 Database Libraries to be sold, licensed, distributed, shared, or otherwise given (in any form) to any
11 other party or used outside of the site set forth herein." Exh. A, § 3.1.
12       Stated differently, section 3.1 provides several prohibitions related to Digital Envoy's
13 Database Libraries. Specifically, the prohibitions can be separated as follows:

14       (A)    "In no event, however, are the Database Libraries to be sold . . . to any other party";
15       (B)    "In no event, however, are the Database Libraries to be . . . licensed . . . to any other party";
16       (C)    "In no event, however, are the Database Libraries to be . . . distributed . . . to any other party";
17
18       (D)    "In no event, however, are the Database Libraries to be . . . shared . . . [with] any other party";
19       (E)    "In no event, however, are the Database Libraries to be . . . otherwise given . . . to any other party"; and
20       (F)    "In no event, however, are the Database Libraries to be . . . used outside of the site set forth herein."
21
22       Thus, any one of the following actions by Google results in a violation of the Agreement:

23       (a)    Selling the Database Libraries in any form to any other party;
24       (b)    Licensing the Database Libraries in any form to any other party;

---

[3] In relying heavily on dictionary definitions, Google implicitly admits that the plain and customary meaning of the terms in the Agreement can be discerned from the dictionary. *See, e.g.*, Google Inc.'s Reply Brief in Support of Its Motion for Summary Judgment, n. 3 (citing to the American Heritage Dictionary of the English Language and Merriam Webster Online dictionary).

   (c) Distributing the Database Libraries in any form to any other party;
   (d) Sharing the Database Libraries in any form with any other party;
   (e) Otherwise giving the Database Libraries in any form to any other party; or
   (f) Using the Database Libraries outside of the "site set forth herein," (Google's own website).

Google previously moved for summary judgment, arguing that it did not "distribute," "share," or "otherwise give" Digital Envoy's Database Libraries to third parties. The Court, however, ruled that those particular terms were ambiguous. *See* Order at 9. Noticeably absent from Google's arguments was an analysis of the prohibition of *licensing* the Database Libraries to any other party.

This prohibition is susceptible of only one reasonable interpretation. Thus, the interpretation of that particular provision is a matter of law for the Court. *AIU*, 51 Cal. 3d at 822.

### 1. A "license" is a grant of permission to do a particular thing.

"License" is both a noun and a verb. As a verb, the dictionary defines "license" as "to permit or authorize especially by formal agreement" or "to give permission or consent to." *Merriam-Webster Online Dictionary*, attached as Exh. B to the Declaration of Sam S. Han in Support of Digital Envoy's Motion for Partial Summary Judgment (hereafter "Han Declaration"). As a noun, the dictionary defines "license" as "permission to act" or "a document, plate, or tag evidencing a license granted." *Id.*

Many California courts have adopted the dictionary definition of "license." *See, e.g., Herman v. United Brotherhood of Carpenters and Joiners of Am.*, 60 F.3d 1375, 1381 (9th Cir. 1995) (adopting dictionary definition of the term "license"); *San Gabriel Tribune v. Superior Court*, 143 Cal. App. 3d 762 at n.12 (1983) (adopting dictionary definition of the term "license"); *Blatz Brewing Co. v. Collins*, 69 Cal. App. 2d 639, 642-643 (1945) (adopting Webster's dictionary definition of "license"). In fact, as one court noted:

> Webster defines 'license' as 'Authority or liberty given to do or forbear an act; permission to do something (specified); esp., a formal permission from the proper authorities to perform certain acts or to carry on a certain business which without such permission would be illegal.' License means leave to do a thing which licensor

-6-

> could prevent. The word 'license,' generally speaking, means a grant of permission to do a particular thing, to exercise a certain privilege, or to carry on a particular business or to pursue a certain occupation.

*Blatz Brewing*, 69 Cal. App. 2d at 642-643. Therefore, the ordinary and popular sense of the term "license" is understood to be a grant of permission to do a particular thing.

Additionally, various legal authorities define "license" consonantly with its ordinary and popular sense. For example, the National Conference of Commissioners on Uniform State Laws approved and recommended for enactment in all states the Uniform Computer Information Transactions Act (UCITA), which included the following language:

> "License" means a contract that authorizes access to, or use, distribution, performance, modification, or reproduction of, information or informational rights, but expressly limits the access or uses authorized or expressly grants fewer than all rights in the information, whether or not the transferee has title to a licensed copy. The term includes an access contract, a lease of a computer program, and a consignment of a copy. The term does not include a reservation or creation of a security interest to the extent the interest is governed by [Article 9 of the Uniform Commercial Code].

Uniform Computer Information Transactions Act (UCITA) § 102(a)(41), approved 2002, attached as Exhibit C to Han Declaration..

The Agreement uses the term "license" in its ordinary and popular sense, and there is no ambiguity to the term "license." Insofar as "license" has only one discernable legal meaning, this Court must construe that term as a matter of law. In particular, the Court should adopt the same definition of "license" that other courts in this jurisdiction have adopted - namely, that "license" means a grant of permission to do a particular thing.

**2.   The phrase "in no event are the database libraries to be . . . licensed . . . to any other party" clearly forbids licensing of the database libraries to third parties.**

Section 3.1 of the Agreement provides: "In no event, however, are the Database Libraries to be . . . licensed . . . to any other party." Exh. A, § 3.1.

The Agreement expressly defines "Database Libraries" as "certain geographic/IP address databases." Exh. A at 1. Google admits to "often us[ing] Digital Envoy's IP Address/Location data as one of several factors in making its determination about a user's geographic location in

AdSense."  Google's Motion for Summary Judgment at 10.  Thus, the meaning of the phrase "Database Libraries" is undisputed.

The Agreement also expressly identifies the parties to the Agreement as being Google ("Licensee") and Digital Envoy ("Licensor").  Exh. A at 1.  In other words, *only* Google and Digital Envoy are parties to the Agreement.  Thus, the ordinary and popular sense of the phrase "any other party" means any person or group that is neither Digital Envoy nor Google.  Thus, there can be no doubt that "any other person" means third parties who were not parties to the Agreement.

Given that "license" is clear and unambiguous, the prohibition "in no event, however, are the Database Libraries to be . . . licensed . . . to any other party" is likewise clear and unambiguous.  Simply, this prohibition means that Google is forbidden to license the Database Libraries to third parties.

Google apparently agrees with Digital Envoy that the Agreement is unambiguous.  *See* Google Inc.'s Reply Brief in Support of Its Motion for Summary Judgment at 4, internal citations omitted ("Here, Digital Envoy contends the License Agreement is unambiguous.  Digital Envoy is correct").  Given the unequivocal meaning of this prohibition, the interpretation of "in no event, however, are the Database Libraries to be . . . licensed . . . to any other party" is a matter of law for the Court.  *AIU*, 51 Cal. 3d at 822.  Thus, the Court should interpret this limitation to mean what it says - namely, that Google was prohibited from licensing Digital Envoy's Database Libraries to third parties.

**D.    Google's Licensing of AdSense with Geo-Targeting Necessarily Resulted in a Licensing of Digital Envoy's Database Libraries in Violation of the Agreement.**

Google violated the clear prohibition in the Agreement.  Specifically, Google violated the Agreement by licensing Digital Envoy's Database Libraries to third parties as a part of AdSense and various search technologies that employed geo-targeting in support of AdSense.

It is axiomatic that a license to the whole necessarily encompasses a license to its component parts.  Here, Digital Envoy's Database Libraries were a component of geo-targeting, and geo-targeting was a component of AdSense.  Deposition of Susan Wojcicki (hereafter

-8-

"Wojcicki Deposition") at 117, relevant portions attached hereto as Exh. K. Thus, it necessarily follows that a license to AdSense with geo-targeting capabilities resulted in a license to the Database Libraries.

In short, Google's violation is summed up as follows:

(1) Google licensed AdSense with geo-targeting capabilities to third parties;
(2) Digital Envoy's Database Libraries were a component of AdSense with geo-targeting capabilities;
(3) Thus, when Google licensed AdSense with geo-targeting capabilities to third parties, Google necessarily licensed Digital Envoy's Database Libraries to those third parties.

### 1. It is undisputed that Google licensed AdSense to third parties.

It is undisputed that AdSense is licensed to third parties. Google specifically uses licensing language in describing AdSense. For example, Google's press release related to Amazon.com is entitled "Google Licenses Web Search and Sponsored Links to Amazon.com." Han Declaration, ¶ 4, Exh. D; *Google Licenses Web Search and Sponsored Links to Amazon.com* (hereafter "Google Press Release"), April 3, 2003 (visited Jun. 16, 2005) <http://www.google.com/press/pressrel/amazon.html> (emphasis added). In that regard, Google did not hesitate in describing sponsored links, or AdSense, as being "licensed." Han Declaration, ¶ 5, Exh. E; *Google AdSense Program Policies* (visited Jun. 16, 2005) <http://www.google.com/adsense/policies>. Insofar as Amazon.com is a third party, it cannot be disputed that Google licensed the AdSense programs to third parties.[4]

According admissions by Google's own corporate representative, AdSense was licensed to third parties. Google's corporate representative admitted that AdSense was contractually defined. Wojcicki Deposition at 148 and 169-170. Such a contractual relationship was a license, insofar as

---

[4] Digital Envoy believes that review of Google's AdSense contracts with third parties will show that these AdSense contracts are "licenses," insofar as they grant permission to third parties to geo-target their advertisements and searches. Google has, to date, refused to provide these third-party contracts, adamantly insisting that these contracts are irrelevant to Digital Envoy's claims. However, as evidenced here, these third-party contracts are relevant to prove that Google licensed AdSense for Search and AdSense for Content to third parties.

it provided various permissions and restrictions for AdSense. Thus, Google can hardly dispute that AdSense was licensed to third parties.

There are many other examples from Google, which relate to third-party licensing of AdSense and various Google technologies, all of which employed geo-targeting. The following examples illustrate how Google both explicitly used the term "license" and implicitly used licensing language in describing its products:

- "Because we also offer to license our web search technology along with Google AdSense for search, companies without their own search service can offer Google WebSearch to improve the usefulness of their web sites for their users while increasing their revenue." Han Declaration, ¶ 6, Exh. F; Google Press Centre: Product Descriptions (hereafter "Google Press Centre") (visited Jun. 16, 2005) <http://www.google.co.uk/press/descriptions.html> (emphasis added).

- "Promptly following the Effective Date, Google shall provide the Google Data Protocol to Customer. Google grants to Customer a nontransferable, nonexclusive license during the Term to use the Google Data Protocol solely for the purpose of communicating information between the Site and the Services." Han Declaration, ¶ 7, Exh. G; Sample Contracts and Business Forms - Advertising Services Agreement (hereafter "Google Example Sales Agreement for Sponsored Links"), ¶ 2.4 (visited Jun. 16, 2005) <http://contracts.onecle.com/shopping/google.sales.2003.04.14.shtml> (emphasis added).

- "Upon the termination of this Agreement for any reason (i) all license rights granted herein shall terminate, (ii) each party shall return to the other party, or destroy and certify the destruction of, all Confidential Information of the other party, and (iii) Customer shall refund to Google any prepayments paid and not yet earned by Customer, if any." Id., ¶ 9.3 (emphasis added).

- "Each party acknowledges that its service/license restrictions contained herein may cause irreparable harm to the other party, the extent of which would be difficult to ascertain." Id., ¶ 9.5 (emphasis added).

- "AdSense affords third party web sites or "publishers" the ability to display to those visiting their own web sites the advertising messages of participants in Google's AdWords program." Wojcicki Declaration, ¶ 6 (emphasis added).[5]

- "Customer shall not acquire any right, title, or interest in or to the Intellectual Property Rights associated with the Services (including the AdSense for Search program, the Google Data Protocol, and Google Brand Features), except for the limited use rights expressly set forth in this Agreement." Han Declaration, ¶ 8, Exh. H; Securities and Exchange Commission, Form 10-Q, Ask Jeeves, Inc., For the Quarterly Period Ended June 30, 2002, Attachment 10.52 (visited Jul. 6, 2005) <http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?SessionID=jKwBIuNdQ_VRQM2&ID=1963121> (emphasis added).

---

[5] This statement shows that Google enabled others to perform geo-targeted searching and advertising.

-10-

Given these numerous examples, it can hardly be disputed that Google licensed AdSense and other geo-targeted programs to third parties.

### 2. It is undisputed that Digital Envoy's Database Libraries were a component of geo-targeting for AdSense.

Google admitted that "Google often used Digital Envoy's IP Address/Location data as one of several factors in making its determination about a user's geographic location in AdSense." Google's Motion for Summary Judgment at 10; Rose Declaration, ¶ 4. Additionally, Google admitted that, "[a]s one step in the process of identifying potentially relevant advertising messages, Google would typically look up the user's geographic location in the Digital Envoy IP Address/Location Database stored at Google." Rose Declaration, ¶ 6. As such, Digital Envoy's Database Libraries were necessarily a component of AdSense with IP-based geo-targeting. In fact, Google admits, in the following exchange, that geo-targeting is "part of its advertising program."

> Mr. Kratz: Another type of targeting that Google employs <u>as part of its advertising program</u> is to target the <u>advertisements based on geo -- geographic location of the user</u>?
> The Witness: <u>Yes</u>.

Wojcicki Deposition at 117 (emphasis added).

Although Google may argue that the Database Libraries were not a component of AdSense, it is difficult to imagine how a process that automatically accesses the Database Libraries can, at the same time, not have the Database Libraries as a component of the automated process. Specifically, Google admitted that "[t]he mechanical process by which Google selects the advertising messages to display to users visiting third party sites is identical, in all relevant respects, to the process used to locate advertising messages to display to users visiting Google's own site." Rose Declaration, ¶ 8. Thus, according to Google's admission, any queries from third-party sites were: (1) processed mechanically (automatically); and (2) processed identically as queries from Google's own site. Automating the process resulted in incorporating the Database

-11-

Libraries into AdSense.  As such, Digital Envoy's Database Libraries necessarily became a component of AdSense.

Additionally, Google has acknowledged that geo-targeting is a component of AdSense for which Google "want[ed] all the syndication partners to work with [geo-targeting]" and those partners were "very excited to do [geo-targeting]."  Han Declaration, ¶ 9, Exh. I.  Digital Envoy's Database Libraries provided the IP-based geo-targeting that was crucial to what all of Google's partners were "very excited to do."  As such, Digital Envoy's Database Libraries were a critical component of geo-targeting for AdSense, and Google specifically permitted and encouraged these syndication partners to use Digital Envoy's Database Libraries.  In other words, Google expressly encouraged its syndication partners (AdSense customers) to license the Database Libraries as a separate, new component of the AdSense Program and these third parties were "very excited" to license this critical component.

### 3. Since a license to the whole necessarily encompasses a license to its component parts, Google's licensing of AdSense with geo-targeting capabilities necessarily resulted in a licensing of Digital Envoy's Database Libraries.

A license of the whole necessarily entails a license of its component parts.  Digital Envoy's Database Libraries were a component of Google's geo-targeting capabilities, and Google's geo-targeting capabilities were a component of AdSense.  Thus, it is axiomatic that a license of AdSense, which included geo-targeting capabilities, necessarily resulted in a license of the Database Libraries.

For third parties that licensed AdSense with geo-targeting from Google, those third parties necessarily licensed Digital Envoy's Database Libraries from Google.  In other words, Google integrated geo-targeting using IP addresses into AdSense.  The Database Libraries were a necessary component of geo-targeting using IP addresses.  Thus, any licensing of AdSense with such geo-targeting resulted in the licensing of Digital Envoy's Database Libraries.

Google admitted that "[t]he mechanical process by which Google selects the advertising messages to display to users visiting third party sites is identical, in all relevant respects, to the process used to locate advertising messages to display to users visiting Google's own site."  Rose

-12-

1  Declaration, ¶ 8.  In other words, any queries from third-party sites were processed identically as
2  queries from Google's own site.  As such, those third-party sites necessarily had identical access to
3  Digital Envoy's Database Libraries as Google.  Insofar as Google permitted third parties access to
4  Digital Envoy's Database Libraries, Google licensed the Database Libraries to third parties.

5  Moreover, a slide presentation prepared by Ms. Leslie Yeh of Google evidences the fact
6  that geo-targeting feature was a licensed component of AdSense, and, hence, Digital Envoy's
7  Database Libraries were necessarily licensed along with the geo-targeting feature.  Wojcicki
8  Deposition, Exh. 61.  Ms. Yeh's presentation separated various email messages from third parties
9  according to whether or not contracts with those third parties permitted geo-targeting.  *Id*.
10  Specifically, the "partner communications" were separated into three distinct categories: (1)
11  "Getting regional targeting"[6]; (2) "Not getting [geo-targeting] due to contract" (emphasis added);
12  and (3) "Not getting [geo-targeting] because not providing end-user IP addresses (in violation of
13  contract)" (emphasis added).  *Id*.  As shown in that presentation, the geo-targeting feature was
14  provided contractually.  In other words, geo-targeting was a licensed component of AdSense.
15  Thus, since Digital Envoy's Database Libraries were a component of IP-based geo-targeting, a
16  license to geo-targeting necessarily entailed a license to Digital Envoy's Database Libraries.

17  Google's various marketing statements bolster the fact that Google deliberately permitted
18  full and automatic access to the Database Libraries to third parties.  For example, Google provided
19  code (java script) to third parties, fully knowing that the code would initiate a mechanical
20  (automatic) process by sending an IP address to Google so that the publisher could receive geo-
21  targeted advertisements for display to users.  *See* Rose Declaration, ¶¶ 4, 6, and 8; Wojcicki
22  Deposition at 170, Exh. K.  In Google's own words, Google knew that "It's your [third party's]
23  show from start to finish."  Han Declaration, ¶ 10, Exh. J (emphasis added).  In other words, once
24  the automatic process had been set up, Google did not manually intervene in the initiation of the
25  process, the mechanical geo-targeting of advertisements, or the conveying of advertisements to
26  third-party websites.  All of these steps occurred automatically.

---

[6] "Regional targeting" is referred to herein as geo-targeting.

1   Having given permission to third parties for the automatic process of obtaining geo-
2   targeted advertisements, and having removed itself from intervening in the automated process,
3   Google necessarily licensed Digital Envoy's Database Libraries to third parties.  Such licensing of
4   the Database Libraries violated the Agreement, which <u>strictly limited</u> Google from selling,
5   <u>licensing</u>, distributing, sharing, or otherwise giving (in any form) the Database Libraries to third
6   parties.  Exh. A, § 3.1.

### IV.   CONCLUSION

Google's violation of the Agreement is indisputable.  The phrase "in no event are the Database Libraries to be . . . licensed . . . to any other party" is clear and unambiguous.  It means that Google is forbidden to license Digital Envoy's Database Libraries to third parties.  Because the ordinary and popular sense of this prohibition is clear and unambiguous, the interpretation of this phrase is a matter of law for the Court.  The Court should therefore construe this limitation as forbidding Google from licensing Digital Envoy's Database Libraries to third parties.

Digital Envoy's Database Libraries were a component of Google's geo-targeting capabilities, and Google's geo-targeting capabilities were a component of AdSense.  Thus, when Google licensed AdSense with geo-targeting to third parties, Google necessarily licensed the Database Libraries to the third parties.  The licensing of the whole (AdSense) by Google necessarily resulted in the licensing of its component parts (Digital Envoy's Database Libraries).  Such licensing to third parties was a violation of the Agreement.  No reasonable juror could find otherwise.

For the reasons set forth above, Digital Envoy respectfully requests this Court to grant its Motion for Summary Judgment.

DATED: July 6, 2005

                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By      /s/ Brian Blackman
          P. CRAIG CARDON
          BRIAN R. BLACKMAN

TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile:  404.443.5751

        Attorneys for DIGITAL ENVOY, INC.