# Exhibit H

## *Securities and Exchange Commission*

## *Form 10-Q*

## *Ask Jeeves, Inc.*

**Exhibit H**

QuickLinks -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly period ended June 30, 2002**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number 000-26521**

# ASK JEEVES, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-3334199** |
| (State or other jurisdiction of Incorporation or organization) | (IRS Employer Identification No.) |

**5858 Horton St., Suite 350, Emeryville, CA 94608**
(Address of principal executive offices, including zip code)

**(510) 985-7400**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☒    Yes    ☐    No

The number of shares outstanding of the registrant's Common Stock as of July 26, 2002 was 41,299,558.

---

**ASK JEEVES, INC.**

**TABLE OF CONTENTS**

Page
——

**PART I. FINANCIAL INFORMATION**

**Item 2.** *Changes in Securities and Use of Proceeds*

Not applicable.

**Item 3.** *Defaults Under Senior Securities*

Not applicable.

**Item 4.** *Submission of Matters to a Vote of Security Holders*

A.   The annual meeting of the stockholders was held on May 15, 2002.

B.   The following matters were voted upon at the annual meeting:

1.   To elect the following directors to hold office until the 2005 Annual Meeting of Stockholders, or until their successors are duly elected and qualified:

| Nominee | In Favor | Withheld |
|---|---|---|
| James D. Kirsner | 31,375,356 | 67,555 |
| David S. Carlick | 31,374,950 | 67,961 |

40

2.   To ratify the selection of Ernst & Young LLP as independent auditors of the Company for its fiscal year ending December 31, 2002.

| For | Against | Abstain | Broker Non-Vote |
|---|---|---|---|
| 31,387,693 | 27,193 | 28,025 | 0 |

**Item 5.** *Other Information*

Not applicable.

**Item 6.** *Exhibits and Reports on Form 8-K*

**a)   Exhibits**

The following exhibits are filed herewith or incorporated by reference:

| Exhibit | Description |
|---|---|
| 3.1(1) | Certificate of Incorporation of the Registrant. |
| 3.1.1(6) | Certificate of Designation of Series A Junior Participating Preferred Stock |
| 3.2(1) | Bylaws of the Registrant. |
| 4.1(1) | Reference is made to Exhibits 3.1 and 3.1.1. |
| 4.2(1) | Specimen Certificate for Registrant's Common Stock. |
| 4.3(1) | Warrant to purchase 15,000 shares of Common Stock granted by the Registrant to Antenna Group PR dated as of June 30, 1998. |

| 4.4(1) | Warrant to purchase 20,000 shares of Common Stock granted by the Registrant to Antenna Group PR dated as of July 31, 1998. |
| 4.5(1) | Warrant to purchase 8,000 shares of Common Stock granted by the Registrant to Antenna Group PR dated as of May 31, 1998. |
| 4.6(6) | Rights Agreement, dated as of April 26, 2001, between the Registrant and Fleet National Bank, N.A., which includes the form of Rights Certificate as Exhibit B and the Summary of Rights to Purchase Series A Preferred Stock as Exhibit C. |
| 4.7(10) | Warrant to purchase 105,000 shares of Common Stock granted by Registrant to Boris Katz dated as of July 26, 2001. |
| 4.8(10) | Warrant to purchase 70,000 shares of Common Stock granted by Registrant to Patrick Winston dated as of July 26, 2001. |
| 10.1(1) | Amended and Restated 1996 Equity Incentive Plan. |
| 10.2(1) | Form of Option Agreement for the Amended and Restated 1996 Equity Incentive Plan. |
| 10.3.3(5)† | 1999 Equity Incentive Plan, as Amended and Restated. |
| 10.4.1(1)† | Form of Option Agreement for the 1999 Equity Incentive Plan. |
| 10.4.2(5)† | Form of Option Agreement for the 1999 Equity Incentive Plan, as Amended and Restated. |
| 10.5.1(1)† | 1999 Employee Stock Purchase Plan. |
| 10.5.2(1)† | 1999 Employee Stock Purchase Plan, as Amended and Restated. |
| 10.6(7)† | 1999 Equity Incentive Plan, as Amended and Restated through May 25, 2000. |
| 10.7(7)† | Form of Option Agreement for the 1999 Equity Incentive Plan, as Amended and Restated through May 25, 2000. |
| 10.8(7)† | 1999 Employee Stock Purchase Plan, as Amended and Restated through May 25, 2000. |
| 10.12(1) | License Agreement dated as of October 2, 1998, by and between the Registrant and Compaq Computer Corporation. |
| 10.18.1†(10) | Severance terms as of April 30, 2001, by and between the Registrant and Frank Vaculin. |

41

| 10.19.3(5)† | Employment Agreement dated as of December 1, 2000, by and between the Registrant and Robert W. Wrubel. |
| 10.26(1) | Form of Indemnity Agreement by and between the Registrant and each of its directors and executive officers. |
| 10.28(1) | Office Lease dated as of April 29, 1999, by and between the Registrant and Emery Station Associates, L.L.C. |
| 10.30(1) | Master Lease Agreement dated as of June 15, 1999, by and between the Registrant and Comdisco, Inc. |
| 10.31(1) | Forms of Promissory Note and Stock Pledge Agreement for loans to executive officers. |
| 10.33(2) | Agreement and Plan of Merger and Reorganization dated as of January 25, 2000, by and among the Registrant, Direct Hit Technologies, Inc. and Answer Acquisition Corp. |
| 10.36(3) | Office Lease dated as of February 24, 2000, by and between the Registrant and Oakland City Center LLC. |
| 10.37(4) | Lease Agreement dated as of May 15, 2000, by and between the Registrant and Oakland City Center, LLC. |
| 10.39(5)† | Offer letter dated as of July 24, 2000, by and between the Registrant and Adam Klein. |
| 10.39.1†(10) | Severance letter dated March 28, 2001, by and between the Registrant and Adam Klein. |
| 10.40(5)† | Offer letter dated as of December 8, 2000, by and between the Registrant and A. George (Skip) Battle. |

| | |
|---|---|
| 10.40.2(8)† | Offer letter of New Terms of Employment dated April 3, 2001, by and between the Registrant and A. George (Skip) Battle. |
| 10.41(8)† | Promissory Note dated March 15, 2001 of Steven Sordello, as Maker, in favor of the Registrant. |
| 10.42(8)† | Offer letter dated April 23, 2001, by and between the Registrant and Steve Berkowitz. |
| 10.44.1†(10) | Promissory Note secured by Deed of Trust, dated February 29, 2000, of Enrique T. Salem and Marcela M. Salem, as Borrower, in favor of the Registrant. |
| 10.44.2†(10) | Addendum to Promissory Note secured by Deed of Trust, dated February 29, 2000, of Enrique T. Salem and Marcela M. Salem, as Borrower, in favor of the Registrant. |
| 10.45.1†(10) | Incentive Agreement, entered into as of January 2, 2001, by and between the Registrant and Claudio Pinkus. |
| 10.45.2†(10) | Amendment to Incentive Agreement, dated June 18, 2001, by and between Registrant and Claudio Pinkus. |
| 10.45.3†(10) | Second Amendment to Incentive Agreement, entered into as of August 29, 2001, by and between Registrant and Claudio Pinkus. |
| 10.45.4†(10) | Third Amendment to Incentive Agreement, entered into as of November 27, 2001, by and between the Registrant and Claudio Pinkus. |
| 10.46.1†(10) | Incentive Agreement, entered into as of January 2, 2001, by and between the Registrant and George Lichter. |
| 10.46.2†(10) | Amendment to Incentive Agreement, dated June 18, 2001, by and between Registrant and George Lichter. |
| 10.46.3†(10) | Second Amendment to Incentive Agreement, entered into as of August 30, 2001, by and between Registrant and George Lichter. |
| 10.46.4†(10) | Separation Agreement, dated February 6, 2002, made by and between George Lichter and Registrant. |
| 10.47.1(9) | Agreement and Plan of Merger and Reorganization, dated as of September 10, 2001, by and among the Registrant, Answer Acquisition Corp. No. 2, and Teoma Technologies, Inc., and, solely with respect to Article X, Hawk Holdings, LLC, as Stockholders' Agent, and Chase Manhattan Bank and Trust N.A., as Escrow Agent. |
| 10.47.2(9) | Registration Rights Agreement, dated September 10, 2001, by and between the Registrant and the multiple parties listed therein. |

42

| | |
|---|---|
| 10.48(10) | Lease Amendment and Termination Agreement, made February 4, 2002, by and between Registrant, as Tenant, and Oakland City Center LLC, as Landlord. |
| 10.49(11) | Agreement relating to the Sale and Purchase of the Entire Issued Share Capital of Carlton & Granada Internet Limited, dated February 7, 2002, by and among Registrant, Carlton Communications, PLC, Granada Media Group Limited, Ask Jeeves International, Inc. and Ask Jeeves (Jersey) Limited. |
| 10.50(11) | Further Supplemental Partnership Deed relating to Ask Jeeves UK, dated February 14, 2002, by and among Registrant, Carlton Communications PLC, Granada Media Group Limited, Carlton & Granada Internet Limited, Ask Jeeves (Jersey) Limited, and Ask Jeeves International, Inc. |
| 10.51(11) | Tax Deed relating to the acquisition of the entire issued share capital of Carlton & Granada Internet Limited, dated March 6, 2002, by and among the Registrant, Carlton Communications PLC and Granada Media Group Limited. |
| 10.52* | Advertising Services Agreement, dated July 17, 2002, by and between Registrant and Google, Inc. |

(1)    Previously filed with Registrant's S-1 Registration Statement, No. 333-77539.

(2)  Previously filed with Registrant's Current Report on Form 8-K, filed with the Securities and Exchange Commission on February 14, 2000.

(3)  Previously filed with Registrant's S-1 Registration Statement, No. 333-30494.

(4)  Previously filed with Registrant's Quarterly Report on Form 10-Q, filed with the Securities and Exchange Commission on November 14, 2000.

(5)  Previously filed with Registrant's Annual Report on Form 10-K, filed with the Securities and Exchange Commission on April 2, 2001.

(6)  Previously filed with Registrant's Current Report on Form 8-K, filed with the Securities and Exchange Commission on May 10, 2001.

(7)  Previously filed with Registrant's S-8 Registration Statement, No. 333-73400.

(8)  Previously filed with Registrant's Quarterly Report on Form 10-Q, filed with the Securities and Exchange Commission on August 14, 2001.

(9)  Previously filed with Registrant's Current Report on Form 8-K, filed with the Securities and Exchange Commission on September 17, 2001.

(10) Previously filed with Registrant's Annual Report on Form 10-K, filed with the Securities and Exchange Commission on February 28, 2002.

(11) Previously filed with Registrant's Quarterly Report on Form 10-Q, filed with the Securities and Exchange Commission on April 30, 2002.

\*    Confidential treatment has been requested for certain portions thereof.

†    Management contract, compensatory plan or arrangement.


**b) Reports on Form 8-K.**

Not applicable.

43

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

ASK JEEVES, INC.

| | | |
|---|---|---|
| August 14, 2002 | By: | /s/  A. GEORGE (SKIP) BATTLE |

A. George (Skip) Battle
*Chief Executive Officer*
*(Principal Executive Officer)*

| | | |
|---|---|---|
| August 14, 2002 | By: | /s/  STEVEN J. SORDELLO |

Steven J. Sordello
*Chief Financial Officer*
*(Principal Financial Officer)*

August 14, 2002                    By:    /s/  SCOTT T. BAUER
                                          _____

Scott T. Bauer
*Vice President and Corporate Controller*
*(Principal Accounting Officer)*

44

QuickLinks

ASK JEEVES, INC. TABLE OF CONTENTS
PART I. FINANCIAL INFORMATION

    Item 1. Unaudited Condensed Consolidated Financial Statements

ASK JEEVES, INC. CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except share and per share data)
ASK JEEVES, INC. CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited) (in thousands, except share and per share data)
ASK JEEVES, INC. CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited) (in thousands)

ASK JEEVES, INC. NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

    Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

RISK FACTORS

    Item 3. Quantitative and Qualitative Disclosures About Market Risk

PART II. OTHER INFORMATION

    Item 1. Legal Proceedings
    Item 2. Changes in Securities and Use of Proceeds
    Item 3. Defaults Under Senior Securities
    Item 4. Submission of Matters to a Vote of Security Holders
    Item 5. Other Information
    Item 6. Exhibits and Reports on Form 8-K

SIGNATURES

QuickLinks -- Click here to rapidly navigate through this document

CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

### ADVERTISING SERVICES AGREEMENT

    This Advertising Services Agreement (the "Agreement") is entered into by and between Ask Jeeves, Inc., a Delaware corporation with principal place of business at 5858 Horton Street, Suite 350, Emeryville, CA 94608 ("Customer"), and Google, Inc., a California corporation with its principal place of business at 2400 Bayshore Parkway,

Mountain View, California 94043 ("Google") regarding Customer's use of the Services (defined below). This Agreement, dated                    (the "Effective Date"), sets forth the terms and conditions under which Google makes the Services available to Customer.

1.   *Definitions.*   For purposes of this Agreement, the following terms will have the indicated meanings:

1.1   *"Brand Features"*   means the names, trade names, trademarks, service marks, logos, URLs and other distinctive brand features of each party respectively as listed in Schedule E.

1.2   *"Client Name"*   means an alphanumeric code or codes assigned to Customer by Google that identifies Customer.

1.3   *"Content"*   means all editorial, text, graphic, audiovisual, and other content that is served to End Users of the Site and that is not provided by Google, including without limitation a search box, instruction pages, frequently asked questions pages and any Site End User terms and guidelines. For avoidance of doubt, any content to which an End User links by clicking on a Google Sponsored Link shall not be considered Content.

1.4   [Intentionally Deleted][in original agreement]

1.5   *"End User"*   means a user of the Site.

1.6   *"Google Data Protocol"*   means the written specification on how the Customer's Site communicates and interacts with the Services.

1.7   *"Intellectual Property Rights"*   means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, and any and all applications, renewals, extensions and restorations thereof, now or hereafter in force and effect worldwide.

1.8   *"Google Sponsored Links Program"*   or "GSLP" or "Services" means the program by which advertisements which are contained in the program currently known as Adwords Select are provided to Customer and its End-Users by Google, and displayed by Customer on its Site according to the terms of this Agreement. Google shall use commercially reasonable efforts to exclude [***]

1.8.1   *"Google Sponsored Links"*   means Sponsored Links sold by Google pursuant to the GSLP.

[***] INDICATES THAT CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION PURSUANT TO RULE 24b-2. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

1

---

1.8.2   *"Google Administrative Console"*   means a password protected area of Google's web site which allows Customer to update contact information and permitted IP addresses for each valid Customer ID.

1.9   *"Query"*   means a search query.

1.10   *"Results Pages"*   means any Web pages displayed by or on behalf of the Customer [***] with respect to which Customer's [***] servers have made a request to Google's servers to receive a Results Set.

1.11   *"Spam Query"*   means those Queries for which Google does not receive payment from an advertiser because such Queries have been reasonably determined to be fraudulent.

1.12   *"Result Set(s)"*   means the data set provided to Customer by Google in response to a Query, consisting of Google Sponsored Links, and which shall be displayed by Customer [***] on the Site pursuant to the terms of this Agreement.

     1.13    *"Site"*   means Ask.com, AJ.com, AskJeeves.com, Teoma.com, [***] and, at Customer's option, other Web sites of which Customer owns or controls greater than a fifty percent (50%) interest. An initial list of domains in the Site is (subject to the approval of [***] attached hereto as Schedule A. All queries sent from the Site to Google shall use the same Client Name (unless otherwise agreed by the parties), and one of the Valid IP Addresses provided by Customer to Google.

     1.14    *"Sponsored Link"*   means a compensated advertising listing that is generated in response to an End User query and that: [***]

     1.15    *"Syndicated Sites"*   [***]

     1.16    *"Term"*   shall have the meaning indicated in Section 10.

     1.17    *"URL"*   means a uniform resource locator for documents or other resources on the Web.

     1.18    *"Valid IP Addresses"*   means any and all valid Internet protocol addresses, or range of valid Internet protocol addresses, that will be used by or on behalf of Customer to access the Services.

     1.19    *"Web"*   means the World Wide Web, containing among other things pages written in the hypertext markup language and/or any similar successor technology.

   2.   *Provision of Services.*

     *General/Implementation.*   Google will provide Customer the Google Sponsored Links Program, whereby Google shall provide the Google Sponsored Links to Customer and its End Users for display by or on behalf of Customer on Results Pages on the Site according to the terms of this Agreement. Customer agrees that it shall use commercially reasonable efforts to implement the Google Sponsored Links Program, and Google agrees that it shall use commercially reasonable efforts to assist Customer

[***] INDICATES THAT CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION PURSUANT TO RULE 24b-2. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

2

in such implementation, on the initial domains included in the Site no later than the implementation dates ("Launch Date") indicated on the table below:

| Initial Domains included in the Site: | Respective Launch Date: |
|---|---|
| Ask.com, AJ.com, AskJeeves.com | September [***], 2002 |
| Teoma.com, DirectHit.com | September [***], 2002 |
| All other Initial Domains | September [***], 2002, [***] |

     Customer's failure to timely implement the Google Sponsored Links Program per the preceding sentence for reasons primarily attributable to Customer shall be, after a period of ten (10) days after a written notice to be sent by Google after the expiration of the above mentioned Launch Dates, a material breach of the Agreement and Google shall be entitled to: (i) delay payment [***] (ii) [***] and (iii) [***]. In any case, Google shall not delay payment for any days of delay that are primarily attributable to Google, nor shall such Google days of delay count toward Customer's days of delay or cure.

     In the event that the Launch Date of any Initial Domain is delayed and such delay is primarily attributable to Google's actions or failure to act, then after a period of [***] after a written notice to be sent by Customer after the expiration of such Launch Date, a material breach of the Agreement by Google shall have occurred and Customer shall:

(i) [***] and/or (ii) [***]. In any case, Google shall not be liable to make payments for any days of delay that are primarily attributable to Customer.

The parties agree to work in good faith to ensure implementation of the Services on future domains included in the Site.

For each Query received by Google from Customer, Google shall provide a Result Set, consisting of [***] for such Query. Customer agrees to list (i) [***] (ii) [***] (iii) [***] and (iv) [***] on [***], unless otherwise mutually agreed to by the parties in writing; provided that in the event that a Query does not generate the number of Sponsored Links specified herein, then Customer shall only be required to display the actual number of Sponsored Links in the Result Set. Except as expressly provided in this Agreement, Customer shall not [***] and otherwise do not [***] without Google's prior written consent. For avoidance of doubt, [***] in the preceding sentence shall not be considered a breach of Section 6.1. Unless otherwise agreed to by the parties (and except for limited Customer testing), Google Sponsored Links [***] to that shown in [***] attached hereto. In addition, the Google Sponsored Links shall be displayed in wide format, [***]. Google shall use commercially reasonable efforts to provide Services that do not contain any content, materials, data, work, link, advertising or services that violate any applicable law or regulation. If Customer discovers that content, data or a link violates a law or regulation, then Customer may provide written notice to Google with a URL or list of URL's, and Google shall use commercially reasonable efforts to exclude from any Results Sets such URL(s) within [***] of such notice.

2.1  *Mechanics.*  Google will receive Queries from or on behalf of Customer at Google's network interface, process the Queries and return a Result Set to Customer via Google's network interface, using the Google Data Protocol, or other means as Google may implement from time to time. Google shall not be responsible for receiving search queries directly from Customer's End Users, for transmission of data between Customer and Google's network interface or for displaying the Result Set to Customer's End Users, nor shall Google be responsible for providing search

[***] INDICATES THAT CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION PURSUANT TO RULE 24b-2. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

3

---

results to end users conducting searches to locate information on the Web. Customer, at its own expense, shall be responsible for providing customer support services to its end users.

2.1.1  *Query Information.*  The parties agree that, as between Customer and Google, any data or information sent by Customer to Google prior to or during the Term, including without limitation that submitted as Queries to Google, shall remain the sole and exclusive property of Customer, and Google shall only use such data and information in connection with the fulfillment of Google's obligations hereunder. Customer considers click-stream data generated in the course of Google providing Services to be [***] and Google agrees it shall not utilize such click-stream data for [***] or [***] and [***] provided that Google may use any such data [***]. All Queries sent by Customer to Google shall include the following: (a) [***] (b) [***] as required by Google, consisting of a [***] which may be [***] or such other information as the parties may agree upon, and (c) [***] each of which corresponds to the [***], none of which shall include [***] which information will be used by Google solely to [***] and [***] and [***]. Google may retain such information during the time it maintains logs containing such information in the ordinary course of its business so long as it [***] in a manner that can be [***].

2.2  *Google Data Protocol.*  Within 5 days after the Effective Date, Google shall provide to Customer the Google Data Protocol and information and resources, as determined solely by Google in its discretion, to enable Customer to start using the Services, and which may include, without limitation, valid Client Names, a valid URL to draw text-sponsored ads and access to Google's Administrative Console. Google grants to Customer a nontransferable, nonexclusive license during the Term to use the Google Data Protocol solely for the purpose of communicating information between the Site and the Services. The Google Data Protocol shall be deemed Confidential Information pursuant to the terms of Section 5.

2.3   *IP Security Process.*   Within 5 days after the Effective Date, Customer shall provide Google with an initial written list of Valid IP Addresses, and Google shall provide Customer a Client Name. Upon mutual agreement and as required by this Agreement, Google shall provide Customer additional Client Names from time to time. All search queries sent to Google by or on behalf of the Customer must contain the Client Name and must use a Valid IP Address. Google shall have the right to immediately discontinue providing Services to IP addresses that are not Valid IP Addresses. Any modifications to the initial list of Valid IP Addresses provided to Google by Customer must be made in a written document executed by both parties or online via the Google Administration Console.

2.4   *End-User Support.*   Customer, at its own expense, shall provide first level customer support services to its End Users. Google, at its own expense, shall provide second level technical support services to Customer regarding the Services. Such support services will be provided as set forth in Schedule C.

2.5   *Google Sponsored Links Program Testing.*   During the Term, Google shall have the right to send uncompensated Queries using automated processes to domains in the Sites owned by Customer (and Customer will use commercially reasonable efforts to procure Google testing rights for the Sites not owned by Customer) in order to verify that Google Sponsored Links are being served in compliance with the terms of this Agreement and for testing purposes to optimize the Services. During each month during the Term, Google shall not be permitted to send an amount of uncompensated Queries greater than [***] during such month. Google agrees to use commercially

[***] INDICATES THAT CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION PURSUANT TO RULE 24b-2. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

4

---

reasonable efforts to only conduct automated testing of the Sites (whether or not related to this Agreement) [***].

2.6   [intentionally deleted] [in original agreement]

2.7   *Comparable Content.*   Google shall provide Google Sponsored Links and Results Sets to the Site that are [***] i.e., that include [***] other than those that are [***] pursuant to this Agreement or by agreement of the parties [***] and that are [***] Google's other GSLP customers. Customer may from time to time conduct reasonable testing on Google's site, provided that any such testing is in accordance with Google's standard testing procedures and policies as outlined in the Google Data Protocol.

2.8   *Service Level Agreement.*   The parties hereby incorporate by reference herein the Service Level Agreement attached hereto as Schedule H.

2.9   *Marketing and Promotion.*   Google agrees to actively sell, market and develop the Google Sponsored Links during the Term.

2.10   *Exclusivity.*   Customer agrees that, during the Term of this Agreement and on any of the domains included in the Site: (i) [***] and (ii) [***] and (iii) [***]. Customer further understands that Google will provide the Services on a nonexclusive basis, and that Google will continue to customize and provide its services to other parties for use in connection with a variety of applications, including search engine applications.

2.11   *Management Committee.*   Google and Customer will act in good faith and use commercially reasonable efforts to promptly resolve any claim, dispute, controversy or disagreement (each a "Dispute") between the parties related to this Agreement. If the parties cannot promptly resolve the Dispute within ten (10) days after written notice is provided from one party to another of the existence of the Dispute, the Dispute will be submitted to the Management Committee (defined below) for resolution. For ten (10) days following submission of the Dispute to the Management Committee, the Management Committee will have the exclusive

right to resolve such Dispute;. If the Management Committee is unable to amicably resolve the Dispute during the ten-day period, then the Management Committee will consider in good faith the possibility of retaining a third party mediator to facilitate resolution of the Dispute. In the event the Management Committee elects not to retain a mediator, then either party shall be free to pursue other courses of action as it deems necessary. "Management Committee" will mean a committee made up of a senior executive from each of the Parties for the purpose of resolving Disputes under this Section 2.11 and generally overseeing the relationship between the Parties contemplated by this Agreement . Notwithstanding the foregoing, with respect to Disputes involving [***] to be made hereunder or [***] determinations, if mediation of the Dispute fails to resolve the Dispute (or if the Management Committee elects not to mediate the Dispute), such Dispute shall be finally settled by binding arbitration in Santa Clara County, California under the Commercial Rules of the American Arbitration Association by one arbitrator appointed in accordance with the rules. The arbitrators' decision award may be entered in any court of competent jurisdiction. Neither Party will seek, nor will be entitled to seek, binding outside resolution of the Dispute unless and until the Parties have been unable to resolve the Dispute as set forth in this Section 2.2.

[***] INDICATES THAT CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION PURSUANT TO RULE 24b-2. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

5

---

3.  *Payments.*

    3.1  *Payment.*    Google shall pay the fees in the amounts and on the terms specified in Schedule B attached hereto. All fees quoted and payments made hereunder shall be made in U.S. Dollars. Customer shall be responsible for all sales taxes and other similar taxes imposed by any federal, state or local governmental entity on the transactions contemplated by this Agreement, excluding taxes based upon Google's net income.

    3.2  *Reports.*    Google will provide up-to-date [***] status reports. All reports shall be treated as Confidential Information of each party under the terms of this Agreement, based on the underlying information contained therein. The status reports shall include the [***] and by [***] and any other [***] as mutually agreed upon by the parties. [***] shall be reported in a [***] revenue report which shall be provided to Customer within [***] after the end of [***] and shall be [***] and shall also include the same information contained in the [***] status reports. Upon mutual agreement between the parties, Google may provide Customer additional reports from time to time.

    4.  *Audit Rights.*    Customer, at its own expense, may retain a mutually acceptable nationally recognized independent auditor to review and audit Google's relevant records to confirm the fees due under this Agreement upon [***] days prior written notice. Such audit shall: (a) be subject to Google's reasonable security and confidentiality requirements; (b) occur no more than [***] and not during the last three (3) weeks of a calendar quarter, provided that if two (2) successive audits show that Google is within [***] of fees owed to Customer, then the frequency of audits shall occur no more than every [***], and (c) transpire during Google's normal business hours. If the audit results in a [***] or more adjustment in the payments for the audited period, then Google shall pay for the reasonable costs associated with such audit.

5.  *Confidentiality.*

    5.1  *Confidential Information.*    Each party (the "Receiving Party") understands that the other party (the "Disclosing Party") has disclosed or may disclose information of a confidential nature including, without limitation, know-how, formulas, processes, ideas, inventions, schematics and other technical, business, financial and product development plans, forecasts, strategies and information ("Confidential Information"). All Confidential Information disclosed in tangible form by the Disclosing Party shall be marked "confidential" or "proprietary" and all Confidential Information disclosed orally or otherwise in intangible form by the Disclosing Party shall be designated as confidential or proprietary at the time of disclosure.

    5.2  *Disclosure and Use.*    The Receiving Party agrees (i) to hold the Disclosing Party's Confidential

Information in confidence and to take all necessary precautions to protect such Confidential Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials), (ii) not to divulge any such Confidential Information or any information derived there from to any third person, except independent contractors under an obligation of confidentiality and with a need to know for purposes authorized under this Agreement, (iii) not to make any use whatsoever at any time of such Confidential Information except as authorized under this Agreement, and (iv) not to remove or export any such Confidential Information from the country of the Receiving Party except as may be allowed by applicable export laws. The Receiving Party shall limit the use of and access to the Disclosing Party's Confidential Information to the Receiving Party's employees, attorneys and independent contractors under an obligation of confidentiality and restricted use who need to know such

[***] INDICATES THAT CERTAIN INFORMATION IN THIS EXHIBIT HAS BEEN OMITTED AND FILED SEPARATELY WITH THE COMMISSION PURSUANT TO RULE 24b-2. CONFIDENTIAL TREATMENT HAS BEEN REQUESTED WITH RESPECT TO THE OMITTED PORTIONS.

6

---

Confidential Information for the purposes authorized under this Agreement. The Receiving Party shall treat the Confidential Information with at least the same degree of care and protection as it would use with respect to its own Confidential Information, but in no event less than a reasonable standard of care. The foregoing obligations shall survive for a period of five (5) years from the date of disclosure of the Confidential Information, except in the case of source code, in which case the foregoing obligations shall be perpetual. Without granting any right or license, the Disclosing Party agrees that the foregoing shall not apply with respect to information that the Receiving Party can establish (i) is in the public domain and is available at the time of disclosure or which thereafter enters the public domain and is available, through no improper action or inaction by the Receiving Party or any affiliate, agent or employee, or (ii) was in its possession or known by it prior to receipt from the Disclosing Party without restriction, or (iii) was rightfully disclosed to it by another person without restriction, or (iv) is independently developed by the Receiving Party without use of such Confidential Information, or (v) is required to be disclosed pursuant to any statutory or regulatory authority, provided the Disclosing Party is given prompt notice of such requirement and the scope of such disclosure is limited to the extent possible, or (vi) is required to be disclosed by a court order, provided the Disclosing Party is given prompt notice of such order and provided the opportunity to contest it.

   5.3   *Return of Confidential Information.*   Upon any termination or expiration of this Agreement each party will destroy, or return to the other party, all tangible copies of the other party's Confidential Information and erase all copies in electronic form.

   5.4   *Confidentiality of Agreement.*   Each party agrees that the existence of this Agreement and the terms of this Agreement shall be deemed Confidential Information of the other party, provided that in addition to the permitted disclosures under section 5.2, either party may disclose the terms of this Agreement (i) if required to do so by law or generally accepted accounting principles, (ii) as required to assert its rights hereunder, and (iii) to its own directors, employees, attorneys, accountants, and other advisors on a "need to know" basis and under an obligation of confidentiality no less stringent than set forth herein. Each party agrees that the Disclosing Party will be given prompt notice of any disclosure made pursuant to clause (i) or (ii) above, and that any such disclosure shall be limited to the extent possible.

6.   *Intellectual Property*

   6.1   *Google Rights.*   As between Customer and Google, Customer agrees that it will not claim ownership, based on this Agreement or its use of Services hereunder, in any right, title and interest, including without limitation Intellectual Property Rights associated with the Services (including, but not limited to, the GSLP service, the Google Data Protocol, and Google Brand Features, whether used by Google and/or Customer, but excluding items licensed by Google from third parties). Customer shall not acquire any right, title, or interest in or to the Intellectual Property Rights associated with the Services (including the GSLP service, the Google Data Protocol, and Google Brand Features), except for the limited right use rights expressly set forth in this