1   DAVID H. KRAMER, State Bar No. 168452 (dkramer@wsgr.com)
    DAVID L. LANSKY, State Bar No. 199952 (dlansky@wsgr.com)
2   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
3   650 Page Mill Road
    Palo Alto, CA 94304-1050
4   Telephone:  (650) 493-9300
    Facsimile:   (650) 565-5100
5
    Attorneys for Defendant/Counterclaimant
6   Google Inc.

7

8                       UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10                           SAN JOSE DIVISION

11

12   DIGITAL ENVOY, INC.,                )   CASE NO.:  C 04 01497 RS
                                         )
13            Plaintiff/Counterdefendant, )
                                         )   **GOOGLE INC.'S NOTICE OF**
14        v.                             )   **MOTION AND MOTION FOR**
                                         )   **PARTIAL SUMMARY JUDGMENT**
15                                       )   **REGARDING DIGITAL ENVOY,**
     GOOGLE INC.,                        )   **INC.'S DAMAGES CLAIMS;**
16                                       )   **MEMORANDUM IN SUPPORT**
              Defendant/Counterclaimant. )   **THEREOF**
17                                       )
                                         )   Judge:      Hon. Richard Seeborg
18                                       )   Courtroom: 4, 5th Floor
                                         )   Date:        September 21, 2005
19                                       )   Time:        9:30 a.m.
                                         )
20   _____)

21

22

23

24

25

26

27

28

2692762_4.DOC

GOOGLE INC.'S NOTICE, MOTION AND MEMO ISO MOTION
FOR PARTIAL SUMMARY JUDGMENT RE DIGITAL ENVOY INC.'S
DAMAGES CLAIMS - CASE NO.: 04 01497 RS

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.     INTRODUCTION ........................................................................................ 1

II.    BACKGROUND ........................................................................................... 3

       The Parties' Agreement ............................................................................. 3

       Google's Understanding of the Agreement ............................................... 5

              Google's Advertising Programs ....................................................... 6

                     AdWords ................................................................................ 6

                     AdSense .................................................................................. 7

III.   ARGUMENT ................................................................................................. 8

       A.     Digital Envoy's Damages Claims Are Barred and/or Severely
              Circumscribed by the Limitation of Liability Clauses in the License
              Agreement. ........................................................................................ 8

              1.     Digital Envoy Is Precluded from Recovering Damages in This Case
                     Because It Cannot Show Willful Misconduct by Google ......................... 9

              2.     To the Extent Digital Envoy Is Permitted Any Recovery, It Is
                     Limited to Amounts Paid by Google to Digital Envoy Under the
                     License Agreement ................................................................ 10

       B.     Digital Envoy Cannot Establish the Requisite Causal Nexus Between
              Google's Supposed Misuse of Digital Envoy's Trade Secrets and Any Loss
              It Suffered or Gain that Google Supposedly Enjoyed ............................. 13

              1.     Digital Envoy Cannot Establish Any Actual Loss Caused by
                     Google's Supposed Misappropriation ........................................ 15

              2.     Digital Envoy Cannot Establish Any Unjust Enrichment Caused by
                     Google's Supposed Misappropriation ........................................ 18

                     a.     Google Did Not Earn Any Direct Revenue from Digital
                            Envoy's Data. ............................................................ 18

                     b.     Digital Envoy Cannot Trace Any of Google's AdSense
                            Revenue to Google's Use of Digital Envoy's Data ............. 18

IV.    CONCLUSION ............................................................................................ 20

2692762_4.DOC

GOOGLE INC.'S NOTICE, MOTION AND MEMO ISO MOTION
FOR PARTIAL SUMMARY JUDGMENT RE DIGITAL ENVOY INC.'S
DAMAGES CLAIMS - CASE NO.: 04 01497 RS

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313 (C.D. Cal. 2004) .........................17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................................................8

*Cline v. Industrial Maint. Eng'g & Contracting Co.*, 200 F.3d 1223 (9th Cir. 2000) ...................8

*Computer Sciences Corp. v. Computer Assocs. Int'l, Inc.*, Nos. CV 98-1374 WMB
    SHX, CV 98-1440-WMB SHX, 1999 WL 675446 (C.D. Cal. Aug. 12, 1999) .................14

*Fedders Corp. v. Haier Am. Trading, LLC*, No. 00 Civ. 5583(JSM), 2002 WL
    519733 (S.D.N.Y. Apr. 14, 2002) ...........................................................15

*Gillespie v. Rawlings*, 49 Cal. 2d 359 (1957)...................................................................9

*Hoopai v. Civil Serv. Comm'n*, 106 Hawaii 205 (2004) ...................................................11

*In re Bennett*, 298 F.3d 1059 (9th Cir. 2002) .................................................................8

*In re Kinoshita & Co.*, 287 F.2d 951 (2d Cir. 1961) .........................................................12

*Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100 (C.D. Cal. 2002)..................................17

*Lundin/Weber Co. LLC v. Brea Oil Co.*, 117 Cal. App. 4th 427 (2004)...............................8

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509 (9th Cir. 1988).............................13

*Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458 (9th Cir. 1983).............11, 12

*Merrill v. Navegar, Inc.*, 26 Cal. 4th 465 (2001) ...........................................................15

*Murphy Elecs., Inc. v. K.R. Anderson Co.*, 102 Wash. App. 1029, No. 45172-3-I,
    2000 WL 1279302 (Wash. App. Sept. 11, 2000)......................................................14

*Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573 (2d Cir. 2000).........................4

*National Micrographics Sys., Inc. v. Canon U.S.A., Inc.*, 825 F. Supp. 671 (D.N.J.
    1993)...................................................................................................12

*Picken v. Minuteman Press Int'l, Inc.*, 854 F. Supp. 909 (N.D. Ga. 1993)............................12, 13

*Saelzler v. Advanced Group 400*, 25 Cal. 4th 763 (2001).............................................15

*Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658 (2003) ...............................14

*State Farm Fire and Cas. Co. v. Geary*, 699 F. Supp. 756 (N.D. Cal. 1987) .......................8

*Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688 (8th Cir. 1997) .........................12, 13

*Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612 (1992) .....................................18

2692762_4.DOC

1  *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940 (S.D.N.Y. 1994) ....................................13

2  *Wiz Tech., Inc. v. Coopers & Lybrand LLP*, 106 Cal. App. 4th 1 (2003)....................................15

3  *Woodson v. Everson*, 61 Cal. App. 2d 204 (1943) ....................................9

4                                       **STATUTES**

5  Cal. Civ. Proc. Code § 1856 ....................................8

6  Cal. Civ. Code § 3426.1(b)(2)(B)(ii)....................................10

7  Cal. Civ. Code § 3426.1(d)....................................11

8  Cal. Civ. Code § 3426.3(a)....................................1, 14, 18, 20

9                                         **RULES**

10  Fed. R. Civ. P. 26(a)....................................17

11  Fed. R. Civ. P. 26(e)(1)....................................17

12  Fed. R. Civ. P. 26(e)(2)....................................17

13  Fed. R. Civ. P. 37(c)(1)....................................17

14  Fed. R. Civ. P. 56 ....................................1

15  Fed. R. Civ. P. 56(c)....................................8

16  Fed. R. Civ. P. 56(d)....................................8

17                                    **MISCELLANEOUS**

18  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 54 (1988)....................................11

19

20

21

22

23

24

25

26

27

28

2692762_4.DOC

GOOGLE INC.'S NOTICE, MOTION AND MEMO ISO MOTION
FOR PARTIAL SUMMARY JUDGMENT RE DIGITAL ENVOY INC.'S
DAMAGES CLAIMS - CASE NO.:  04 01497 RS

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 21, 2005 at 9:30 a.m., defendant/counterclaimant Google Inc. ("Google") will move this Court pursuant to Fed. R. Civ. P. 56 for partial summary judgment in favor of Google:

(1)     that Digital Envoy, Inc.'s ("Digital Envoy") damages claims are barred and/or circumscribed by the limitation of liability clauses in the license agreement entered into between Google and Digital Envoy on November 30, 2000 and subsequently amended (the "License Agreement"); and

(2)     that Digital Envoy cannot establish the requisite causal nexus between Google's supposed misuse of Digital Envoy's trade secrets and any loss it suffered or gain that Google supposedly enjoyed and that Digital Envoy therefore is not entitled to any recovery under Cal. Civ. Code § 3426.3(a).

Google's motion is supported by the following memorandum, the accompanying declarations of David H. Kramer, Mark Rose, Susan Wojcicki, the argument of counsel and any other matters properly before the Court.


## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

In November 2000, Google and Digital Envoy entered into a relatively modest contract under which Google received the right to use Digital Envoy's geolocation data throughout its business in exchange for a few thousand dollars a month. Today, the parties have spent far more litigating over the interpretation of that contract than Google was required to pay in license fees during its four-year term. The reason for this extravagant litigation campaign is simple: Digital Envoy wrongly seeks to parlay its minor contract with Google into an enormous financial windfall.

Based upon a made-for-litigation contract interpretation, Digital Envoy charges that Google violated the parties' agreement by using Digital Envoy's data to enhance the

2692762_4.DOC

1 geotargeting capabilities in Google's AdSense advertising program. Citing this alleged

2 violation, Digital Envoy claims entitlement to untold millions of dollars – either as compensation

3 for its imagined loss of business, or to prevent Google's supposed unjust enrichment. These

4 damages claims, however, suffer from two fatal deficiencies. First, Digital Envoy's claims are

5 barred or greatly constrained by the two limitation of liability clauses in the parties' contract.

6 Second, Digital Envoy cannot establish the required causal nexus between Google's alleged

7 contract violation and the damages Digital Envoy claims.

8     The Court is already familiar with the causation problems that pervade Digital Envoy's

9 lost profits claim. Asked in interrogatories to provide evidence of the link between Google's

10 alleged contractual violation and any lost licensing revenue, Digital Envoy came up with

11 nothing. Not surprisingly, the Court recently held that Digital Envoy had failed to offer evidence

12 of the requisite causal connection. Digital Envoy's inability to supply such evidence is no

13 accident – there is none; its theory is impossibly speculative.

14     The same is true with respect to Digital Envoy's claim that Google was unjustly enriched

15 by its supposed contractual violation. While Google has undoubtedly profited from its AdSense

16 program, there is no way to attribute any portion of its profits from that program to the use of

17 Digital Envoy's data. Indeed, Digital Envoy again failed to offer evidence of any such link in

18 response to Google's interrogatories. Moreover, given the way in which Google used Digital

19 Envoy's data – solely to prevent ads from being shown – Digital Envoy's theory makes no sense.

20 Digital Envoy simply cannot demonstrate that any advertisement that Google displayed and

21 earned revenue from was shown or clicked upon because of Digital Envoy's data. It thus cannot

22 show that "but for" use of the data, Google would have earned lower profits.

23     Digital Envoy's inability to establish causation dooms its claims for actual damages and

24 unjust enrichment. But no matter what damages claim it puts forth, Digital Envoy cannot

25 overcome two limitation of liability clauses in the parties' contract. These clauses were included

26 in the agreement to address the circumstances presented here; one party seeking to take

27 advantage of the other through litigation.

28

The first contractual clause precludes the imposition of any liability against a party except in cases of that party's "willful misconduct."  As applied, the provision bars any recovery to Digital Envoy absent a showing that Google *knew* it was engaged in misconduct in its use of Digital Envoy's data.  As prior proceedings in this case have shown, Digital Envoy cannot possibly make such a showing.  Google's representatives have testified that they always believed the company's use of the data was licensed, and there is no evidence whatsoever to suggest they knew Google was violating the contract, assuming that Google ever was.

The second contractual clause limits Google's liability in "any lawsuit or other action" "brought under" the contract to amounts actually paid by Google during the term of the contract.  That provision certainly applies to Digital Envoy's claim which is predicated upon Google's supposed breach of the parties' contract, would not exist but for the contract, and stands or falls on the contract's ultimate interpretation.  Courts examining similar language in forum selection clauses have routinely held that it covers tort claims that are based upon the contractual relationship.  The provision is by no means restricted in application to claims styled as "breach of contract" as Digital Envoy seems to believe.  It would have been a simple matter to word such a restrictive clause.  Instead, the parties used the expansive phrase "any lawsuit or other action" to reflect their intent that the limitation not be circumvented through the dodge of artful pleading.

Given the applicable limitations of liability and the causation problems endemic to Digital Envoy's case, Google requests that the Court grant partial summary judgment to Google barring or substantially circumscribing Digital Envoy's claims for damages.

## II.  BACKGROUND

### The Parties' Agreement

Google and Digital Envoy entered into the License Agreement at the heart of this dispute in November 2000.  Declaration of David H. Kramer ("Kramer Decl."), Ex. A.  Google negotiated for and obtained the right to make unlimited use of the data in Digital Envoy's IP

2692762_4.DOC

1 Address/Physical Location database[1] in Google's business, specifically including Google's

2 advertising programs. *See* Court's Order, May 20, 2005.[2]  In exchange for these expansive

3 rights, Google agreed to pay Digital Envoy $3,000 a month, reflecting the commoditized nature

4 of the data and the limited relationship of the parties.  Kramer Decl., Ex. A.

5      As further evidence that the parties did not intend to share either the risks or rewards of

6 their relationship, their contract contains a host of limitation of liability clauses dramatically

7 circumscribing the parties' rights to claim damages from one another:

8     It is mutually acknowledged that data entry, communication and storage are
subject to a possibility of human and machine errors, omissions, delays, and

9 losses, including inadvertent loss of data or damage to media, which may give rise
to loss or damage.  Neither party hereto undertakes any liability to the other for

10 any such errors, omissions, delays, or losses.  EXCEPT AS STATED ABOVE,

11 LICENSOR MAKES AND LICENSEE RECEIVES NO WARRANTIES,
EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF

12 THIS AGREEMENT OR ANY OTHER COMMUNICATION, REGARDING
THE PRODUCT, THE DATABASE LIBRARIES AND THE SERVICES, AND

13 LICENSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF
MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

14 <u>NEITHER PARTY UNDERTAKES OR ACCEPTS ANY LIABILITY</u>

15 <u>WHATSOEVER TO THE OTHER FOR ERRORS, OMISSIONS, DELAYS,
INTERRUPTIONS, OR LOSSES UNLESS CAUSED BY THEIR WILLFUL</u>

16 <u>MISCONDUCT.  EXCEPT FOR INDEMNIFICATION UNDER SECTION 7.5,
IN NO EVENT SHALL EITHER PARTY'S DAMAGES IN ANY LAWSUIT</u>

17 <u>OR OTHER ACTION BROUGHT UNDER THIS AGREEMENT EXCEED
THE AMOUNTS PAID BY LICENSEE HEREUNDER.</u>

18

19

20

21     [1]   Digital Envoy is one of several companies that generates data that can help users make an

22 educated guess about the approximate geographic location of a visitor to a website.  Specifically,
Digital Envoy's data attempts to match the unique IP addresses assigned to the computers of

23 individual Internet users to particular countries, regions or metropolitan areas.  Declaration of
Mark Rose ("Rose Decl.") at ¶ 2. *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573,

24 576 (2d Cir. 2000) (describing concept of IP address).

    [2]   The License Agreement, which was repeatedly extended and expired in January 2005,

25 authorized Google to use Digital Envoy's data in Google's "Business" – broadly defined as "the
business of producing and maintaining information search technology."  Kramer Decl., Ex. A

26 (whereas clause defining "Business").  Google was expressly authorized to use the data at any of
its "offices and data centers" and to "develop indices, services, or applications that are provided

27 to third parties." *Id.* at § 3.

28

1   *Id.* at § 8 (underlining added).  This provision was drafted by Digital Envoy, with Google's only

2   relevant contribution consisting of an edit to make reciprocal the last sentence.  Kramer Decl.,

3   Ex. B at § 8 (redline of license agreement showing addition of mutuality).

4   <u>Google's Understanding of the Agreement</u>

5   The language of the License Agreement and the parties' negotiations made plain to

6   Google's representatives that Google's right to use Digital Envoy's technology was expansive.

7   Indeed, from the time they negotiated the contract to this day, Google's representatives have

8   always understood that Google had the right to use Digital Envoy's data as Google saw fit,

9   subject only to the limitation that it not distribute or resell the data to third parties.

10   For example, Matthew Cutts, who negotiated the contract with Digital Envoy and then

11   implemented Google's use of Digital Envoy's technology in Google's advertising program,

12   testified under cross-examination:

13   Q.  So your understanding is that -- at that point in time, your understanding was that you
    could use the data in any way you wanted except for giving the complete code to another
14   third-party?

15   A.  I believe that's correct.

16   * * *

17   Q:  My question is, that understanding, did you have that understanding consistently
    from the time of entering into the relationship with Digital Envoy to today, that you had
    the ability to use the information for whatever you wanted, except for moving the whole
18   database to a third-party?

19   A.  I believe I did have that understanding.

20   Kramer Decl., Ex. C (Cutts Dep.) at 54:3-7; 64:6-16;  *see also* Kramer Decl., Ex. D (Schimmel

21   Dep.) at 103:8-11, 105:18-106:5; Kramer Decl., Ex. E (Rana Dep.) at 8:15-10:16, 20:2-14.

22   Based on the understanding of its representatives, Google openly used Digital Envoy's

23   data to support its advertising programs for years without any objection whatsoever from Digital

24   Envoy.  Kramer Decl., Ex. F (Friedman Dep.) at 213:2-6.  Specifically, Google used Digital

25   Envoy's data in its advertising programs – first in AdWords, and later in AdSense.

26

27

28

2692762_4.DOC

-5-

1     **Google's Advertising Programs**

2     AdWords

3         The advertising program that Google offers to advertisers is known as AdWords.

4     AdWords permits hundreds of thousands of advertisers to display their messages to Internet

5     users all over the world.  If a user "clicks" on a given advertising message, the sponsoring

6     advertiser pays Google for that click.  Declaration of Susan Wojcicki ("Wojcicki Decl.") at ¶ 2.

7         To implement the AdWords program, Google analyzes the content of advertisers'

8     messages and stores them in an indexed database.  When called upon to display a message to an

9     end-user, Google searches this database to find what it believes is the most relevant commercial

10    information using a highly complex, weighted algorithm that takes dozens of factors into

11    consideration.  Rose Decl. at ¶ 3.

12        One of the most important factors Google uses to locate advertisements to display to a

13    user is the user's demonstrated interest in a particular subject.  Thus, for example, when a visitor

14    queries Google's web index for "basketball," Google will search its inventory for a basketball-

15    related advertisement to match the user's interest.  But the user's demonstrated interest is only

16    the first of dozens of factors used in the search process.  Others include, for example, the

17    "clickthrough" rate for a particular advertisement, and the amount of money that an advertiser is

18    willing to pay for a user's click.[3]  Wojcicki Decl. at ¶¶ 3, 4.

19        In some cases, another factor used in Google's search for a relevant advertisement is the

20    perceived geographic location of the Internet user.  Google uses this factor to prevent the display

21

22        [3]     In the Google AdWords program, Google's advertisers inform Google of the "keywords"
         to which they want display of their advertisements connected (*e.g.*, display only when users
23       search for the term "basketball").  Advertisers also select the maximum amount they are willing
         to pay Google each time a user "clicks" on their message (*e.g.,* $.50 per click).  Where two
24       advertisers are interested in the same keywords, one advertiser can generally increase its chance
         of having its message displayed by setting a higher maximum payment per click than another.
25       But because Google is interested in locating advertisements that users find relevant, the
         advertiser offering the highest maximum cost per click will not necessarily have its message
26       displayed.  Users may find another advertiser's message more appealing and thus "click" on that
         message more often.  Google uses the comparative "clickthrough rates" of competing messages
27       as one of the factors in its analysis of which message to display.  Wojcicki Decl. at ¶ 4.

28

2692762_4.DOC

1  of advertisements outside the geographic area selected by an advertiser (*e.g.,* where the

2  advertiser asks to display its messages only to users in Nebraska). *Id.* at ¶ 5. And for a time,

3  until shortly after this lawsuit was filed, as one step in estimating a user's geographic location,

4  Google often used information from Digital Envoy's IP Address/Location database. Rose Decl.

5  at ¶ 4.

6        To be clear, Google does not actually utilize geotargeting or Digital Envoy's data to

7  select the particular ads it ultimately displays to end users. Rather, *to the extent Google can*

8  *ascertain a user's geographic location, it uses that information to exclude advertisements from*

9  *the selection process*. For example, if Google determines that a user searching for "basketball"

10  is in California, Google would drop from its selection process the messages of any advertiser that

11  wanted its ads shown only to those in Nebraska. Google would continue its search for the

12  appropriate advertising messages from the remaining pool of candidate-advertisements using its

13  complex multi-factored algorithm. Rose Decl. at ¶ 6. It would then send the selected

14  advertisements back to the user's computer. In many, but not all cases, the ads ultimately

15  displayed would be those from the remaining advertiser that offered the highest amount per click

16  for the word "basketball." Wojcicki Decl. at ¶ 4.

17        AdSense

18        In 2002, Google formally launched its AdSense program. The program allows Google to

19  display advertisements to users visiting the web sites of participating third-party publishers who

20  comprise the Google Network. If a user clicks on a message displayed on a third-party site, the

21  advertiser pays Google, and Google shares a portion of that payment with the third-party

22  publisher. Wojcicki Decl. at ¶ 6.

23        The mechanical process by which Google searches for the advertising messages to

24  display to users visiting third-party sites is identical, in relevant part, to the process used to locate

25  advertising messages to display to users visiting Google's own site. Indeed, the process of

26  selecting advertising messages is run by the same computers using virtually identical multi-

27  factored and weighted algorithms. Google uses geotargeting and used Digital Envoy's data in

28

2692762_4.DOC

-7-

1  AdSense just as it used them in AdWords – solely to exclude ads from the selection process and

2  prevent them from being displayed.  Rose Decl. at ¶¶ 7-9.

3  **III.    ARGUMENT**

4        A party is entitled to summary judgment as a matter of law where the pleadings and

5  evidence show that there is no genuine issue of material fact on the claim in question.  Fed. R.

6  Civ. P. 56(c).  Where the moving party does not have the burden of proof on a particular issue, it

7  need not introduce evidence to obtain a summary judgment.  Rather, it need only show the Court

8  that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v.*

9  *Catrett*, 477 U.S. 317, 323 (1986); *Cline v. Industrial Maint. Eng'g & Contracting Co.*, 200 F.3d

10  1223, 1229 (9th Cir. 2000).[4]

11        **A.    Digital Envoy's Damages Claims Are Barred and/or Severely Circumscribed**
              **by the Limitation of Liability Clauses in the License Agreement.**

12        The lengthy limitation of liability provision in the License Agreement contains two

13  clauses at issue here.  The first clause prevents Digital Envoy from recovering any damages

14  absent a showing of willful misconduct; the second caps any recovery by Digital Envoy under

15  any circumstances at $308,600, the total amount paid by Google to Digital Envoy under the

16  License Agreement.  *See* Wojcicki Decl. at ¶ 5.

17        The parties' License Agreement is integrated and, according to Digital Envoy,

18  unambiguous.  Kramer Decl., Ex. A at § 13 (integration clause); Kramer Decl., Ex. G

19  (interrogatory responses) at Nos. 5, 6 (Digital Envoy admitting contract is unambiguous).  The

20  interpretation of the limitation of liability clauses is therefore a question of law for the Court.  *In*

21  *re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002); *Lundin/Weber Co. LLC v. Brea Oil Co.*, 117 Cal.

22  App. 4th 427, 433 (2004) (contract interpretation is essentially judicial function); Cal. Civ. Proc.

---

24  [4]    Even if summary judgment or summary adjudication of an entire claim is not warranted,
25  Federal Rule of Civil Procedure 56(d) allows a court to grant partial summary judgment, thereby
   reducing the number of facts at issue in a case.  Fed. R. Civ. P. 56(d); *State Farm Fire and Cas.*
26  *Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987).  If for any reason the Court believes that
   summary judgment is unavailable, Google respectfully requests that the Court grant it partial
27  summary judgment with respect to the specific issues raised herein.

28

2692762_4.DOC

GOOGLE INC.'S NOTICE, MOTION AND MEMO ISO MOTION
FOR PARTIAL SUMMARY JUDGMENT RE DIGITAL ENVOY INC.'S
DAMAGES CLAIMS - CASE NO.: 04 01497 RS

Code § 1856.  Because the meaning of these clauses is clear, the Court should enforce them as written, barring and/or appropriately limiting Digital Envoy's claims for damages.

### 1.  Digital Envoy Is Precluded from Recovering Damages in This Case Because It Cannot Show Willful Misconduct by Google

Google and Digital Envoy agreed that neither party would be liable to the other except in cases of "willful misconduct."  *See* Kramer Decl., Ex. A at § 8 ("Neither party undertakes or accepts any liability whatsoever to the other for errors, omissions, delays, interruptions, or losses unless caused by their willful misconduct.").  The phrase "willful misconduct" is described as being much more than mere negligence or even gross negligence, and as involving conduct of a quasi-criminal nature.  *See Woodson v. Everson*, 61 Cal. App. 2d 204, 208 (1943) (finding that defendant was liable for negligence but not for willful misconduct).  While gross negligence constitutes merely such a lack of care as to indicate a passive and indifferent attitude toward results, willful misconduct involves a positive intent actually to harm another or to do an act with a positive, active, and absolute disregard of its consequences.  *Id.* at 209.  Further, willful misconduct involves deliberate conduct in doing acts, with "*knowledge* or appreciation of the fact" that harm is likely to result.  *Id.* at 208 (emphasis added).  Thus, to constitute willful misconduct there must be "actual knowledge, or that which in the law is deemed to be the equivalent of actual knowledge" of the probability of injury to another.  *Id.* at 209.

To demonstrate willful misconduct, it is plainly not enough for a plaintiff to show that a defendant intended to act in a manner that is later shown to have been wrongful.  *See Gillespie v. Rawlings*, 49 Cal. 2d 359, 367 (1957).  The plaintiff must show that the defendant acted with either knowledge that serious injury would result, or a wanton and reckless disregard of the possible results.  *Id.* (finding that defendant was not liable for willful misconduct because defendant was neither aware of nor reckless with respect to probable injury).

Accordingly, to recover damages at all in this case, Digital Envoy must show that in utilizing Digital Envoy's Database Libraries, Google *knew* that it was breaching the License Agreement and *intended* to breach its terms to the detriment of Digital Envoy.  Digital Envoy

2692762_4.DOC

-9-

1   cannot possibly make such a showing.  There simply is no evidence that Google knew or

2   believed that it was engaging in improper sharing or disclosure of Digital Envoy's data or

3   violating the parties' contract.  There is no evidence suggesting that Google did not honestly

4   believe that it was authorized to use the data as it did. [5]  In fact, all of the evidence is to the

5   contrary, as each of Google's representatives testified that he believed the contract authorized

6   Google's use of the data in AdSense.  Accordingly, by the plain terms of the License Agreement,

7   Digital Envoy is not entitled to recover damages from Google.

8               **2.      To the Extent Digital Envoy Is Permitted Any Recovery, It Is Limited
                          to Amounts Paid by Google to Digital Envoy Under the License
9                         Agreement.**

10          From the start, this has been a contract case masquerading as a claim for trade secret

11  misappropriation.  Digital Envoy would have no trade secret claim against Google but for the

12  parties' License Agreement, and its claim stands or falls based upon the contract's ultimate

13  interpretation.  Accordingly, the claim falls squarely within the second limitation of liability

14  clause of the contract capping Digital Envoy's recovery in "any lawsuit or other claim brought

15  under th[e] Agreement" to the amount paid by Google during the contract term.  Kramer Decl.,

16  Ex. A at § 8.

17          Digital Envoy's trade secret claim depends entirely upon its License Agreement with

18  Google.  Its sole theory of misappropriation is that Google misused its trade secrets while *under*

19  *a duty to limit their use*.  *See* Cal. Civ. Code § 3426.1(b)(2)(B)(ii); Amended Complaint, ¶¶ 27-

20  28, 40, 46.  That claim simply would not exist absent the License Agreement, as the License

21  Agreement is the sole basis for the use-limitation duty upon which Digital Envoy's claim rests. [6]

22  _____

23          [5]   In a prior Order, the Court indicated that a jury could find that Google's use of Digital
     Envoy's data in AdSense was a violation of the License Agreement.  *See* Court Order, May 20,
24   2005, at 10:11-14.  It further indicated that a jury could find that Google's interpretation of the
     License Agreement was unreasonable.  *Id.* at 10:20-23.  But the Court did not find that Google
25   acted in willful violation of the contract.  Nowhere did the Court suggest that Google did not
     actually hold an interpretation of the License Agreement allowing it to use the data as it did.
26   Digital Envoy has not offered and cannot offer evidence upon which such a finding could be
     based.

27          [6]   As the Court has seen first hand, Digital Envoy' claim turns entirely upon the
     interpretation of the License Agreement – either Google was entitled to use the data as it did, or
28                                                                                      (continued...)

2692762_4.DOC

1    Digital Envoy thus seeks to enforce rights that owe their existence to the parties' contract.[7]

2    Accordingly, its action is one brought under the agreement and it is subject to the limitation of

3    liability clause in that contract.

4         An analysis of the language of the clause confirms this interpretation.  The term "action"

5    is commonly understood to mean "a proceeding in a court of justice by which one demands or

6    enforces one's right."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 54 (1988).  "Brought,"

7    as the past tense of bring, means "to institute."  *Id.* at 182, 180.  "Under" is commonly

8    understood to mean "subject to the authority, control, guidance, or instruction of."  *Id.* at 1285.

9    Thus, an action "brought under the agreement" is a court proceeding instituted subject to the

10   authority, control, guidance or instruction of the parties' agreement.  It is difficult to see how

11   Digital Envoy's claim is not one instituted subject to the control, guidance or instruction of the

12   License Agreement, since the rights at issue arise from the contract and the entire case turns

13   upon the ultimate interpretation of the contract.

14        There is virtually no case authority interpreting the precise language at issue.  *But see*

15   *Hoopai v. Civil Serv. Comm'n*, 106 Hawaii 205, 222 (2004) (contract clause covering

16   "complaints with respect to ... matters under the collective bargaining agreements" as covering

17   "complaints *related to* matters covered under collective bargaining agreements") (emphasis

18   added).  The Ninth Circuit has passed upon similar language in an arbitration clause in a contract

19   which was applicable to claims "arising hereunder."  *Mediterranean Enters., Inc. v. Ssangyong*

20   *Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983).  Noting that the clause was not as broad as one

21   covering claims "arising out of or relating to" the contract, the court nevertheless held the

22   _____

23   (...continued from previous page)
     it violated some use prohibition in the License Agreement and thus might have committed
     misappropriation (assuming it acted with the requisite intent).  Indeed, as if to highlight the

24   essential nature of the contract to its case, Digital Envoy recently filed a motion for summary
     judgment the outcome of which turns entirely upon interpretation of language in the contract.

25        [7]  Digital Envoy's claim that its data actually is a trade secret is also entirely dependent
     upon the License Agreement, as Digital Envoy must invoke the confidentiality provisions of the

26   License Agreement to establish the supposed confidentiality of the data in the first instance.  *See*
     Cal. Civ. Code § 3426.1(d) (requiring that "trade secrets" be subject to reasonable efforts to

27   maintain their secrecy).

28

                                                                                                2692762_4.DOC

1   language was broad enough to cover all "disputes and controversies relating to the interpretation

2   of the contract and matters of performance." *Id., citing In re Kinoshita & Co.,* 287 F.2d 951, 953

3   (2d Cir. 1961) (when clause "refers to disputes or controversies 'under' or 'arising out of' the

4   contract," arbitration governs "disputes and controversies relating to the interpretation of the

5   contract and matters of performance..."). Notably, the *Ssangyong* court held that the clause

6   covered the plaintiff's claim for breach of fiduciary duty because the duty itself was created by

7   the parties' contract. *Id.*

8       Other courts have likewise interpreted such language to include all claims dependent

9   upon an agreement, including tort claims that rest upon the parties' contractual relationship. *See*

10  *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 692 (8th Cir. 1997) (while forum

11  selection covering "disputes arising between the parties hereunder" was limited to disputes

12  "arising under the license agreement," it covered plaintiff's negligence and strict liability claims

13  because such claims would not have existed but for the agreement); *National Micrographics*

14  *Sys., Inc. v. Canon U.S.A., Inc.,* 825 F. Supp. 671, 677-78 (D.N.J. 1993) (forum selection clause

15  in contract applying to "any and all causes of action *hereunder* by and between the parties

16  hereto" covered tort claims).

17      Digital Envoy seems to believe the clause in question applies only to claims styled as

18  "breach of contract" claims. But if the parties had intended for the clause to be so restricted, they

19  could easily have crafted one which applied only to "claims for breach of contract." They did

20  not. Instead they used broader language covering "any lawsuit or other action brought under

21  th[e] agreement." In so doing, the parties made clear that if their contract was at the heart of a

22  dispute, their agreed upon limitation of liability would operate regardless of one party's creative

23  efforts to plead around their agreement. As Digital Envoy's home district has explained:

24      Reading the word "hereunder" to apply only to a pure breach of contract claim
        between the parties would be unduly crabbed and narrow. "Hereunder" refers to
25      the relations that have arisen as a result of th[e] contract. To read otherwise
        would mean that the mere recitation of a form of action would dictate the
26      enforceability of a forum selection clause. Such a restrictive reading would
        frustrate commercial reliance on such clauses which are encouraged.

27

28

2692762_4.DOC

-12-

1    *Picken v. Minuteman Press Int'l, Inc.,* 854 F. Supp. 909, 911-12 (N.D. Ga. 1993) (contract clause

2    applicable to claims "hereunder" not limited to claims styled as breach of contract and covers

3    claims for fraud and deceit); *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 947-49 (S.D.N.Y.

4    1994) (finding tort claims covered by forum selection clause reading, "[a]ny dispute or issue

5    arising hereunder...").  Moreover, it simply makes no sense that the parties would have agreed

6    upon limits for breach of contract claims but not for tort claims dependent on that contract when

7    it is the tort claims that present a far greater risk of unexpected liability.

8        According to the Eighth Circuit, a court should not permit a party to use "[s]trategic or

9    artfully drawn pleadings . . . to circumvent an otherwise applicable" contractual provision.  *See*

10   *Terra Int'l, Inc.*, 119 F.3d at 695 (refusing to elevate pleading form over substance of parties'

11   forum selection clause applicable to disputes arising under the contract); *see also Manetti-*

12   *Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) (interpretation of clause

13   depends not on a party's artful pleading but on whether "resolution of the claims relates to

14   interpretation of the contract"; forum selection clause applying to claims regarding

15   "interpretation" or "fulfillment" of contract applies to plaintiff's tort claims); *Picken,* 854 F.

16   Supp. at 911-12 (mere recitation of a form of action should not dictate the enforceability of

17   contractual clause).  That is precisely what Digital Envoy hopes to do here.  Its efforts should be

18   rejected.

19       The limitation of liability provision caps Digital Envoy's potential recovery in this case at

20   the amount Google paid to Digital Envoy under the contract.  It is undisputed that Google paid

21   Digital Envoy $308,600 under the contract.  Wojcicki Decl. at ¶ 5.  Accordingly, Google is

22   entitled to a partial summary judgment order barring Digital Envoy from recovering more than

23   $308,600 in this action.

24       **B.    Digital Envoy Cannot Establish the Requisite Causal Nexus Between Google's Supposed Misuse of Digital Envoy's Trade Secrets and Any Loss It**

25       **Suffered or Gain that Google Supposedly Enjoyed.**

26       Limitations of liability aside, discovery has made clear that Digital Envoy cannot

27   establish claims for damages based upon either its own alleged losses, or Google's supposed

28

2692762_4.DOC

-13-

1   unjust enrichment.  In both cases, Digital Envoy's claims are entirely speculative, and it cannot

2   prove any causal connection between Google's supposed misappropriation and its damages.

3   Google is thus entitled to partial summary judgment barring Digital Envoy from seeking a

4   recovery under Section 3426.3(a) of California Civil Code.

5          Civil Code Section 3426.3(a) – part of California's enactment of the Uniform Trade

6   Secrets Act ("USTA") – provides:

7          A complainant may recover damages for the actual loss *caused* by
       misappropriation. A complainant also may recover for the unjust enrichment
8      *caused* by misappropriation that is not taken into account in computing damages
       for actual loss.

9

10  Cal. Civ. Code § 3426.3(a) (emphasis added).  Thus, as part of its prima facie case, a party

11  claiming actual damages must show that its supposed damages were caused by the defendant's

12  alleged trade secret misappropriation.  Likewise, a party seeking to recover for a defendant's

13  alleged unjust enrichment may only recover for enrichment caused by the alleged

14  misappropriation.  *Id.; see also Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658,

15  1666 (2003) (listing elements of UTSA claim, including damages, and noting that plaintiff bears

16  burden on each element of claim).

17         Courts that have had occasion to consider the UTSA's causation requirement in the

18  summary judgment context have strictly enforced it.  *See, e.g., Murphy Elecs., Inc. v. K.R.*

19  *Anderson Co.*, 102 Wash. App. 1029, No. 45172-3-I, 2000 WL 1279302 (Wash. App. Sept. 11,

20  2000) (granting summary judgment to trade secret defendant on damages where plaintiff failed

21  to show its lost sales were caused by defendant's alleged misuse of customer list; plaintiff failed

22  to offer evidence from customers indicating they would have remained plaintiff's customers but

23  for alleged misappropriation); *Computer Sciences Corp. v. Computer Assocs. Int'l, Inc.*, Nos. CV

24  98-1374 WMB SHX, CV 98-1440-WMB SHX, 1999 WL 675446 (C.D. Cal. Aug. 12, 1999)

25  (granting summary judgment to trade secret defendant on damages highlighting requirement that

26  a defendant's wrongful acts be a "but for" cause of plaintiff's damage and noting plaintiff failed

27  to show that defendant would not have undertaken a tender offer against which plaintiff had to

28

2692762_4.DOC

-14-

1  defend absent alleged misuse of supposed secrets); *Fedders Corp. v. Haier Am. Trading, LLC*,

2  No. 00 Civ. 5583(JSM), 2002 WL 519733 (S.D.N.Y. Apr. 14, 2002) (granting summary

3  judgment to trade secret defendant on damages where plaintiff failed to show that defendant's

4  alleged misuse of competitive bid information caused injury to plaintiff in process; plaintiff

5  offered only speculation as to what would have happened in the competitive process absent

6  supposed misappropriation).

7       These trade secret decisions are in accord with California law which precludes any

8  recovery of damages where a plaintiff fails to offer concrete, admissible evidence that a

9  defendant's alleged misconduct caused its injury. *See, e.g., Saelzler v. Advanced Group 400,* 25

10  Cal. 4th 763, 767, 775-76 (2001) (granting summary judgment to defendant where plaintiff failed

11  to present evidence that breach of duty of care caused plaintiff's harm). As the California

12  Supreme Court has made clear, summary judgment on a claim for damages is warranted where

13  the plaintiff's evidence is little more than guesswork "in the realm of mere speculation and

14  conjecture." *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 490 (2001) (citation omitted); *see also Wiz

15  Tech., Inc. v. Coopers & Lybrand LLP*, 106 Cal. App. 4th 1, 4 (2003) (granting summary

16  judgment on damages claims where plaintiff failed to offer admissible evidence of causal

17  connection between defendant's allegedly improper resignation as plaintiff's accountants and a

18  host of claimed injuries).

19       Here, even assuming that Google was not licensed to use Digital Envoy's data in

20  connection with its AdSense program, and even assuming such use constitutes trade secret

21  misappropriation, Digital Envoy cannot show that such use caused it any actual loss or that

22  Google was unjustly enriched because of such use.

23    **1.    Digital Envoy Cannot Establish Any Actual Loss Caused by Google's
           Supposed Misappropriation**

24

25       In its initial disclosures, Digital Envoy claimed: "Google's wrongful actions have caused

26  Digital Envoy to suffer actual damages, including lost income, licensing and business

27

28

1   opportunities." [8]  Kramer Decl., Ex. H (Digital Envoy, Inc.'s Rule 26(a)(1) Disclosures) at 7.

2   Tellingly, Digital Envoy acknowledged the speculative nature of its claim even then.  *Id.* ("To

3   the extent sufficient specificity of this category of damages cannot be achieved, Digital Envoy

4   will claim recovery [through disgorgement].")  Digital Envoy has since had ample opportunity to

5   provide evidence in support of its actual damages theory.  But as the Court has already

6   recognized, Digital Envoy has offered nothing to suggest that its theory is anything other than

7   speculation:

8           Digital has failed to establish any link between its claims that Google exceeded
            the scope of its License and discovery regarding Google's agreements, revenue,
9           negotiations, and communications with Google Network members.  Rather,
            Digital must establish a causal relationship between such members and itself, such
10          as an allegation that a Google Network member told Digital that, but for Google's
            inclusion of geo-targeting technology in its package, that member would have
11          licensed the technology from Digital . . . .

12  Court Order, July 15, 2005, at 6.

13          Not only did Digital Envoy fail to establish the requisite causal nexus in prior

14  proceedings, it refused to do so in response to Google's discovery requests.  Specifically, Google

15  asked Digital Envoy to identify any publisher that it believed would have licensed Digital

16  Envoy's data but for Google's supposed misuse of the data.  Kramer Decl., Ex. I (Response to

17  Interrogatory No. 17). [9]  While Digital Envoy is surely in the best position to know of any lost

18  business, Digital Envoy did not identify a single publisher in response to the interrogatory.

19  Having refused to supply the information as requested in discovery, Digital Envoy may not now

20  _____

21      [8]     According to Digital Envoy, "potential customers of Digital Envoy ... instead entered into
        a sharing relationship with Google."  *See* Digital Envoy's Motion to Compel, April 29, 2005, at
        11.  It claims that Google "[ate] Digital Envoy's market...."  *Id.* at 9.  As Google has previously
22      noted, Digital Envoy's actual damages claim is highly suspect from the start.  Even before it
        licensed Google, Digital Envoy licensed the then-leading Internet advertising network in the
23      country, Advertising.com, to use its data to run advertisements across a network of publisher
        sites - - precisely the use it complains about in this case - - for a flat fee of a few thousand dollars
24      a month.  Advertising.com and a host of other Digital Envoy licensees have been and remain free
        to use Digital Envoy's data to display advertisements on publishers' websites and thereby "eat"
25      the supposed market in which Digital Envoy claims to have suffered loss.

26      [9]     Having failed to identify any such publisher in response to Google's first interrogatory,
        Digital Envoy then elected not to answer Google's next interrogatory asking it to explain the
27      basis for any contention that a publisher would have licensed its data.  Kramer Decl., Ex. I
        (Response to Interrogatory No. 18).

28                                                                              2692762_4.DOC

1   come forward with the evidence in the hopes of forestalling summary judgment.  Fed. R. Civ. P.

2   37(c)(1) ("[a] party that without substantial justification fails to disclose information required by

3   Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is

4   not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a

5   motion any witness or information not so disclosed."); *see also Cambridge Elecs. Corp. v. MGA*

6   *Elecs., Inc.,* 227 F.R.D. 313, 323-34 (C.D. Cal. 2004) (plaintiff that failed to supply information

7   in responses may not rely on undisclosed information to raise a triable issue of fact in opposition

8   to summary judgment); *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1118 (C.D. Cal. 2002)

9   (same).

10      It is not enough for Digital Envoy to assert incessantly that publishers participating in

11  Google's AdSense program (*i.e.* Google's network) are Digital Envoy's "potential customers."

12  Rather, to establish the causation required to recover for its supposed actual loss, Digital Envoy

13  must show that but for Google's alleged misappropriation these "potential customers" would

14  have become actual customers for Digital Envoy.  Given that Digital Envoy has not shown (and

15  indeed, now cannot show) that a single publisher would have become a Digital Envoy licensee

16  but for Google's alleged misappropriation, Digital Envoy's causation theory fails as a matter of

17  law.[10]  Accordingly, Google is entitled to partial summary judgment with respect to Digital

18  Envoy's claim for actual damages.

19

20

21  _____

22      [10]  In order to establish a causal connection that would be anything other than speculation,
    Digital Envoy would have to show that a website publisher cared enough about receiving geo-
23  targeting ads to have acted differently if Google had been unable to supply them.  Digital Envoy
    has made no such showing.  Accordingly, there is no reason to believe that publishers would
24  have sought out an alternative means of geo-targeting advertisements that appeared on their sites.
    Further, Digital Envoy has failed to show that any publisher that believed geo-targeting of
25  advertisements on its site was important would have sought geo-targeting capability from Digital
    Envoy directly instead of using a host of other options, most notably alternative advertising
26  networks who offer geo-targeting.  Given the presence of other advertising networks offering
    geo-targeting, there is simply no way Digital Envoy could show that a website publisher would
27  have itself become a Digital Envoy licensee if it were unable to obtain geo-targeted
    advertisements from Google in the AdSense programs.

28

1

### 2.   Digital Envoy Cannot Establish Any Unjust Enrichment Caused by Google's Supposed Misappropriation

2

3       Digital Envoy's unjust enrichment theory fares no better.  According to Digital Envoy,

4   Google unjustly earned profits by making unlicensed use of Digital Envoy's data to enhance the

5   geotargeting capabilities offered to advertisers in Google's AdSense program.  Again, Digital

6   Envoy must offer evidence demonstrating causation – that but for Google's allegedly unlicensed

7   use of the data, Google would not have earned the profits it did from its AdSense program.  Cal.

8   Civ. Code § 3426.3(a); *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612 (1992).  Again,

9   Digital Envoy cannot possibly make that showing.

10              ### a.   Google Did Not Earn Any Direct Revenue from Digital Envoy's Data.

11

12       Google does not and has never charged advertisers for the ability to target their messages

13   to a particular geographic location.  Wojcicki Decl. at ¶ 5.  Likewise it has never charged

     advertisers for (or allowed advertisers to have) use of or access to Digital Envoy's data.  *Id.***;**

14   Rose Decl. at ¶¶ 8-9.  Accordingly, Google has not earned any revenue that can be directly

15   attributed to the use of Digital Envoy's data in its AdSense program.

16              ### b.   Digital Envoy Cannot Trace Any of Google's AdSense Revenue to Google's Use of Digital Envoy's Data.

17

18       Because it cannot establish any direct connection to any portion of Google's AdSense

19   profits, Digital Envoy claims that Google would have earned less from AdSense advertisers if

20   Google had not enhanced its geo-targeting capabilities using Digital Envoy's data.  But this

21   theory, like the others, is nothing but pure speculation.  Digital Envoy has not made and cannot

22   make a showing that Google would have earned less money but for the use of Digital Envoy's

23   data as part of the geo-targeting process in AdSense.

24       In discovery, Google specifically asked Digital Envoy to identify any advertiser that

25   would not have advertised with Google or would have paid Google less but for Google's use of

26   the data in its AdSense program.  Digital Envoy could not identify a single entity and has offered

27

28

2692762_4.DOC

-18-

Google Inc.'s Notice, Motion and Memo ISO Motion
for Partial Summary Judgment re Digital Envoy Inc.'s
Damages Claims - Case No.: 04 01497 RS

1    no evidence that an advertiser would have acted differently.  Kramer Decl., Ex. I (Response to

2    Interrogatory Nos. 11-14).[11]

3        As noted, Google earns revenue from its AdSense program when its ads are displayed on

4    third party sites and then clicked on by end users.  Thus, to show some connection between use

5    of its data and revenues earned by Google, Digital Envoy would have to show, at the very least,

6    that its data was used to select the particular ads that Google displayed to end users.  But **Google**

7    **never used its own geo-targeting capabilities or Digital Envoy's data to select the ads it**

8    **displayed.  Instead, it used geo-targeting and Digital Envoy's data solely to exclude**

9    **advertisements from the selection process**.  Rose Decl. at ¶ 9.  The distinction is critical.  It

10   means that Digital Envoy could never show that Google's use of the data caused the display of

11   an advertisement upon which a user clicked to generate revenue for Google.  The best that

12   Digital Envoy could ever hope to show is that but for the use of Digital Envoy's data to exclude

13   ads from possible selection, Google would, as a theoretical matter, have had a larger group of ads

14   to select from and thus **might** have displayed a different advertisement.  *Id.*  There is simply no

15   way, however, for Digital Envoy to show that there would have been any difference in the ads

16   that Google actually selected to display (much less the extent of any difference) had Google not

17   used Digital Envoy's data.  *Id.*  For all anyone knows, Google's use of the data had no impact at

18   all on the selection process - - the ads selected for display, the clicks on those ads, and the

19   revenues generated from them could have been the same without use of Digital Envoy's data.

20

21       [11]   Further, Digital Envoy has repeatedly conceded that Google was licensed to use Digital
       Envoy's data in the process of selecting advertising messages in its AdWords program (for
22   display on Google's own web sites).  During the relevant time period, the AdWords program was
       significantly larger than AdSense as every advertiser necessarily participated in it (in contrast to
23   their selective participation in AdSense).  Declaration of David DiNucci in Support of Google's
       Motion for Summary Judgment (filed 6/1/2005) at ¶ 2.  Under the circumstances, it would do
24   Digital Envoy no good to show that an advertiser was attracted to Google because of its
       geotargeting capabilities.  To the extent an advertiser even cared about geotargeting, Google was
25   perfectly entitled to attract such advertisers to the vastly more prominent AdWords program.
       What Digital Envoy would have to show in this case is that an advertiser participated in the
26   allegedly unlicensed AdSense program (and would not otherwise have) *solely* because Google
       offered geotargeting using Digital Envoy's data in AdSense.  Digital Envoy has not and could
27   not possibly make such a showing.

28

2692762_4.DOC

1  As a result, Digital Envoy cannot show any causal connection between Google's AdSense

2  revenues and its use of Digital Envoy's data to enhance its geotargeting capabilities.

3       While the analysis need go no further, the causation problems in Digital Envoy's unjust

4  enrichment theory are actually even more insurmountable.  Even if one were to assume that

5  absent use of Digital Envoy's data, Google might have displayed a different advertisement to a

6  user, there is simply no way to know whether or how often the user would have clicked on that

7  different advertisement so as to generate revenue for Google.  Again, Digital Envoy cannot show

8  what might have happened in this alternate universe.[12]  It thus cannot establish a "but for" causal

9  connection between Google's use of Digital Envoy's data and Google's AdSense revenues.

10  Accordingly, Digital Envoy's unjust enrichment claim fails as a matter of law.

11  **IV.    CONCLUSION**

12       For the foregoing reasons, Google respectfully requests that the Court grant it partial

13  summary judgment barring Digital Envoy from recovering damages from Google in this action, or

14  in the alternative limiting any such recovery to $308,600, the amount paid by Google to Digital

15  Envoy under the License Agreement.  Google further requests that the Court grant partial

16  summary judgment barring Digital Envoy from seeking damages for Google's alleged trade secret

17  misappropriation under California Civil Code Section 3426.3(a).

18                                          Respectfully Submitted,

19  Dated:  August 17, 2005                 WILSON SONSINI GOODRICH & ROSATI
                                            Professional Corporation
20

21                                          By:  _____/s/ David H. Kramer_____
                                                     David H. Kramer
22

23                                          Attorneys for  Defendant/Counterclaimant
                                            Google Inc.
24

---

25       [12]  It is quite possible that absent use of Digital Envoy's data to *exclude* ads from the
     selection process, Google would have been better off.  Use of the data conceivably excluded
26   advertisers from the process who had offered Google a greater amount per click than that offered
     for the ad that Google actually displayed.  If such ads had been selected for display instead of
27   being excluded, clicks on those ads would have made Google more money than Google actually
     made.  Rose Decl. at ¶ 9.
28

2692762_4.DOC

-20-