P. CRAIG CARDON, Cal. Bar No. 168646
BRIAN R. BLACKMAN, Cal. Bar No. 196996
KENDALL M. BURTON, Cal. Bar No. 228720
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:    415-434-9100
Facsimile:    415-434-3947

TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
LUKE ANDERSON (Admitted *Pro Hac Vice*)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5500
Facsimile: 404.443.5751

Attorneys for DIGITAL ENVOY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DIGITAL ENVOY, INC.,<br><br>　　　　Plaintiff/Counterdefendant,<br><br>　v.<br><br>GOOGLE, INC.,<br><br>　　　　Defendant/Counterclaimant. | Case No. C 04 01497 RS<br><br>**[REDACTED VERSION]**<br><br>**REPLY BRIEF IN SUPPORT OF DIGITAL ENVOY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACT ISSUES**<br><br>Date:　　　August 10, 2005<br>Time:　　　9:30 a.m.<br>Courtroom:　4, 5th Floor<br><br>**The Honorable Richard Seeborg** |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION .................................................................................................................. 1

II. ARGUMENT AND AUTHORITY ....................................................................................... 1

    A. DIGITAL ENVOY'S MOTION SEEKS PARTIAL SUMMARY JUDGMENT ON A LIMITED AND SIMPLE ISSUE. ........................................... 2

    B. THE PLAIN AND UNDISPUTED TERMS OF THE PARTIES' AGREEMENT PROHIBITS GOOGLE FROM LICENSING DIGITAL ENVOY'S PROPRIETARY INFORMATION. ......................................................... 2

    C. GOOGLE'S CONDUCT CONSTITUTES LICENSING PROHIBITED BY THE AGREEMENT. ............................................................................................... 6

        1. Google's Permitted Use of Digital Envoy's Proprietary Information in AdWords Is Relevantly Distinct from Google's Non-Permitted Use of Digital Envoy's Proprietary Information in AdSense. .................... 6

        2. Google Admits That It Licenses Its AdSense Product to Third Parties. ........................................................................................................ 9

        3. Google's Reliance on Intel and Lisle Are Misplaced – Google's Licensing of AdSense Constitutes A License of Digital Envoy's Proprietary Technology Contained Therein. ........................................... 11

III. CONCLUSION .................................................................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

In re Bennett,
  298 F.3d 1059 (9th Cir. 2002) ............................................................................... 4

DiSandro v. Makahuena Corp.,
  588 F. Supp. 889 (D. Haw. 1984) ......................................................................... 2

Intel Corp. v. ULSI Sys. Tech., Inc.,
  995 F.2d 1566 (Fed. Cir. 1993) .................................................................. 11, 12, 13

Lies v. Farrell Lines, Inc.,
  641 F.2d 765 (9th Cir. 1981) ................................................................................ 2

Lisle Corp. v. Edwards,
  777 F.2d 693 (Fed. Cir. 1985) .................................................................... 11, 12, 13

State Farm Fire & Casualty Co. v. Geary,
  699 F. Supp. 756 (N.D. Cal. 1987) ....................................................................... 2

### STATE CASES

AIU Ins. Co. v. Superior Court,
  51 Cal. 3d 807 (1990) ........................................................................................... 4

Blatz Brewing Co. v. Collins,
  69 Cal. App. 2d 639 (1945) .................................................................................. 3

### DOCKETED CASE

Advanced Semiconductor Materials of Am., Inc. v. Applied Materials, Inc.,
  No. C-93-20853 (N.D. Cal. Jul. 10, 1995) ............................................................ 2

### STATE STATUTES

California Civil Code
  § 1638 ................................................................................................................... 4
  § 1639 ................................................................................................................... 4
  § 1644 ................................................................................................................... 4

### FEDERAL RULE

Federal Rule
  Rule 56 ................................................................................................................. 2

## I. INTRODUCTION

Google's Opposition to Digital Envoy, Inc.'s Motion for Partial Summary Judgment on Contract Issues ("Opposition") fails to address the heart of Digital Envoy's Motion – that (1) the Agreement prohibits Google from licensing Digital Envoy's Database Libraries to third parties and (2) Google's AdSense program, by allowing third parties to access and actively use Digital Envoy's Database Libraries, is a violation of that prohibition. Google instead ignores that Digital Envoy's Motion is one for partial summary judgment aimed at discreet issues and insists that its own affirmative defenses shield the Court from construing the Agreement and analyzing Google's conduct. Google also mischaracterizes – to the point of obfuscation – the actual workings of its AdSense program and the active involvement of third parties in those workings that violate the terms of the parties' Agreement.[1] The evidence is clear that Google, through AdSense, permitted third parties to access and/or actively use Digital Envoy's Database Libraries for the purpose of geolocating visitors to the third parties' web sites. Such conduct is a violation of the Agreement for which there is no exception.

The Agreement uses plain language to describe the limitations on Google's use of Digital Envoy's proprietary technology, including the explicit prohibition against Google's licensing that technology to third parties. Given the clarity of the Agreement and the uncontroverted evidence establishing Google's licensing of Digital Envoy's technology to third parties, Digital Envoy is entitled to judgment as a matter of law that Google's conduct violates the terms of the parties' limited licensing agreement.

---

[1] Google also asserts – quite astoundingly – that Digital Envoy's reliance on Section 3.1 of the Agreement is a "made-in-the-midst-of-litigation alternative." Opposition at 6. Google ignores the fact that Digital Envoy has always maintained that Sections 3.1 and 7.2 of the Agreement prohibit Google's use of Digital Envoy's technology in AdSense. *See* Amended Complaint, ¶¶ 27, 28, and 46.

1  II.  ARGUMENT AND AUTHORITY

2  A.  **DIGITAL ENVOY'S MOTION SEEKS PARTIAL SUMMARY JUDGMENT ON A LIMITED AND SIMPLE ISSUE.**

Digital Envoy has moved for partial summary judgment on a limited and simple issue: to wit, (1) the Product and Electronic Database Evaluation and Licensing Agreement (the "Agreement") expressly prohibits Google from licensing Digital Envoy's proprietary technology to third parties; and (2) Google's conduct, through providing third-party ad publishers access to Digital Envoy's geo-targeting technology, is a violation of that express prohibition. *See, e.g.*, Agreement, § 3.1, attached as Ex. A to Digital Envoy's Motion for Partial Summary Judgment on Contract Issues. Digital Envoy is, at this time, seeking partial summary judgment on these discreet issues – not final adjudication of its claims.

As the Federal Rules provide, Rule 56 permits a claimant to move for "summary judgment in the party's favor upon all *or any part thereof.*" As such, Digital Envoy is not required to move for summary judgment of the entire case, but may move for partial summary judgment on "any part thereof." *DiSandro v. Makahuena Corp.*, 588 F. Supp. 889, 891-92 (D. Haw. 1984), citing *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 768-69 and n.3 (9th Cir. 1981) ("The fact that less than an entire claim is settled by the summary judgment ruling does not vitiate the court's jurisdiction to decide the issue."); *see also Advanced Semiconductor Materials of Am., Inc. v. Applied Materials, Inc.*, No. C-93-20853 RMW, 1995 WL 419747, at *3 (N.D. Cal. Jul. 10, 1995); *State Farm Fire & Casualty Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987) ("Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried"). Therefore, Google's assertion of affirmative defenses, which Digital Envoy does not address, are separate issues and do not affect the propriety of resolving the limited issues Digital Envoy raises in its Motion for Partial Summary Judgment.[2]

---

[2] Presumably in support of one or more of its affirmative defenses, Google argues that                                      . *See* Opposition at 5-6. This argument is irrelevant to the resolution of Digital Envoy's Motion for Partial Summary Judgment. Nevertheless, Google's assertion is incorrect. As late as

1  B. **THE PLAIN AND UNDISPUTED TERMS OF THE PARTIES' AGREEMENT
2     PROHIBITS GOOGLE FROM LICENSING DIGITAL ENVOY'S PROPRIETARY
3     INFORMATION.**

4  The Agreement expressly and plainly provides:

6  Agreement, § 3.1.[3] In its opposition, Google does not seriously dispute the plain and
7  unambiguous meaning of this prohibition. Nor does Google dispute that the term "license," as
8  used in the Agreement, conveys the ordinary, dictionary meaning, as articulated by a California
9  court:

> Webster defines "license" as "Authority or liberty given to do or forbear an act; permission to do something (specified); esp., a formal permission from the proper authorities to perform certain acts or to carry on a certain business which without such permission would be illegal." License means leave to do a thing which licensor could prevent. The word "license," generally speaking, means a grant of permission to do a particular thing, to exercise a certain privilege, or to carry on a particular business or to pursue a certain occupation.

14 *Blatz Brewing Co. v. Collins*, 69 Cal. App. 2d 639, 642-43 (1945). Therefore, Digital Envoy's
15 first point is established: the Agreement expressly prohibits Google from licensing Digital
16 Envoy's proprietary technology to *any* third party.

---

. *See* Declaration of Craig Cardon in Support of Digital Envoy, Inc.'s Motion for Partial Summary Judgment ("Cardon Declaration"), Ex. A, Deposition of Matthew Cutts ("Cutts Deposition") at 148. Google apparently relies on a misinterpretation of a Digital Envoy power point slide on which Digital Envoy refers to Google as 
 . *See* Opposition at 5-6. This is inconclusive evidence at best, especially considering that Mr. Friedman explained that his understanding was that 

, which was a permissible use of Digital Envoy's technology under the terms of the Agreement. *See* Cardon Declaration, Ex. B, Deposition of Robert B. Friedman ("Friedman Deposition") at 249-50.

[3] Perhaps in an attempt to minimize the importance of Section 3.1, or Google's violation thereof, Google continues to refer to this provision as "
." *See, e.g.*, Opposition at 9. In addition to the fact that this provision is contained within a section of the Agreement titled "Grant of Rights," whether this provision is "remarkable" to Google or not, the provision and the prohibitions contained therein are part and parcel of the parties' Agreement and have legal effect.

1    Thus, the Agreement unambiguously prohibits Google from "licensing" Digital Envoy's Database Libraries to third parties. When a contract provision is unambiguous, "[t]he clear and explicit meaning of the provisions, interpreted in their ordinary and popular sense . . . controls judicial interpretation." Cal. Civ. Code, §§ 1638, 1644; *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). Where, as here, the contract is integrated, extrinsic evidence, such as parol evidence, is generally not admissible to interpret the plain terms of the contract. *See In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002). Therefore, Google's proffer of communications that occurred between the parties prior to the execution of the Agreement to contradict the plain terms of the Agreement, are improper and inadmissible. The intent of the parties, as plainly expressed in the Agreement, should be discerned "solely from the written provisions of the contract." Cal. Civ. Code § 1639.

Nevertheless, Google attempts to carve a convenient (though false) exception to the Agreement's prohibition of licensing to third parties to cover its use of Digital Envoy's proprietary technology in the AdSense programs. In furtherance of this effort, Google blatantly misquotes the express terms of the Agreement, stating:

Opposition at 1. Google's statement is false, and it is contradicted by the express language of the Agreement:

. Agreement, § 3.1 (emphasis added). The grant of permission "to develop" clearly does not include permitting third-party publishers to routinely access and/or use Digital Envoy's Database Libraries in order to ascertain the geographic location of visitors to their web sites.[4] In addition, Section 3.1's prohibition against 'licensing" occurs in the very next sentence, and addresses the nature of the permission given by the terms "to develop":

---

[4] The sentence at issue was added at the suggestion of Google, which wanted to ensure that it had the right to use the Database Libraries to manipulate Google's own information to develop products. It was never contemplated that the limited permission "to develop" would grant Google the right to allow third parties to regularly access the Database Libraries on an ongoing basis. *See* Cardon Declaration, Ex. B, Friedman Deposition at 124-27.

1
2                                                              . Agreement, § 3.1 (emphasis added).
3 And Google's in-house attorney has admitted that the permission given in the second sentence ("to
4 develop") is subject to the limitations of the third (prohibiting selling, licensing, distributing,
5 sharing or otherwise giving). *See* Declaration of Craig Cardon in Support of Digital Envoy, Inc.'s
6 Motion for Partial Summary Judgment on Contract Issues ("Cardon Declaration"), Ex. G,
7 Deposition of Kulpreet Rana at 25-26.
8        Moreover, the specific example of permissible use, contained within the grant of
9 permission itself, demonstrates precisely why Google's proposed interpretation is grossly
10 incorrect. Section 3.1 states that Google may use Digital Envoy's Database Libraries in
11                                                  Indeed, consistent will this plain language,
12 during the negotiation of the Agreement, Robert Friedman of Digital Envoy expressly inquired of
13 Google's Steve Schimmel about the intent of the permission "to develop":
14
15
16 *See* Cardon Declaration, Ex. C, Deposition of Steven L. Schimmel ("Schimmel Deposition"), Ex.
17 25 (emphasis added). Mr. Schimmel responded to Mr. Friedman's inquiry by assuring him "
18
19
20
21        . *See* Cardon Declaration, Ex. B, Friedman Deposition at 207-08. Another Google
22 employee, Matthew Cutts, confirmed this understanding of the Agreement as late as April 9, 2001
23 in an e-mail exchange with an outside investment banker, who inquired:
24
25                                                                 *See* Cardon Declaration,
26 Ex. A, Cutts Deposition, Ex. 8. To which Mr. Cutts, replied:                    *See id.*
27
28

-5-

C.  **GOOGLE'S CONDUCT CONSTITUTES LICENSING PROHIBITED BY THE AGREEMENT.**

   1.  **Google's Permitted Use of Digital Envoy's Proprietary Information in AdWords Is Relevantly Distinct from Google's Non-Permitted Use of Digital Envoy's Proprietary Information in AdSense.**

Google incorrectly asserts that

Opposition at 11. Although it may be true that both AdWords and AdSense are components of Google's advertising revenue and provide mechanisms through which geographically-relevant advertisements are served, there exists a *critical* difference between them. In AdWords, the program through which advertisements are displayed on Google's own web sites, Google uses Digital Envoy's technology to discern the geographic location of a web site visitor based on that visitor's Internet Protocol ("IP") address. *See* Cardon Declaration, Ex. D, Declaration of Mark Rose in Support of Google's Motion for Summary Judgment ("Rose Declaration"), ¶¶ 4 and 8. Therefore, in AdWords, the entire process is controlled by *Google*, on *Google's* web site, using the IP address obtained from *Google's* web site visitor, accessing Digital Envoy's Database Libraries for the purpose of displaying a geographically-relevant advertisement on *Google's* web site. In other words, in the AdWords process, *Google* itself is using its own information to conduct its own query of Digital Envoy's proprietary information in order to geo-target. This process used by AdWords is *precisely* the process that is within the bounds of the license.

In stark contrast, Google's AdSense is, in all relevant respects, quite different. In AdSense, by virtue of computer code implanted on the third party's web site, the *third party* transmits the IP address of the *third party's* web site visitor to Google, thereby accessing Digital Envoy's Database Libraries in order to discern the geographic location of *its visitor's* IP address for the purpose of displaying geographically-relevant advertisements on the *third party's* web site. *Cf.* Cardon Declaration, Ex. D, Rose Declaration, ¶ 8. The entire process is automated, with Google essentially allowing the *third party* to have access to and/or use Digital Envoy's

1  proprietary information.[5] *Cf. id.*; *see also* Digital Envoy's Motion for Partial Summary Judgment on Contract Issues, Han Declaration ¶ 10, Ex. J (Google itself states "It's your [third party's] show from start to finish.") (emphasis added). Thus, while in AdWords, Google is geolocating visitors to Google's own web sites, in AdSense, the third party is geolocating visitors to the third party's web site (*i.e.*, the *third party's information*) using Digital Envoy's proprietary technology provided by Google thereby supplanting the third party's need for a license from Digital Envoy to engage the very same process.[6] In addition, as emphasis on the clear prohibition against licensing, the Agreement states that the Database Libraries shall not be licensed "in any form." *See* Agreement, § 3.1. Google's suggestion that the Database Libraries were not made *directly* available, but as part of a more complicated process with the inclusion of other information fails in light of the expansive prohibition of licensing "in any form." Therefore, no matter what "form" of access to or inclusion of Digital Envoy's Database Libraries Google now claims occurred, such conduct was barred by the plain terms of the Agreement.

---

[5] Google continues to emphasize that Digital Envoy's Database Libraries remain on Google's own servers. *See, e.g.*, Opposition at 5. However, in this instance, the physical location of the Database Libraries is quite beside the point. Whether Google physically relocated the Database Libraries to the third party's site or simply opened the door allowing the third party direct access to the Database Libraries, the effect is the same – Google authorized (or "licensed") the third party to                                        . Google, which obtains significant licensing revenue from its licensing of intellectual property over the Internet, which never leaves Google's own servers, surely is not taking the position that licensing necessitates some kind of *physical* transfer. Such a position would undermine the efficacy of most Internet licensing transactions and blatantly ignores the reality of the Internet economy of which Google itself has been one of the chief beneficiaries.

[6] The presence of advertisers (those who seek to have their advertisements placed on web sites) in both AdWords and AdSense do not make the programs the same in any relevant sense. Advertisers in Google's "ad network" occupy a very different position than do publishers (those who make their web site "space" available for the placement of advertisers' advertisements), because Google's advertisers do not use or have access to Digital Envoy's proprietary technology. Advertisers are simply not in the flow of data to or from Google in its advertisement placement process, and, therefore, do not send IP addresses to Google to be looked up in Digital Envoy's database. The visitors and associated IP address information are the property of the third party publisher (*i.e.*, for AdWords: Google; for AdSense: a third party publisher), not the advertiser.

1    Google recognizes that the effect of the process utilized in AdSense eliminates the need for
2  a third party to conduct its own geo-targeting. *See* Cardon Declaration, Ex. E, Deposition of Salar
3  Kamangar, Ex. 49 (asserting that AdSense publishers would no longer "need to geotarget").
4  Moreover, Google, in the licensing of its own search technology seems to recognize the difference
5  between permission to use Google's search and the impermissible repackaging of the search and
6  providing it to others:

> You may not take the results from Google search and reformat and display them, or mirror the Google home page or results pages on your Web site, You may not 'meta-search' Google. If you want to make commercial use of the Google services, you must enter into an agreement to do so in advance
>
> * * *
>
> You may not send automated queries of any sort to Google's system without express permission in advance from Google. Note that 'sending automated queries' includes, among other things:
>
> * * *
>
> using any software which sends queries to Google to determine how a website or web page 'ranks' on Google for various queries.

*See* Cardon Declaration, Ex. F, http://www.google.com/terms_of_service.html. For Google to now claim that there is no distinction between its own use of Digital Envoy's data (permitted by the Agreement) and repackaging Digital Envoy's data for use by third parties on third parties' web sites[7] (not permitted by the Agreement), is simply not credible, given the plain language of the agreement prohibiting licensing and Google's own demonstrated understanding of the differences between possible uses of licensed technology.

Therefore, Digital Envoy's admission that Google's use of Digital Envoy's databases in AdWords is permissible is consistent with the terms of the Agreement, which permits *Google* to geotarget. *See, e.g.*, Agreement, § 3.1. Google's insistence that the process used for AdWords is the same as that used in AdSense ignores the participation of the third party publisher, and the

---

[7]  Steve Schimmel, the Google employee who negotiated the Agreement for Google, testified that
                                    . *See* Cardon Declaration, Ex. C, Schimmel Deposition at 184-85.

,[8] that render AdSense outside the scope of the Agreement.

### 2. Google Admits That It Licenses Its AdSense Product to Third Parties.

Not only does AdSense substantively constitute a license of Digital Envoy's proprietary technology, Google ignores the multitude of instances and occasions on which Google itself describes its "services," including the AdSense product, as a "license":

- "Because we also offer to <u>license</u> our web search technology <u>along with Google AdSense</u> for search, companies without their own search service can offer Google WebSearch to improve the usefulness of their web sites for their users while increasing their revenue." Digital Envoy's Motion for Partial Summary Judgment on Contract Issues, Han Declaration, ¶ 6, Ex. F; *Google Press Centre: Product Descriptions* (visited Jun. 16, 2005) <http://www.google.co.uk/press/descriptions.html> (emphasis added).

- "Promptly following the Effective Date, Google shall provide the Google Data Protocol to Customer. Google grants to Customer a nontransferable, nonexclusive <u>license</u> during the Term to use the Google Data Protocol solely for the purpose of communicating information between the Site and the Services." Digital Envoy's Motion for Partial Summary Judgment on Contract Issues, Han Declaration, ¶ 7, Ex. G; *Sample Contracts and Business Forms - Advertising Services Agreement*, ¶ 2.4 (visited Jun. 16, 2005) <http://contracts.onecle.com/shopping/google.sales.2003.04.14.shtml> (emphasis added).

- "Upon the termination of this Agreement for any reason (i) <u>all license rights granted herein</u> shall terminate, (ii) each party shall return to the other party, or destroy and certify the destruction of, all Confidential Information of the other party, and (iii) Customer shall refund to Google any prepayments paid and not yet earned by Customer, if any." *Id.*, ¶ 9.3 (emphasis added).

- "Each party acknowledges that its service/<u>license restrictions contained herein</u> may cause irreparable harm to the other party, the extent of which would be difficult to ascertain." *Id.*, ¶ 9.5 (emphasis added).

- "AdSense <u>affords third party web sites</u> or 'publishers' <u>the ability to display to those visiting their own web sites</u> the advertising messages of participants in Google's AdWords program." Wojcicki Declaration, ¶ 6 (emphasis added).[9]

---

[8] Mr. Schimmel admitted that                                        . *See* Cardon Declaration, Ex. C, Schimmel Deposition at 233-34.

[9] This statement establishes that Google enabled others to perform geo-targeted searching and advertising.

- "Customer shall not acquire any right, title, or interest in or to the Intellectual Property Rights associated with the Services (including the <u>AdSense for Search</u> program, the Google Data Protocol, and Google Brand Features), except for the <u>limited use rights</u> expressly set forth in this Agreement." Digital Envoy's Motion for Partial Summary Judgment on Contract Issues, Han Declaration, ¶ 8, Ex. H; *Securities and Exchange Commission, Form 10-Q, Ask Jeeves, Inc., For the Quarterly Period Ended June 30, 2002*, Attachment 10.52 (visited Jul. 6, 2005) <http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?SessionID=jKwBIuNdQ_VRQM2&ID=1963121> (emphasis added).

Therefore, the evidence establishes that Google "licenses" its AdSense product both in practice and in name.[10]

Importantly, Google ignores entirely that Digital Envoy contends in its brief that Google specifically licensed geotargeting as a separate component of AdSense to third party publishers. *See* Digital Envoy's Motion for Partial Summary Judgment on Contract Issues, Han Declaration, ¶ 9, Ex. I. Google's public statements are consistent with this position, and explain that AdSense third party publishers have a choice whether to geo-target or not, but that Google "wanted all the syndication partners to work with [geo-targeting], and generally they are very excited to do it." *See id.*

Thus, not only were the Database Libraries licensed as "part of the whole" of AdSense, Google also aggressively licensed the Database Libraries to third party publishers as an *independent part* of the AdSense program, because it meant more revenue for both Google and the third party publisher. Google's own internal modeling demonstrates that AdSense participants more than doubled the number of "click-thrus" (web site visitors actually "clicking" on an advertisement displayed to them) when the advertisement was geo-targeted. Thus, both Google

---

[10] Google astonishingly complains that Digital Envoy has failed to offer Google's actual license agreements with third party publishers. *See* Opposition at 12. Google also rests its argument on the content of these third party publisher licenses. *See id.* ("Google's contracts simply do not empower third parties to use Digital Envoy's data."). These are the very same contracts which Google has vehemently resisted providing in response to Digital Envoy's discovery requests to the point of opposing Digital Envoy's motion to compel their production. Google, here, highlights the relevance of the licenses with its third party publishers, and, yet, Digital Envoy has no ability to evaluate, challenge, or analyze Google's evidence because Digital Envoy has never seen it because Google has never produced it. Google therefore should be required to produce this evidence on which it relies.

and the third party publisher could more than double their revenues because Google's advertising fees are based on a pay-per-click model.

### 3. Google's Reliance on Intel and Lisle Are Misplaced – Google's Licensing of AdSense Constitutes A License of Digital Envoy's Proprietary Technology Contained Therein.

Although Google argues that "Digital Envoy's motion rests entirely upon an incorrect legal premise," it is Google which advances an incorrect legal premise. As an initial matter, Google misunderstands Digital Envoy's position. Digital Envoy's position is that a *license* to the whole necessarily encompasses a license to its component parts. Digital Envoy's position is *not* that a *sale* of the whole results in a license of its component parts. Indeed, the Agreement itself expressly recognizes the distinction between a sale and a license (both of which are expressly prohibited). Nevertheless, Google appears unable to recognize the same distinction.

Specifically, Google cites *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566 (Fed. Cir. 1993) and *Lisle Corp. v. Edwards*, 777 F.2d 693 (Fed. Cir. 1985). These cases are both factually and legally distinguishable from the pending controversy. *First*, the factual circumstances in the current dispute are exactly the opposite of those present in *Intel*. Specifically, Intel and HP granted each other an "irrevocable, retroactive, nonexclusive, world-wide, royalty-free license under all patents and patent applications." *Intel*, 995 F.2d at 1566. The *Intel* court noted that if Intel "had not granted that license or if the license had been limited in some relevant way, that would be a different case from the one before us." *Id.* at 1569.

In this case, the Agreement is limited in a relevant way – namely, it prohibits Google from licensing Digital Envoy's technology. In that regard, as explicitly acknowledged by the Federal Circuit, this is "a different case from [*Intel*]." *Id.* Similarly, the nonexclusive license in *Lisle* granted a right "to make, have made, use and sell" the patented technology. *Lisle*, 777 F.2d at 694. Conversely, Digital Envoy's Agreement with Google prohibits Google from "licensing" Digital Envoy's technology to third parties. In that regard, what was expressly permitted in both *Intel* and *Lisle* is expressly prohibited in the pending case. Thus, neither *Intel* nor *Lisle* apply to the factual circumstances of this case.

The Agreement at issue in this case is abundantly clear that no third party web site should be able to have any use of Digital Envoy's Database Libraries whatsoever, other than the limited right of Google to use the database libraries in the process of "developing" a product that would be provided to third parties. Thus, if Google had used Digital Envoy's database solely to "manufacture" or "design" (*i.e.*, to "develop") AdSense rather than actively allowing third parties to access or use the Database Libraries as part of AdSense, such use would have been permitted under the Section 3.1 of the Agreement and the facts would have been more analogous to the use of the "design" in *Intel*

*Second*, the legal holding of *Intel* and *Lisle* have no bearing on this case. *Intel* holds that under the patent exhaustion doctrine a first *sale* of a patented product exhausts a patent owner's rights at the point of sale. *Intel*, 995 F.2d at 1568. Thus, at best, *Intel* stands for the proposition that a *sale* of a product does not constitute a *license* to the component parts or the technology used to make the ultimate product. *Intel* does not stand for the proposition that a *license* to the whole does not constitute a sub-license to its component parts.

*Lisle* also has no relevance to this case. In *Lisle*, the "sales by Lisle were authorized by the nonexclusive license agreement." *Lisle*, 777 F.2d at 696. In that regard, *Lisle* involved a *sale* and not a *license*. Thus, it is evident that a *sale* of the whole has no bearing on whether its component parts are *licensed*, since a sale and a license are two wholly distinct legal concepts.

Unlike Google's mischaracterization of Digital Envoy's position, Digital Envoy is not positing that a *sale* of the whole constitutes a licensing of its component parts. Rather, Digital Envoy's position is that a *license* to the whole necessarily constitutes a license to its component parts. For example, a license to (*i.e.*, permission to use) a computer (whole) necessarily includes a license to its memory and processor (component parts). Similarly, permission to use a car (whole) necessarily includes permission to use its engine (component part). Likewise, a license to a geo-targeted advertising engine (whole) necessarily constitutes a license to that advertising engine's

1  geo-targeting software (component part).[11]  Google's use of Digital Envoy's technology in
2  AdSense bears the incidents of a sub-license that did not exist in *Intel* or *Lisle* – namely, through
3  AdSense, Google grants the third party access to Digital Envoy's data.

### III. CONCLUSION

For the foregoing reasons and for the reasons stated in its Motion for Partial Summary Judgment on Contract Issues and brief in support, Digital Envoy respectfully requests that the court grant Digital Envoy's motion.

DATED: August 17, 2005

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By  /s/ Brian Blackman
P. CRAIG CARDON
BRIAN R. BLACKMAN

TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile:  404.443.5751

Attorneys for DIGITAL ENVOY, INC.

---

[11]  For the same reason, Google's Microsoft Word analogy is inapt. *See* Opposition at 6. *First*, Google has failed to point to any actual licensing agreement that governs a user's right to use Microsoft software, so any attempt to analogize to the facts in this case is hopelessly speculative. *Second*, the client whose lawyer uses Microsoft Word in rendering legal services is paying the lawyer for *legal services* and not a license for word processing software. Microsoft Word is merely a tool the lawyer uses in its practice. Here, Google permits third parties to acquire the same direct benefit of geolocation which the third parties would have obtained otherwise directly from Digital Envoy. It is more than reasonable to assume that had the lawyer in Google's analogy licensed a computer program to the client containing Microsoft Word, Microsoft would have viewed the situation very differently and as a violation of the license that likely existed between it and the lawyer.