1  P. CRAIG CARDON, Cal. Bar No. 168646
   BRIAN R. BLACKMAN, Cal. Bar No. 196996
2  KENDALL M. BURTON, Cal. Bar No. 228720
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
3  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4106
4  Telephone:    415-434-9100
   Facsimile:    415-434-3947
5

6  TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
   LUKE ANDERSON (Admitted *Pro Hac Vice*)
7  MCGUIRE WOODS, L.L.P
   1170 Peachtree Street, N.E., Suite 2100
8  Atlanta, Georgia 30309
   Telephone: 404.443.5500
9  Facsimile: 404.443.5751

10 Attorneys for DIGITAL ENVOY, INC.

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14 DIGITAL ENVOY, INC.,                  | Case No. C 04 01497 RS

15        Plaintiff/Counterdefendant,    | **[REDACTED VERSION]**

16     v.                                | **OPPOSITION TO GOOGLE'S MOTION
                                           FOR PARTIAL SUMMARY JUDGMENT
17 GOOGLE, INC.,                           RE: DIGITAL ENVOY, INC.'S
                                           DAMAGES CLAIMS**
18        Defendant/Counterclaimant.

19                                        | **Date:         September 21, 2005**
                                          | **Time:         9:30 a.m.**
20                                        | **Courtroom:   4, 5th Floor**

21                                        | **The Honorable Richard Seeborg**

22

23

24

25

26

27

28

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
                                          SUMMARY JUDGMENT ON DAMAGE ISSUES

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND .................................................................................................. 2

      A.    The License Agreement ........................................................................... 2

      B.    Google's Advertising Programs and Their Marketing ............................. 3

III.  ARGUMENT AND AUTHORITY ..................................................................... 7

      A.    Google Is Not Entitled to Partial Summary Judgment. ............................ 7

      B.    Section 8 Of The License Agreement Does Not Limit Google's Liability
            For Misappropriating Digital Envoy's Trade Secrets. ............................. 7

            1.    Google's interpretation of Section 8 is incorrect as a matter of
                  California contract law. ................................................................. 8

            2.    Google's proffered interpretation of the limitation provision violates
                  California law. ............................................................................. 12

            3.    Google's misappropriation of Digital Envoy's trade secrets was
                  willful, in the ordinary and plain meaning of that term. ............ 14

      C.    Google Is Not Entitled To Summary Judgment On Digital Envoy's
            Damages Claims. .................................................................................... 16

            1.    The Uniform Trade Secrets Act authorizes the recovery that Digital
                  Envoy seeks. ............................................................................... 16

            2.    The record evidence establishes that Google achieved revenues
                  through its sale of a product that incorporated Digital Envoy's trade
                  secret. .......................................................................................... 18

            3.    The evidence, including Google's own admissions, demonstrates
                  that geo-targeting was a valuable component in Internet advertising. ........ 21

IV.   CONCLUSION ................................................................................................. 23

# **TABLE OF AUTHORITIES**

**Page(s)**

## FEDERAL CASES

Anderson v. Liberty Lobby,
    477 U.S. 242 (1986) .................................................................................. 7

Carnival Cruise Lines, Inc. v. Shute,
    499 U.S. 585, 111 S. Ct. 1522 (1991) ...................................................... 12

Carter Products, Inc. v. Colgate-Palmolive Co.,
    214 F. Supp. 383 (D. Md. 1963) ........................................................ 18, 20

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) .................................................................................. 7

Clark v. Bunker,
    453 F.2d 1006 (9th Cir. 1972) ................................................................. 14

Computer Assocs. Int'l, Inc. v. American Fundware, Inc.,
    831 F. Supp. 1516 (D. Colo. 1993) .......................................................... 16

Del Monte Fresh Produce Co. v. Dole Food Co., Inc.,
    148 F. Supp. 2d 1326 (S.D. Fla. 2001) .................................................... 13

Electro-Miniatures Corp. v. Wendon Co.,
    771 F.2d 23 (2d Cir. 1985) ................................................................. 17-18

Farrow, Inc. v. Gucci Am., Inc.,
    858 F.2d 509 (9th Cir. 1988) ................................................................... 11

In re Kinoshita & Co.,
    287 F.2d 951 (2nd Cir. 1961) .................................................................. 11

M/S Bremen v. Zapata Off-Shore Co.,
    407 U.S. 1 (1972) ..................................................................................... 12

Mediterranean Enters., Inc. v. Ssangyong Corp.,
    708 F.2d 1458 (9th Cir. 1983) ................................................................. 11

Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,
    460 U.S. 1 (1983) ..................................................................................... 12

National Micrographics Sys., Inc. v. Canon USA, Inc.,
    825 F. Supp. 671 (D.N.J. 1993) ............................................................... 11

Picken v. Minuteman Press Int'l, Inc.,
    854 F. Supp. 909 (N.D. Ga. 1993) ........................................................... 11

Shearson/American Express, Inc. v. McMahon,
    482 U.S. 220 (1987) ................................................................................. 12

MEMO. of P&A ISO DIGITAL ENVOY'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON
CONTRACT ISSUES



T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,
    809 F.2d 626 (9th Cir. 1987).............................................................................. 7

Telex Corp. v. Int'l Bus. Machines Corp.,
    510 F.2d 894 (10th Cir. 1975)....................................................................... 16-17

Terra Int'l, Inc. v. Mississippi Chem. Corp.,
    119 F.3d 688 (8th Cir. 1997)............................................................................ 11

Ting v. AT&T,
    182 F. Supp. 2d 902 (N.D. Cal. 2002) ............................................................. 13

University Computing Co. v. Lykes-Youngstown Corp.,
    504 F.2d 518 (5th Cir. 1974)............................................................................ 17

STATE CASES

Badie v. Bank of America,
    67 Cal. App. 4th 779 (1998)............................................................................... 9

Brawthen v. H & R Block, Inc.,
    52 Cal. App. 3d 139 (1975).............................................................................. 17

Coast Plaza Doctor's Hospital v. Blue Cross of California,
    83 Cal. App. 4th 677 (2000)............................................................................. 15

Continental Manufacturing Corp. v. Underwriters at Lloyds London,
    185 Cal. App. 2d 545 (1960).............................................................................. 9

Farnham v. Sequoia Holdings, Inc.,
    60 Cal. App. 4th 69 (1997)............................................................................... 13

Gillespie v. Rawlings,
    49 Cal. 2d 359 (1957)....................................................................................... 15

Jet Spray Cooler, Inc. v. Crampton,
    385 N.E.2d 1349 (Mass. 1979) ........................................................................ 18

Klein v. Asgrow Seed Co.,
    246 Cal. App. 2d 87 (1966).............................................................................. 13

Miller v. National Broadcasting Company,
    187 Cal. App. 3d 1463 (1987).......................................................................... 14

Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Company, Inc.,
    200 Cal. App. 3d 1518 (1988).......................................................................... 13

PMC, Inc. v. Kadisha,
    78 Cal. App. 4th 1368 (2000)........................................................................... 12

Philippine Airlines, Inc. v. McDonnell Douglas Corp.,
    189 Cal. App. 3d 234 (1987)............................................................................ 12

W02-SF:5BB\61460337.1

MEMO. of P&A ISO DIGITAL ENVOY'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON
CONTRACT ISSUES



Schroeder v. Auto Driveway Co.,
   11 Cal. 3d 908 (1974)..............................................................................................17

Stott v. Johnston,
   36 Cal. 2d 864 (1951)..............................................................................................17

USM Corp. v. Marson Fastener Corp.,
   467 N.E.2d 1271 (Mass. 1984) ...............................................................................18

Unilogic, Inc. v. Burroughs Corp.,
   10 Cal. App. 4th 612 (1992).....................................................................................20

Woodson v. Everson,
   61 Cal. App. 2d 204 (1943) ..............................................................................14, 15

DOCKETED CASE

RiLoro, Inc. v. Tumanjan,
   Case No. B171371, 2005 WL. 1120087 ...................................................................13

STATE STATUTES

California Civil Code
   § 1636........................................................................................................9, 10
   § 1664..............................................................................................................9
   § 1668......................................................................................................12, 13-14
   § 3426.1(b)(2)....................................................................................................11
   § 3426.3.....................................................................................................16-17, 19
   § 3426.3(a).......................................................................................................17

California Vehicle Code
   § 403..............................................................................................................15

MEMO. of P&A ISO DIGITAL ENVOY'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON
CONTRACT ISSUES

I.    **INTRODUCTION**

In the latest of its string of summary judgment motions, Google now contends that it is entitled to "partial summary judgment barring Digital Envoy from recovering damages from Google in this action." Google Memorandum at 20. However, Google relies on a misinterpretation of the License Agreement and a convoluted and incorrect assessment of Digital Envoy's basis for damages in support of its motion – neither of which entitle Google to the relief it seeks.

More importantly, Google's Motion is premature. To date: (i) Google has not yet completed its compliance with the Court's Order requiring production of additional documents and information directly related to revenues it achieved from incorporating Digital Envoy's proprietary technology into its AdSense product[1]; (ii) Google has not produced corporate witnesses knowledgeable to testify regarding the topics of Google's use of Digital Envoy's technology or revenues derived from that use as called for in Digital Envoy's Rule 30(b)(6) deposition notice; and (iii) pursuant to the Court's case management order, the parties has not even started expert designations or discovery. To seek summary judgment on the issue of damages prior to the completion of the factual record or the proffering of expert opinion is unjustifiable attempt to short-circuit the legal process.

Nevertheless, on the basis of its own arguments, Google's motion must fail. *First*, Google urges the Court to adopt an illegal interpretation of the parties' Agreement that would insulate Google from damages resulting from Google's intentional tortious conduct, in violation of California law and in plain contradiction of the purpose of the limited license agreement. *Second*, despite indisputable evidence that Google incorporated Digital Envoy's proprietary technology into its wildly profitable AdSense product, Google asserts that Digital Envoy cannot recover Google's unjust enrichment. Yet Google cites not a single authority that denies an aggrieved party recovery where the misappropriating defendant used that party's trade secret in a marketed

---

[1]    Prior to filing this Motion, Google requested, and Digital Envoy granted, an extension to produce the documents and information required by the Court's Order.

1    product that achieved substantial revenue.  Google instead attempts to rely on the purported

2    complexity of the AdSense product to suggest that ascertaining the value of Digital Envoy's

3    contribution to AdSense's success would be too difficult to permit Digital Envoy to recover.  (Any

4    ambiguity that might exist would be due to the manner in which Google used Digital Envoy's

5    proprietary technology and Google's own records (or lack of records) regarding that use –

6    ambiguities that must be resolved against Google, not Digital Envoy.)  Google's position is

7    unsupported by the law or the facts in this case.  For the reasons set forth below, Google's motion

8    must be denied.

9                             **II.    BACKGROUND**

10    **A.    The License Agreement**

11          Digital Envoy and Google both acknowledge that they were parties to the November 2000

12    Product and Electronic Database Evaluation and License Agreement, as amended (the "License

13    Agreement").  *See* Google Inc.'s Notice of Motion and Motion for Partial Summary Judgment

14    Regarding Digital Envoy's Damages Claims; Memorandum in Support Thereof ("Google

15    Memorandum") at 1; Declaration of David H. Kramer ("Kramer Declaration"), Ex. A.  However,

16    despite Google's assertion that the License Agreement grants Google ";

17  i                                **REDACTED**                                   " Google Memorandum

18    at 3-4, the License Agreement, in fact, was plainly limited in scope:

19      • *First*, the License Agreement restricted Google's use of Digital Envoy's proprietary
            technology to use in Google's Business.  Kramer Declaration, Ex. A., Preamble;
20

21      • *Second*, the License Agreement expressly prohibits Google from:
                                                Digital Envoy's proprietary technology
22                                                                                Kramer
        Declaration, Ex. A., § 3.1; and
23

24      • *Third*, the License Agreement provides that '
                                          **REDACTED**
25

26              Kramer Declaration, Ex. A., § 7.2.

27          That Digital Envoy's license to Google was limited (and not unlimited) is consistent with

28    the parties' communications both during and after the negotiations and execution of the License

                                                -2-

1  Agreement during which time Digital Envoy expressly communicated the limited nature of the

2  license. *See* Declaration of Robert J. Waddell, Jr. ("Waddell Declaration"), ¶ 2, Ex. A.  Further,

3  Google itself confirmed to a potential investor in Digital Envoy that the License Agreement did

4  not permit Google                           **REDACTED**                    *See id.*, ¶ 3,

5  Ex. B.

6          Google's assertion that it '

7             is also not supported by the evidence.  It was not until February 2004, in response to a

8  direct inquiry from Digital Envoy, that Google finally admitted that it used Digital Envoy's

9  proprietary technology in its AdSense programs[2] approximately two years after Google began

10  doing so.  Perhaps more telling is the fact that Google's own employees who were most involved

11  in the Digital Envoy-Google relationship did not know that Google had incorporated Digital

12  Envoy's proprietary technology into the AdSense program until they conducted an investigation in

13  response to Digital Envoy's inquiry.  *See, e.g.*, Waddell Declaration, ¶ 3, Ex. B.

14       [3], the same Google employee who confirmed the limited scope of the license to the potential

15  Digital Envoy investor, first (naturally) presumed that Google was honoring the limitations in the

16  license, writing:          **REDACTED**

17                              *See* Waddell Declaration, ¶ 3, Ex. B.  Ultimately,

18  Google did confirm to Digital Envoy that Google was using Digital Envoy's proprietary

19  technology in AdSense.  *See id.*, ¶ 2, Ex. A.

20  **B.    Google's Advertising Programs and Their Marketing**

21          Google markets two advertising products: AdWords and AdSense.  Google Memorandum

22  at 6.  As Google explains: ",                       **REDACTED**

23  ─────────────────────────────

24  [2]    AdSense is the product through which Google licenses its advertising program third-party
    web sites thereby permitting the third-party site to display advertisements, including

25  advertisements that are targeted based on the content of the third-party site or visitor-input search
    terms and the geographic location of the visitor.  *See, e.g.,* Rose Declaration, ¶ 7.

26
    [3]    Upon information and belief,                   refers to himself as "googleguy" on Internet

27  message boards and often speaks knowledgeably and authoritatively about Google on such
    message boards.

28

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
                                                   SUMMARY JUDGMENT ON DAMAGE ISSUES

1    **REDACTED**                              " Google Memorandum at 2.  Google earns revenue

2    when a user "clicks" on a displayed advertisement and the advertiser pays Google for that click.

3    *See id.*  Through AdWords, advertisements are displayed on Google's own web sites.  *See id.* at 6.

4        In AdSense, Google displays advertisements on third-party web sites.  Google

5    Memorandum at 7.  Google earns revenue in AdSense

6                                            **REDACTED**

7        *See id.*  In AdSense, Google

8                                                              *See id.*

9        For both advertising products, Google markets its ability to display an advertiser's

10   advertisements that are relevant to the Internet user.  *See, e.g.*, Waddell Declaration, ¶ 4, Ex. C.  In

11   setting up their advertising campaigns, advertisers are provided the opportunity to select (i) "key

12   words" to be associated with their advertisements on which content relevance can be determined;

13   and (ii) the geographic locations (*e.g.*, country, state, or region) in which they want their

14   advertisements to be displayed.  *See id.*  Advertisements are thus targeted based on the interests of

15   the user (based on, for example, the content of the third-party web site and/or user-input search

16   terms) and, where possible, the geographic location of the user.  Google Memorandum at 6.

17       Google marketed its ability to serve targeted advertising.  In particular, Google marketed

18   the geotargeting capabilities of its advertising programs.  *See, e.g.*, Waddell Declaration, ¶ 8, Ex.

19   G,

20                            **REDACTED**

21                                                          *Id.*, ¶ 9, Ex. H,

22   http://www.google.co.uk/services/adsense_tour/page4.html,

23

24                                *Id.*, ¶ 10, Ex. I, http://www.google.com/adsense/ourhometown,

25                                        **REDACTED**

26                                                                          *Id.*, ¶ 11,

27   Ex. J, http://www.google.com/adsense/wifinder

28

1          **REDACTED**

2

3          In addition, Internet advertisers and publishers also have stated the importance of geo-

4    targeting.  *See, e.g., Id.*, ¶ 5, Ex. D, http://searchenginewtach.com/searchday/article/php/3099591

5          **REDACTED**

6                                                        *Id.*, ¶ 6, Ex. E,

7    http://siliconvalley.internet.com/news/article.php/3098431

8                               **REDACTED**

9                                                           *Id.*, ¶ 7, Ex. F,

10   http://volokh.blogspot.com/2004/10/bellsouths-alliance-with-google.html

11        **REDACTED**

12

13        As Google admits, Digital Envoy's proprietary technology was "often used" in

14                                                      .[4]  Google

15   Memorandum at 6-7.  During the period in which Google incorporated Digital Envoy's

16   proprietary technology in AdSense, Google achieved revenues from the AdSense product in

17   excess of $            .[5]  *See* Waddell Declaration, ¶ 15, Ex. N.  Therefore, it is undisputed that

18

19   [4]       Google's use of Digital Envoy's proprietary technology in AdSense was outside of the
     scope of the License Agreement, because, in AdSense, Google effectively provided

20        **REDACTED**                                         allowing

21

22   [5]       To date, Google has provided extremely limited information or support for its revenue
     numbers.  Pursuant to the Court's July 15, 2005 Order, Google is required to produce additional

23   information, including the revenue received by Google for

                                                   **REDACTED**

24   Order at 5 (                                                    ).  Based on
     Google's representations that it needed additional time to gather and produce the required

25   information, Digital Envoy granted Google an extension by which to produce this additional
     information.  In addition, Google now claims that costs associated with its AdSense product

26   further reduce the profits AdSense generated.  To date, however, Google has provided no
     explanation for or description of these "costs" or any supporting documentation thereof.  Digital

27   Envoy assumes that Google's supplemental production will supply this critical, but missing,
     information.  Also, despite Digital Envoy's pending Rule 30(b)(6) Deposition Notice, Google has

28

-5-

1  Google achieved substantial revenues from a product that incorporated Digital Envoy's

2  proprietary technology.

3  　　　Nevertheless, Google asserts that Digital Envoy is not entitled to damages, even if it can

4  establish that Google misappropriated Digital Envoy's trade secrets.  To support this contention,

5  Google offers a complex description of its advertisement selection process contending that Google

6  uses Digital Envoy's data to                    **REDACTED**

7  　　　　　　　　　　　　　　　　　　　　　　Google Memorandum at 7-8.

8  Thus, according to Google, an advertiser who selects to have its advertisements displayed only in

9  a particular geographic location would have

10 　　　　　　　　　　　　　　　　　**REDACTED**

11

12 　　　Google Memorandum at 6-7.

13 　　　Even accepting Google's description at face value, it is difficult to see what relevance

14 Google sees in its emphatic emphasis on this distinction.  Whether advertisements are ultimately

15 　　　or '        " the result is the same: Google's process is aimed at

16 　　　　　　　　　and that process, as it relates                    , utilizes Digital

17 Envoy's proprietary technology to achieve the desired result and, thus, the display of the

18 　　　　　　　　　Indeed, according to Google's own logic, its advertising selection

19 process (whether described as '        or        ') is absolutely dependent on the

20 determination of (                    and Google uses

21 Digital Envoy's technology to make that determination.  *See, e.g.*, Deposition of Mark Rose, at 26,

22 45, 50-51.

23

24

25

26 yet to provide a witness to testify on behalf Google on the topics of (i) how Google used Digital
   Envoy's data in its AdSense programs; or (ii) the nature and amount of revenue Google achieved

27 from AdSense.  At Google's request, Digital Envoy has communicated to Google the deficiencies
   in its Rule 30(b)(6) response, to which Google has not yet responded.

28

W02-SF:5BB\61467342.1                    OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
                                         SUMMARY JUDGMENT ON DAMAGE ISSUES

# III.    ARGUMENT AND AUTHORITY

## A.    Google Is Not Entitled to Partial Summary Judgment.

For purposes of summary judgment, "all evidence must be construed in the light most favorable to the party opposing summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, n.2 (1986); *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). The "party seeking summary judgment *always* bears the *initial responsibility* of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added). Thus, the non-moving party – here, Digital Envoy – is only obliged to produce evidence when the moving party has discharged its initial responsibility of showing "the absence of a genuine issue concerning any material fact." *Id.* at 325. Such a dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party." 477 U.S. at 248.

As set forth in greater detail below, Google attacks Digital Envoy's theory of recovery based on Google's own flawed damages theory. In relying on such a flawed theory of damages, Google's proffered facts are not material to the proper theory of damages. As such, Google has failed utterly to meet its initial burden of showing the Court that there is an absence of a genuine issue of material fact.

In contrast, Digital Envoy provides evidentiary support that directly connects Google's AdSense profits to the use of Digital Envoy's proprietary technology. In other words, despite Google's failure to meet its initial burden, Digital Envoy sets forth the specific facts that show the direct causal link between Google's AdSense profits and Google's wrongful use of Digital Envoy's proprietary technology. Google's motion must therefore be denied.

## B.    Section 8 Of The License Agreement Does Not Limit Google's Liability For Misappropriating Digital Envoy's Trade Secrets.

In a attempt to escape liability for its misappropriation of Digital Envoy's trade secrets, Google argues that a provision of the License Agreement that limited damages arising as a result

-7-

1  of a party's performance of its duties under the License Agreement shields Google from liability

2  for its commission of the intentional tort of misappropriation of trade secrets. Google's proffered

3  interpretation of this provision is contrary to both California law and the intent of the parties as

4  expressed in the License Agreement. Accordingly, this Court should reject Google's

5  interpretation.

6       **1.    Google's interpretation of Section 8 is incorrect as a matter of California**

7                   **contract law.**

8       The License Agreement contains a section whereby both parties disclaimed certain

9  warranties and accepted liability for certain acts. Section 8 of the License Agreement reads as

10 follows:

11

12                                    **REDACTED**

13

14

15

16

17

18

19

20

21

22                                           **REDACTED**

23

24 Kramer Dec. Ex. A, § 8 (capitalization in original).

25      With one exception, this is a typical seller's warranty. The provider of services – Digital

26 Envoy – issued certain warranties, disclaimed all other warranties, and then limited its liability for

27 any claim brought under the License Agreement. What makes this section unusual, however, is

28

REDACTED

1   that Google insisted                                            .[6]  *See Badie v. Bank of*

2   *America*, 67 Cal. App. 4th 779, 782 (1998) (citing Cal. Civ. Code § 1664 for the proposition that

3   ambiguities in contracts are construed against the drafter.)

4         The subject matter of the initial sentences in Section 8 make clear that the last sentence

5   was meant to apply to claims such as                                    .  In the first

6   sentence, Digital Envoy warrants that

7                       In the second sentence, both parties acknowledge

8                       REDACTED                                    In the third sentence,

9   both parties                                    In the fourth sentence, Digital Envoy

10

11                                         REDACTED                       .  In the fifth

12  sentence, both parties

13        These five sentences serve as a prelude to the limitation in the sixth sentence.  That

14  limitation reads:

15                            REDACTED

16

17                       "  Kramer Declaration, Ex. A, § 8.  The parties intended this

18  limitation to apply in situations where

19  Based on the clear language of Section 8, the parties did not intend           REDACTED

20

21        Contracts are to be interpreted "so as to give effect to the intention of the parties as it

22  existed at the time of the contract, so far as the same is ascertainable."  *Continental Manufacturing*

23  *Corp. v. Underwriters at Lloyds London*, 185 Cal. App. 2d 545, 549 (1960) (citing Cal. Civ. Code

24

25  _____
    [6]     Section 8 expressly refers to
                              These types of harm may be more directly
26  applicable to Digital Envoy's performance under the License Agreement; nevertheless, Google
    that drafted                              , seeking, presumably,
27                                              under the License Agreement.
    Google Memorandum at 5.
28

1  § 1636). "The language of the contract governs its interpretation if the language is clear." *Id.*

2  (citing Cal. Civ. Code § 1638). "In determining the meaning of a contract, the court may take into

3  consideration the circumstances under which it was made and the matter to which it relates." *Id.*

4  (citing Cal. Civ. Code § 1647). "To determine what the parties meant by one clause of [a]

5  contract, the whole contract must be examined, and other clauses of the contract may be

6  considered in interpreting the meaning of the one in question." *Id.*  (citing Cal. Civ. Code § 1641).

7        Applying these rules to Section 8, it is clear the parties intended it to address only

8

9        **REDACTED**              Under Google's interpretation of Section 8, it could

10                                          **REDACTED**

11

12        under the License Agreement.  The rules of contract construction, as well as common sense,

13  dictate that this result is not one the parties intended when they negotiated and drafted the License

14  Agreement.

15        Indeed, Google's interpretation of the limitation essentially guts the purpose of the License

16  Agreement.  The License Agreement allowed Google to have

17        **REDACTED**              .[7]  Under Google's interpretation, Google

18  would be allowed

19        [8]  The interpretation and result urged by Google renders, as farce,

20  the parties' careful negotiations about the scope of the license and the price to be paid.

21  _____

22  [7]     Despite its contention that it believed it could us
        Google has acknowledged that at the time of execution it was aware

23                              *See* Schimmel Deposition at 106-108 (

24                    ).  Thus, Mr. Schimmel admits that Google
                                                          In light of this

25  awareness at the time of execution that there were
                  Google's current argument that it could

26                                          strains credulity.

27  [8]     This is because under Google's interpretation, its liability for anything it does with Digital

28  Envoy's                                          Therefore, Google could

                              -10-

1    Digital Envoy's claim is not brought pursuant to the License Agreement. It is not brought

2    based on any rights granted to it in the License Agreement. Digital Envoy's claim is, by

3    definition, *ex delicto*. Cal. Civ. Code § 3426.1(b)(2)(B)(ii) provides:

4       (b) Misappropriation means. . . (2) Disclosure or use of a trade secret of another
        without express or implied consent by a person who: . . .(B) At the time of the
5       disclosure or use, knew or had reason to know that his or her knowledge of the
        trade secret was: . . . (ii) Acquired under circumstances giving rise to a duty to
6       maintain its secrecy of limit its use.

7    In order for Digital Envoy to prevail on its trade secret claim, it must prove that Google's use of

8    its technology was beyond the scope of the License Agreement. Logically, any claim brought

9    against Google for its acts outside License Agreement is not brought "UNDER THE

10   AGREEMENT." Indeed, Digital Envoy's claim is hinged entirely to the fact that Google is

11   operating *outside the bounds of the License Agreement*.

12       To support its contention that Section 8 applies to Digital Envoy's trade secret, Google

13   cites a series of federal cases which it contends support its claim that Digital Envoy's claim is

14   brought "UNDER THIS AGREEMENT." However, each case Google cites is clearly

15   distinguishable. The cases cited by Google can be divided into one of two categories: (i) cases

16   analyzing the scope of arbitration clauses under the liberality standard of the Federal Arbitration

17   Act, *see Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983); *In*

18   *re Kinoshita & Co.*, 287 F.2d 951, 953 (2nd Cir. 1961) (both holding that claims arose under the

19   contract for purposes of the arbitration agreement); and (ii) cases analyzing the scope of forum

20   selection clauses under federal law, *see Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688,

21   692 (8th Cir. 1997); *National Micrographics Sys., Inc. v. Canon USA, Inc.*, 825 F. Supp. 671, 677-

22   78 (D.N.J. 1993); *Picken v. Minuteman Press Int'l, Inc.*, 854 F. Supp. 909, 911-12 (N.D. Ga.

23   1993); *Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) (all holding that claims

24   arise under the contract for purposes of forum selection clauses).

25

26

27   completely ignore the License Agreement's limitations and have

28

-11-

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON DAMAGE ISSUES

1     The contexts in which Google's cases were decided were unique, and their reasoning does

2   not apply to Google's invocation of Section 8 as a bar to Google's liability

3   *cf. Philippine Airlines, Inc. v. McDonnell Douglas Corp.*, 189 Cal. App. 3d. 234, 237 (1987)

4   (California law requires courts to narrowly construe contract provisions that limit a party's

5   liability.)  In direct contrast to California's rule that purported "limitation of liability" provisions

6   must be construed narrowly against the party invoking their protection, the Supreme Court of the

7   United States has ruled that forum selection clauses and arbitration provisions are to be given

8   broad interpretations and to be generally enforced. *See Carnival Cruise Lines, Inc. v. Shute*, 499

9   U.S. 585, 589, 111 S. Ct. 1522 (1991); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15

10   (1972) (both holding that forum selection clauses are presumptively valid and should be enforced);

11   *see also Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 23, n. 7 (1983);

12   *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 220 (1987) (both holding that

13   federal law requires a liberal reading of arbitration agreements).  Accordingly, when interpreting

14   such provisions, courts are to construe liberally whether claims are brought under such

15   agreements.  These cases, therefore, are inapposite to the question of whether Google's

16   misappropriation is covered under Section 8 of the License Agreement.  As Google concedes,

17   there is no case that stands for the proposition that misappropriation claims arise under the License

18   Agreement.  *See* Google Memorandum at 11 (noting that "[t]here is virtually no case authority

19   interpreting the precise language at issue.").

20     **2.    Google's proffered interpretation of the limitation provision violates**

21           **California law.**

22     Moreover, Google's interpretation of Section 8 renders it unenforceable under California

23   law.  Cal. Civ. Code § 1668, entitled "Contracts contrary to policy of law," provides as follows:

24           CERTAIN CONTRACTS UNLAWFUL.  All contracts which have for
           their object, directly or indirectly, to exempt anyone from responsibility
25           for his own fraud, or willful injury to the person or property of another, or
           violation of law, whether willful or negligent, are against the policy of the
26           law.

27   As Google itself has noted "[t]rade secret misappropriation is an intentional tort."  *See* Google,

28   Inc.'s Supplemental Brief in Support of its Motion for Summary Judgment at 1 (citing *PMC, Inc.*

-12-

1  *v. Kadisha*, 78 Cal. App. 4th 1368, 1382 (2000); *Del Monte Fresh Produce Co. v. Dole Food Co.,*

2  *Inc.*, 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001)(both holding that misappropriation of trade

3  secrets is an intentional tort).  Accordingly, any provision in the License Agreement that purports

4  to limit liability for an intention tort, such as the misappropriation of trade secrets, would be

5  invalid pursuant to California Civil Code Section 1668.

6       California courts consistently have held that exculpatory clauses that purport to limit

7  damages for a party's willful, wanton, or intentional acts are invalid as a matter of law.

8  "[C]ontractual releases of future liability for fraud and other intentional wrongs are invariably

9  invalidated." *Farnham v. Sequoia Holdings, Inc.,* 60 Cal. App. 4th 69, 71 (1997).  Prospective

10  limitations on damages resulting from intentional torts are invalid as a matter of law.  *See RiLoro,*

11  *Inc. v. Tumanjan*, Case No. B171371, 2005 WL 1120087 (Cal. App. 2d Dist. May 12, 2005)

12  (holding that liquidated damages clause limiting liability to $103,750 did not apply to plaintiff's

13  fraud claim since Cal. Civ. Code § 1668 invalidated any prospective limitation on damages for an

14  intentional tort); *see also Ting v. AT&T*, 182 F. Supp. 2d 902 (N.D. Cal. 2002) (holding that a

15  limitation on liability for an intentional tort is invalid pursuant to California Civil Code § 1668);

16  *Klein v. Asgrow Seed Co.*, 246 Cal. App. 2d 87, 100-101 (1966) (same); *Nunes Turfgrass, Inc. v.*

17  *Vaughan-Jacklin Seed Company, Inc.*, 200 Cal. App. 3d 1518, 1535 (1988) (recognizing that *Klein*

18  holds that limitations on liability for intentional torts are void as against public policy).[9]

19       Clearly, the parties intended for the

20                                                                    such as

     **REDACTED**

21                                                    The parties clearly did not intend for

22  the

23  However, even accepting Google's interpretation, such an interpretation amounts to a prospective

24  limitation                              and would be invalid under California Civil Code §

25

---

26  [9]    The *Farnham* court held that a "limitation of liability" provision that insulated directors of
     company from liability for the corporation's intentional torts, and permitted full recovery from the

27  corporation, was not *per se* illegal because the plaintiff retained the right to seek redress for the
     total amount of his loss from the corporation.  60 Cal. App. 4th at 77.

28

-13-

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON DAMAGE ISSUES

1  1668. Accordingly, this Court should reject Google's interpretation of the limitation provision or

2  invalidate the provision *in toto*.

3  **3.  Google's misappropriation of Digital Envoy's trade secrets was willful, in the**

4  **ordinary and plain meaning of that term.**

5  Further, Google's assertion that Digital Envoy must prove that Google "intended" to harm

6  Digital Envoy is unsupported by the plain language of the License Agreement and California law.

7  Google attempts to raise again essentially the same issue already decided by this Court in ruling

8  on Google's motion on the so-called "*mens rea*" issue. *See* Supplemental Order Denying

9  Google's Motion on the Trade Secret Claim, at 3 ("Accordingly, if it is ultimately found that

10  Google exceeded the scope of its License, then a trier of fact may also conclude that Google knew

11  or should have known that its use of Digital's proprietary technology in its AdSense program was

12  a misappropriation of Digital's trade secrets."). Once again, Google is wrong.

13  As the Court noted in its Supplemental Order, "liability in a trade secret case lies only in

14  the wrongful acquisition of a trade secret, but also in the unauthorized disclosure or use of the

15  proprietary information." Supplemental Order at 3. (citing *Clark v. Bunker*, 453 F.2d 1006, 1008,

16  n. 2 (9th Cir. 1972). Whether or not Google *intended* to misappropriate Digital Envoy's trade

17  secrets is quite beside the point for purposes of determining whether Google's use was

18  "unauthorized" under the License Agreement. As Digital Envoy has previously argued, bad faith

19  is not an element of a violation of California Civil Code § 3426.1(b)(2)(B)(ii).[10]

20  Google cites *Woodson v. Everson*, 61 Cal. App.2d 204, 208 (1943), for the proposition that

21  "willful misconduct" is conduct "of a quasi-criminal nature." Google Memorandum, at 9.

22  However, the *Woodson* court expressly stated that its was interpreting the phrase willful

23

---

24  [10]    A party need only intentionally "use" "disclose" the trade secret in order to be liable under
this section of CUTSA. It need not do so with knowledge that it is breaching its duty to maintain
25  its secrecy or limit its use. In this regard, subsection (b)(2)(B)(ii) is similar to the tort of trespass.
To be liable for trespass, a party need not know it is crossing onto another's property – he need
26  only cross onto another's property of his own volition. *See Miller v. National Broadcasting
Company*, 187 Cal. App. 3d 1463, 148 (1987) (trespass actions are "characterized as intentional
27  torts, regardless of the actor's motivation.").

28

W02-SF:5BB\61467342.1                                   OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
                                                        SUMMARY JUDGMENT ON DAMAGE ISSUES

1  misconduct "as that term is used in Section 403 of the Vehicle Code." 61 Cal. App. 2d at 207.

2  Google next cites *Gillespie v. Rawlings*, 49 Cal.2d 359 (1957) for the proposition that in order to

3  show "willful misconduct" plaintiff must show "that the defendant acted with either knowledge

4  that serious injury would result, or a wanton and reckless disregard of the possible results."

5  Google Memorandum, at 9. Just like *Woodson*, *Gillespie* involved an interpretation of "willful

6  misconduct" as that term is used in Section 403 of the California Vehicle Code. *Id.* at 363. As

7  such, the *Woodson* and *Gillespie* interpretations of the phrase "willful misconduct" are not

8  relevant to meaning of the phrase as it was used in the License Agreement. The phrase as it

9  appears in the License Agreement is to be given its ordinary meaning. *See Coast Plaza Doctor's*

10  *Hospital v. Blue Cross of California*, 83 Cal. App. 4th 677, 684 (2000). It is on this point that

11  *Gillespie* provides a relevant holding. In discussing the meaning of the phrase, the Court noted

12  that "[i]f we were to use the words in their ordinary sense, they would mean simply the indulging

13  in wrongful conduct by conscious choice. Such conduct might consist of doing something that

14  ought not to be done or in failing to do something that ought to be done." 49 Cal. 2d at 367.

15  Thus, "willful," in its ordinary sense, does not imply a heightened standard of Google's intention

16  to do Digital Envoy harm or to violate the terms of the License Agreement.

17       This is precisely what the phrase means it the License Agreement. "Willful," as that term

18  is used in Section 8, refers to Google's *actions*, not its *intentions*.[11] The second sentence in

19  Section 8 expressly                                          In

20  the fourth sentence,               **REDACTED**

21

22                            Thus                  as that term is

23  used in Section 8, simply describe:     **REDACTED**

24

25

26  [11]   *See* BLACK'S LAW DICTIONARY 1593 (7th ed. 1999) (defining "willful" as "voluntary and

27  intentional, but not necessarily malicious.").

28

1

2                                    **REDACTED**

3

4   **C.      Google Is Not Entitled To Summary Judgment On Digital Envoy's Damages Claims.**

5           **1.      The Uniform Trade Secrets Act authorizes the recovery that Digital Envoy**

6                   **seeks.**

7           Google continues to caricature and misrepresent the bases for Digital Envoy's claim for

8   damages.  Through its enactment of the Uniform Trade Secrets Act ("UTSA"), California has

9   recognized the inherent difficulty for a plaintiff to ascertain and prove damages resulting from the

10  misappropriation of its trade secrets and, thus, provides multiple avenues for recovery to serve the

11  overarching goal of making the plaintiff whole.  *See Telex Corp. v. Int'l Bus. Machines Corp.*, 510

12  F.2d 894, 931 (10th Cir. 1975) (recognizing that underlying purpose of UTSA's damage

13  provisions is to make the plaintiff whole and awarding damages for unjust enrichment as well as

14  compensatory damages); *cf. Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*, 831 F.

15  Supp. 1516, 1518 (D. Colo. 1993) (recognizing that measure of damages for misappropriation of

16  trade secrets can be elusive).  Specifically, the California Trade Secrets Act ("Section 3426.3")

17  authorizes the following recovery:

18          (a)     A complainant may recover damages for the actual loss caused by
                    misappropriation.  A complainant may also recover for the unjust
19                  enrichment caused by misappropriation that is not taken into account in
                    computing damages for actual loss.
20
            (b)     If neither damages nor unjust enrichment caused by misappropriation are
21                  provable, the court may order payment of a reasonable royalty for no
                    longer than the period of time use could have been prohibited.
22
            (c)     If willful and malicious misappropriation exists, the court may award
23                  exemplary damages in an amount not exceeding twice any award made
                    under subdivision (a) or (b).
24
    ─────────────────────
    [12]     *See, e.g.*, Supplemental Order Denying Google's Motion for Summary Judgment on the
25  Trade Secret Claim, at 2-3 ("Nonetheless, Digital pointed out that the License contained limits
    prohibiting Google from
26                                                                          . Digital also
    noted that, prior to the execution of the License, it clarified with Google the meaning of that
27  clause, informing Google that it would not be permitted to

28
    ─────────────────────────────────────────────────────────
                                        -16-

1 | *See* Cal. Civ. Code § 3426.3.

2 |     Although Google acquired a limited license from Digital Envoy for

3 | and used that technology in products that achieved substantial revenue, Google now

4 | contends that provided no enhancement at all to its advertising

5 | programs – including its AdSense programs. *See* Google Memorandum at 19. Further, Google's

6 | incredulity aside, every third-party web site with which Google shared (or licensed) Digital

7 | Envoy's geo-targeting technology was a potential licensee of Digital Envoy, and that Google's

8 | unauthorized provision of Digital Envoy's technology to "hundred of thousands" of web sites

9 | significantly and detrimentally impacted the market for Digital Envoy's technology to other

10 | advertising networks – all of which were potential licensees of Digital Envoy's technology.

11 |     Nevertheless, Google continues to devote its critique of Digital Envoy's damage theories

12 | to the actual loss prong of recovery, thereby ignoring the fact that Section 3426.3 authorizes

13 | Digital Envoy to recover Google's unjust enrichment resulting from its unauthorized use of Digital

14 | Envoy's technology. *See* Cal. Civ. Code § 3426.3(a); *University Computing Co. v. Lykes-*

15 | *Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir. 1974) (an appropriate measure of damages for

16 | misappropriation of a trade secret are "the benefits, profits, or advantages gained by the defendant

17 | in the use of the trade secret").

18 |     In its Motion for Partial Summary Judgment, Google has taken aim at the alleged difficulty

19 | of establishing the *amount* of Digital Envoy's damages and Google's unjust enrichment. *Cf. Telex*

20 | *Corp. v. Int'l Bus. Mach. Corp.*, 510 F.2d 894, 932 (10th Cir. 1975) ("The fact that [damages for

21 | trade secret misappropriation] are difficult to pin down should not militate in favor of the

22 | wrongdoer."). California courts are clear: Certainty about the existence, not the amount of

23 | damages, is controlling. *See, e.g., Stott v. Johnston*, 36 Cal. 2d 864, 875 (1951); *see also*

24 | *Brawthen v. H & R Block, Inc.*, 52 Cal. App. 3d 139, 148 (1975) ("Once plaintiff has established

25 | the basis for a loss of anticipated profits with reasonable certainty, then any other uncertainties that

26 | necessarily arise in calculating the amount of anticipated profits should be resolved against the

27 | [defendant]."); *Schroeder v. Auto Driveway Co.*, 11 Cal. 3d 908, 921 (1974) ("Liability cannot be

28 | evaded because damages cannot be ascertained with exactness"); *cf. Electro-Miniatures Corp. v.*

1   *Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985) (holding in trade secret misappropriation case,

2   "[w]here . . . there is a clear showing of injury that is not susceptible to exact measurement

3   because of the defendant's conduct, the jury has some latitude to 'make a just and reasonable

4   estimate of the damages based on relevant data.'").

5          Under the UTSA, the defendant – here, Google – bears the burden of establishing both (i)

6   the costs and expenses to be deducted from revenues derived from the misappropriated trade

7   secret; and (ii) the amount, if any, of the defendant's own contribution to the value of the product

8   or service containing the misappropriated trade secret. *See, e.g., USM Corp. v. Marson Fastener*

9   *Corp.*, 467 N.E.2d 1271, 1276 (Mass. 1984) ("Once a plaintiff demonstrates that a defendant made

10  a profit from the sale of products produced by improper use of a trade secret, the burden shifts to

11  the defendant to demonstrate those costs properly to be offset against its profit and the portion of

12  its profit attributable to factors other than the trade secret. If a defendant cannot meet its burden as

13  to costs and profits, the defendant must suffer the consequences."); *see also Electro-Miniatures*

14  *Corp.*, 771 F.2d at 27 (holding that for equipment depending upon the ability to use the smaller

15  component embodying the trade secret, it could be proper to compute damages based on the sales

16  of all equipment including the secret component); *Jet Spray Cooler, Inc. v. Crampton*, 385 N.E.2d

17  1349, 1358 (Mass. 1979) (holding that the defendant's net profits from sales were the proper basis

18  for recovery where the defendant's product "incorporated" the trade secret); *Carter Products, Inc.*

19  *v. Colgate-Palmolive Co.*, 214 F. Supp. 383, 397 (D. Md. 1963) (holding that once the plaintiff

20  proves that profits were achieved due to the sale of products incorporating the proprietary

21  information, the burden shifts to the defendant to show what part of the profit is attributable to

22  features other than the proprietary information).

23          **2.    The record evidence establishes that Google achieved revenues through its sale**

24                 **of a product that incorporated Digital Envoy's trade secret.**

25      In this case, it is undisputed that:

26  •   Google's AdSense products incorporated and utilized Digital Envoy's proprietary
        technology allowing :
27                 Indeed, as Google admits, Google                    **REDACTED**

28

-18-

REDACTED

1                               Declaration of Mark Rose in Support of Google Inc.'s Motion for Partial Summary Judgment Regarding Digital Envoy, Inc.'s Damages Claims ("Rose Declaration"), ¶ 7; *see also* Declaration of Susan Wojcicki in Support of Google Inc.'s Motion for Partial Summary Judgment Regarding Digital Envoy, Inc.'s Damages Claims ("Wojicki Declaration"), ¶ 5 ('

                                                                  ").

- Google's AdSense products achieved significant revenues from the licensing of AdSense.[13] *See* Waddell Declaration, ¶ 15, Ex. N.  Therefore, once Digital Envoy establishes that Google's use of Digital Envoy's technology in AdSense was unauthorized, Google's unauthorized use would constitute misappropriation for which Digital Envoy is entitled to recover.  *See* Cal. Civ. Code § 3426.3.

      Furthermore, based on Google's own admissions, Digital Envoy's technology was a *necessary* factor                                     The logical analysis of Google's own statements is simple:

          ○                                REDACTED

                *See* Wojcicki Declaration, ¶¶ 4-5.

          ○                                 REDACTED         *See* Rose Declaration, ¶¶ 6, 9.

          ○         REDACTED

          ○              *See, e.g.*, Rose Declaration, ¶¶6, 9.

          ○                                *See* Rose Declaration, ¶¶ 6, 7.

                  REDACTED

          ○                   *See* Rose Declaration, ¶7.

      The conclusion is obvious: If Google achieved revenue from

                                           then Digital Envoy's

---

[13]     During the relevant time period, based on information Google provided to Digital Envoy, Google achieved revenues in excess of $          dollars.  *See* Waddell Declaration, ¶ 15, Ex. N.

-19-

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DAMAGE ISSUES

Envoy's proprietary technology. Whether in the alternative universe Google proposes, Google

could have created a different product with different capabilities (*e.g.*,

) that might have achieved different revenues is of no matter.[14] *See,*

*e.g.*, *Carter Products*, 214 F. Supp. at 396-97 (rejecting the defendant's argument that it could

have produced its product without the trade secret and achieved the same success noting that the

defendant nevertheless chose to market the product containing the trade secret). Here, in the real

world, Google *did use* Digital Envoy's proprietary technology in its AdSense product, which *did*

*achieve* substantial revenues. Digital Envoy does not and never has contended that its

proprietary technology was the *sole* factor in the success of the AdSense product, but it

undoubtedly was a *necessary* factor, thereby directly contributing to Google's actual revenue.

The only case Google cites in support of its assertion that Digital Envoy cannot recover

Google unjust enrichment is *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612 (1992).

However, *Unilogic* does not apply to the facts in this case. The *Unilogic* court held that

summary judgment was proper where the trade secret plaintiff failed to adduce evidence that the

defendant was unjustly enriched by the use of the plaintiff's trade secret, where (i) the product

containing the trade secret was never marketed and the defendant earned no profits, and (ii) the

only evidence of enrichment was the plaintiff's unsupported testimony of the purchase price of

the trade secret many years prior to the misappropriation. *Unilogic*, 12 Cal. App. 4th at 627-28.

Here, in stark contrast, there is no doubt that the very product that incorporated Digital Envoy's

trade secret was marketed on the basis of the enhancement that trade secret provided, was sold,

---

[14]    Google's Mark Rose states in his declaration that "

." Rose Declaration, ¶ 9. However, Rose's assertion is rank speculation,
because Google did use Digital Envoy's technology to          . *See id.*, ¶ 7.

- 24 -

1    proprietary technology was a *necessary* factor                                  Under the

2    system that Google chose to employ,                  REDACTED

3                                                                    through the use of

4    Digital Envoy's proprietary technology. Whether in the alternative universe Google proposes,

5    Google could have created a different product with different capabilities (*e.g.*,

6                                                      ) that might have achieved different revenues is of no

7    matter.[14] *See, e.g., Carter Products*, 214 F. Supp. at 396-97 (rejecting the defendant's argument

8    that it could have produced its product without the trade secret and achieved the same success

9    noting that the defendant nevertheless chose to market the product containing the trade secret).

10   Here, in the real world, Google *did use* Digital Envoy's proprietary technology in its AdSense

11   product, which *did achieve* substantial revenues. Digital Envoy does not and never has contended

12   that its proprietary technology was the *sole* factor in the success of the AdSense product, but it

13   undoubtedly was a *necessary* factor, thereby directly contributing to Google's actual revenue.

14           The only case Google cites in support of its assertion that Digital Envoy cannot recover

15   Google unjust enrichment is *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612 (1992).

16   However, *Unilogic* does not apply to the facts in this case. The *Unilogic* court held that summary

17   judgment was proper where the trade secret plaintiff failed to adduce evidence that the defendant

18   was unjustly enriched by the use of the plaintiff's trade secret, where (i) the product containing the

19   trade secret was never marketed and the defendant earned no profits, and (ii) the only evidence of

20   enrichment was the plaintiff's unsupported testimony of the purchase price of the trade secret

21   many years prior to the misappropriation. *Unilogic*, 12 Cal. App. 4th at 627-28. Here, in stark

22   contrast, there is no doubt that the very product that incorporated Digital Envoy's trade secret was

23   marketed on the basis of the enhancement that trade secret provided, was sold, and achieved

24

25

---

26   [14]   Google's Mark Rose states in his declaration that "it is quite possible that in any given
     instance, Google would have selected the same advertisements for display with or without
27   geotargeting." Rose Declaration, ¶ 9. However, Rose's assertion is rank speculation, because
     Google did use Digital Envoy's technology to geotarget. *See id.*, ¶ 7.

28

1   substantial revenue.  Based on this record evidence, contained in Google's own admissions,

2   summary judgment is not warranted.

3   **3.       The evidence, including Google's own admissions, demonstrates that**

4   **was a valuable component in Internet advertising.**

5   Google would have this Court (and, ultimately, a jury) believe that:

6   (i)      Google actively sought the ability to perform                              ;

7   (ii)     incorporate                              it into its advertising programs;

8   (iii)    market the                 capabilities of those programs;

9   (iv)     sign up advertisers who desired                              ; and

10  (v)      after Digital Envoy filed this lawsuit, acquire
            when there is no ascertainable value in
11  *See* Google Memorandum at 19 ("For all anyone knows, Google use of
    [Digital Envoy's proprietary technology] had no impact at all on the

12

13                              REDACTED

14  Google's position is, simply, incredible.

15  In its own statements and on its own web site, Google has admitted the importance of

16          .  For example:

17  •

18                  REDACTED
                                    *See* Waddell Declaration, ¶ 8, Ex. G,

19

20  •
                                            REDACTED

21  *See Id.*, ¶ 9, Ex. H,

22  •

23          REDACTED
                            *See id.*, ¶ 10, Ex. I,

24

25  •

26          REDACTED

27                  *See Id.*, ¶ 11, Ex. J,

28

-21-

1

- **REDACTED**

2

    *See Id.*, ¶ 12, Ex. K.

3

                    *See Id.*, ¶ 13, Ex. L

4

5

Internet advertisers and publishers also have stated

6

- **REDACTED**

                              *See Id.*, ¶ 5,

7

Ex. D

8

- **REDACTED**

9

                                " *See id.*, ¶ 6, Ex.

10

11

- **REDACTED**

12

13

    *See id.*, ¶ 7, Ex. F,

                         and

14

15

16

- Reporting that, based on an internal Google case study, geo-targeted advertisements generated a 117 percent increase in the "click-thru" rate over non-geo-targeted advertisements. *See* Waddell Declaration, ¶ 14, Ex. M.

17

Perhaps most importantly, Google's internal case study demonstrated

18

19

    *See* Waddell Declaration, ¶ 14, Ex. M.  Google also directly touted and

20

encouraged advertisers to                 – a capability that was made

21

possible, in part, by Google's use of Digital Envoy's proprietary technology. *See id.*

22

    Thus, under the weight of its own statements and other evidence that demonstrate that

23

Google, and other participants in the Internet advertising market, placed high value on

24

                Google cannot possibly satisfy its burden on its motion for partial

25

summary judgment that no "reasonable juror" could find that          **REDACTED**

26

27

28

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON DAMAGE ISSUES

1

IV.     **CONCLUSION**

2      For the foregoing reasons, Digital Envoy respectfully requests that Google's Motion for

3    Partial Summary Judgment Regarding Digital Envoy's Damages Claims be denied.

4

5      DATED:  September 1, 2005

6                                      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

7

8                                      By

9                                                  P. CRAIG CARDON
                                                   BRIAN R. BLACKMAN
10
                                       TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
11                                     MCGUIRE WOODS, L.L.P
                                       1170 Peachtree Street, N.E., Suite 2100
12                                     Atlanta, Georgia 30309
                                       Telephone: 404.443.5706
13                                     Facsimile:  404.443.5751

14                                            Attorneys for DIGITAL ENVOY, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO GOOGLE'S MOTION FOR PARTIAL
                                       SUMMARY JUDGMENT ON DAMAGE ISSUES