1  P. CRAIG CARDON, Cal. Bar No. 168646
   BRIAN R. BLACKMAN, Cal. Bar No. 196996
2  KENDALL M. BURTON, Cal. Bar No. 228720
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
3  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4106
4  Telephone:    415-434-9100
   Facsimile:    415-434-3947
5

6  TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
   LUKE ANDERSON (Admitted *Pro Hac Vice*)
7  MCGUIRE WOODS, L.L.P
   1170 Peachtree Street, N.E., Suite 2100
8  Atlanta, Georgia 30309
   Telephone: 404.443.5500
9  Facsimile: 404.443.5751

10 Attorneys for DIGITAL ENVOY, INC.

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

| | |
|---|---|
| 14  DIGITAL ENVOY, INC., | Case No. C 04 01497 RS |
| 15         Plaintiff/Counterdefendant, | **[REDACTED VERSION]** |
| 16  v. | **DIGITAL ENVOY'S SUPPLEMENTAL BRIEF IN OPPOSITION TO GOOGLE'S** |
| 17  GOOGLE, INC., | **MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DIGITAL** |
| 18         Defendant/Counterclaimant. | **ENVOY, INC.'S DAMAGES CLAIMS** |
| 19 | **The Honorable Richard Seeborg** |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT AND CITATION OF AUTHORITY ..................................................... 2

    A. "Willful Misconduct" Would Include Google's Reckless Disregard of Its Obligations Under the Agreement. ..................................................................... 2

    B. The Record Evidence Establishes That Google's Misappropriation of Digital Envoy's Trade Secrets Constitutes "Willful Misconduct." ..................... 4

        1. Google's knowledge of the license restrictions and knowledge of potential harm to Digital Envoy's business if the restrictions were violated. ............................................................................................... 5

        2. Google's misappropriation of Digital Envoy's trade secrets was willful misconduct. ....................................................................................... 8

III. CONCLUSION ............................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

Hannon v. U.S.,
    801 F. Supp. 323 (E.D. Cal. 1992) ................................................................................ 2

Husain v. Olympic Airways,
    316 F.3d 829 (9th Cir. 2002) .................................................................................... 2, 3

State Cases

Acosta v Glenfed Development Corp
    128 Cal. App. 4th 1278 (2005) ..................................................................................... 3

Colich & Sons v. Pacific Bell,
    198 Cal. App. 3d 1225 (1988) ..................................................................................... 3

Ibrahim v. Ford Motor Co.,
    214 Cal. App. 3d 878 (1990) ....................................................................................... 3

RiLoro, Inc. v. Tumanjan,
    Case No. B171371, 2005 WL. 1120087 ...................................................................... 1

Shell Oil Co. v. Winterthur Swiss Insurance Co.,
    12 Cal. App. 4th 715 (1993) ........................................................................................ 2

Federal Statutes

Federal Rules of Civil Procedure 56(F) ................................................................................ 0

## I. INTRODUCTION

As set forth in Digital Envoy's Opposition, Section 8 of the Database Evaluation and Licensing Agreement (the "Agreement") would not limit Google's liability for misappropriating Digital Envoy's proprietary technology. *See generally* Digital Envoy's Opposition to Google Inc.'s Motion for Partial Summary Judgment Regarding Digital Envoy's Damages Claims. Google's proffered interpretation of Section 8 to the contrary is incorrect as a matter of law because that interpretation (i) would gut the Agreement of its essential purpose and meaning – *i.e.*, Digital Envoy's agreement to provide and Google's agreement to pay for Digital Envoy's technology subject to the plain boundaries and limitations set forth in the Agreement;[1] and (ii) is illegal under California law as it would insulate Google from liability for its own intentional tortious conduct.[2]

Nevertheless, the Court has requested that the parties provide supplemental briefing to (i) identify the record evidence that establishes that Google's misappropriation of Digital Envoy's trade secret constitutes "willful misconduct"; and (ii) define "willful misconduct" under California law – specifically, whether Google's reckless disregard of its duties under the Agreement constitutes "willful misconduct."

As set forth below, the record evidence is sufficient to establish that Google's conduct was "willful misconduct" in that the Agreement is plainly a *limited* license, which Google acknowledged in communications with Digital Envoy contemporaneous with the negotiation and

---

[1] Indeed, Google's interpretation of the limitation essentially guts the purpose of the License Agreement. The License Agreement allowed Google to have *limited* access to Digital Envoy's technology for a specified dollar amount per month. Under Google's interpretation, Google would be allowed *unlimited* access to Digital Envoy's technology by simply paying twice the amount due under the contract.[1] The interpretation and result urged by Google renders as farce the parties' careful negotiations about the scope of the license and the price to be paid.

[2] Prospective limitations on damages resulting from intentional torts are invalid as a matter of law. *See, e.g., RiLoro, Inc. v. Tumanjan*, Case No. B171371, 2005 WL 1120087 (Cal. App. 2d Dist. May 12, 2005) (holding that liquidated damages clause purporting to limit plaintiff's liability to $103,750 did not apply to plaintiff's fraud claim because Section 1668 invalidated any prospective limitation on damages for an intentional tort).

execution of the Agreement. (Indeed, those very communications establish that Google knew and understood that the very conduct forming the basis of Digital Envoy's claims in this case would be outside the boundaries of the Agreement.) In addition, subsequent to the Agreement's execution, Google informed a potential third-party investor in Digital Envoy that Google was prohibited from engaging in the objectionable conduct. In spite of these explicit understandings of the limited nature of the Agreement, Google nevertheless proceeded to use Digital Envoy's proprietary technology in the precise manner it admitted was outside the bounds of the Agreement. Moreover, despite the existence of a written agreement and stated understandings of the Agreement's limitations, Google cavalierly ignored the Agreement altogether and proceeded to use Digital Envoy's proprietary technology as Google saw fit.

In addition, this Court has already held that if it is ultimately found that Google exceeded the scope of the License, then a trier of fact may also conclude that Google knew or should have known that its use of Digital's proprietary technology in its AdSense program constituted a misappropriation of Digital's trade secrets." *See* Supplemental Order Denying Google's Motion for Summary Judgment on Trade Secret Claim dated June 16, 2005 at 3. If a trier of fact could find that Google *knew* it was misappropriating Digital Envoy's trade secrets by using them in AdSense, then such trier of fact would necessarily also find that such actions were "willful misconduct."

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   "Willful Misconduct" Would Include Google's Reckless Disregard of Its Obligations Under the Agreement.

"Under California law, the concept of willful misconduct has a well-established, well-defined meaning." *Hannon v. U.S.*, 801 F. Supp. 323, 327 (E.D. Cal. 1992). "Willful misconduct has been defined as the intentional performance of an act with knowledge that the . . . act will probably result in injury or damage or the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences." *Husain v. Olympic Airways*, 316 F.3d 829, 839 (9th Cir. 2002) (internal quotations omitted). As such, "willful misconduct" is defined coextensively with reckless disregard. *See, e.g., Shell Oil Co. v. Winterthur Swiss Insurance Co.*,

12 Cal. App. 4th 715, 742 (1993) ("As a practical matter, the distinction between reckless conduct and positive, active, wanton, reckless and absolute disregard of an act's possibly damaging consequences is too fine to be significant.") (internal citations and quotations omitted).

"In civil cases, the word 'willful,' as ordinarily used in the courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent." *Ibrahim v. Ford Motor Co.*, 214 Cal. App. 3d 878, 894 (1990). "Determining willful misconduct is based on a subjective standard and can be satisfied through circumstantial evidence." *Husain*, 316 F.3d at 839.

As the California Court of Appeals held in *Acosta v Glenfed Development Corp.*, "[w]illfulness generally is marked by three characteristics: (1) actual or constructive knowledge of the peril to be apprehended; (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) conscious failure to act to avoid the peril." 128 Cal. App. 4th 1278, 1294-95 (2005). "Willful misconduct," therefore does not invariably entail a subjective intent to injure. It is sufficient that a reasonable person under the same or similar circumstances would be aware of the highly dangerous character of his or her conduct. *See id.* (internal citations omitted). "Ordinarily whether an action constitutes willful misconduct is a question of fact." *See Colich & Sons v. Pacific Bell*, 198 Cal. App. 3d 1225, 1242 (1988).

As set forth more fully below, there is both substantial direct and circumstantial evidence from which a trier of fact could, and necessarily should, find that Google's misappropriation of Digital Envoy's trade secrets is "willful misconduct." Specifically, the evidence establishes that Google must have known, and indeed actually knew, that there were restrictions on the use of Digital Envoy's technology. Additionally, the evidence is overwhelming that Google knew that Digital Envoy did not want Google to distribute, resell or share Digital Envoy's database libraries by allowing third party parties to benefit by having their IP addresses looked up in Digital Envoy's database and did not want Google to bundle it together with other Google technology for the benefit of third parties, because Digital Envoy would be harmed by this by having its market

diminished. Notwithstanding this knowledge of the restrictions and the danger to Digital Envoy's business, which would naturally flow from such license violations, Google either recklessly or intentionally engaged in conduct to violate these license restrictions and harm Digital Envoy's business.

### B.     The Record Evidence Establishes That Google's Misappropriation of Digital Envoy's Trade Secrets Constitutes "Willful Misconduct."

Digital Envoy is the developer of patented technology that allows, among other things, web sites, search portals, enterprises and ad networks to target users based on their IP addresses. Digital Envoy uses its patented technology to develop proprietary databases of IP addresses correlated to information such as user location. Digital Envoy then licenses this database to companies doing business on the Internet.

In the Internet advertising space, Digital Envoy's technology has particular value because a user's location is especially important in targeting advertisements. Digital Envoy licenses its geolocation technology to web sites for ad geo-targeting either (i) directly to entities such as AOL, CNN.com, Disney, CNet and others (in order that the web sites can target their own ads using their own proprietary ad network); or (ii) through value-added resellers or distributors (such as a third-party advertising network like DoubleClick) which build services around Digital Envoy's geolocation technology to deliver geo-targeted ads. *See* Declaration of Robert Friedman in Support of Digital Envoy's Motions to Compel (a copy is attached hereto as Exhibit "A"), ¶¶ 5, 9.

The market for geo-targeted advertising is finite, and it is therefore limited by the amount of available space (inventory) on web sites throughout the web. *See* Declaration of Robert Friedman in Support of Digital Envoy, Inc.'s Opposition to Google, Inc.'s Second Motion for Summary Judgment (a copy is attached as Exhibit "B"), ¶ 2 (To the extent that space is eaten up, Digital Envoy's prospective market shrinks.) Thus, Digital Envoy structures licensing and distribution deals that balance its ability to seize the inventory itself versus using a distributor who may have better access to significant amount of space (such as an advertising network) to maximize its license fees. *See id.* This distribution/value-added reseller-versus-direct-sale mix

-4-

was one of the most important business decisions that Digital Envoy faced in its early stages and continues to be a very important consideration in its business. *See id.*

### 1. Google's knowledge of the license restrictions and knowledge of potential harm to Digital Envoy's business if the restrictions were violated.[3]

The following undisputed facts show that Google knew that it was restricted from using Digital Envoy's technology and that if the restrictions were violated Digital Envoy's business would likely be harmed:[4]

- In 2000, when Google and Digital Envoy negotiated the Agreement, Google knew that Digital Envoy was a small company that had not finalized its distribution strategy, and that was concerned about its market being taken away by Google. *See* Declaration of Robert J. Waddell, Jr. ("Waddell Decl."), Ex. 1 at 108.

- Google knew that the Agreement did not give Google distribution rights due to the potential harm to Digital Envoy's Business. *See* Waddell Decl., Ex. 1 at 108 ("[

**REDACTED**

- Google recognized that Digital Envoy might, in the future, have decided to grant Google distribution rights to Digital Envoy's technology, but such a grant of rights would require a

---

[3] Despite counsel for Google's recent contention at the September 21, 2005 hearing that there is "zero" evidence to establish Google's "willful misconduct," the evidence is fact significant.

[4] During the negotiations, Digital Envoy's statement in an early email (oft cited by Google) that Google could have an "all you can eat" license, obviously was not meant to convey "all third party web sites could eat" (thereby somehow giving Google the belief that it had distribution/sharing rights), because every phone and email conversation set forth herein took place *after* that email. It would be nonsensical for Google to contend that such statement granted Google so-called "unlimited" rights, yet the parties discuss in great detail the limitations that would apply to Google and the ultimate agreement contain multiple restrictions on Google's use.

[5] This admission by Mr. Schimmel, who negotiated the Agreement on behalf of Google, also makes it clear that this action is not "brought under" the Agreement for purposes of the damage cap of Section 8. Plainly, the parties went to great lengths deliberately *not* to deal with the subject of distribution under this Agreement, instead, agreeing that if Google was to be granted distribution rights to Digital Envoy's technology, this would be in a separate agreement to be executed at some later date. The Court has already found that a trier of fact could find Google to be "distributing" Digital Envoy's technology in AdSense. *See* May 20, 2005 Order at 10. To allow Google, in effect, to "elect" unilaterally to obtain distribution rights through the operation of a so-called "liability cap," would fly in the face of the parties' intent and give a windfall to Google. Such an outcome was clearly not contemplated by the parties and in fact the opposite was specifically contemplated by both parties – that the Agreement would not give Google any distributions rights and such rights were *beyond the scope* of the Agreement.

separate agreement and was not contemplated under the Agreement. *See* Waddell Decl., Ex. 1 at 108 ("[                                                                    ) and Ex. 2 at 208

**REDACTED**

.").

- In particular, Digital Envoy wanted to ensure that Google understood that Google could not provide the benefits of Digital Envoy's technology to Google's customers, because that would eat into Digital Envoy's available market and take away large potential customers. *See* Waddell Decl., Ex. 1 at 108 ("[

  **REDACTED**

  ."]; *see also id.*, Ex. 2 at 207-08.

- At the time of the negotiations, the only use of Digital Envoy's data that the parties discussed was use by Google for its own web sites. *See* Waddell Decl., Ex. 1 at 205. And, as Google admits, the parties *never discussed at any point* – either before or after the signing of the agreement – allowing Google to look up IP addresses of users on third-party web sites. *See id.*, Ex. 1 at 234.

- To erase any doubts, Digital Envoy later confirmed with Google, in writing and by phone, that Google could not distribute or share Digital Envoy's technology with third parties or repackage/bundle Digital Envoy's technology with Google's technology and provide that bundle to third parties. *See* Waddell Decl., Ex. 1 at 185 and Ex. 2 at 211.

- Digital Envoy also explained to Google that it understood the contract restrictions on distribution and sharing to mean that Google could only apply Digital Envoy's technology against *Google's own information* (*i.e.*, but not to IP addresses of third-party web sites), among other things. *See* Waddell Decl., Ex. 3. After reviewing this correspondence from Digital Envoy, Google assured Digital Envoy that Digital Envoy was "totally legally covered" under the Agreement. *See* Waddell Decl., Ex. 1 at 124. The parties' Agreement is consistent with these understandings. *See* Agreement, §§ 3.1 and 7.2 (prohibiting distribution, reselling, sharing, or making available the Database Libraries to third parties).

- In April 2001, due to the importance of this distribution strategy to Digital Envoy's future business prospects, a prospective investor in Digital Envoy confirmed with Google that Google did not have distribution rights to Digital Envoy's technology. That investor explained:

  **REDACTED**

  *See* Declaration of Andrew Lindner in Opposition to Google, Inc.'s Second Motion for Summary Judgment (a copy is attached hereto as Exhibit "C"), ¶ 5. Google's Matthew Cutts reiterated to the investor what Messrs. Schimmel and Friedman agreed to – that Google could not resell products or services based on Digital Envoy's technology: Responding to the investor's query: "]

  **REDACTED**

**REDACTED**

."[6] *See id.*, Plaintiff's Ex. 8 attached thereto (emphasis added).

- Google knew that by offering third parties geotargeting in AdSense for free, these parties would not want to acquire it for themselves from Digital Envoy or any other party. *See* Waddell Decl., Ex. 5.[7]

Thus, based on the written communications and conversations of the parties, it should be indisputable that the parties understood:

- Google could not repackage Digital Envoy's data or bundle Digital Envoy's data with other Google technology for use by third-parties;

- Google could use Digital Envoy's data *only* against Google's own information and not the information of third-party web sites;

- Google could not act as a distributor or value-added reseller of Digital Envoy's technology; and

---

[6] Quite curiously, Mr. Cutts has given sworn testimony in this case, that utterly contradicts the statements he gave to Digital Envoy and to its investors:

**REDACTED**

*See* Waddell Decl., Ex. 4 at 54, 64. Obviously, the veracity of this post-dispute statement, along with other post-dispute claims by Google that it believed that there were "no restrictions" on its use would be a question of fact to be weighed against the clear language of the Agreement along with the powerful evidence from Google's own statements, made pre-dispute, that Google did in fact fully understand that it was restricted under the Agreement. Additionally, such post-litigation claims by Google that it believed its use of the database libraries was "unlimited" by the Agreement, in light of the clear limitations contained in the plain language of the Agreement and the unambiguous acknowledgements by Google employees of such limitations during the negotiations, further indicate Google's conscious disregard of the restrictions in the Agreement.

[7] Indeed, the Court has already acknowledged that the fact that if Google partners, in Google's own words, could "forget about having to try any geotargeting on their own side," such represented a lost business opportunity for Digital Envoy. *See* May 20, 2005 Order at 10.

-7-

- Google could not share Digital Envoy's technology with third parties or make it available to them.

- Google would harm Digital Envoy's business if it did any of the above.

Nevertheless, in spite of the plain language of the Agreement and these unambiguous understandings, unbeknownst to Digital Envoy, Google began to distribute and share Digital Envoy's technology with third-party sites in its AdSense programs, using Digital Envoy's database to look up IP addresses of users on third-party web sites in order to provide targeted advertisements on those sites. Google achieved revenues of more than $         from AdSense during the period in which it was using Digital Envoy's technology. *See* Declaration of Robert J. Waddell, Jr. in Opposition to Google Inc.'s Motion for Partial Summary Judgment, Ex. N.

Based on Google's own testimony, the AdSense program:

- Involves the bundling of Digital Envoy's data with other Google technology for the benefit of third party web sites. *See* Declaration of Mark Rose in Support of Google Inc.'s Motion for Partial Summary Judgment, ¶¶ 4, 5, 6, & 8.

- Involves the use of Digital Envoy's data against IP addresses of users at third party web sites. *See id.*

- Allows third parties to obtain the benefits of Digital Envoy's data without contracting directly with Digital Envoy (thereby depriving Digital Envoy of potential business by eating into Digital Envoy's market). *See id.*; Waddell Decl., Ex. 5.

Google is therefore acting as a value-added reseller/distributor contrary to the parties' agreement regarding the meaning of those terms. *See* Waddell Decl., Ex. 2 at 110-11.

    **2.  Google's misappropriation of Digital Envoy's trade secrets was willful misconduct.**

Throughout the relevant time period, Google either deliberately transgressed or willfully ignored the Agreement and its limitations:

- Google had no formal legal policies or procedures whatsoever to ensure compliance with its license agreements, such as the Agreement with Digital Envoy. *See* Waddell Decl., Ex. 6 at 11; Ex. 4 at 61, 63.

- Prior to incorporating Digital Envoy's technology into AdSense, no one at Google ever consulted Messrs. Schimmel and Cutts about the limitations on Google's use of that technology, because neither of them knew that Digital Envoy's data was being used in AdSense until February 2004 when Mr. Friedman expressly inquired. *See* Waddell Decl., Ex. 1 at 193-94 and Ex. 4 at 162-63. Additionally, there is no evidence that anyone

-8-

consulted Kulpreet Rana, the attorney involved in reviewing and approving the Agreement. *See id.*, Ex. 6 at 13 ("**REDACTED** ")

- Mr. Schimmel never did anything whatsoever to explain to Google employees what was permitted or not permitted under the Agreement. *See* Waddell Decl., Ex. 1 at 54. Moreover, Mr. Schimmel, the chief negotiator of the Agreement, was not aware of anyone's practice within the entire Google organization that " ." *See id.*

- Key Google employees (including Salar Kamangar, the product manager in charge of AdSense, Mr. Cutts, and Mark Rose, senior engineer at Google) had no knowledge of any internal legal procedures to ensure Google's compliance with its contractual obligations. *See* Waddell Decl., Ex. 4 at 62; Ex. 7 at 88, and Ex. 8 at 81-84.

- Google's Mark Rose and Salar Kamangar knew that Google had a license agreement with Digital Envoy, but never checked the Agreement (or talked to anyone) to review its restrictions on use, despite being involved with AdSense, thereby consciously disregarding the Agreement's terms and limitations. *See* Waddell Decl., Ex. 8 at 79-84 and Ex. 7 at 86-89.

- There is no evidence that anyone at Google ever checked the terms of the License Agreement while developing and deploying the AdSense program until Digital Envoy complained that the program was in violation of the Agreement, in February 2004, leading to this action. *See, e.g.*, Waddell Decl., Ex. 1 at 54.

- Google created an interface to Digital Envoy's database so that anyone at Google could use Digital Envoy's database in any manner, without any internal monitoring or access procedures whatsoever to ensure that Google was complying with its obligations under the Agreement. *See* Waddell Decl., Ex. 4 at 76-77.

Google's cavalier disregard of its agreements – never even consulting them to ascertain its rights and obligations, including any applicable limitations – constitutes willful misconduct. Google allowed its engineers unchecked and unfettered access to Digital Envoy's technology, and there is no evidence whatsoever that anyone at Google ever consulted the license agreement to see if its incorporation of Digital Envoy's technology into AdSense was permitted. Indeed, Google acted in reckless disregard even to the existence of the Agreement and acted as if the Agreement's restrictions did not even exist, despite the clear harm to Digital Envoy's business from such actions. To allow Google to somehow benefit from its complete lack of processes and procedures and its willful disregard of the restrictions of the Agreement by obtaining protection under a "damage cap," would be both contrary to California law and the clear intent of both parties whose express statements unambiguously indicate that "distribution" and "sharing" of Digital Envoy's technology were subject matters that were deliberately not covered by the scope of Agreement

-9-

(and therefore a trade secret action related to such unlicensed use could not be considered to be an action "brought under" the Agreement), and permission for such distribution or sharing would be covered, if at all, under a separate agreement – which was never negotiated nor executed by the parties.

### III.  CONCLUSION

For the foregoing reasons, and for those set forth in Digital Envoy's Opposition, Google's Motion for Partial Summary Judgment should be denied.

DATED:  October 5, 2005

          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By    /s/ Brian Blackman
       P. CRAIG CARDON
       BRIAN R. BLACKMAN

TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile:  404.443.5751

Attorneys for DIGITAL ENVOY, INC.