EXHIBIT A

Dockets.Justia.com

CLERK:  Calling matter number 2 on the calendar.  Case no C04-01497-RS, Digital Envoy v. Google.  Counsel, state your appearances, please.

MR. KRAMER:  Your honor, Dave Kramer and Dave Lansky from Wilson Sonsini for Google.

THE COURT:  Good morning.

MR. KRATZ:  Good morning, Your Honor.  Timothy Kratz and Robert Waddell for Digital Envoy.

THE COURT:  Good morning.  We took a break because I was going to see if Mr. Torreano had been freed up to assist as a court reporter.  He's become very fond of all of you but, alas, he's otherwise engaged, so he can't assist us.

All right, let me make a couple of comments and this is in the form not of a tentative ruling, I mean, you're used to – we've gone through many a motion in this case, so you know my *modus operandi*.  And knowing that, I want to tell you why what I'm about to say to you is somewhat different.  This is not a tentative ruling.  I've read through your papers and I've been giving it some thought, but this really is much more in the form of just some reactions I have.  I'm not at the, sort of tentative ruling stage, so don't – I suppose what I'm saying is don't overreact to my reactions, because that's really what they are.  I want to hear what you have to say on this.  Perhaps the best way for me to phrase this is to perhaps give you my impression of the strength of the arguments that have been made by Google in this instance.  And those arguments as I understand them, are – the first one is more of a contract interpretation argument, that summary judgment is appropriate because of the language in the contract that limits liability or bars liability, and the second claim is a causation claim that they, they being Digital Envoy – Digital Envoy is not in a position to demonstrate as a matter of law, according to Google, that the necessary causation that

-1-

they would need to show for any kind of damage presentation. That second point I view is the weaker of the arguments. I'm not particularly inclined – I know I've read the distinctions that Google draws about the technology excludes rather than – all of the various arguments. I just don't think that as a matter of law at this juncture we can say that there isn't a damage presentation – the strength of it remains to be seen, but whether or not a damage presentation can be presented under various alternative theories of damage and we'll see what is ultimately presented. But it does not seem to me, even though there are many hurdles in the path of putting together a damage case that would ultimately meet the test that it has to be non-speculative and other concerns of that nature, I'm just not convinced at this juncture that I can say that they can't do that.

The stronger arguments seem to me to be the contract interpretation arguments and in particular the provision in Section 8 of the contract that talks about anything, any claims other than willful conduct claims being by agreement of the parties not subject to a cause of action or a claim for relief, because I do see this dispute arising out of this license agreement. I just don't see how you can argue that the trade secret claim is divorced from the license agreement. Indeed, any trade secret claim as we have seen will be met not surprisingly by the argument by Google that we have a license. And then the dispute becomes: what's the scope of the license? So I just don't see how it isn't a claim arising out of that agreement and then the question is, in my mind: is the contract, by carving out willful misconduct, is it essentially addressing the California Code issue, which is: there are certain things you cannot exclude by contract and is that really what this contract is doing? And then the question is: are these claims properly characterized as claims for willful misconduct or not? And that is something I want to hear the parties discuss.

With respect to the part of the contract that limits or caps recovery, I think that, as I indicated before, I think that the willful misconduct issue is the strongest of the issues that are

-2-

presented in the motion.  But that doesn't mean that I don't want to hear about the cap issue as well.

So, I don't know if that gives you any assistance at all in addressing what you think you need to

address, but I always think the parties are entitled to know what the particular judge is thinking

about, as crazy as those thoughts may be.  But you're entitled to know that to assist you, if it assists

you in any way in making the arguments you're going to make.  All right.  Mr. Kramer.

        MR. KRAMER:  Certainly, Your Honor.  Let me start where you left off, which is

with respect to the limitation of liability clauses.  And let me state what I think is a fairly

uncontroversial proposition, which is that these raise pure questions of law that are ripe for judicial

determination today.  There was no negotiation, there is no parol evidence, the question simply is

what do these clauses mean and how do they apply here?

        With respect to the willful misconduct provision, it's a very simple analysis.  The

only dispute between the parties is what does "willful misconduct" mean in this contract?  And

under California law, willful misconduct is defined.  There are a legion of cases, dozens of cases that

tell you what willful misconduct means.  We cited a number of them in our papers.

        THE COURT:  Digital Envoy points out that most of them arise in a context other

than this.

        MR. KRAMER:  I'm not sure that that's so, Your Honor.  There are cases which talk

about willful misconduct in the context of 1668, so we looked at 1668.  There are other cases that

talk about willful misconduct as defined by statutes.

        California law defines what willful misconduct means.  This contract is governed by

California law.  Willful misconduct has a plain and unambiguous meaning.  And if you look in the

dictionary, even though Digital Envoy is fond of citing the dictionary, they mis-cited it.  Black's

Law Dictionary defines willful misconduct.  It requires malevolence.  It requires quasi-criminal

-3-

intent.  It requires knowledge that you're engaged in wrongdoing and intent to harm.  And there is no dispute, there's no evidence here of any of that *mens rea* for Google.

THE COURT:  Where does reckless disregard fall on the willful misconduct – your definition of willful misconduct?  Can conduct which amounts to reckless disregard be willful misconduct?

MR. KRAMER:  There are cases which suggest that a complete indifference to the consequences of an act that is likely or certain, substantially certain to cause harm qualifies as willful misconduct.  Again, we're not even close to that on this evidentiary record.  Digital Envoy didn't offer evidence on *mens rea.*

THE COURT:  Well, Digital Envoy, for example, and I can go back and find it, would presumably point to some testimony by Google employees that seem to indicate at a certain point in time anyway, "well we don't really know what this – we're under the impression that we have the right to do this, but we don't really know," but then they go on and do what they're going to do.  Perhaps Mr. Kratz can point me to what I have in mind and maybe I'm misquoting it.

MR. KRAMER:  I'm not sure I know what you're talking about, Your Honor.  I will tell you that for purposes of this motion –

THE COURT:  I think it was an email that I came across, but OK, go ahead.

MR. KRAMER:  For purposes of this motion, Digital Envoy came forward with no evidence of willful misconduct.  They didn't attack Google's *mens rea.*

THE COURT:  How about did they come forward with any evidence in your mind at all, and give them the benefit of the doubt, on reckless disregard?

MR. KRAMER:  No, Your Honor, they did not.  And there was no reckless disregard.
I mean, we put in a bunch of evidence to show what our *mens rea* was.  The Court has seen it
already, because we argued it in connection with the trade secret motion.

THE COURT:  And I – so it's clear, I agree with you that there is no evidence that
I've seen anyway, and Mr. Kratz can correct me if I'm wrong, that reflects any sort of affirmative
statement on the part of anyone at Google saying, we know we don't have a right to this, and we're
going to do whatever we want to do.  There isn't anything that I've seen along those lines.

MR. KRAMER:  That's right, Your Honor.  And there's nothing to suggest that
Google didn't hold the interpretation of the contract that it did.  There is no one out there suggesting
that the interpretation that we've advanced here wasn't the understanding of everyone associated
with the contract negotiation and everyone associated with the implementation of the technology
using the data at Google.

THE COURT:  And there is no evidence that a contrary interpretation was presented
to any individuals at Google and they said, "OK, fine, that's somebody else's view, but we're just
going to proceed and do what we want to do."

MR. KRAMER:  Absolutely none, Your Honor, absolutely none.  So it comes down
to that.  What does willful misconduct mean?  It's a very high bar, and they didn't even try to satisfy
it.  They couldn't have satisfied it if they had tried, because there's no evidence in this case.

THE COURT:  Is your contention, and I realize this – I ask this with some hesitation
because as you suggest, going into parol evidence and the like – but is it your contention that this
contract is in some fashion is drafted with §1668 in mind?  I mean, is this an effort to address 1668?

MR. KRAMER:  My suspicion, Your Honor, and again, this is a contract that was
drafted by Digital Envoy, this is their form contract and I would suggest to you that in various

-5-

jurisdictions in this country there are prohibitions on the enforcement of limitations of liability that are similar to 1668, I would not say specifically that it was drafted with 1668 in mind. But it certainly takes care of 1668 as it takes care of the prohibitions around the rest of the country to the extent they exist. I'm just not familiar with them. I know it takes care of 1668.

THE COURT: All right. I take it – I mean, I know the answer to this – your contention is that an intentional – a claim of intentional tortious conduct is not willful misconduct. It doesn't equate with willful misconduct.

MR. KRAMER: Certainly not.

THE COURT: Right.

MR. KRAMER: Certainly not, Your Honor.

THE COURT: So you can be – you could violate an intentional tort and you can do it in a non-willful willful way.

MR. KRAMER: We'll we've got the *Farnham* case that's involving intentional tort of defamation. That's a clear example which shows that that can't possibly be so. But again, the standard for willful misconduct is very high. It equates to the standard in the insurance code for barring coverage for claims of intentional misconduct. And in that context, we see insurance coverage for things like negligent child molestation and failure – there are a host of cases –

THE COURT: I've never heard of that concept, but OK...

MR. KRAMER: I understand that. But it is that kind of standard that you need to satisfy. You need to show that you set out with malice in your heart, with intent to harm, before you can be deprived of your insurance coverage under section 1553 – 533 – and before you can be deprived of the benefits of your limitation of liability clause under civil code §1668.

C:\NrPortbl\PALIB1\DAG\2737573_1.DOC (78055)

THE COURT: 1668 does talk about fraud as one of the areas that you can't carve out.

MR. KRAMER: That's right.

THE COURT: And in my mind, fraud doesn't necessarily equate to willful misconduct.

MR. KRAMER: I think it does because the requirement of scienter for fraud does equate to willful misconduct. You, with scienter, lied to someone. You intended to deceive that person. That's willful misconduct. Knowing that you're engaged in wrongdoing, you lied. You lied for purposes of harming that individual. That's what scienter is. That's the same – that's why fraud is there. Fraud is essentially akin to willful misconduct. It's essentially the same standard because of the scienter requirement in fraud. I can go on and talk about the second clause if you'd like, Your Honor but I think . . .

THE COURT: Yes.

MR. KRAMER: . . . the first clause is the ballgame. At the end of the day – if you resolve the first clause as we believe you should, there's no liability for Google to Digital Envoy.

The second clause – as the Court has already recognized in its comments – this is a case that owes its very existence to the contract. All Digital Envoy's claims are based on the contract. They allege duties that arise exclusively from the contract. And you saw in their last summary judgment motion – they're charging Google with violations of this contract. That's what their case is. It's a breach of contract claim dressed up as a trade secret claim. The clause in this contract applies to claims – any claim – or other action brought under the Agreement. The question simply is what does the phase "brought under the Agreement" mean? We say it means "based upon the Agreement." There is no controlling authority out there, but we cited a host of cases interpreting

-7-

analogous language saying it means "based upon."  And the dictionary definitions say "brought under" means "based upon the authority of."  And if you apply the presumption against the drafter that Digital Envoy wants you to apply, since Digital Envoy drafted that language, we're home. "Brought under the contract" means "based upon the contract."

It doesn't make any sense to suggest that it is limited to claims for breach of contract, claims styled as breach of contract.  If that's what the parties wanted to do, that's what they would have said.  It's a pretty straightforward concept.  It also doesn't make any sense to say that they would have limited their liability for claims for breach of contract and not for tort claims based on the contract because it's the tort claims where the action is.  It's the tort claims where there's a real uncertainty, where there's a real possibility of significant loss or injury.

I think you've got to keep in mind, in looking at both of these clauses, really, civil code §1647, which we didn't cite in our papers, but it's not a controversial proposition.  It says you interpret a contract based on the circumstances of its making and the subject matter that it relates to. Keep in mind what this deal was.  It was very limited, effectively a sale.  Digital Envoy gives Google data that Google can use however it wants in its business, and Google gives Digital Envoy money.  However Digital Envoy wants to use it, that's up to Digital Envoy.  These parties weren't in business together.  They weren't sharing the risks, and they weren't supposed to be sharing the rewards of one another's business.  And to make that clear to the world they put in a whole page of limitations of liability.  These are only two of the clauses in that provision; there are five or six others.  They wanted everybody to know that they weren't sharing the risks, and unless one party set out to intentionally injure the other, everybody acted at their own risk.

If Digital Envoy supplied Google with data that blew up Google's system and caused millions of dollars of damage to Google, that's Google's problem.  That's what these limitations of

-8-

liability say.  And so too here.  If Google acts in error based on a mistaken understanding, according to Digital Envoy, of its rights under the contract, Digital Envoy bears the risk of that loss, not Google.  This was not intended to be a vehicle – this contract was not intended to be a vehicle by which one party could parasitically profit off of the success of the other.  It would be manifestly unjust at this point to allow Digital Envoy to ignore the bargain that it struck – Digital Envoy, who shared none of the risks of Google's business – to now reap a massive windfall from Google's success.  That's what the limitations of liability are supposed to prevent, and that's why Google is entitled to summary judgment with respect to those limitations of liability clauses.

THE COURT:  The language on the cap provision, the "no more than the amount paid," which I guess comes out to 300-some-odd-thousand dollars – that does seem – the context of that provision, as Digital Envoy points out, seems to be addressing things like equipment failure and warranty – I mean, it doesn't seem to be addressing, at least what surrounds it doesn't seem to be going to the question of tort claims and the like.  I know this is separate and apart from your argument about willful misconduct, but the cap language seemed – you know, the context in which it arises seems to be addressing a situation other than this one.

MR. KRAMER:  I don't think so, Your Honor, and I'll tell you why.  If you look at the limitation of liability clause, there are, like I said, eight different provisions limiting liability.  And the kinds of claims that Digital Envoy says this provision is directed to –

THE COURT:  Where are the eight?  I thought we had two.

MR. KRAMER:  Well, we have two at issue in this motion.  But in Section 8 of the contract there are, I haven't counted because the others are not at issue –

THE COURT:  Okay.

-9-

MR. KRAMER:  But there are five or six or eight different provisions limiting liability.

THE COURT:  Okay.

MR. KRAMER:  And the kinds of claims that Digital Envoy would like you to believe this last clause are directed to are actually covered by the very first sentence of Section 8. There are errors in data entry and communication and storage and subject to a possibility of human and machine errors and omissions and delays and –

THE COURT:  Right.

MR. KRAMER:  There's losses to the network and harm to the network.  And then the next sentence says nobody's liable for any of that.  The last sentence isn't limited to those kinds of claims because there's nothing left at that point for those kinds of claims.  What the last sentence says is "in any event...."  "otherwise...." "without regard for anything else...."   This is a catch-all. Any other claim that falls within this language is subject to a cap on liability because we don't intend this to be a vehicle by which you enrich yourself at my expense.

THE COURT:  Except, except for willful misconduct, right?

MR. KRAMER:  Certainly except for willful misconduct.

THE COURT:  And the example that Digital Envoy used in its brief to me about you going off and packaging up their software and putting your label on it and doing all sorts of things would be a case of willful misconduct.

MR. KRAMER:  I would think so, certainly, Your Honor.  I would also say that with respect to any of these provisions there's an unconscionability check on its application.  That is, if the answer is that they were done wrong willfully and we stand here and say "we're entitled to invoke these claims, entitled to invoke these provisions, they get nothing" – that, I would suggest to

-10-

you, would be an unconscionable result and the Court would have the power to set it aside.  But that's not what we have here.  There's a pot of money here.  There's $300,000 here.  This is as much as Digital Envoy earned in five years under the parties' relationship.  That's a significant amount of money for them – that they stand to recover.  So I don't think unconscionability has anything to do with this.  I don't think, frankly, we get to this second clause, of course, because I do think that the first clause is the ballgame.  I do want to spend some time talking about causation but if you would like Mr. Kratz to talk about limitation of liability clauses I am happy to do it that way too.

THE COURT:  No.  Why don't you go ahead and address the causation issue.

MR. KRAMER:  Sure.  We've been talking about causation for a long time in this case.  We have been making noises about it for almost a year.  And the problem that we have, and the problem that we pointed out, is that Digital Envoy can't – can't – offer evidence to show either an actual loss to itself or unjust enrichment to Google caused by Google's use of Digital Envoy's data in the AdSense program.  Now the Court said – [distraction in Courtroom] please Your Honor – the Court said well I don't think at this juncture it is appropriate for me to look at whether they could ever do it.  But it is, because on summary judgment that's their burden.

THE COURT:  Well, let me flush out a little of what I had behind that comment.

MR. KRAMER:  Sure.

THE COURT:  I mean it seems to me that there is some evidence that Digital Envoy has presented, that their intellectual property was certainly being promoted as something of value by Google in the overall service that Google is offering.  And so then the question is, to use a simplistic analogy, lets take an automobile, and somebody really likes the leather seats in the automobile.  Alright, it seems to be your contention that they have to prove but for if they wouldn't have bought the car – if you are the leather seat manufacturer you have to show that leather seats were the be-all

-11-

and end-all.  And, for example, a customer would say, "well, I would rather have the leather seats but you don't offer those, I will still buy the car for the same price that you are going to offer it."  I think it may be sufficient for them to demonstrate that value is added to the overall product.  It is something that the advertiser wants and the fact that it is packaged in a fashion by you that makes it very difficult to deconstruct that is not as a matter of law subject to having that tossed out because they may, as they point out, adopt some reasonable royalty concept, some unjust enrichment concept.  Your argument seems to be, we bundle it all together and it is very hard to unbundle it because to the nature of the way our technology works and therefore nobody can ever get any – any component aspect to our overall product, you are out of luck because we are never going to be able to deconstruct that for you.  That's kind of what you are saying.

MR. KRAMER:  No, no your honor.  That is not what I intend to say.

THE COURT:  Alright.

MR. KRAMER:  If that is the message that has been communicated, well, I am glad I am here to correct it.

THE COURT:  Go ahead.

MR. KRAMER:  Let me start by saying that with respect to the actual damages claim, the claim that they suffered loss.

THE COURT:  Yes.

MR. KRAMER:  That they lost money.  It's last Order on the discovery motion for purposes of that motion the Court said you haven't proven causation.  You haven't come forward with evidence to demonstrate that Google's use of the data in AdSense caused you any loss.  So we seized upon that and said, OK, for purposes of this case, come forward with evidence and show me that you suffered loss because of the use of the data in the AdSense program.  And they came

-12-

forward with nothing.  They abandoned the actual damages claim entirely.  It is not mentioned in the opposition.

THE COURT:  So its your claim you do need to have, it needs to be a, they need to present a customer who says, "if I didn't have the geo-targeting capability that is reflected in Digital Envoy's technology, I wouldn't have utilized Google's services.  I, the advertiser."

MR. KRAMER:  Well, hang on your honor.  That is talking about unjust enrichment. I am talking about a loss to Digital Envoy.  Some licensee that would have gone to Digital Envoy but for Google's use.  And, yes, as the Court said in its Order on the discovery motion, you have got to come forward with someone who says, "I would have licensed your data *but for*."  That's what you said in the discovery motion.   All we are saying is to extend that ruling here because we have given them the opportunity to do it and they haven't come forward.  Heck we asked them in discovery . . .

THE COURT:  Okay, let's focus on unjust enrichment.

MR. KRAMER:  Okay, but let me be clear, we are asking for a partial summary judgment with respect to the actual damages portion of their claim in this case independent of unjust enrichment.  It is a separate theory and there is a significant, a significant benefit to this case of throwing out the actual damages claim.  But let's focus on unjust enrichment.  I think you get to exactly the same result because you do need to show that but for.  But for Google's use of the data in AdSense, Google would have made less money.  Google was, they say, enriched, but what they really say is, hey, my stuff is in there somewhere and you made money, therefore, give me the money.

THE COURT:  Doesn't the burden shift to you at that point?

MR. KRAMER:  No, your honor, that is with respect to quantification of damages, that is not with respect to the existence of a causal connection.  They spent a whole brief arguing

-13-

about how to calculate how much they are entitled to. You don't get there. You don't get there. You don't get there because before you consider that question you have to show causation. You have to show that this use of the data affected Google's bottom line.

THE COURT: Let's say what in your mind would be an example of evidence for causation in this instance?

MR. KRAMER: Well, certainly, certainly you could show, as you suggested, an advertiser that said, "I would have paid less" or "I would have not advertised with Google but for the availability of Digital Envoy's data in AdSense." That would certainly be evidence of causation. They don't have that. They don't have that. We asked them for that in discovery and they didn't come forward with anything and we think that should be the end of it because that is how Google gets paid. Google makes its money from advertisers and if they can't show an advertiser would have paid us less or an advertiser would have acted any differently, then there is no unjust enrichment claim because there is no causation. Something else that they could do, I suppose, would be to say, "here is some statistical evidence that says, our data, generating . . ." I don't want to do their job for them, but "our data generates 10% more clicks on ads than in the absence of use of our data." But they haven't come forward with that evidence either. There is no evidence that this data used in the AdSense program affected Google's bottom line. And the analogy that your honor just cited is apt. I mean, a car manufacture can't come in and say, in the example we cited in our papers, a trade secret plaintiff can't come in and say, "hey, my paint was used on that car. You sold cars that in some way used my paint. The burden is on you to show that the value of the car wasn't entirely due to the paint." You have got to show causation. You have got to show that the shade of red paint that you used made a difference in the sales of the car, that the car manufacturer sold more.

-14-

THE COURT:  But isn't it somewhat – can't one infer from the fact, as they suggest to me, that because you promote your product in part based on the ability to operate it in the fashion that their intellectual property allows you to do, isn't that indicative that in some fashion you are placing a value on that aspect of your service.  And can't we at that point say, "alright, well you haven't done that."  Then it is – and your argument is, "yes we promoted it. We said it is valuable to do it, to have this component or aspect of our service and, yes, we made X amount of money but because it is really difficult to unbundle it all and know exactly why the customer has wanted one thing or the other it is their problem."

MR. KRAMER:  Well let me add, I still haven't touched on the unbundling part and the bundling together part.  My point is simply that you have to show that affect on the bottom line if you want to show unjust enrichment damages.  But, again, returning to the analogy . . .

THE COURT:  Why can't we infer it did, based upon the promotion activities at Google.

MR. KRAMER:  Because there is no evidence that it did.  There is no evidence.  In fact, we asked them for that evidence.  Show me that it did.  Show me.  Prove to me that some customer somewhere cared.  It is like advertising your red car.  Hey, check out my slick red car.  You can't match this red anywhere.  Sure, they sold a lot of cars, but would they have sold fewer if they didn't market it that way?

THE COURT:  Well, but their case as they presented to me is they say, "alright, this service is being provided.  Advertisers are told, 'bid for your opportunity to be placed on these third-party sites' and they are also being told that 'we can, through exclusion or inclusion, or what have you, if you only want to reach Nebraska residents we can do that for you.'  Okay.  And people sign up for your service and you make money."

-15-

MR. KRAMER:  That's right, Your Honor.

THE COURT:  Okay.  They say at that point, going back to this earlier concern that that is enough to get them to the point that they can say that granted there are going to be all sorts of issues on how to quantify and all of that and I agree with you that that is really not the focus of this, but can't you draw all inferences in their favor sufficient to supply at least at this juncture – I can't say as a matter of law no reasonable jury could make that inference and find that there is a causation link that has been established.

MR. KRAMER:  So, two points on that.

THE COURT:  Probably about twelve.  I'm sorry, but go ahead.

MR. KRAMER:  Just two.  Just two.  I cited this before in a prior motion.  I want to cite it again because I like saying things in Latin, but Judge Posner says: "*post hac ergo procter hac*, that is not good enough."  You can't say just because it is there I get your money.  That is "simplistic extrapolation," he calls it, "childish arithmetic."  In the *Schiller* case.

THE COURT:  But as an extra element. I think you are being a bit – its painting it with perhaps with more – back of the hand more than it should.  There is an extra element in there and that is your promotional activities.  You tend to say that is "so what."  But it is not the case of a component aspect of the service being built in an invisible fashion where let's say a vendor comes forward and says, "well, there is something in there in our product and customers buy it and this ultimate manufacturer makes a lot of money.  Therefore..."  They are doing a little more than that. They are saying you're. . .

MR. KRAMER:  So its the red paint example.  Here is my – buy my red car.

THE COURT: Yeah.

MR. KRAMER:  Or you show a picture of the red car.

THE COURT:  Yeah, right.

MR. KRAMER:  There are a couple of things.  One, I think the evidentiary issue with respect to the promotional activities.  I don't think there is a showing that ties Google's promotions to Digital Envoy's data.  I think that the evidence . . .

THE COURT:  They don't say it is Digital Envoy.  I agree with you on that.

MR. KRAMER:  They don't say it at the relevant time.  That is, the documents that they just put forward on promotions are dated in August of 2005, not 2004.

THE COURT:  When you are not using their software?

MR. KRAMER:  When we are not using their software.  That's right.  So there is an evidentiary problem there.  But that is why we got into, Your Honor, the mechanics of the AdSense program.  Because, under these circumstances where, given the way that we use the data – to prevent ads from being shown – it is quite possible that Google lost money as a result of using Digital Envoy's data.  In fact it is quite likely that Google lost money.  The beneficiaries of this data are Google's advertisers, not Google.  Google doesn't get a financial benefit from this data.  It gets the goodwill, if you will, at best, of its advertisers.

THE COURT:  I have to tell you that I think that is looking at it in such a narrow way that – I understand the distinction you make but I don't see how that distinction gets you where you want to go.  I think you have to step back and say that how the process is being manipulated is that the advertiser perceives a benefit from having its advertisements being targeted.  And whether or not the actual operation of that process means that when you apply the Digital Envoy technology the result is that certain advertisements do not pop up, which is your point, I don't think that that means, therefore, it is, putting aside all the other defects you say they have, on that particular point I don't

-17-

think that that means its valueless what they have provided to your overall service and I don't buy the idea that that is a basis on which you conclude in an appropriate case that they couldn't recover damages.

MR. KRAMER:  Well, let me address one last point then, your honor, and then I will sit down.  In the end this is precisely the kind of case that the Uniform Trade Secrets Act contemplates for an award of a reasonable royalty.  You can't prove actual damages.  You can't prove unjust enrichment.  They are too speculative.  We have no idea what would have happened. We are not saying that they can't recover a reasonable royalty here.  We are saying that they don't get an award under 3426.3(a), which says, actual damages and unjust enrichment.  There is a separate provision of the act which says you can recover a reasonable royalty.  If you can't prove causation, if you can't prove actual damages, reasonable royalty is available to you.  And if they want to walk in and say, given the value that we provided to Google, this is what Google should have been paying us, we are not asking you to throw that out.  That is subject to the limitations of liability of course, but that claim stays in the case and that is why this is a partial summary judgment motion.  Reasonable royalty is precisely the right measure of damages in this case because they can't establish causation.  The *Burroughs* case, the *Unilogic* case, reaches that conclusion.  There are other cases which apply a reasonable royalty.  In California, you get a reasonable royalty when you can't establish either of those things.

What you can't do is walk in without any evidence of a direct causal connection for either actual damages or unjust enrichment and say, "someday I will be able to prove it up" because the time for them to do that was on this motion and they came forward with no evidence.  I can address the 56(f), your honor, if you want or I can wait.

THE COURT:  No.

-18-

MR. KRAMER:  Okay.

THE COURT:  Okay.  Mr. Kratz.

MR. KRATZ:  Thank you, your honor.  I am inclined to talk about causation first but I'm happy to do it either way.

THE COURT:  You can order this any way you feel most comfortable.

MR. KRATZ:  Alright.  Well let's go ahead and talk about causation because I think it is easily answered.  What Mr. Kramer has done is taken a *but for* causation requirement that may or may not exist in lost profit of the potential damage calculations – you can get lost profits, you can get unjust enrichment, or alternatively, you can get reasonable royalty – and he has taken that and applied it to the unjust enrichment, which is a damage there that we do contend we are entitled to here, and he has done it without any case law support and in contrary to significant case law that suggests that the way that we have set forth the evidence thus far is sufficient to have a jury decide if unjust enrichment is a proper measure of damages here.  So, to be clear, we are claiming in this case that we are entitled to unjust enrichment damages against Google.  We also, in the alternative, will suggest a reasonable royalty, that Mr. Kramer may like that theory better, he is not entitled to say that is sufficient and therefore, you are out of court on the rest of this stuff.  Unjust enrichment is supported in this case by a significant amount of evidence, and the issue . . .

THE COURT:  Let me stop you.  What is a significant amount of evidence?  Highlight it for me.

MR. KRATZ:  Okay.  Okay.  The evidence is this: that they, and it is sufficient to establish causation for unjust enrichment that by establishing that they incorporate our technology into their product, they marketed it and they sold it.  The only case that he has that supports the idea that you may not be able to get unjust enrichment damages is this case that he cites called *Unilogic*

-19-

and there the distinction is that there is no proof offered that the product was sold and marketed at all. So that the question there was, well you can't show unjust enrichment because there wasn't any financial transactions associated with the use of the product.

THE COURT: How about his point that, to the extent you have provided some evidence of promotional activity, and on Google's part it is all post the time they are using post-license?

MR. KRATZ: It's not. That is the print date of the marketing materials. We have asked them in discovery to produce the website and all the documents associated with it. You know, they didn't do it. But the fact of the matter is the evidence we do have – and it is in the attachments to Mr. Waddell's declaration. We have Larry Page at the beginning of their decision to go into geo-targeting information, him saying that we need to get this geo-information working as soon as possible because we can translate this into ad dollars fairly quickly. They understood the connection even before the relationship at the highest level that they can make money on this. They promoted it integrally with their product and all the documents are in there. There is a very good one attached as Attachment G where the customer said they wanted AdSense because it offered geo targeting. This is something on their own website that suggests that this is a phenomenon that occurs. We have customers that want this. The date isn't October 2005 if that is when this was, it was before then. They also have case studies – that's attached as Attachment N to our statement – that says this, it says – these were done at the time they were moving from national targeting to a finer level granularity. In other words, they were moving to regional targeting, and ultimately went down to where they were using zip codes and what not, all using the geo-information. But this is squarely during the time the license was in operation and force they moved to what was called the "regional targeting." And at the time they did some case studies on regional targeting that, depending on the

-20-

type of customer they were dealing with, they saw an increase in click-through rates of 117% versus if they just had this general geography. That translates into dollars to them. That is something, in fact, that the advertiser wants. But in fact, it is almost cash neutral for the advertiser because they are paying for clicks. They want an ad that has some efficiency, but a 117% increase in click-through rate what that means for the advertiser is fairly cash neutral because they are saying we are going to pay a certain amount for a certain amount of clicks – they just might get it quicker during a given month. But for Google, it makes all the difference in the world. They are the ones who care about the increase in click-through rates. They are the ones that care about a high degree of relevance that their ads they show have. That is what they are all about. You look at everything that they say. The reason why Google's ad program is so good is because of the ability to deliver a relevant ad to the user. It enhances the user's experience. They have all sorts of fluff here but what that really means is they get a high degree of click-through rates. And who makes money from that? It is not the advertisers. They are paying a certain amount for a certain amount of clicks so they are buying traffic to their own website.

THE COURT: Although, I mean, if you hue too closely to that don't you run into the argument that Mr. Kramer made that I said I didn't give a whole lot of credence to? But isn't your argument just bringing it back up the fore, which is, what your software does, what your intellectual property does is result in ads not popping up. So this click-through rate, if you are really relying upon that increase in the click-through rate, don't you have to contend with his point that that is not – your software is not going to result when it is applied? It is not resulting in higher click-through rates directly anyway.

MR. KRATZ: I want to walk through this slow, because exactly the opposite is true. It is the actual exclusion of ads that aren't going to get clicked on that gets Google the benefit,

Okay? An advertiser authorizes their ad to be – its not shown a certain amount of times per month, its clicked on. Once they hit the maximum amount of clicks then their ads don't appear anymore and it moves on to other ads. It is Google's economic interest, not the advertiser, to max through those clicks as fast as possible because then they can show someone else's ad that then gets clicked on more. So the higher click-through rate then the only person who makes money on this transaction is Google and its AdSense partner. The publisher that has also displayed the ad they get a share of that money as well. Okay? Not the advertiser.

THE COURT: Well, presumably the click-through rates will equate to the particular advertiser's products being sold more. One assumes.

MR. KRATZ: Sure. But if I take, that is absolutely right and that is another phenomenon that is fine. But for Google, all they really care about is the click-through rate because by increasing that they have a certain amount of authorized money through the entire ad network, authorized money per month and the closer they get to hitting that authorized amount of money, then the more they make. And they make that by getting ads on there that get clicked on. And the higher the click-through rate, maybe the closer they get to that nirvana number that's where they have pretty much tapped out everyone's authorized amount of money. They are the ones who have a variable amount of money. They make an income amount based on that phenomenon. Now, the inclusion/exclusion argument: (1) and I think, I don't mean to belabor the point but the point is either way it is a feature of the product authoring. We are talking about the fact they make money. But in fact, by their use of the technology to eliminate ads that will unlikely be clicked on, then that enhances their click-through rate. That is why you get the 117% increase for a very reasonable advertiser that their ads be shown to someone, you know, they are in Florida and they get ads shown to someone in California, they don't get clicked on. Alright? That doesn't cost the advertiser

-22-

anything it just means their ad got shown to them and it didn't happen.  It costs Google though, because that prevented Google – if they were able to exclude that ad from that user's view that they were able to put up an ad that they might click on.  And so the increase in click-through rate by the exclusion of ads that are probably not relevant because we are talking about a Florida dentist that is being shown to a California guy, that is very important and it is important to Google in terms of enhancing the profitability of that entire program by having the ability to eliminate ads that don't have a chance of being clicked on.

THE COURT:  How are you going to prove that?  I mean how, let's assume that I buy into your formulation of the focus being on the benefit to Google's bottom line that your software provides.  How are you ever going to be in a position to prove that?

MR. KRATZ:  There are two separate inquiries here.

THE COURT:  Yes.

MR. KRATZ:  The first inquiry is, are we in the game to determine what the damage amount is.  And that is what they tried to erect here at this in time is that we have a causation issue that somehow case law suggests that and considering there is tons of case law that says they do incorporate it and there is sales, you do get an apportionment of the amount of sales involved based on a variety of factors.  We are in the game at this point because we have amply shown that they marketed it, that they sold it, they made money on it, they used it.  Now I am not even sure we have to show that they marketed it or that they promoted it that way.  The fact is that they used it and they sold product based on it.  But the fact is that they also marketed it and we also think it undeniably enhances the value of their own product.  That is why we did it.  That is why we bothered to go ahead and get to this.  That is why Larry Page wanted it in the first place.  So, that is all we have to show for purposes of this motion. We are in the game.  Your question though relates to, what do we

-23-

do now. What is our level of proof? And here's where we get into the idea that, where we are at right now is beyond this motion. Where we are at is: we have the ability to show that this is the amount of money they made on sales using our product. Okay? And it is a portion of that, and it is going to be done by expert testimony, and a portion of that is attributable to this product and that is going to be a subject of expert testimony, that subject that they probably have the burden on trying to get the deducts out of. They have started to do this process of where they are going to say, "yeah, but we had to pay the cost of goods sold or the cost of these advertising dollars, we get a deduct with that." They have got a little bad debt thing going on in some of their charts. They are starting to understand that they are going to have to come up with it. Now, the fact of the matter is that they are going to be in real trouble here because they haven't given us the underlying documents in order to be able to do that.

THE COURT: How is your expert – and I know it has not come to the point of disclosure time for expert reports – but what is the factual information this expert is going to use to come up with a calculation? What is the expert going to point to say, "well, the value that Google received from the contribution, if you will, of Digital Envoy's software is X"? That that is what – and I know I am mixing, to some extent, the unjust enrichment concept in – but what is the expert going to look at?

MR. KRATZ: The expert is going to look at anything that has been produced in this case . . .

THE COURT: Well, that's okay, but . . .

MR. KRATZ: Well and that is a seriously relevant point. Because our expert probably will have categories of deducts that he would allow but for the fact that Google has refused to turn over certain documents.

-24-

THE COURT:  Okay, but what is he – the expert is going to sit down, what is the expert going to use to say, okay, the expert, and I don't disagree with you, you have information that Google achieved certain results and you got information that the product that was provided in the AdSense program is – at some point in time incorporates your software.  Okay.  I'm with you so far.  What else is the expert going to look at to apportion out your contribution for purposes . . .yeah, go ahead.

MR. KRATZ:  The expert is going to, among other things shall we say, because he is doing his work, among other things he is going to look at the variety of product features that are involved.  So, when we are dealing with the car, for example, you have got the paint and you can have market analysis done on the buyer and the paint and things like that.  But in a car you have got, you know, if you are breaking it down to the level of features associated with the car, you have got the paint and you have got 100,000 other features involved.  Here you don't.  Here you have when the advertiser signs up he is only asked to target based upon what we are talking about here: geography and target based on the key word and the content.  And so when we are talking about targeted advertisement and features here, we are not talking about paint.  We are talking about paint only in the sense you are talking about a can of paint.  Well, you have got the can and you have got the paint.  So it is a much easier inquiry for him to be able to do that.  He is going to look at the other features involved, how that affects the competitive marketplace.  He is going to look at the industry, the advertising industry itself and the internet advertising industry and what is important in internet advertising and what distinguishes Google's program from other programs whether out of the mouths of Google themselves or through the industry and his understanding and expertise of how the industry works in the first place and come up with a number.  Now, it is going to be hard to do and there is going to be, we are not aided by the fact that Google has refused to produce documents, both

-25-

the fact that Google incorporated this technology and do all that.  Those aren't going to be laid at our doorstep.  The case law is extremely clear that just because it is difficult and just because it is tied in with other things, and so you are dealing with some measure of speculation involved that is not going to preclude us from presenting this to the jury and having the jury reasonably conclude.  Right here we are at a stage and I remember beyond that, right here where they are saying they are not even making this argument, that we can't prove the amount of damages.  They're just trying to erect this little false barrier out here saying that now we don't even get there because no reasonable jury could conclude that there was a feature that there was a patent.

THE COURT:  They will.  They will argue you won't be able to.  I wouldn't take the fact that they haven't thus far as indicative of any agreement on their part that you will be able to do that, but...

MR. KRATZ:  Oh, I understand.  The motions will continue.  I understand that.

THE COURT:  Well, not on . . . okay.  Address for a moment for me – move on to the contract issues.

MR. KRATZ:  Okay.  And that's, I understand, I wanted to do that causation thing quicker.  But it is an interesting debate.  We have a lot of things to unpack regarding this contract language and we have got some misconceptions as to the nature of the evidence before your honor as well as the contract provision itself.  And so I am going to do it as quickly as I can but in the order I can.  He says repeatedly as a given fact that we don't make a showing of willfulness, of willful misconduct or intent and that there is this absence of no effort associated with this.  We had a *mens rea* argument already and we beat that based on the evidence.  And we absolutely contest, and this will be the affirmative statement is, not only do we not concede that there's willful misconduct here and we will talk about whether or not that is the standard or not.  Not only do we not concede that,

-26-

we believe that the evidence is overwhelming that we meet that standard even at this stage.  We

don't have to.  We just have to have sufficient evidence for that to go to the jury.

THE COURT:  The *mens rea* argument, by the way, seems to me not to address the

willful misconduct issue.  The *mens rea* argument, as I recall it, is that you can prove the intentional

tort case without proving that there was – that the intent required is an intent to violate your

intellectual property rights.  That actually, what that stands for is that you don't need willful

misconduct for purposes of establishing intentional tort.  So that doesn't, the fact that that was the

conclusion on the *mens rea* point doesn't satisfy the willful misconduct.

MR. KRATZ:  I understand that that is the conclusion and that the argument was

twofold in that *mens rea* time.  That we were able to defeat that as a standard, but at that point in

time and in this brief we have presented the evidence in which a jury could conclude that there is

willful misconduct there under their standards.

THE COURT:  Okay.

MR. KRATZ:  And that is what I want to talk about.

THE COURT:  Good.

MR. KRATZ:  So far the discussion today has been that it is a given fact that we

don't have this evidence and it is there.  It has been repeated.  He pretends it is not there.  Here is

what we have got.  We have got Steve Schimmel, who is the guy who negotiated this agreement, the

day before the agreement was signed having a conversation with Rob Freedman and where they

specifically talked about: "you are not going to do this, right?"  He said, "no.  You are fully legally

covered, it will not be done because you are protected."  Which tells you two things: one is he

absolutely understood that he was limited.  Besides that he keeps repeating that Google thought that

there was this unlimited contract and that is undisputed that we fought that consistently throughout.

-27-

False. He has in deposition testified, you know this is Matt Cutts and we will talk about him in a minute, where at that time this was their pet theory that this was an unlimited contract. The very first case management he said that even though this language says it is a limited license. But he is saying that it is a proven fact that they understood this to be an unlimited license. Just because they have got a guy coming in now saying, "gee, that's what I thought it was."

THE COURT: It isn't the critical question if there is any evidence that shows – I'll grant for purposes of discussion that there was some awareness by Google, that there was some limitation in the agreement. Isn't the thing that you'd have to show is: they know they are acting outside those limitations?

MR. KRATZ: Yes, and it is not just that there are some limitations in this agreement.

THE COURT: Yeah.

MR. KRATZ: The conversation was: "you are not going to apply this to other people's information." In other words, the IP addresses of the third-party websites and go out and do that. And Schimmel's response is, "no, that is prohibited by this third" – because the debate was on this second sentence where it said "developed to provide to third parties" and before they signed the agreement they had a discussion that said, now that provision doesn't give you the right to take other people's information and apply it and package it into a different product and make money from that. I mean, literally, that is – the parol evidence in this case is absolutely conclusive that what they are asking for. We tried to do it on unambiguous terms like "license" but when we get to the parol evidence we are winning big time because that is exactly what they discussed and it is worse than that because Cutts, Mr. Cutts, who is a guy that now says in his deposition, "gee, I thought it was always unlimited," where he is saying now, "see, this is uncontroverted proof that this has always been unlimited and that we have always understood it that way." You know, Cutts was specifically

-28-

asked by a potential investor in Digital Envoy, that "you are not going to package this onto your own services and make money from it on third-party sites?" And he said, "no, that's right, we don't do that" and he wanted to make sure that the license didn't let him do that.

THE COURT: Is there any evidence that you are going to be in a position to present, or have presented, that indicates that Google thought they were indeed doing exactly what it is you say they are prohibited from doing? I mean, it begs the question to some extent, it is the whole battle we are engaged in as to whether or not what they did is probably characterized just as you have described. So, is there some evidence that Google thought – anyone within Google in a responsible position – thought that what they were doing, that their conduct was as you characterize it as opposed to how they have argued it, which is, we never did share it, license it, etc. with a third party. I mean they have continually argued that that is not what they did. So . . .

MR. KRATZ: Well they do now.

THE COURT: Well, that is the question. That is the question.

MR. KRATZ: That is their effort to . . .

THE COURT: Is there someone, is there some evidence that someone at Google said, you know, what we are doing is sharing licensing, all the other language, with a third party.

MR. KRATZ: No. Our evidence is better than that. Our evidence is that at the time there were doing it, and before they started doing it, they were saying "we know we can't do that." What they did...

THE COURT: Yes, let me stop you right there. Is there any evidence that there is a recognition in anyone within Google that, in fact, they did then violate it? Is there anyone at Google that's saying "you know..." I just want to know what's out there. Is there anybody saying, "the limitations are 'x' and we're going to go forward with it."

-29-

MR. KRATZ:  No,  because...

THE COURT:  Okay.  All right.  That's a start.  Okay.  Is there any evidence that anyone within Google is saying we don't know what this limitation is but we're going to do it anyway -- something to that effect?

MR KRATZ:  That's the action that they did.  I mean, at this point, you look at Google as the entity, as opposed to any individual actors within Google.  We're suing Google. We're not suing these individual people.  We have uncontroverted proof – we believe – certainly sufficient for a jury, that they at Google knew they couldn't do it.

THE COURT:  And what's the facts?  What facts support that?

MR. KRATZ:  The Cutts e-mail.  The Schimmel e-mail.  The Schimmel conversation.  What I've just described.

THE COURT:  And those?

MR. KRATZ:  It is imputed to Google.  Google had then-present knowledge and consistent knowledge up until the time of February 2004, whatever, that they knew it couldn't be done.  Okay?  Now, Google also did it.  Okay?  They used our technology and did it.  There is a disconnect within Google with the people that have that knowledge, even though it's imputed to everybody.  There is a disconnect between the knowledge that is imputed to everyone, but those individuals held knowledge.  There's a disconnect between that and the people that implemented AdSense.

THE COURT:  Yes.  But I'm still not clear on what this even – alright, fine, there's a disconnect and there are some employees who you're pointing to, Schimmel and others, who you say have an understanding of the limitations on what can and cannot be done.  But what is the evidence that any of those individuals recognized that the particular conduct that Google then did

-30-

engage in violated those limitations?  You're asking me to simply say, based on evidence that there's some recognition by some individuals at Google, that there are limitations in this agreement.  And then you're saying –and there's conduct.  And *we* view – we being Digital Envoy – we view that conduct as contrary to the limits in the license.  Therefore, you can infer that they must have known that it was contrary.  Well every tort case will then become a willful misconduct case under that approach.

MR. KRATZ:  No, because if we want to heighten that standard – we're looking at willful misconduct, we'll talk about the applicability of that provision in a minute – but it is met by the fact that Google, that the specific thing that Google knew is the specific thing that Google did.  Okay?  It's not just "we knew that there were some limitations and then, whoa, gee, we went ahead and did it anyway."  We haven't even gotten into this reckless disregard thing for a minute.  But I think it's more than that because I think that if you look at Google's knowledge, things that Google said that confirmed that their understanding was that it was prohibited – those specific things, taking information from other people, their IP address from a third-party website, for example, and packaging it into a product that they marketed and made money on.  That's both Schimmel and Cutts.  So, you can find – it's not just that there's these limitations out there and then they did it.  You've got Google's certain knowledge as an imputed company that that exists.  You also have what Google did, and Google certainly knew what it did.  That would be imputed to the company as well.  I don't think there's any dispute about that.  So you have a connect between – even though there's no individuals that have that connection – you have a connect between that organization and that organization knew they couldn't do it and did it.  And it being the specific thing.

THE COURT:  And my question . . .

-31-

MR. KRATZ:  Which is different than the notion that, oh, I was under – this is different from the *mens rea* thing, which was if you get acquire information under a duty to protect its confidentiality, you then can't generally go out and do whatever you want to because you might just run afoul of a trade secret even though there's not a connect between your exact understanding of what you can't do and what you actually did.   You wouldn't have to meet that in order to get a trade secret case.  It's subject to a sort of willful misconduct.  Okay?  But we have, we have that extra thing because we have a connect between specifically what Cutts and Schimmel knew they could not do, and therefore Google, and specifically what Google did.

THE COURT:  I'll review the testimony again, but . . . this Schimmel/Cutts testimony.  It would be one thing if the testimony is "we know the AdSense program as it is being implemented violates the terms of our license and we recognize that."  That's not what the evidence says.  The evidence as I understand it reflects an understanding on the part of certain Google employees that there are some limits to the agreement, to the right to use the software.  But, there's no evidence, rightly or wrongly, that anyone at Google thought they were violating the agreement.  Maybe they're wrong.  Maybe they're deluded.  And maybe you would prevail on the argument ultimately that they did violate the terms of the license.  But for willful misconduct that does require a level of recognition and understanding on the part of the entity you're suing...

MR KRATZ:  The entity.

THE COURT:  ... and you're asking –   Well, but your distinction between ascribing Schimmel and Cutts's understanding to the entity – I'm fine with that – but I just don't get to the point that that testimony as you've described it to me is indicative of individuals who are engaged in willful misconduct.

MR KRATZ:  Google is the individual who is engaged in willful misconduct ...

-32-

THE COURT:  Well Google...

MR. KRATZ:  because Google knew that it couldn't do 'x.'

THE COURT:  Why?

MR. KRATZ:  'X' is exactly what Google did, and there's a connect there.  Okay?

THE COURT:  What's the – But you agree with me that this Schimmel and Cutts testimony is not "we know the AdSense program violates the license."

MR. KRATZ:  It is!

THE COURT:  Alright, I'll look at it again.

MR. KRATZ:  Except that they didn't know it was AdSense.  They didn't know that.  But that's Google's state of knowledge.  When Google implemented AdSense, Google's state of knowledge is we can't do 'X.'

THE COURT:  But that begs the question, Mr. Kratz.  That gets us all the way back to whether or not what Google is doing in the AdSense program violates the terms of the license, and it is not a situation where those employees are saying "we know that we can't manipulate the information as we do in Adwords and have a third-party host site."  I mean it's not that.  It's saying "we can't package this stuff up and send it off to a third party."  Well, that begs the question.

MR. KRATZ:  If that's all it were, if that is what they're finding now is obvious, it's still going to be a matter of what the jury decides those words are – the difference is we think that the trade secret case – forget about the contract claims – the trade secret case can be maintained by – rise to the level of an intentional tort, meets *mens rea* – by an understanding of you acquire information lawfully but under a general understanding that you're to limit its use and then the fact that those limitations were violated.  So they don't have to be connected from what the general understanding was and what the actual limitation was.  Okay?  So that would be you generally can't

-33-

do certain things with it.  You have a general understanding.  In fact, Cutts says that.  This is

licensed; don't go _____.  That's another email.  *That* would be sufficient to establish the

*mens rea* necessary for a trade secret case in the general.  But, here we've got something more.  And

if more is required – which we don't think that it is but we'll get to it – if more is required, it's met

by the exact connection, if we can prove it, that the exact connection between the words of

Schimmel and Cutts which imputes the understanding of what Google understood it could not do,

the connection between that and what Google actually did, and even though it's different people,

they're not insulated by that.  Think of it as one person.  You got one person saying "I'm not going

to package it and redistribute it and bundle it with our services because that would be wrong, and

confirm that later.  I'm not going to do this."  And then two weeks later, two months later, do it.

That's willful misconduct.  And if you look at Google as the entity saying "I understand I can't do

it" – this being the specific thing, not just the general limitation, the specific thing.  Google:  "I

understand I can't do it" -- Google is one person – "I also, I understand that and I'm not going to do

it" and then I go and do it. . . .

    THE COURT:  But, then again, what you're asking me to assume in that process is

that, the first part of that equation is the individuals that you identify saying "I know we can't do this

precise thing" and then they're doing it.  Well, the Google people will say that's not what they said.

They did not say that this precise thing is what we realize we can't do.

    MR KRATZ:  It's in the record though.

    THE COURT:  Well, I think rather than fighting I obviously will review the

testimony again.  I understand the arguments.  So, why don't we now go on to – you should address

the other aspect of the contract because I need to bring this to a close.

MR. KRATZ:  I understand that.  Now, we're at the meat of where you're having the trouble.

THE COURT:  No, we just covered the meat of the – I think the strongest argument is . . . Oh?  You mean whether or not willful misconduct is the standard?  Alright

MR. KRATZ:  Exactly, exactly.   So the second argument is on its face – there's two sentences here that we're dealing with, a big clause -- and so I wanted to address the first sentence which is, I think, a fifth of the paragraph, first.  And this is the one that has the willful misconduct.  It doesn't have the "brought under this agreement" language, and there's a big problem here that we're kind of mixing the applicability of the fifth sentence, the willful misconduct sentence, as if it's a given thing.  There's trigger language that suggests that willful misconduct is an exception to -- what?  And the exception it is, is that you don't get liability for certain things unless there's willful misconduct.  Okay?  So it says that neither party accept liability for x, y, z, and a unless it's willful misconduct.  That the entirety of that sentence.  That's the sentence that's being analyzed at this moment in time.  Okay?  So in order for that sentence to have the applicability in the first instance, one of the triggering language's words has to apply.  So, we never get to the exception because the sentence doesn't apply because these triggers were not met.  So, it says " neither party accepts liability for errors, omissions, delays, interruptions or losses" – a series of five things.  It is our contention that this entirety of the sentence doesn't apply because none of those five things are what we're talking about here.

THE COURT:  Losses?

MR. KRATZ:  Well, for one, we're not talking about losses.  We're talking about unjust enrichment.  We're talking about theft of trade secrets.

THE COURT: Isn't that a loss to you?  You're claiming it's a loss.

MR. KRATZ: We're out of court on that. This isn't a loss. This isn't an actual loss then. We're on unjust enrichment and reasonable loyalty.

THE COURT: Which translates as a loss to you.

MR. KRATZ: No, I don't think it's a loss. The plain language here – and that's why we looked at the entirety of the paragraph – the plain language is that this is the warranty that we're talking about related to mechanical errors, data loss, and the like. We're talking about if we crash their system, they crash our system, there's these things that might cause public interruptions, public delays, public losses – none of that applies because we don't want to have that unless we intentionally bug their system or they give us a virus and it's intentional that they did that, then that's what this all applies to. And if you look at the context of the sentence, its clear that that's what it applies to.

THE COURT: Why should I read this – chop this apart and read it in a vacuum? I don't understand why I don't read – start with 'neither' and read to the end of the... I don't understand why you say that the reference to an "action brought under this agreement" is totally divorced from the reference in the prior sentence to carving out willful misconduct, and I don't see why you're saying that.

MR. KRATZ: This sentence says, this sentence on the warranties and limitations of this contract, this sentence says "neither party accepts liability to the other for errors, omission, delays, interruptions and losses."

THE COURT: Right.

MR. KRATZ: We think that the better interpretation of what that means is that we're talking about the mechanical process by which this data is exchanged. We're talking about bugs and errors and crashes, and things like that, because that's the intent of the parties on this paragraph. In

-36-

other words, for you to accept it, that okay, what we really want here is this transaction where they actually get a secret, second unlimited rights to this as a result of the operations in these two paragraphs whether it be by a cap or by the fact well, gee, as long as we don't tell each other what the limitations are, then we're scott-free, that we can then do whatever we want to with it.  The intent of the parties, that's what was intended by these sentences that deal with warranties and the mechanical process, is designed to give them unfettered ability to use our data for whatever they want as long as they don't tell each other what they're doing, and so therefore we're not willful, is absurd.  It's absurd that they get a license to do what they've done as a result of the operational interpretation of this paragraph in this fashion.  And there's no indication, as Mr. Kramer says, there isn't any testimony yet as to what was meant by that because they didn't ask.  But what we've got is a situation where, at worst, it's an ambiguous situation.  What are these five?  What is this sentence intended to prevent?

THE COURT:  Well, if it's ambiguous, then what's the – are you saying ambiguous in the sense that there are facts that need to be found to understand it – in other words, parole evidence, or what?

MR. KRATZ:  Yeah.  And the issue is, the issue is it probably is ambiguous, as to the application of it.  I think that it's clear that that sentence is not intended to cover this type of tortious conduct.  We've got a tort here.  We've got the intentional effect of our trade secret and the idea that that's supposed to heighten the standard for that, it's alright for us to intentionally tort you as long as we don't do it with willful, malicious intent.  It's okay, and we would accept that.

THE COURT:  There's no reason why parties couldn't agree to that.  That's the question.

-37-

MR. KRATZ:  Well, we think there is, and we think there's no doubt about it.  Let's set that aside for the moment.

THE COURT: Well, but right.

MR. KRATZ:  But, the idea that that's the assumption, that that's what was intended by this paragraph, that refers to the mechanical process— He says there are eight different limitations.  No, there's all this prefatory language saying that we all understand that there is the possibility of human machine errors and this is how we're going to treat it.  Okay?  These things can happen by accident and we don't want the other party to get all bent out of shape if this happen by accident.  That's what the paragraph says.  That's what the paragraph means.  When you look at it all in context you can see that what they're saying is there *are* possibilities of human machine errors of omissions, delays and losses including the inadvertent loss of data or damage to media that may give rise to loss or damages.  It happens.  That stuff happens.  We don't want to have the other party upset about it.  Say, for example, we mistarget people.  Or, for example, they give us some feedback, user feedback, and they cause us to mistarget people with other customers.  They maybe increase the amount of errors that we have and so when we try to go out and get another customer they say "no, I'm not going to buy your stuff, it has too many errors."  And we said, "I think that it was Google that did that, but we're going to go sue them."  That's what this refers to, and it's not there's eight separate limitations when you look at this.  It's the prefatory language saying that we realize that these types of errors happen – we're talking about, you know, blips and ones and zeros, and it can happen, that we have a problem.

THE COURT:  The meaning of these contract provisions, just as a matter of process, of procedure, walk through this with me.  Let's assume that you prevail in the sense that the motion

for summary judgment is denied.  This isn't an issue of law, correct – this interpretation of this agreement?

MR. KRATZ:  I think that it's a spectrum.  And one end of the spectrum is that our proffered interpretation is unambiguously correct.  The other end of the spectrum is that their proffered interpretation is unambiguously correct, and then there's all this in-between that it becomes fact issue that its ambiguous.

THE COURT:  What facts are being found at that point? I mean, I, with respect to the last contract interpretation issue, I did find that there were factual issues potentially as to what was intended and in use of terms such as sharing and the like.  It was the basis on which summary judgment was denied.  In this instance, what would we be looking for?  Why isn't this....let me put it in a different way...why isn't this issue right for decision now?  One way or the other.

MR. KRATZ:  Here's why.  Here's why.  When I said that all the in-between is a fact issue....that's not quite correct.  All that's in-between is subject to interpretation by means other than the four corners of the document.  Okay, and the other means...

THE COURT:  All legal argument, is to...

MR. KRATZ:  It still can be, it still may be up to the Court.  If fact, with respect to sharing, that still may be up to Your Honor as well, if the parol evidence is one sided.  So, you still have the situations where you have the in-between, between our proffered interpretation and their proffered interpretation, and the ambiguity between that.  You imply rules of construction to determine who's proffered interpretation is better.  The parties haven't really done that.  The parties instead have said, "you know, he says it's clear that its this way, I say it's clear that it's this way." So what we've got...

-39-

THE COURT:  They made some view points like, your the drafter, it's interpreted against you and other rules of constructions.

MR. KRATZ:  The other thing that we talk about, and I think they do to, is the suggestion that, one interpretation that kind of renders there being a nullity associated with it or whether something can be absurd, should be discarded.  In fact, that, with the contention we primarily argue, if we get into it, ok, now we need, we found that it's ambiguous, what do we do, that's what we're talking about.  We found that it's ambiguous, what do we do, our primary front center argument will be, that it still will be determined the intent of the parties, with respect to this even though they didn't maybe specifically negotiate it, what is the intent of the parties as best as you can determine, that's what's up to you.  And our argument, our first argument is going to be is that the best evidence is that it's absurd to accept their interpretation because of what I just said, which is the notion that we would give them the ability to go out and use our data for whatever they want, as long as they just, you know, turn a blind eye to the limitations that are apparently discussed and negotiated in the contract, and they're Scott-free.

THE COURT:  Well, that would, presumably that would be reckless disregard, which begs the question, which is, goes to the question, which I started with, which was where reckless disregard fell, in this willful misconduct point.

MR. KRATZ:  But here we're talking about whether that even applies.

THE COURT:  I understand.

MR. KRATZ:  I think we would suggest to you, your Honor, that better interpretation is ours, because it's absurd for us to have agreed after we specifically, painstakingly negotiated the actual specific limitation, and have a good reasons for doing so, which is you know the idea that Google can go out and eat up as much market as they turned out to do, then the fact that we would

-40-

do that, and give them the ability to go ahead and circumvent all the license negotiations circumvented by operations of this language is indicative of the idea that, the idea that this language applies to the situation isn't a good . . .

THE COURT:  People agree to contracts, and when the results of those contractual understandings don't turn out the way they want, and one side may benefit more than they would have if both sides could see the future, but that's kind of beside the point, the question is what was the intended when this agreement was done, what's the meaning of the language and that's what I have to do.

Let me do this with you, because whenever this case is on my docket, I always say to myself, I'm going to limit the arguments to half an hour, I'm not going to ask for supplemental briefing, and every time, and it's my decision, I realize, very good lawyers who have interesting things to present, it goes on endlessly, I always ask for supplemental briefing, and lo and behold, I'm going to do the same thing again today.  What I want you to do, and I've don't want you to, Mr. Kratz, overreact to this either, because I've heard your arguments, and I'm not saying that I've come to a conclusion on them, that the willful misconduct point is, it is not the reading that Google gives to it.  And I understand you have an argument that I shouldn't even get to this issue that I'm about to ask you to brief, but, nonetheless, what I would like the parties to do is to target two questions for me.  And the first question is, what is, what is the evidence, or lack thereof, of either willful misconduct or reckless disregard, and secondly, and perhaps they're mixed together, is reckless disregards sufficient, does it equate, for purposes for this contractual language here with willful misconduct.  Just give me a supplemental brief on that point, I know it's probably included in all the briefing I've gotten but I'd like it to be distilled down so you can really identify for me Schimmel, Cutts, whatever, exactly what it is and try to keep this to five pages, maybe a little, I'll

-41-

give you eight pages, but I really want it just targeted on those questions because I can hunt around

but it would help me if you could crystalize the argument, and I realize that's, you've got a lot of

other arguments and I'm not disregarding those, but I do want some supplemental briefing on that

issue.  Do you understand what I want?  So that... ok, allright.

        MR. KRATZ:  Absolutely, your Honor.  I have no problem with that.  I'm not going

to overreact.

        THE COURT:  Good.  You understand kind of the issue I'd like to have briefed.  Mr.

Kramer?

        MR. KRAMER:  A little specificity, Your Honor?

        THE COURT:  Go ahead.

        MR. KRAMER:  The reason you couldn't hunt around is because it's not in there.

        THE COURT:  Well, that's the point you will make.

        MR. KRAMER:  Are we talking about throwing in more evidence now in opposition

to the summary judgment motion because what evidence Mr. Kratz just referred to at some length in

his discussions with you isn't in there, isn't cited in their papers, it isn't offered in opposition to this

motion.  So that's the issue.

        MR. KRATZ:  It is.

        THE COURT:  Ok.  Well, I mean I frankly don't want to get really hung up on the

question of whether or not – if evidence has been developed in this case thus far, I want to know

what it is, and I want it presented to me.  Now, if there's an argument that, well gee, we should have

seen that before in their brief and now it's coming late, I feel your pain, but the bottom line is, you

know, if it's in the record, present it to me so I can have it in front of me, and if you think that it's

something you didn't have an opportunity to respond to, then, I hate to say this, but you can

probably give me some supplemental supplemental, but, you know, the point of this is, your position

has been, and I'm taking it not just what they've presented in the briefs, you're telling me there's no

evidence out there, none . . . .

       MR. KRAMER:  Absolutely none.  Absolutely zero.

       THE COURT:  Alright.  Well then, and I'm not, and I'll deal with 56(f) in a moment,

but right now, its whatever's out there, were limiting it to that, so Mr. Kratz can tell me where in this

record, is evidence indicative of Google acting with willful misconduct, and/or reckless disregard,

and with respect to reckless disregard, what's the support for the notion that that's good enough to

come under the rubric of willful misconduct.  You with me on this supplemental brief I want?

       MR. KRATZ:  I am.

       THE COURT:  And you also Mr. Kramer?

       MR. KRAMER:  Yes Your Honor.

       THE COURT:  We'll do the schedule in a moment.  Ok.  Alright.  Now I want to

bring this to a close.  Anything I give you another two or three minutes, I'll give Mr. Kramer two or

three minutes, and then we'll bring it to a close.

       MR. KRATZ: The only other thing that I'd like to discuss is twofold and that is still

with respect to these provisions.  I think we have an extreme problem with respect to the legality of

that.  We've got case law that is quite clear that this type of exculpatory provision is not permissible

under California law.  And what they've got...

       THE COURT:  And is it the Code 1668 that you're talking about?

       MR. KRATZ:  Yes.

       THE COURT:  Alright.  1668 – it's good that you brought that up.  I had a long

discussion with Mr. Kramer about that obviously.  It talks about fraud, it talks about certainly

-43-

intentional misconduct being against public policy to try to contract out of. Where is any support for the notion that in intentional tort, it is against public policy for parties to contract out of, because I don't read 1668 in that fashion.

MR. KRATZ: Well, I think the *Singh* case. I think *Farnham* says it. Now, *Farnham*, I think, carves itself out an exception where there's sufficient and that's why *Farnham* is distinguishable from their use of it, because *Farnham* allows the provisions which ordinarily would be disallowed and they allowed it only because they were able to get, they did try to get recovery from both the corporation and the directors within the corporation. So *Farnham* allowed the provisions to withstand because they had full recovery against the corporation. But those were just intentional tort cases as well.

THE COURT: And you're saying that 1668 says that it is against public policy for parties to contract out of intentional tort cases?

MR. KRATZ: I think that that's exactly right, and as well as the fact that I think there's good authority and we cited it in our brief -- and I don't have the cite for you , but it's in our brief ...

THE COURT: I'll go back and look at it.

MR. KRATZ: ... that says that the theft of a trade secret is tantamount to a fraud claim for purposes of this analysis.

THE COURT: Alright, I'll take a look at it.

MR. KRATZ: So there's authority that gives us the ability to kind of – if we need to push that into something more than just your garden variety intentional tort, we've got that there. So there's the legality problem. The other is whether this is brought under this agreement -- and I know what you're inclination is with respect to this – but it's based on a lack of case law in support. The

-44-

case law they support is on venue selection clauses, foreign selection clauses, which are absolutely favored. This, at least whether or not you apply 1668 to prohibit it, at least shows that there certainly not this liberality that's associated with the notion of applying arbitration clauses and applying venue that have been announced by the courts as being favored clauses. Here we don't have that situation. So they're not benefited by this presumption that it's valid and it's over-inclusive.

THE COURT: What do you have going the other way, though? I mean, as a matter of just logic, I don't see how you can say – you put blinders on and you ignore – you can bring a claim for trade secret, a trade secret claim, not acknowledging at all that there's a license there, and it's got, you know . . . .

MR. KRATZ: And, I think, there is a disconnect between this being brought under this license because what they've done and we'll talk about partisan negotiations here for just a second. We've got a situation where not only Schimmel recognized that this type of stuff would not be permitted but if it were not covered by this agreement, but if it came that we wanted to do this, we would either get a separate license from you, which would be subject to all sorts of other provisions, so it would be a different contract so that it's not this contract or we would get arranged licenses through the third-party network who would then take the licenses from you. So, by saying that he's acknowledging that this contract is does not govern the relationship . . . .

THE COURT: Let me ask you this question. Is the intellectual property that you claim they stole, intellectual property covered by the license agreement? The answer is yes.

MR. KRATZ: The answer is the thing is covered, but . . . .

THE COURT: The answer is yes. And that tells you . . . . You may disagree with me, but that answers to my mind the question as to – If they had licensed intellectual property of a very different sort, and then you accused them of stealing different intellectual property from you,

-45-

that would be a circumstance where you may have a license relationship but it doesn't matter to your claim. But this is plainly about the scope of your license. You acknowledge that. You say "they exceeded what we let them use our intellectual property for" so the idea that it is not a claim arising out of that agreement just doesn't make any sense to me.

   MR. KRATZ: I'll make two points.

   THE COURT: Okay.

   MR. KRATZ: One, it's not arising out of it. It's brought under this agreement. The venue provisions which have been litigated for does say that "lawsuit regarding the agreement." It's broader in scope and it's definitely regarding the agreement that this lawsuit was brought under this agreement. Second point is that if this contract didn't exist, they're still liable for theft of trade secrets. The contract did not give us the cause of action. It's our trade secrets separate and apart from the contract. It's our stuff. The fact is they used that stuff. If they didn't have the contract – the contract is their defense. The contract isn't our cause of action. The cause of action is that they took our stuff and they distributed it, they shared it with other people. Now they're specifically prohibited from doing that but they're also not licensed to do that, and they're not licensed, and so if there is no license, they're still liable for theft of trade secrets. If that contract for some reason was null and void or non-existent or never existed in the first place and they got our stuff and they used that stuff, then that's theft of trade secrets. It's not dependent on there being the existence of the contract. Their defense is dependent on the existence of the contract, but this claim was not brought under the agreement. The claim was brought under the fact that we own a trade secret, they used it and distributed it, and they made money from it and we're entitled to the damages as a result of it. None of that has to do with the contract. The contract rises on their defense. It's not brought under

this agreement.  It may be regarding the agreement which is why we're here instead of Atlanta.  But, it's not brought under this agreement.

THE COURT:  Alright.  Anything further you want to say, Mr. Kramer?

MR. KRAMER:  Sure, I'll take as long as you'll give me, your Honor.  I'll be brief, though.  I really will.  I recognize that your going to put in evidence, or that you are going to take supplemental briefing on the evidence of the limitation of liability clauses of willful misconduct and reckless disregard – I don't need to touch that.  We'll talk about it in papers.

THE COURT:  I've been advised that the Grand Jury is about to come in.  [Background conversation]  So, uhhhhh.  Oh, I thought that . . . . [Background conversation]  Alright, go ahead, but there's going to be some folks coming in and I got to deal with it.  Go ahead.

MR. KRAMER:  Of course, this is an issue of law, the limitation of liability clauses.  There is no parole evidence on what they mean.  They weren't negotiated provisions.  Of course, it's an issue of law.  If they wanted to offer evidence of ambiguities and offer evidence in support of what they meant and suggest that they should go to a jury on what these clauses mean.  The time to do that was in their opposition, and they haven't.  Of course, it's an issue of law.

THE COURT:  Just going to the point in argument that Mr. Kratz made, why is he wrong that you can't read the agreement as he suggests that that sentence before is connected up – that the reference to willful conduct carve-out is not the same as the then subsequent sentence that talks about . . . .  The willful misconduct sentence applies in his argument to a narrower set of claims because it is in conjunction with the errors, omissions, delays, etc. and then the "arising out of the agreement" language is in a separate sentence.  Why is he wrong that he . . .

MR. KRAMER: Easy answer: Because the second sentence of this clause says, "Neither party hereto undertakes any liability to the other for any such errors, omissions, delays or

-47-

losses." The sentence is repeated. That sentence is in there twice. Take a look. The idea that the second time it appears it's talking about errors and data omissions is just wrong. The first time it appears it's talking about human and machine errors, omissions, delays and losses and the next sentence says, before the capitalization, "Neither party hereto undertakes any liability to the other for any such errors, omissions, delays or losses. That's off the table as a result of that sentence. Later on in here, it's broader. It says, And no matter what happens, unless you act with willful misconduct, no liability. With respect to the "brought under" clause, the final clause, here.

THE COURT: Yes.

MR. KRAMER: Let's be clear. We think that a limitation of liability can be asserted even in the face of reckless disregard or willful misconduct as long as it's a limitation and not an exemption. And again we cite the *Farnham* case for that. So, I don't want that argument to get lost in the shuffle.

The idea that this claim would exist in the absence of a contract, in the absence of a contract, is just not so. Their whole case depends upon this contract because their misappropriation theory is "Google used this while under a duty to limit its use." The duty is imposed by the contract. Absent the contract, if Google had this stuff, a) it wouldn't be a secret, and b) it would be free to use it any way it wanted to. So, of course this claim is based upon the contract. Of course it's a claim that's brought under the contract. [*Pause*] 3426.3(a) which is the unjust enrichment causation issue.

THE COURT: Right.

MR. KRAMER: It specifically says that in order to establish entitlement to unjust enrichment you've got to show causation. You're not relieved of your causation burden because you're talking about...because you're talking about unjust enrichment. It's in the statute. We don't cite a case for it because it's right in the statute. And unjust enrichment is about how much money

-48-

Google made.  Not how valuable this stuff is.  How valuable this stuff is, that's a reasonable royalty question but how much —  Unjust enrichment is about how much money Google made and they don't have any ability to tie Google's use of the data to how much money Google made.

There are evidentiary issues here.  I mentioned them in the opening.  They're worth looking at.  We filed some objections to the evidence.  I believe . . .  I believe you will find that the evidence upon which they are relying is not admissible here. [*Pause*]  That's all I've got Your Honor.

THE COURT:  Alright.  This is what we'll do timing-wise.  Because I know the pattern in this case, what I'd like to do is have you file simultaneously but then you can each file a simultaneous, more limited, response because I know just as sure as the sun rises that I'm going to get some requests when it comes in, and I was thinking of staggering it, but I'd rather do it this way.  So, what I'd like you to do is, a week from today, file specifically to those questions that I want answered.  File whatever you want to file for me.  And then, I'll give you one more week to respond to the other per—, the other side's submission and then there will be no further briefing on the subject.  And even if in that supplemental, supplemental supplemental, they say something that causes your blood to boil, you're just going to have to calm down.  So, that will be what we will do.  And I'll limit it to, I'd like to limit it to each of those two pleading opportunities to five pages but I realize that because I'm asking you to address—I'll say ten pages—for both of those to be limited.  And then we'll be done with the briefing on this.  And perhaps done with motions for awhile.  Correct?  I don't think there are any other motions pending in this case.

KRATZ:  Your Honor, there are no motions pending but there will be by the time we file these.   We've got compel issues.

THE COURT: Oh, alright.

-49-

KRAMER:  Your Honor, this week is particularly bad for me.  I've got a number of arguments in another case and some briefings in another case.

THE COURT:  You've got other cases?

KRAMER:  Believe it or not.

THE COURT:  Okay.

KRAMER:  So perhaps, two weeks for the first?

THE COURT:  Oh, alright.  That's fine.  Two weeks, and then one week thereafter.  Alright.  Let me quickly address and then I have to deal with the grand jury folks.  None of you want to be in the room when the grand jury's around?  You all want to leave?

The 56(f) issue.  The 56(f), and I think I've indicated this before to you, Mr. Kratz.  I think there is a very specific way you do 56(f).  56(f) is that at the time that your opposition is due, if you feel that, and it can be an argument in the alternative, but, if that argument is, in order to respond to this particular issue, or this particular motion, we need to develop this particular discovery.  It cannot come in subsequent to your opposition, the day before the hearing and say, "Oh, by the way, we also want to make a 56(f) argument."  It just can't work that way.  It is not right.  And therefore, my view is that I'm going to deny the 56(f) request.  And we'll just go forward because I think it's too late.  So, very well, thank you very much.

-50-