1  P. CRAIG CARDON, Cal. Bar No. 168646
   BRIAN R. BLACKMAN, Cal. Bar No. 196996
2  KENDALL M. BURTON, Cal. Bar No. 228720
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
3  Four Embarcadero Center, 17th Floor
   San Francisco, California  94111-4106
4  Telephone:     415-434-9100
   Facsimile:     415-434-3947
5

6  TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
   LUKE ANDERSON (Admitted *Pro Hac Vice*)
7  MCGUIRE WOODS, L.L.P
   1170 Peachtree Street, N.E., Suite 2100
8  Atlanta, Georgia 30309
   Telephone: 404.443.5500
9  Facsimile:  404.443.5751

10  Attorneys for DIGITAL ENVOY, INC.

11                    UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13                            SAN JOSE DIVISION

14  DIGITAL ENVOY, INC.,                    Case No. C 04 01497 RS

15           Plaintiff/Counterdefendant,    **DIGITAL ENVOY'S REPLY TO GOOGLE'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DIGITAL ENVOY, INC.'S DAMAGES CLAIMS**
16       v.

17  GOOGLE, INC.,

18           Defendant/Counterclaimant.     **The Honorable Richard Seeborg**

I. **ARGUMENT AND CITATION OF AUTHORITIES**

A. **Google Acknowledges That Reckless Disregard Can Be Willful Misconduct.**

In its Supplemental Brief, Google acknowledges that intentional conduct done with "wanton and reckless disregard of the possible results" constitutes "willful misconduct." *See* Supplemental Brief at 1 (citing *O'Shea v. Claude C. Wood Co.*, 97 Cal. App. 3d 903, 912 (1979)). Nevertheless, Google continues to assert (wrongly) that Digital Envoy must prove that Google possessed a subjective *intention to harm* Digital Envoy in order for Google's conduct to be deemed "willful." *See id.* (willful misconduct "requires a showing that Google actually 'put [its] mind" to harming Digital Envoy."). *This is not true.* In fact, the very case on which Google relies for this incorrect proposition formulates the applicable standard quite differently: (Mis)conduct is sufficiently willful if done "with knowledge of the peril to be apprehended, *or* done with a positive and active disregard of the consequences." *See Hawaiian Pineapple Co., Ltd. v. Industrial Acc. Comm'n*, 40 Cal. 2d 656, 663 (1953) (emphasis added). Thus, according to *Hawaiian Pineapple*, Google need only to have "put [its] mind" to an "act or omission" with "affirmative and knowing disregard of the consequences," which the record evidence in this case establishes.[1]

Google's failure even to consult the Agreement or to implement *any* compliance efforts before engaging in widespread use and dissemination of Digital Envoy's data is more than sufficient to satisfy the standard, in the face of: (i) the plain limitations of the Agreement – specific limitations that Google acknowledged both at the time and after executing the Agreement; and, (ii) Google's knowledge that its use of Digital Envoy's technology outside the bounds of those limitations would be unauthorized (which would certainly harm Digital Envoy[2] by disseminating its trade secrets far and wide beyond the limited license).[3] *See id.* at 663.

---

[1] Which is very different from the picture painted by Google's counsel at the September 21, 2005 hearing at which time he told the Court that the relevant evidence was "Absolutely none. Absolutely zero." Transcript of September 21, 2005 Hearing ("Hearing Transcript") at 43. (Google filed its own transcription of the September 21, 2005 Hearing on October 6, 2005).

[2] According to Google, Digital Envoy told Google that Digital Envoy did *not* want Google to be a distribution channel. In fact, in internal emails, Google anticipated that only "one-in-a-million" would choose to purchase their own geo-targeting in lieu of getting it for free from Google, making it a virtual certainty that Digital Envoy would be harmed. *See* Declaration of

1  Moreover, Google's conduct is "willful" even if Google acted without a "precise"
2  understanding of the resulting harm. The Ninth Circuit, applying California law, has held:

> Where an actor's conduct is of an unreasonable character and in disregard of a known risk, or one that should have been known, and that risk is so great as to make it highly probable that harm will follow, we term it willful misconduct and apply to it the consequences and legal rules which we use in the field of intended torts.
>
> * * *
>
> *The actor is not protected because he personally failed to recognize the precise peril posed.* His inability to realize the danger may be due to the abnormally favorable results of previous conduct of the same sort. It is enough that he knows or has reason to know of the circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct.

*See Rost v. United States*, 803 F.2d 448, 451 (9th Cir. 1986) (emphasis added). Thus, Google's conscious action of incorporating Digital Envoy's technology into AdSense – thereby permitting third parties to use Digital Envoy's technology – in the context of the admitted limitations of the Agreement, Digital Envoy's explicit and expressed concerns regarding Google's use of Digital Envoy's technology, without ever even consulting the Agreement or the parties who negotiated the Agreement constitutes willful misconduct. Whether Google *appreciated* the quality or magnitude of the resulting harm is irrelevant.[4]

Moreover, Google deliberately chose to operate in a reckless "no rules" atmosphere and should be forced to live with the known consequences in light of the unreasonable risk it created

---

Robert J. Waddell, Jr. in Support of Digital Envoy's Supplemental Brief in Opposition to Google's Motion for Partial Summary Judgment, Ex. 5.

[3] In *Hawaiian Pineapple*, the defendant, unlike Google in this case, had enacted an "energetic safety program "promulgating various safety rules" as precautions against possible injury. *See Hawaiian Pineapple*, 40 Cal. 2d at 660. As Digital Envoy has demonstrated, Google took no action whatsoever to encourage, promote, or arguably even allow compliance with the limitations in the Agreement. One would be hard-pressed to devise a less "energetic" (or, more reckless) contract compliance program than Google enacted. *See* Digital Envoy's Supplemental Brief in Opposition to Google's Motion for Partial Summary Judgment at 8-10.

[4] Digital Envoy is not conceding that Google's behavior was merely reckless in this matter. It also believes that the finder of fact could reasonably determine, based on the contradictory statements of Google personnel before and after the litigation as well as the utter disregard for Digital Envoy's rights under the license agreement despite clear knowledge of the limitations, represented a deliberate act by Google to "take" Digital Envoy's technology and market it.

-2-

with respect to compliance with its agreements and violation of the rights of others.  In *Rost*, the Ninth Circuit (applying California law) held that the "willful misconduct" standard was met because the tortfeasor "consciously failed to act to avoid the extant peril because of other priorities." *Rost*, 803 F.2d at 452.  Indeed, on its own web site, Google brags about its casualness and irreverent unconventionality:

- "Google's founders have often stated that the company is not serious about anything but search. . . . Meetings that would take hours elsewhere are frequently little more than a conversation in line for lunch. . . . To that end, Google's culture is unlike any in corporate America, and it's not because of the ubiquitous lava lamps and large rubber balls, or the fact that the company's chef used to cook for the Grateful Dead."  *See* Declaration of Robert J. Waddell, Jr. in Support of Reply to Google's Supplemental Brief in Support of Motion for Partial Summary Judgment, filled contemporaneously herewith, Ex. A.
- "Ideas are traded, tested and put into practice with an alacrity that can be dizzying." *See id.*
- "Though growing rapidly, Google still maintains a small company feel. . . There's little in the way of corporate hierarchy and everyone wears several hats." *See id.*, Ex. B.
- Google's founders joked about Google's "lack of rules" in its interview with *Playboy* magazine, while discussing its famous (and somewhat ironic) "Don't be evil" policy:

    > [Google co-founder Sergey] BRIN: Yes. We have other rules, too.
    > [Google co-founder Larry] PAGE: We allow dogs, for example.

*See. id.*, Ex. C. at B-3.[5]

This deliberate and conscious decision to choose a culture of unbridled growth rather than enacting traditional corporate governance rules, safeguards and procedures represents a reasoned choice by Google.  Google weighed the risks and chose that its priority was to operate a reckless

---

[5]  In an ironic twist that shouldn't be surprising given Google's willful indifference toward corporate governance, this interview was included as an exhibit to its S-1 filing because Google's founders arguably violated section 5 of the Securities Act of 1933 by giving the interview during the "quiet period" of its public offering.  *See* Waddell Decl., Ex. C at 21.

system with little or no traditional rules, so that its revenue growth would not be slowed. While this approach has doubtlessly benefited Google greatly, its adoption of this business strategy also brings with it a downside – a substantial likelihood of running afoul of its legal obligations (which perhaps explains why Google's approach to its business is "unconventional"). In short, Google has made its own bed by intentionally operating its business with complete disregard for the rights of its contracting partners, and it should not be surprised when it is forced to lie in it.

A finder of fact could certainly find that Google's conscious decision to acquire and make use of Digital Envoy's technology subject to explicit limitation while acting as if no such limitation existed renders Google's misappropriation of Digital Envoy's trade secrets "willful misconduct." *See Husain v. Olympic Airways*, 316 F.3d 829, 839 (9th Cir. 2002) ("Determining willful misconduct is based on a subjective standard and can be satisfied through circumstantial evidence."); *Colich & Sons v. Pacific Bell*, 198 Cal. App. 3d 1225, 1242 (1988) (holding that "whether an action constitutes willful misconduct is a question of fact"). On this basis alone, Google's Motion for Partial Summary Judgment should be denied.

**B.     Despite Google's Willful Misconduct, Section 8 Does Not Apply to Google's Misappropriation of Digital Envoy's Trade Secrets.**

In its Supplemental Brief, Google incorrectly asserts that it "demonstrated that a limitation of liability clause in its clause in its contract [Digital Envoy] precluded imposition of liability against Google absent a showing that Google had engaged in 'willful misconduct.'" Supplemental Brief at 1. Digital Envoy respectfully suggests that no such "demonstration" has occurred. Indeed, the Court explicitly stated that it was not even offering so much as a "tentative ruling" at the time of the September 21, 2005 hearing on Google's motion. Digital Envoy continues to maintain that, in spite of the wanton and reckless nature of Google's conduct, Section 8 of the Agreement simply does not apply in this case.

For the reasons stated more fully in Digital Envoy's Opposition to Google's Motion for Partial Summary Judgment, Section 8 does not contemplate, and therefore cannot reasonably apply to, Google's unbridled use and distribution of Digital Envoy's proprietary data. Section 8 plainly applies to "human and machine errors, omissions, delays, and losses" which might affect

"data entry, communication and storage" causing "inadvertent loss of data or damage to media, which might give rise to loss or damage." *See* Agreement, § 8.  Naturally, all of these specified events could and would occur in the normal course of the parties' *performance under the Agreement*.  Therefore, also quite naturally, the so-called "damage limitation" would apply only to *damages* arising from these types of specified events in "any lawsuit or other action (*i.e.*, an arbitration or other quasi-legal proceeding) brought under the Agreement."  *See id.*

In no way, however, does Section 8 reasonably give Google permission to use Digital Envoy's technology in any way Google saw fit – inconsistent with the Agreement's explicit boundaries – by merely paying double the agreed-upon license fee as Google now urges.  *First*, Google's proffered interpretation of Section 8 guts the core of the parties' extensive and careful negotiations regarding the scope of the license and price rendering the vast majority of the Agreement superfluous.[6]  *See Continental Mfg. Corp. v. Underwriters at Lloyds London*, 185 Cal. App. 2d 545, 549 (1960) (proper contract construction examines "the whole contract" using other clauses to interpret the clause in question).  (If Google were correct about the meaning of Section 8, then surely the parties could have expressed their intention for "an unlimited license at twice the price" more succinctly and with greater clarity.)

Further, Google's proffered interpretation would mean that Google has effectively pre-negotiated any and all unlimited uses of Digital Envoy's technology for a price certain in advance.  Plainly, this cannot be the meaning and result the parties intended.  The unambiguous statements of *both* parties – before and after the commencement of this litigation – make it clear that the subject matter of "distribution" was not intended to be covered under the Agreement; therefore, the parties plainly went out of their way to avoid "pre-negotiating" distribution (or any other extended) rights, which Google's proffered interpretation of Section 8 effects.[7]

---

[6] After all, Google's proffered interpretation knows no limits.  According to Google, it could "willfully" with "the intention to harm Digital Envoy" disclose the contents and functionality of Digital Envoy's Database Libraries *to every person on the Internet* by making a payment of twice the agreed-upon fee.  This makes no sense – either in the context of Section 8 specifically or the purpose of the Agreement generally.

[7] In fact, Google implicitly admits that the words "brought under" in Section 8 does not cover trade secret actions by bringing its own trade secret counterclaim, not "under the Agreement,"

*Second*, the basis for Digital Envoy's claim exists independent of the Agreement, and, therefore, Digital Envoy's claim to vindicate its own property rights – which existed prior to its grant of limited license to Google – is not "brought under the Agreement." Instead, the Agreement essentially provides for Google a defense to Digital Envoy's misappropriation claim – *i.e.*, the boundaries within which Google can operate legally without "stealing" Digital Envoy's property. Had there been no Agreement – and had Google acquired access to Digital Envoy's technology in another context and used it without authorization – Digital Envoy could still have brought a claim for misappropriation.[8] *See* Cal. Civ. Code § 3426.1(b) (*no* part of the statute requires or depends upon the existence of a contract in order for misappropriation to occur). The mere fact that the Agreement is *relevant* to whether Google's use was authorized does not alter the fundamental basis for Digital Envoy's claim or make it one "brought under" the Agreement.[9]

---

but instead "under a non-disclosure agreement" between the parties, in spite of the fact that the alleged "misappropriation": (i) occurred several years after the Agreement was signed; and (ii) clearly relates to information shared between both parties pursuant to carrying out their performance under the Agreement. *See* Answer to Amended Complaint of Digital Envoy and Amended Counterclaims for Breach of Contract, Declaratory Judgment, and Trade Secret Misappropriation at 20-21.

[8] Here, the Agreement grants Google a license for certain specified uses of Digital Envoy's proprietary technology – *i.e.*, trade secret. Absent the license, there can be no question that misappropriation occurred. In other words, the Agreement essentially creates for Google a safe harbor, but does not affect claims outside the unprotected bounds of the license, such as the ones made by Digital Envoy in this case. Thus, Digital Envoy's claims are not "brought under the Agreement" at all. Indeed, Google's assertion that its conduct was within the bounds of the license contained in the Agreement is an affirmative defense, but not the basis on which Digital Envoy's trade secrets claim rests. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, (9th Cir. 2001) (holding that license is an affirmative defense to claim that defendant improperly distributed plaintiff's copyrighted material and defendant's lack of evidence justified rejection of defense); *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) ("The existence of a license creates an affirmative defense . . . ."); *Michaels v. Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823, 834 (C.D. Cal. 1998) (holding that defendants bore the burden of proving the affirmative defense of license in copyright infringement action). Therefore, Google, not Digital Envoy, bears the burden of proof of establishing that its conduct was within the scope of the license.

[9] In fact, the parties made a distinction between the more expansive "regarding this Agreement" in the forum selection clause found in Section 12 and the more narrow "brought under this Agreement" in Section 8 – the difference being in the latter the parties intended to limit Section 8 applicability to actions on the contract and "damages" arising in the normal and intended course or performance of the Agreement.

1  *Finally*, as counsel for Digital Envoy noted at the September 21, 2005 hearing, there is an important distinction between "damages" as that term is used in Section 8 and the restoration of an ill-gotten gain through unjust enrichment.  *See* Hearing Transcript at 36.  Here, the recovery Digital Envoy seeks, and to which it is entitled, is Google's unjust enrichment realized through Google's misappropriation of Digital Envoy's trade secrets.  Unjust enrichment is restitutionary in character and, thus, is not predicated on Digital Envoy's "loss" or "damages" caused by Google's conduct (in fact, Google has repeatedly claimed in this action that Digital Envoy cannot prove that it has suffered a "loss").  Courts, including California courts, have recognized this important distinction.  *See, e.g.*, *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (holding that the term "damages" did not encompass restitutionary relief).  *Jaffe v. Cranford Ins. Co.*, 168 Cal. App.3d 930, 934-35 (1985) (holding that restitutionary payments are not "damages" noting that "'damages' describes a payment made to compensate a party for injuries suffered. . . . The defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct."); *O'Neill Investigations v. Ill. Emp. Ins.*, 636 P.2d 1170, 1173-77 (Alaska 1981) ("damages" are not the restitutionary return of money acquired from consumers through unfair debt collection practices); *Central Dauphin School v. American Cas. Co.*, 426 A.2d 94, 95-7 (Pa. 1981) ("damages" are not the required return of unlawfully collected taxes); *Haines v. St. Paul Fire & Marine Ins. Co.*, 428 F. Supp. 435, 439-42 (D. Md. 1977) ("damages" do not cover the disgorgement of attorney's fees).

The Seventh Circuit's Judge Posner agrees:

> [A] loss within the meaning of an insurance contract does not include the restoration of an ill-gotten gain . . . An insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than "stolen" is used to characterize the claim for the property's return.

*Level 3 Communications, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910-11 (7th Cir. 2001).  In the very same way, the parties' so-called limitation of "damages" in Section 8 should not be construed to mean Digital Envoy's rightful recovery and Google's mandated return of property to which Google is not entitled.  This is further evidence that the parties could not have intended Section 8 to operate as Google urges.

The plain language of the so-called damages limitation provision therefore cannot apply to Digital Envoy's claims here – namely, the return of Google's wrongfully-acquired profits achieved through its improper use of Digital Envoy's proprietary technology. Section 8 simply does not address the circumstances of this case. Google's attempt to turn an ordinary limitation-of-liability provision addressing the technical performance of the product relating to "human and machine errors, omissions, delays, and losses" in the context of "data entry, communication and storage" into an unlimited grant of rights to Digital Envoy's data to shield Google from liability is, frankly, nonsensical and without merit. Google's Motion for Partial Summary Judgment should be denied.

## II.    CONCLUSION

For the reasons stated above, and in Digital Envoy's previous filings in opposition to Google's Motion for Partial Summary Judgment Regarding Digital Envoy, Inc.'s Damages Claims, Google's Motion should be denied.

DATED:  October 13, 2005

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By    /s/ Brian Blackman
P. CRAIG CARDON
BRIAN R. BLACKMAN

TIMOTHY H. KRATZ (*Pro Hac Vice* To Be Applied For)
LUKE ANDERSON (*Pro Hac Vice* To Be Applied For)
MCGUIRE WOODS, L.L.P
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone: 404.443.5706
Facsimile:  404.443.5751

Attorneys for DIGITAL ENVOY, INC.