1  DAVID H. KRAMER, State Bar No. 168452 (dkramer@wsgr.com)
   DAVID L. LANSKY, State Bar No. 199952 (dlansky@wsgr.com)
2  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
3  650 Page Mill Road
   Palo Alto, CA 94304-1050
4  Telephone: (650) 493-9300
   Facsimile: (650) 565-5100
5
   Attorneys for Defendant/Counterclaimant
6  Google Inc.

7

8　　　　　　　　　　UNITED STATES DISTRICT COURT

9　　　　　　　　　　NORTHERN DISTRICT OF CALIFORNIA

10　　　　　　　　　　　　　　SAN JOSE DIVISION

11

12  DIGITAL ENVOY, INC.,　　　　　　　)　　CASE NO.: C 04 01497 RS
                                     )
13  　　　　Plaintiff/Counterdefendant,)　　**GOOGLE INC.'S**
                                     )　　**SUPPLEMENTAL REPLY BRIEF**
14  　　v.　　　　　　　　　　　　　　　)　　**IN SUPPORT OF ITS MOTION FOR**
                                     )　　**PARTIAL SUMMARY JUDGMENT**
15  GOOGLE INC.,　　　　　　　　　　　)　　**REGARDING DIGITAL ENVOY,**
                                     )　　**INC.'S DAMAGES CLAIMS**
16  　　　　Defendant/Counterclaimant. )
                                     )
17                                   )
                                     )　　Judge: Honorable Richard Seeborg
18                                   )
                                     )

GOOGLE'S SUPPLEMENTAL REPLY BRIEF ISO ITS MOTION　　　　　　　　　C:\NrPortbl\PALIB1\DAG\2741023_3.DOC
FOR PARTIAL SUMMARY JUDGMENT RE DAMAGES CLAIMS
CASE NO. 04-01497 RS

Dockets.Justia.com

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT .........................................................................................................................2

    A.    Mere Recklessness Does Not Constitute Willful Misconduct ...............................2

    B.    There Is No Evidence of Willful Misconduct by Google ......................................4

    C.    There Is No Evidence That Google Believed It Was Violating the Agreement ...............................................................................................................5

    D.    There is No Evidence that Google Either Was Aware That Harm to Digital Envoy Would Result or Foresaw Harm to Digital Envoy and Acted in Conscious Disregard of it ......................................................................................8

    E.    Digital Envoy's Claim That Google Recklessly Disregarded the Agreement Is Inapposite ........................................................................................9

CONCLUSION .....................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abron v. Workmen's Comp. Appeals Bd.*, 34 Cal. App. 3d 232 (1973) ...................................... 2, 3

*Atwood v. Villa*, 25 Cal. App. 3d 145 (1972) ........................................................................... 3

*Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714 (1998) ....................................................... 3, 4

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313 (C.D. Cal. 2004) ........................ 5

*Cole v. State of California*, 11 Cal. App. 3d 671 (1970) ............................................................ 2

*Colich & Sons v. Pacific Bell*, 198 Cal. App. 3d 1225 (1988) .................................................... 3

*Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934 (9th Cir. 2002) ..................................... 2, 9, 10

*Hannon v. United States,* 801 F. Supp. 323 (E.D. Cal. 1992) ..................................................... 3

*Hawaiian Pineapple Co. v. Industrial Acc. Comm'n*, 40 Cal. 2d 656 (1953) ............................. 2

*Howard v. Howard*, 132 Cal. App. 124 (1933) .................................................................. 2, 3, 9

*Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100 (C.D. Cal. 2002) ............................................. 5

*Johns-Manville Sales Corp. Private Carriage v. Workers' Comp. Appeals Bd.*, 96
    Cal. App. 3d 923 (1979) ............................................................................................... 3, 10

*Judd v. United States*, 650 F. Supp. 1503 (S.D. Cal. 1987) ....................................................... 3

*O'Shea v. Claude C. Wood Co.*, 97 Cal. App. 3d 903 (1979) ..................................................... 3

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715 (1993) ................................ 3, 4

## RULES

FED. R. CIV. P. 37(c)(1) ............................................................................................................. 5

## MISCELLANEOUS

BLACK'S LAW DICTIONARY (7th ed. 1999) ................................................................................. 4

**INTRODUCTION**

After eighteen months of discovery and multiple opportunities, Digital Envoy has failed to come up with any evidence demonstrating that Google engaged in "willful misconduct" by using Digital Envoy's data in connection with Google's AdSense program. That is because no such evidence exists. Because Section 8 of the parties' Agreement bars the imposition of liability on Google absent such "willful misconduct," Google is entitled to summary judgment.

In its supplemental brief, Digital Envoy once again attempts to lead the Court astray with respect to the definition of "willful misconduct." But the very authorities on which Digital Envoy relies betray its misdirection. They leave no doubt that Digital Envoy must show that in using its data in AdSense, Google: (1) engaged in intentional wrongful conduct; and (2) acted with either knowledge that serious harm to Digital Envoy would result, or a wanton and reckless disregard of the possible harm. Digital Envoy's authorities also establish that reckless conduct simply does not satisfy the "willful misconduct" standard. In fact, the term "reckless" as it appears in the standard is not even addressed to the challenged conduct itself. Rather, as Google explained in its opening brief, it describes the requisite state of mind for a party who engages in intentional wrongful conduct in complete disregard for potential harm that it has affirmatively foreseen.

Digital Envoy's supplemental submission also confirms what Google has maintained all along: there is no evidence that Google engaged in "willful misconduct." Digital Envoy spends much of its brief arguing that Google recognized that the Agreement in some way restricted Google's use of Digital Envoy's data. But that issue is entirely beside the point. The question is whether Google ever believed that it was violating those restrictions. Its liberties with the record aside, Digital Envoy has come up with no evidence that Google ever held such a belief. For this reason alone, Digital Envoy cannot show willful misconduct.

In addition, Digital Envoy has not offered evidence suggesting that Google either knew that harm to Digital Envoy would result from its use of the data in AdSense or acted in wanton and reckless disregard of potential harm that it foresaw. Indeed, Digital Envoy could never make that showing given that Google believed that it was merely exercising rights that Digital Envoy affirmatively granted to it. The notion that Google actually contemplated such harm is especially

implausible given that Digital Envoy encouraged Google to use the data in Google's advertising programs, never once objected to that use, and actually boasted of it to prospective customers.

In sum, Google did not engage in intentional wrongful conduct as it has always believed its use of Digital Envoy's data was permitted under the Agreement. Further, it did not even foresee, much less affirmatively and absolutely disregard the possibility of harm to Digital Envoy. Accordingly, Google has not engaged in "willful misconduct," and summary judgment in Google's favor is warranted.

## ARGUMENT

### A. Mere Recklessness Does Not Constitute Willful Misconduct

Google understood that the parties' supplemental briefs were to be directed to the legal question of what was meant by the "wanton and reckless disregard" prong of the "willful misconduct" standard. Digital Envoy does not appear to have addressed that point at all. As Google explained in its opening brief, to satisfy the "wanton and reckless disregard" standard, Digital Envoy must demonstrate that Google "put [its] mind" to the possibility of causing harm to Digital Envoy.[1]

Instead of addressing the question posed by the Court, Digital Envoy yet again misstates the definition of "willful misconduct" in its Supplemental Brief ("DE Supp. Br."). Most notably, Digital Envoy errs in attempting to equate mere recklessness with "willful misconduct." In reality, "willful misconduct . . . involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences." *Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934, 941 (9th Cir. 2002); *see also Hawaiian Pineapple Co.,* 40 Cal. 2d at 662 ("'reckless disregard' . . . is not sufficient in itself unless the evidence shows that the disregard was more culpable than a careless or even a grossly careless omission or act. It must be an affirmative and knowing disregard of the consequences."); *Colich & Sons v. Pacific Bell*, 198 Cal. App. 3d 1225,

---

[1] *See Hawaiian Pineapple Co. v. Industrial Acc. Comm'n*, 40 Cal. 2d 656, 663 (1953); *Abron v. Workmen's Comp. Appeals Bd.*, 34 Cal. App. 3d 232, 238 (1973) (stating that willful misconduct requires defendant to have "put [its] mind to the existence of a danger to [plaintiff] and have failed to take precautions to avert that danger"); *Cole v. State of California*, 11 Cal. App. 3d 671, 677 (1970) (affirming defendant's motion for nonsuit because plaintiff could not show that defendant actually "put [its] mind" to danger of injury and "nevertheless deliberately failed to take precautions to avert it"); *Howard v. Howard*, 132 Cal. App. 124, 130 (1933) (finding that defendant did not act with reckless disregard for purposes of willful misconduct standard because he did not, knowing of danger, "consciously and intentionally fail[ ] to act to avoid peril").

1242 (1988) (plaintiff could not state a cause of action for willful misconduct where it could "[not] show an intentional, conscious act of misconduct."); *Johns-Manville Sales Corp. Private Carriage v. Workers' Comp. Appeals Bd.*, 96 Cal. App. 3d 923, 933 (1979) (declining to find willful misconduct based upon alleged reckless disregard absent evidence that defendants "kn[e]w of the dangerous condition, kn[e]w that the probable consequences of its continuance [would] involve serious injury . . . , and deliberately fail[ed] to take corrective action"); *Abron*, 34 Cal. App. 3d at 237 (explaining that willful misconduct involves "deliberate, intentional or wanton *misconduct*") (emphasis added); *Howard*, 132 Cal. App. at 128-29 (stating that "misconduct must be wilful" and "involve[ ] distinct positive elements rather than the merely negative elements of negligence or carelessness").

Digital Envoy's own authorities confirm that "willful misconduct" requires a showing of considerably more than mere recklessness, and accord with Google's position. For example, Digital Envoy inexplicably quotes *Hannon v. United States* for the proposition that "[u]nder California law, the concept of willful misconduct has a well-established, well-defined meaning." DE Supp. Br. at 2, quoting *Hannon v. United States,* 801 F. Supp. 323, 327 (E.D. Cal. 1992). Not surprisingly, Digital Envoy then fails to apprise the Court of the "well-established, well-defined meaning" that *Hannon* provides. According to *Hannon*:

> Willful or wanton misconduct is intentional wrongful misconduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results.

*Id.* That is precisely the definition offered by Google in its opening brief. Google Supp. Br. at 1 *citing O'Shea v. Claude C. Wood Co.*, 97 Cal. App. 3d 903, 912 (1979); *Judd v. United States*, 650 F. Supp. 1503, 1511-12 (S.D. Cal. 1987); *Atwood v. Villa*, 25 Cal. App. 3d 145, 147 (1972). It is also the definition supplied by California's Supreme Court. *Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 735 (1998) (requiring "intentional *wrongful* conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results") (emphasis in original). The parties thus agree on the meaning of the phrase "willful misconduct," and it is clearly not satisfied by conduct that is merely reckless.

Digital Envoy's reliance on *Shell Oil Co. v. Winterthur Swiss Ins. Co.* is equally mystifying as *Shell* in no uncertain terms differentiates between recklessness and "willful misconduct." *Shell Oil*

*Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 742 (1993) (mere "[r]ecklessness . . . does not necessarily require actual foreknowledge of the harmful consequences of particular acts . . . A merely reckless person lacks subjective awareness of the near certainty of harm."). In *Shell*, the court held that a statute prohibiting an insurer from providing coverage for loss caused by an insured's "willful act" "does not prohibit coverage for reckless conduct." *Id.* That is, the court found that conduct by a party that was merely reckless did not rise to the level of willful misconduct. *Id.* at 742-43 ("willful acts" include a *heightened* degree of recklessness in the form of "a deliberate, liability-producing act that the individual, before acting, expected to cause harm;" party must *subjectively* expect to cause harm).

Finally, Digital Envoy returns to the sophistry it previously offered, citing authority for the proposition that the term "willful" does not require malice but merely an intent to act. DE Supp. Br. at 3. As before, Digital Envoy misses the mark. The issue is not what "willful" means, but rather what a party must show in order to demonstrate "willful *misconduct*." *Compare* definition of "willful" ("voluntary and intentional, but not necessarily malicious") *with* definition of "willful misconduct" ("*[m]isconduct* committed voluntarily and intentionally.") BLACK'S LAW DICTIONARY 1593, 1014 (7th ed. 1999) (emphasis added); *see also Calvillo-Silva* 19 Cal. 4th at 729 ("While the word 'willful' implies an intent, the intention must relate to the misconduct and not merely to the fact that some act was intentionally done."). On the question at hand, the case law is legion and undisputed. To show "willful misconduct" Digital Envoy must establish that Google engaged in intentional wrongful conduct, either with knowledge that harm to Digital Envoy would result or in "wanton and reckless disregard" of harm to Digital Envoy that it actually foresaw.

**B.    There Is No Evidence of Willful Misconduct by Google**

The evidence of record, even as erroneously represented by Digital Envoy, in no way suggests that Google believed it was prohibited from using Digital Envoy's data in AdSense yet did so anyway, knowing that harm to Digital Envoy would result or recklessly disregarding harm that it actually contemplated.

As an initial matter, virtually all of Digital Envoy's evidentiary submission is improper. The Court previously ordered Digital Envoy to identify all evidence that "Google's actions have been wilful and malicious." *See* Order Granting Google's Motion to Compel (Document No. 206, filed

June 23, 2005). Despite that Order, Digital Envoy failed to identify most of the evidence it now submits. See Declaration of David L. Lansky ("Lansky Decl.,") Ex. B (Digital Envoy's Supplemental and Amended Responses to Google's Third Set of Interrogatories).[2] Having failed to supply the information the Court ordered, Digital Envoy is not permitted to now come forward with different evidence in the hopes of forestalling summary judgment. FED. R. CIV. P. 37(c)(1); *see also Cambridge Elecs. Corp. v. MGA Elecs., Inc.,* 227 F.R.D. 313, 323-34 (C.D. Cal. 2004) (plaintiff that failed to supply information in responses may not rely on undisclosed information to raise triable issue of fact in opposition to summary judgment); *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1118 (C.D. Cal. 2002) (same).

Even if it were properly before the Court, however, Digital Envoy's proffered evidence does not come close to satisfying its burden. In large part, Digital Envoy's evidence is offered to establish that Google knew there were *some* restrictions on what it could do with Digital Envoy's data. *See*, *e.g.*, DE Supp. Br. at 5 ("Google knew that it was restricted"); *id.* at 7 n.6 ("Google did in fact fully understand that it was restricted under the Agreement."). But the fact that there were minor restrictions on Google's use of the data is clear from the contract. As the Court correctly recognized, merely identifying the existence of restrictions begs the question on this motion. Digital Envoy must show that Google knew those restrictions prohibited it from using the data internally as part of its AdSense advertising program. *See*, *e.g.*, Transcript of September 21, 2005 hearing (Exhibit A to Google's Supplemental Brief) at pp. 32-33. On that question, the evidence is indisputable. Google has never believed that the Agreement prevented such use.

**C.    There Is No Evidence That Google Believed It Was Violating the Agreement**

The primary evidence Digital Envoy advances to show that Google knew it was violating the Agreement by using Digital Envoy's data in AdSense is an email exchange between Steven Schimmel and Google attorney Kulpreet Rana (Waddell Ex. 3 ("Schimmel email")). According to

---

[2] Of the documents cited in Digital Envoy's supplemental brief, only five were identified in response to Interrogatory No. 10: the Linder Declaration; GOOG 000062; GOOG 009358-009360; GOOG 009696-009698, and one page (out of 12 cited) of the deposition of Steven Schimmel. The interrogatory response fails to identify several documents and the deposition testimony of Matt Cutts, Salar Kamangar, Mark Rose, and the portions of Kulpreet Rana's testimony on which Digital Envoy now relies.

1  Digital Envoy, the email thread shows that Google understood it was prohibited from looking up the
2  IP addresses of Internet users visiting third-party websites, as Google does in its AdSense program.
3  DE Supp. Br. at 6.  Even indulging Digital Envoy with every conceivable inference in its favor, the
4  thread shows no such thing.  Rather, it shows Google attentively addressing Digital Envoy's concern
5  that Google not ship the database libraries to third parties or give them direct access to the data,
6  restrictions present in the Agreement.  Waddell Ex. 3 ("Schimmel email").

7  In the message thread, Rob Friedman of Digital Envoy expressed his desire to ensure that the
8  Agreement's provision permitting Google to "develop indices, services or applications that are
9  provided to third parties . . . would not involve *shipping* [Digital Envoy's] *database to third parties*
10 *(or giving them direct access to [its] database*)." *Id*. at GOOG 009359 (emphasis added).  Friedman
11 wrote, "Obviously, our concern would be Google repackaging our Database in conjunction with
12 product offerings and allowing other third parties to *directly access* it[.]" *Id*. (emphasis added).[3]
13 Before responding to Friedman, Schimmel checked with Google's counsel to ensure that "[w]e really
14 don't intend to ship this ... correct?" *Id*. at GOOG 009358.  Rana responded that "the agreement
15 already makes clear that *we won't do what they're concerned about: ship their libraries*." *Id*.
16 (emphasis added).  Schimmel replied that he would call Friedman "to tell him he's fully legally
17 covered." *Id*.  As this exchange makes plain, Digital Envoy expressed concerns about Google
18 shipping the libraries or allowing third parties to directly access them.  The notion that Google would
19 itself be restricted in looking up IP addresses was never mentioned in this exchange or any other.[4]

---

[3] Notably, Friedman's comment refutes Digital Envoy's latest made-for-litigation position that Google merely had the right to "develop" services for third parties using the data, but would be required to obtain a further license in order to provide those services.  Friedman clearly understood that Google would actually be providing services to third parties under the Agreement, and wanted to ensure that Google did not, in that process, ship Digital Envoy's databases to others.  Not surprisingly the Agreement expressly authorizes Google to *provide* such services to third parties. Declaration of David H. Kramer filed Aug. 17, 2005 ("Aug. 17 Kramer Decl."), Ex. A § 3 (Google granted right to "develop indices, services, or applications that *are provided* to third parties.") (emphasis added).

[4] Digital Envoy reveals its own dissembling on this issue by admitting that the parties "had *never discussed* allowing IPs of users on third party websites (outside of Google) to be looked up in [Digital Envoy's] database." Lansky Decl., Ex. C (emphasis added); *see also* DE Supp. Br. at 6 (same).

Google undisputedly addressed the concerns that Digital Envoy actually raised. It never shipped Digital Envoy's database libraries to third parties, and the Court has already found that Google never gave third parties direct access to them. *See* Order dated September 8, 2005 at 4:11-13 ("AdSense participants were provided only with the results of Google's internal use of Digital's geo-targeting method. *As a result, no third party could access Digital's proprietary data*.") (emphasis added). In short, far from demonstrating that Google knowingly violated the Agreement, the Friedman/Schimmel/Rana email exchange and Google's subsequent conduct show that Google considered and respected Digital Envoy's concerns.

Digital Envoy offers a similarly fictional description of its other main piece of evidence, an email sent by Google's Matt Cutts to a Digital Envoy investor. *See* DE Supp. Br. Ex. C, (Plaintiffs' Exhibit 8 to the Linder declaration ("Cutts email")). According to Digital Envoy, Cutts "informed a potential third-party investor in Digital Envoy that Google was prohibited from engaging in the objectionable conduct [*i.e*., the use of Digital Envoy's data in AdSense]." DE Supp. Br. at 2. Again, that is nonsense. In the email, the investor asked whether the "agreement w/ DE allows you to use their raw IP data for internal consumption, but not to resell products or services based on it?" *Id*. Digital Envoy quotes only part of Mr. Cutts' response: "[T]hat's basically correct." *Id*., DE Supp. Br. at 7. Yet Digital Envoy fails to quote Mr. Cutts' explanation that "[t]he only revenue-generating thing we use it for is *geotargeting ads* . . . ." Cutts email (emphasis added). Thus, Mr. Cutts explicitly and truthfully informed the investor that Google used Digital Envoy's data internally in connection with its advertising programs, not that it was prohibited from doing so. *Id*.[5]

Digital Envoy's presentation serves to underscore the dispositive omission in Digital Envoy's submission – there is no evidence that Google ever understood that its use of Digital Envoy's data in AdSense was a violation of the Agreement. The Court has previously held that Digital Envoy may at least argue that Google's use amounted to a "sharing" or "distribution" of the data. But there is simply nothing to suggest that Google itself ever believed that its purely internal use of the data,

---

[5] Digital Envoy's supplemental submission misrepresents the evidence in other significant respects. *See* Lansky Decl., Ex. A submitted herewith. In light of the discrepancies between the actual documents and Digital Envoy's characterizations, Google notes that the evidence submitted by Digital Envoy with its supplemental briefs requires close scrutiny.

through which no third party gained access, could ever be so characterized. Accordingly, there is no evidence that Google knowingly violated the Agreement, and thus no evidence of "willful misconduct."

### D. There is No Evidence that Google Either Was Aware That Harm to Digital Envoy Would Result or Foresaw Harm to Digital Envoy and Acted in Conscious Disregard of it

Separately, Digital Envoy has offered nothing to suggest that Google ever knew or even considered that Digital Envoy would be harmed by Google's use of Digital Envoy's data in AdSense. Indeed, it makes no sense to believe Google ever contemplated that it could harm Digital Envoy by exercising the rights Google genuinely believed Digital Envoy had granted to it.

Moreover, there was nothing in the parties' interactions to inform Google that its use of the data would somehow harm Digital Envoy. From its very first communication to Google, Digital Envoy encouraged Google to use Digital Envoy's data to support Google's advertising programs. *See*, *e.g*., Declaration of David H. Kramer filed Aug. 10, 2005 ("Aug. 10 Kramer Decl."), Ex. A. Google then negotiated for and was promised the right to use the data however it saw fit. *See, e.g.,* Declaration of David H. Kramer filed Feb 23, 2005 ("Feb. 23 Kramer Decl."), Ex. B (Digital Envoy promising "The fee that I quoted earlier would be for 'all you can eat' metro-targeting – *you can use it for everything* and there is no volume cap.") (emphasis added). For years thereafter, Digital Envoy never once objected to Google's obvious use of the data in its AdSense program even though Digital Envoy itself long participated in the program. *See* Aug. 10 Kramer Decl., Ex. E (Friedman Dep.) at 213:2-6 (Digital Envoy did not object); Ex. O (showing Digital Envoy's advertising account with Google created on June 26, 2002); Ex. N (email regarding Digital Envoy advertisements syndicated by Google to a third-party website, noting "Lots of value, I gotta say, in those Google ads.") Far from complaining, Digital Envoy actually bragged in its marketing materials about Google's use of the data in Google's "advertising network." Aug. 10 Kramer Decl., Ex. F at DE 004454 (standard Digital Envoy marketing presentation claiming that "*Digital Envoy's technology is relied on by many of the leading Ad Networks on the Internet including*" Google, among others); Feb. 23 Kramer Decl., Ex. M (Friedman email to colleagues dated October 24, 2003 referencing Google's advertising

network: "This is our stuff in action with Google.").[6]  In sum, Google believed it was doing precisely what Digital Envoy had authorized, encouraged and boasted about.  There is no evidence that Google ever envisioned that that would somehow harm Digital Envoy.  Absent evidence that Google ever contemplated harm to Digital Envoy, Google could not possibly have acted in wanton and reckless disregard of it.  For this reason as well, Digital Envoy cannot show Google engaged in willful misconduct.

### E. Digital Envoy's Claim That Google Recklessly Disregarded the Agreement Is Inapposite

As a last gasp, Digital Envoy argues that Google recklessly disregarded the Agreement because it purportedly failed to implement mechanisms to ensure compliance.  DE Supp. Br. at 8-10.  The discussion is irrelevant for two reasons.

First, Digital Envoy once again misapprehends the applicable standard.  It is not nearly enough for Digital Envoy to show that Google "recklessly disregarded" the *terms of the Agreement*.[7]  Instead, it must show that Google acted with a "positive intent actually to harm" or acted "with a positive, active and absolute disregard of its consequences."  *Dazo*, 295 F.3d at 941.  Google's purported lack of internal procedures simply does not evince a *conscious* disregard of *harm* to Digital Envoy that Google allegedly foresaw.[8]

---

[6] Digital Envoy also publicly trumpeted its agreements with various other advertising networks that, like Google, used the data to serve advertisements to visitors of third-party websites.  *See*, *e.g.,* Aug. 10 Kramer Decl., Ex. J (December 11, 2000 press release announcing 24/7 Media contract); Ex. K (Digital Envoy marketing materials praising Advertising.com's use of data in online advertising network).

[7] For what it is worth, the very evidence Digital Envoy cites (and misrepresents) establishes that Google *did* have procedures in place to ensure compliance with its contractual obligations.  For example, Salar Kamangar testified that "an attorney at Google would review the legal licensing terms, and . . . in some cases they would make sure and talk with people and see if the licensing agreement made sense to the people involved and in the use of that service or product."  Waddell Ex. 7 at 88.  Matt Cutts testified that he believed Google's attorneys checked on contract compliance and further believed that Google segregated Digital Envoy's data to "prevent an instance in which everyday engineers would need to touch Digital Envoy code unless there was some strange circumstances."  Waddell Ex. 4 at 62.  Similarly, Kulpreet Rana testified that he believed Google had mechanisms in place to ensure compliance with license restrictions.  Waddell Ex. 6 at 11.

[8] In truth, Digital Envoy's evidence is directed to whether Google was *negligent* in failing to ensure compliance with (Digital Envoy's interpretation of) the contract.  *See Howard*, 132 Cal. App. at 130 ("While he may be said to have been reckless in the sense of being careless, that is only negligence and is not within the [willful misconduct definition]. But the intentional doing of an act
(continued...)

<1>
<2>
</2>
</1>

<3>
</3>

Second, it would not have made any difference what controls or procedures Google employed as the result would have been the same – Google would have used Digital Envoy's data in AdSense because it believed, and continues to believe, that it was permitted to do so under the Agreement. No matter how many attorneys reviewed the Agreement or how thoroughly the data was segregated and safeguarded, Google believed that it was free to use the data as part of advertising services provided to third parties, so long as it did not ship the databases to others, or provide others with direct access to them. *See*, *e.g.*, Schimmel email; Waddell Decl., Ex. 4 at 54, 64 (Cutts testimony). Far from turning a blind eye to the Agreement's restrictions, Google believed that it was honoring them. There simply is no evidence to the contrary.

## CONCLUSION

Willful misconduct requires considerably more than mere recklessness. It requires Digital Envoy to present evidence establishing that Google engaged in intentional wrongful conduct knowing it would harm Digital Envoy or with a conscious disregard of harm that it expected. After several chances, Digital Envoy has failed to make that showing. As Google argued at the hearing and as Google has maintained all along, there is absolutely no evidence of willful misconduct. Summary Judgment in Google's favor is accordingly appropriate.

Dated: October 13, 2005

WILSON SONSINI GOODRICH & ROSATI

By:   /s/ David H. Kramer
       David H. Kramer

Attorneys for Defendant/Counterclaimant
Google Inc.

---

(...continued from previous page)
with a wanton and reckless disregard of its possible consequences implies the doing of such an act either with the intent that harm shall result therefrom or in the attitude of mind of not caring if it does result in injury."). Negligence, even gross negligence, does not amount to willful misconduct. *See Dazo*, 295 F.3d at 941 ("Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care."); *Johns-Manville Sales Corp. Private Carriage*, 96 Cal. App. 3d at 931 (willful misconduct involves "much more than mere negligence, or even gross or culpable negligence").