P. CRAIG CARDON, Cal. Bar No. 168646
BRIAN R. BLACKMAN, Cal. Bar No. 196996
BRIAN D. ANDERSON, Cal. Bar No. 221645
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:     415-434-9100
Facsimile:     415-434-3947

TIMOTHY H. KRATZ (Admitted *Pro Hac Vice*)
LUKE ANDERSON (Admitted *Pro Hac Vice*)
ROBERT J. WADDELL, JR. (Admitted *Pro Hac Vice*)
JOHN A. LOCKETT III (Admitted *Pro Hac Vice*)
MCGUIREWOODS LLP
1170 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Telephone:     404.443.5500
Facsimile:     404.443.5751

PATRICK J. FLINN, Cal. Bar No. 104423
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777

Attorneys for DIGITAL ENVOY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DIGITAL ENVOY, INC., <br><br> Plaintiff/Counterdefendant, <br><br> v. <br><br> GOOGLE, INC., <br><br> Defendant/Counterclaimant. | Case No. C 04 01497 RS <br><br> **DECLARATION OF ROBERT B. FRIEDMAN [REDACTED]** <br><br> **[PORTIONS OF DOCUMENT SUBMITTED UNDER SEAL]** <br><br> The Honorable Richard Seeborg |

-1-

W02-SF:5BA1\61491696.1                                    DECLARATION OF ROBERT B. FRIEDMAN

I, Robert B. Friedman, declare as follows:

1. I am over twenty-one years of age and under no legal disability. I have personal knowledge of all facts set forth herein.

2. I am the Executive Vice President and General Counsel of Digital Envoy.

3. I prepared or supervised the preparation of the prospective customer presentations numbered DE003349 – 003361; DE004554 – 004566; DE 003457 – 003471; DE004445 – 004460; DE 004727 – 004740; DE004538 – 004552. All of the information contained in these presentations was gathered from (i) Google's publicly-available web site; (ii) third parties not under a non-disclosure agreement; (iii) publicly-available trade articles; or (iv) conversations with Google employees not covered by any confidentiality or non-disclosure agreement. Thus, all of the information disclosed during these presentations was derived from public sources or my unaided memory. I never disclosed any specific implementation by Google of Digital Envoy's technology, but, rather, only general concepts derived from publicly-available, non-confidential information.

4. For example, I reviewed following publicly available Internet articles as well as information from Google's web site, which were substantially similar to the following:

(i) "Inside the Soul of the Web" (see Exhibit A, a true and correct copy of which is attached hereto);

(ii) "Google Beta Tests Regional AdWords Testing" (see Exhibit B, a true and correct copy of which is attached hereto);

(iii) Google AdWords Learning Center "Creating An Account" (see Exhibit C, a true and correct copy of which is attached hereto);

(iv) Google AdWords Learning Center "Lessons Catalog" (see Exhibit D, a true and correct copy of which is attached hereto);

1  (v)  Google AdWords Learning Center "Setting Up An Account" (see Exhibit E, a true and correct copy of which is attached hereto);

(vi)  Google Help Center (see Exhibit F, a true and correct copy of which is attached hereto);

(vii)  The October 2003 issue of Technology Review Magazine (see Exhibit G, a true and correct copy of which is attached hereto);

(viii)  Google Groups "Automatic Redirect" posting by "Google Guy" (see Exhibit H, a true and correct copy of which is attached hereto); and

(ix)  "Up Close With Google AdWords" (see Exhibit I, a true and correct copy of which is attached hereto).

5. All of the articles in paragraph 4 directly address Google's use of IP geolocation.

**REDACTED**

6. Articles such as those identified in Paragraph 5, and not any information produced to me by Google, supported the statements related to Google in the customer presentations.

7. All of the customer presentations were given in October 2003 or shortly thereafter.

8. The mention of Google in these presentations was minimal and not the focal point of any of the presentations. In fact, any mention of Google during these presentations consisted of no more than one to two minutes of the meetings, which lasted between 60 to 90 minutes each. In some of the meetings, Google was never even mentioned.

9. None of the prospective customers were provided copies of the presentations numbered DE003349 – 003361; DE004554 – 004566; DE 003457 – 003471; DE004445 – 004460; DE 004727 – 004740; DE004538 – 004552. None of these presentations were for "public use." All of the presentations were given in the

context of non-disclosure agreements executed by those in attendance, which were private audiences of no more than 5 people.

10. None of the prospective customers to whom Digital Envoy gave these presentations ever signed a license agreement for commercial deployment with Digital Envoy related to the subject matter of the presentations nor, to my knowledge, ever implemented a similar functionality using technology similar to that of Digital Envoy.

11. To my knowledge, no customer of Digital Envoy agreed to do business with Digital Envoy due to the fact that Google was also a Digital Envoy customer nor has Digital Envoy derived any revenue from its association with Google other than amounts paid to by Google under the Product and Electronic Database License Agreement.

12. The 2000 Non-Disclosure Agreement identified by Google was executed on November 29, 2000. Google representatives and I conducted the vast majority of conversations and negotiations related to the License Agreement prior to the execution of the Non-Disclosure Agreement.

13. In fact, Google insisted that many of the negotiations take place prior to entering into a non-disclosure agreement. See Exhibit J, a true and correct copy of Plaintiff's Deposition Exhibit 12 attached hereto (a November 2, 2000 email from Matts Cutts of Google to Robert Friedman in which Cutts states that Google is "trying to stay NDA-free."). Many of these conversations discussed many of the uses identified in the customer presentations. Indeed, many of these uses identified in the customer presentations were conceived of and suggested by Digital Envoy, not Google.

14. For example, I am a co-inventor on Digital Envoy's patent, filed on March 31, 2000. In the patent, Digital Envoy discloses: (i) the concept of tailoring a web site based on user location using IP targeting, including varying language and content and send folks to different location specific versions of a web site; (ii) the

1  concept that examining user locations can be useful to aid in the marketing of
2  Internet sites; (iii) the use of IP targeting to target ads and increase ad revenues; (iv)
3  the concept of global load balancing based on user location; and (v) the concept of
4  fraud detection using IP targeting. See Exhibit K, a true and correct copy of U.S.
5  Patent No. 6,757,740. Digital Envoy's patent was filed approximately seven
6  months before Digital Envoy began discussions with Google about Google's
7  potential use of Digital Envoy's technology. See Exhibit K.
8      15.   The information that Google claims to be confidential was, in fact,
9  disclosed to third parties and made public by Google itself on numerous occasions.
10     16.   In January 2003, Mr. Cutts disclosed to Jonathan Skolnick of
11 technologyreview.com that Google was using Digital Envoy's technology in
12 Google's business. See Exhibit L, a true and correct copy of which is attached
13 hereto. This email is a communication which is kept in the ordinary course of
14 business and its is the regular practice of Digital Envoy to retain such
15 communications. As a result of this disclosure, in October 2003, Technology
16 Review Magazine published an article in which it was stated that
17                              **REDACTED**                    See Exhibit G, a true
18 and correct copy of which is attached hereto.
19     17.   In June 2003, Mr. Cutts admitted to me that he disclosed portions of
20 Digital Envoy's confidential database libraries to Dani Roisman of Sony Online
21 Entertainment, without Digital Envoy's permission, thereby publicly revealing
22                              **REDACTED**
23     18.   Mr. Cutts' disclosures are consistent with Google's long-standing
24 practice of prominently disclosing that        **REDACTED**
25                                                                              See
26 Exhibits C-F (in which Google admits its use of IP-based geolocation).
27     19.   Google employees also regularly disclosed
28                                         **REDACTED**

-4-

W02-SF:5BA1\61491696.1                                    DECLARATION OF ROBERT B. FRIEDMAN

1    These prospective customers were under no obligation to maintain the
2  confidentiality of Google's disclosures.
3    20.    Shortly after the License Agreement was executed in November 2000,
4  Google, either through Steven Schimmel or Matthew Cutts, authorized me to list
5  publicly on Digital Envoy's web site that Google was a Digital Envoy customer. As
6  a result of this authorization, Digital Envoy listed Google as a customer on Digital
7  Envoy's publicly-available web site from 2001 until January 31, 2005. At
8  approximately that same time, Google, again through either Mr. Schimmel or Mr.
9  Cutts, also stated to me that Digital Envoy did not need authorization from Google
10  every time it issued a press release listing Google as a customer, because this
11  practice was consistent with Google being listed as a Digital Envoy customer on
12  Digital Envoy's web site.
13    21.    Digital Envoy therefore listed, with Google's permission, Google as a
14  customer in numerous press releases in 2002 and 2003, long before the October
15  2003 presentations. A sample of these press releases included:
16    (i)    "Digital Envoy and translations.com Partner to offer Multilingual
17  Personalized Content Solution" (see Exhibit M, a true and correct copy of which is
18  attached hereto);
19    (ii)    "Digital Envoy Teams with Verisign to Analyze Global Internet Traffic
20  Patterns to Improve Internet Performance" (see Exhibit N, a true and correct copy of
21  which is attached hereto);
22    (iii)    "Engage Selects Digital Envoy As New Geo-Targeting Solution
23  Provider for Ad Serving and Promotional Solutions Portfolio" (see Exhibit O, a true
24  and correct copy of which is attached hereto);
25    (iv)    "International Shopping Gets Faster and Easier with E4X's New
26  Dynamic Currency Detector" (see Exhibit P, a true and correct copy of which is
27  attached hereto);
28

1  (v) "Digital Envoy Introduces First Intelligent Routing Technology Based on Network Topology and Geography." (see Exhibit Q, a true and correct copy of which is attached hereto).

22. In late 2002 or early 2003, Mr. Schimmel also told me that Google was increasingly more willing to be a reference for Digital Envoy. I interpreted Mr. Schimmel's statement to mean that Google did not consider the fact and nature of its relationship with Digital Envoy to be confidential or secret.

23. During the entire course of the License Agreement and the Non-Disclosure Agreement between Google and Digital Envoy, Digital Envoy always operated under the belief it was complying with its obligations and duties under both agreements.

24. In 2003, I spoke to Allen Beasley of Redpoint Ventures, a venture capital firm. He told me he had spoken to Matt Cutts during 2003 and that Mr. Cutts told him

REDACTED

This reconfirmed to me that Google was not treating the terms of the License Agreement as confidential.

25. To the best of my knowledge, Google never validly designated any of the claimed "trade secrets" confidential pursuant to the Mutual Non-Disclosure Agreement.

26. Attached as Exhibit R is a true and correct copy of a December 2002 article "Breathing New Life into Layer 4" which I authored

**REDACTED**

See Exhibit R.

27. Digital Envoy initially filed this action in the Northern District of Georgia in good faith and after due diligence and analysis of Digital Envoy's claims and the forum selection clause contained in Section 13 of the License Agreement.

I declare these things under the penalty of perjury under the laws of the United States.

-6-

Executed this 12th day of April, 2006 at Norcross, Georgia.

<u>/s/ Robert B. Friedman</u>
Robert B. Friedman